**Langrin, Taryn A**

| | |
|---|---|
| **From:** | marc fishman <rentdriver@gmail.com> |
| **Sent:** | Monday, August 31, 2020 2:56 PM |
| **To:** | romannysdchambers@nysd.uscourts.gov; lalit.loomba@wilsonelser.com; Langrin, Taryn A |
| **Cc:** | JOELAW40@aol.com |
| **Subject:** | Case 19-cv-00265-ns4 |
| **Attachments:** | New Document.pdf |

Dear hon judge roman:

Second motion filed in appellate court to get conclusion in state criminal case by getting underlying order of protection in state family case dismissed for failure to serve the order on me.

Your honor....why should case be dismissed against me now in federal court....if new da is goi g to withdraw charges against me in a couple of months if da Scarpino does not drop case first?

Suggest we go right to depositions to ask cops and district Atty about the discovery in the federal case that proves I was not served.  Once da changes in january, may be difficult to get da to answer questions about this case.

If federal court knows state charges will be dismissed by January..Mr loombas and westchester county motion to dismiss should be denied...because one way or another's y alleged pending conviction will be reversed erased, dropped or dismissed.

Not my fault state case taking longer....with covid and the state courts own delays/adjournments.  No way appellate state court does not reverse.  Police knew your honor...knew I was not served before they arrested me when I was begging and requesting a police report for my exwife missing visitation.

But as chief clerk Agostino says in second Dept..." Mr fishman there is no conviction to reverse..because you have no final order or certificate of disposition."  Hence...Mr loombas motion to dismiss is premature until state case finally resolved and completed with paperwork stating conviction and ability to appeal.

Thanks
Marc Fishman, pro Se

```
-------------------------------------------------------X
```
Supreme Court State of New York
Appellate Division Second Department

JENNIFER SOLOMON,

      Petitioner,

          -against-            Fam. Ct.:
                           Fu 131794

MARC FISHMAN,               **ORDER TO
                               SHOW CAUSE**

      Respondent
```
-------------------------------------------------------X
```

UPON reading and filing the accompanying Affidavit of Marc Fishman, Respondent, and all exhibits attached thereto, and the pleadings and prior proceedings in this matter, and due deliberation having been had and sufficient cause appearing,

NOW, on motion of Respondent MARC FISHMAN, it is

**ORDERED** that Petitioner JENNIFER SOLOMON, by counsel, and the Attorney for the children, show cause at Family court, 45 monroe place brooklyn, New York , on _____, at 10:30 in the morning, or

1

as soon thereafter as parties/counsel may be called, why an order should not be entered:

1.    To vacate and reverse the decision of this court dated 6/27/2018 in 2018 NY slip op 04740 [162 AD3d 1051] (in exhibit A, attached)on the basis that there could not be a finding of willfulness by Judge Schauer because she knew Mr. Fishman was hearing, visually, writing and memory impaired, and suffered from post concussion registering cognitive impairments, tinnitus hearing impairments and occipital neuralgia vision impairments, and cubital tunnel writing impairments and did not hear or register or fully understand/comprehend Judge Schauer's verbal instructions due to Schauer's intentional denial of tools/aides(required under the ada in 28    cfr    35.160)    to    help    with    Mr.    Fishman's communication/movement/hearing disabilities.

2.    To vacate the decision of this court dated  6/27/2018 NY Slip op 04741 [162 AD3d 1052]  (in exhibit B, attached) denying a note taker and large print court orders as aides/tools for Mr. Fishman's regarded and acknowledged  disabilities  by  the  state  court  administration(required accommodations to be made under the American with disabilities act under 28 cfr 35.160, New York human rights laws and New York city human

2

rights laws) and order/ grant these reasonable accommodations as the are granted today after New York human rights commission involvement and federal litigation where New York State has acknowledged I am disabled under the ada with impairments that effect bodily functions of hearing, seeing, remembering, registering and writing.

3.    To declare and order it was improper and discriminatory of Judge Schauer to interfere and deny administrative American with Disabilities act accommodations granted by the Westchester court ada liaison, William Curry BEFORE SCHAUERS JAILING OF MR FISHMAN,  . as the judicial order of judge schauer intentionally interfered with the administrative order/approvals of both William Curry, ada liaison, and Barbara Gringer- Zahler counsel to the court disability access committee to allow Mr. Fishman's notetaker court access to help him and large print typed court orders for Mr. Fishman to be able to understand and have meaningful communication with the court and court staff.  Mr Curry knew mr fishman could not take his own notes with cubital tunnel syndrome and knew of mr fishman's hearing problems and parotid mass/tmj ear surgery in 2016.

4.    To declare Judge Schauer intentionally denied the administrative accommodations recommended/ordered by both Dan weitz, the court's ada professional coordinator and William Curry ada liaison now approved by the

state court, because these administrative accommodations in no way interfered with Judge Schauer's judicial discretion or judicial orders. The sole purpose of Schauer's judicial orders to deny administrative accommodations approved by court administration was to punish/retaliate against Mr. Fishman for the side effects of his multiple disabilities, and retaliate for mr fishman complaining to civil rights authorities that Judge Schauer was violating his state and federal civil rights intentionally.

5.     To order that Judge schauer should have been removed from Mr. fishman's cases(after the 17 application for judge schauer to recuse were made form 2015 to 2018)and appellate court failed to address these recusal requests/motions in any ada grievance appeals) and a new custody determination be made by a new unbiased family court judge due to the willful and intentional disability discrimination, retaliation, and failure to accommodate disabilities by judge schauer and willful interference with the court ada liaison granting administrative accommodations in the court proceedings.

6.     To order four new attorneys for the children as Judith woods, afc has been tainted and biased by the disability discrimination conduct of the court and appoint 4 new unbiased afcs for each child to move forward in the

custody and visitation case so the children have frequent and regular unsupervised contact with their father..

7.    The appellate court has a judicial, administrative, legal duty to vacate court orders that violate the State and federal laws civil rights laws. Not to so violates each judge's oath to enforce the law at all times and hold court proceedings free of disability discrimination.

8.    The appellate court must act to vacate orders that effect mr fishman's civil rights as the long lasting effect of Schauer's illegal orders are still effecting mr fishman in his proceedings this day in family and criminal court where Mr Fishman has been denied access to his four children for nine months now.

9.    If the appellate division does not act now with swift, prompt and immediate action to enforce the  state human rights  laws and ada, this grievance court is basically ceding its appellate authority to the federal court. Under the separation of powers states retain jurisdiction for visitation and custody decisions.   However under Supreme court case Tennessee v Lane(541 US 509 2004) there is federal authority to intervene, override state administrators and grant reasonable accommodations to insure meaningful access to the state court by disabled people.

10.     The NYS human rights division has taken the rare step of holding hearings and conferences(see exhibit "C") against the state unified court system on my behalf for conduct it deems is willful disability discrimination, retaliation, and failure to accommodate disabilities. Indeed in February, the appellate court first dept fined the state court system $35,000 for discriminating against one of its employees mr ziac 2020 NY slip op 01252 (see case in exhibit D) (who was also hearing impaired like mr fishman.) In the decision the appellate court affirmed that (similar to my case), the unified court system discriminated against mr zaic for his hearing disabilities, hearing aid use and declared the state court violated the ada and the NYS Human Rights Laws intentionally.

11.     The New York Human Rights Division did not have authority to review judges/administrator decisions in 2016, but does now under nys laws. Judge Schauer, Judge Scheinkman and April Ann Agostino are well aware of the 8000 pages of certified medical records delivered to and subpoenaed by the state court detailing disabilities of hearing, eating, sleeping, remembering, speech, writing, vision from years of litigation. This is also true in the complaints from Magistrate Jordan that judge schauer took these boxes from New Rochelle family court to Yonkers family court ion 2016 when Judge schauer moved my case with her.

12.    The court must act now because the court of appeals denied permission to appeal the denial of ada accommodations by this court in these unlawful orders yesterday in published decision 2020-317. Dan weitz, , the courts professional ada liaison stated that grievance appeals are handled by the appellate court.   Now that court administrators have ordered these accommodations in other my state cases an d others, the appellate court grievance committee cannot leave Schauer's intentional disability discrimination unaddressed.  This is because Schauer's decision denying me administrative accommodations granted by court administration and Nys human rights for disabilities from car accidents in 2013, effects support and visitation cases now and must be struck down as a violation of state and federal law, as unlawful.

13.    Under title two of the ada a state entity with 50 or more employees must hold a grievance appeal/hearing to address denial of required accommodations.  As April Ann Agostino, appellate division liaison denied my accommodations request for four judges of the court to attend a human rights hearing to go over the human rights oversight of the is court earlier this week, the appellate court must act as the grievance committee and grant accommodations that the nys human rights commission state dictates are

required. These include but are not limited to a note taker, large print court orders, cart real time transcription and aides for my disability.

14.    It is very important for this appeals court to set an example by hearing this motion and issuing an order to make it blatantly and directly clear that judges should not be making administrative ada accommodations at all and that these request are to be handled at all times by the experienced ada liaisons/court administrator trained in disability matters..

15.    If the appellate court will not grant all the items requested in this showcause then I request a confidential ada hearing free of the adversarial process between four judges of the appellate court, myself, my disability advocate and the nys human rights commission to resolve these matters to comply with state and federal law.

16.    Order that Marc Fishman may proceed pro se in making this application since appointed counsel, del atwell is unresponsive and mr fishman wishes to file this motion on his own.

Sufficient show cause being shown, it is ordered that:

a.  Ordered Mr. fishman is to have eight hours supervised visitation weekly starting this weekend with ann Elliot , court approved social

8

worker. With all 4 children because mr fishman has not had any visitation in none, (9) months stemming from the denial of these accommodations and the consequences thereof—of forgetting or not hearing court orders verbally without a notetaker or large print court orders or cart real time transcription and the punishment by the lower courts.    This punishment violates the ada and its anti-retaliatory provisions in 28 cfr 35.134.

b.  Ordered Mr. fishman may represent himself going forward in this appeal/motion as he has been unable to reach assigned counsel Del Atwell.

c.  Ordered that any filing fees or grievance fees are waived as per the ada. the disabled may not be charged for requesting appeals of denials of ada accommodations (see title two of the ada and 28 cfr 35, where appeals are to be free of charge by the state government.)

17.        **ORDERED** that service of this Order, together with all supporting papers, on all other parties shall be made by email or facsimile on or before _____, to be deemed good and sufficient service, on the following counsel at the following addresses:

NICOLE E. FEIT, ESQ.
Legal Services of the Hudson Valley
Attorney for Petitioner-Respondent
90 Maple Avenue

9

White Plains, NY 10601

Judith Woods, Esq.
Atty for the Children
445 Hamilton Ave
White Plains, NY 10601

WILLIAM CURRY
ADA Liaison AWARE OF MR FISHMANS DISABILITIES
Westchester Family Court – Yonkers, Third Floor
131 Warburton Avenue
Yonkers, NY 10701

E N T E R:

HON. _____
        Judge.    APPELLATE DIVISION 2ND DEPT

C: Judge Egitto, chief family ct judge supervisor
   Judge De fiore, chief judge NY
   Judge Marks, chioef admin judge ny
   Judge Caruso, chief admin judge ny outside nyc
   Judge Davidson, chief Judge Westchester

APPELLATE DIVISION SECOND DEPT COURT OF THE STATE OF NEW YORK
COUNTY CITY OF BROOKLYN

..................................................................X

JENNIFER SOLOMON,

                        *Petitioner*

                                               *Grievance hearing—ada accommodations*

       -against-                                 <u>AFFIDAVIT IN SUPPORT</u>

MARC FISHMAN,

                        *Respondent.*                    *FILE NO  FU 131794*

..................................................................X

State of New York        )

                         ) ss.:

County of Westchester  )

              **Marc Fishman**, being duly sworn, deposes and states as follows

1. Title two of the ada requires an in person, interactive, negotiated grievance process to obtain administrative American with disabilities act accommodations for the disabled like myself including tools and aides for meaningful communication and access to courts by the qualified disabled.

2. Ny State Human rights commission requires the state court to comply with human rights laws and has requested a conference hearing  that the state court did not show up for on 8/25/2020 on denied administrative accommodations for my unique disabilities.

3. Dan weitz , chief ada professional executive for New York state courts stated that the grievance procedure for denial of judicial ada accommodations is the appellate division 2nd dept and or court of appeals.

4. The appellate division never held an in person or interactive grievance procedure for my denied administrative ada accommodations including a notetaker, large print court orders, tape recorder, and morning only court appearances that were denied judicially

I

by judge schauer. Supervising judges Caruso, Marks, Egitto and Davidson have stated that the appellate division second dept is the grievance procedure for denied judicial ada accommodations.

5.  Grievance procedures with the state per the ada technical Manuel are to be held, adjudicated and resolved within 30 days.

6.  These administrative accommodations were requested years ago and there still not has been a compliant ada grievance procedure.

7.  Judge Schauer intentionally and improperly made my ada accommodations judicial ones by interfering and overriding the courts liaison William Curry and chief courts administrator Dan weitz in denying administrative accommodations including but not limited to a note taker, and large print court orders in her courtroom. These determinations were erroneous and the effect of her denial had a large impact in my case. Judge schauer opined that the side effects of my disabilities, because there were not accommodated, warranted a change in custody. Judge schauer opined in court that I talked loudly when that was a side effect of my disabilities. Judge schauer chastised me for not remembering what she said over and over again.

8.  I submit that if all my accommodations were satisfied and granted including an aide, note taker and large print court orders that I would have been able to mitigate my lack of hearing and remembering to behave in way those without disabilities do. Instead judge schauer punished me by jailing me for not remembering what she said in state court and not being able to read her half-centimeter incomplete and confusing small print orders. In some cases, like the 6 27 17 order of protection, allegedly read on the record in open court, I was unable to register or remember because I did not

2

receive any written order or hear what judge said. Indeed at the hearing my notetaker was blocked from entry and I told judge repeatedly on the record that I did not understand. This instance alone has resulted in a criminal proceeding and conviction for me alleged not remembering terms of an order of protection that were never physically given to me or served on me. So it is of utmost important to rule on the denial of ada accommodations and the consequences of Schauer's intentional failing to listen and abide by the recommendations and orders of William curry ada liaison and the courts administrative procedures for granting ada accommodations. Schauer knew my memory in 2016-2017 was at 8 percent compared to other 45 year olds my age. Schauer knew I had an implant for tinnitus and occipital neuralgia that treats tinnitus and have hearing difficulties. Schauer knew I was enrolled full time in rehab for speech, cognition, memory and talking/breathing, but ignored intentionally my doctors requests for administrative accommodations. Schauer also knew I had hearing surgery to remove a mass in 2016 from my left ear and had complications. Despite knowing all these bodily major function impairments including writing, hearing, registering, seeing, sleeping and memory disabilities, schauer jailed me 6-27-17 for three weeks as retaliation for the side effects of my disabilities by stating I faked not remembering or hearing. With post concussion syndrome, TMJ and tinnitus it is difficult to eat, hear and register. The appellate division needs to right this wrong intentional act of judge schauer once and for all or the matter will have to be resolved in federal court.

9. Two motions were made to the court of appeals (one in 2018 and one in 2020) to have a grievance hearing on the denied ada administrative accommodations I need for

my hearing disability and memory writing visual disabilities. In 2018, the court of appeals ruled the denied ada appeal was not a final order for them to consider under the NY constitution. In 2020, yesterday, the court of appeals denied permission to appeal the denial of ada accommodations in the underlying case

10. Hence am coming back to the appellate division with this motion to address my urgently needed accommodations for my major bodily impairments that was never taken place in a way that complies with both nys and federal civil rights laws for state government entities with 50 employees or more.

11. As April Agostino, appellate court clerk is very aware through multiple communications, I have not seen or had any contact with my four amazing children(two of which are disabled) children for over nine months due to disability discrimination that stems from the underlying custody decision and decision to deny ada accommodations by Judge Michelle Schauer.

12. A formal proceeding has been commenced by the NYS Human rights Division see exhibit" ⊆ ", attached against Judge Capeci, Ny Unified Court System, Ivy Ozer, Elizabeth Bussian and Judge Davidson for failing to make the court program of visitation accessible to me and accommodate my disabilities

13. I submit this affidavit to recall the 2018 orders attached and vacate the decisions from the appellate division and to restate the decisions to remove judge schauer for her willful blatant and intentional disability discrimination to deny me cart real time transcription, notetaker, aide of my choice, service dog, disability transportation person with hearing memory writing seeing disabilities.

4

14. I suffer from tinnitus and TMJ. These together with my neurostimulator and occipital neuralgia limit my hearing. Instead of giving me cart real time closed captioned transcription that the court gives now in other proceedings judge schauer denied cart and notetaker accommodations for me.

15. If the court does have the grievance appeal now and appoint a neutral independent judge to oversee this case to award me frequent and regular visitation, I fear I will never see my kids until they are over 18 and not subject to family court. The kids and I face imminent harm and need the court to award in person visitation immediately.

16. These denial of accommodations are now subject to a federal lawsuit 20-1300 in federal court. Had schauer not denied these accommodations for my hearing and memory impairments, I would have had meaningful communication(approved by the court ada liaison William curry) and be able to understand the proceeding. Under Tennessee v Lane 541 us 509 (2004), it is illegal for a state to deny aids and tolls for the hearing and memory impaired. This also violates atty general enforcing regulations under 28 cfr 35.130 and 28 cfr 35.134 and 28 cfr 35.160. Judge Schauer intentionally denied the notetaker after having an ada hearing six days before being told I do not hear and remember well.

17. Am making this last and final appeal to the appellate division to show the federal judges that I have done every possible appeal and motion in the state before seeking injunctive an declaratory relief from them.

18. This court is well aware an order of protection is invalid under criminal and family law if it is not served. Judge schauer's discrimination resulted in limiting my kids

access to me be cause of this illegal, unserved, and unexplained and unacknowledged order of protection.

19. My ada advocate was in court 6/27/17 (donna drum) and also did not receive this order of protection that is being used in 2020 to keep kids away from their dad. My atty never gave me any order of protection and told the guards an I and court officers in jail that he had not received the order of protection 6.27.17 to explain it to me when he visited me twice in jail. Furthermore, my atty Ian Spier who was assigned was very forgetful with his Parkinson's condition and judge schauer refused to replace him or allow my notetaker to help him during trial. Atty dambrosio blocked my notetaker access to the court on 6.27.17 in violation of the ada and a central issue in federal lawsuit 20-1300 now in federal appedate court 2nd district

20. There was no special order to serve me in jail from the court. This further supports that I was not served the order of protection issued after I was jailed 6.27.17. No one served me any order of protection in jail after the 6.27.17 hearing

21. I submit this affidavit requesting the court immediately restore the previous supervisor, licensed Social worker African American (with 24 years social worker experience) Ann Elliot as supervisor foe eight hours visitation weekly starting 8/28/2020.

22. I submit this affidavit in advance of the Human rights hearing now rescheduled 9/9/2020 where the NY unified court system Judge Capeci, Ivy Ozer, Judge Davidson and Elizabeth bussian have been found to be in violation of the human rights laws of the sate of Ny and the ada for willful disability discrimination.

retaliation and failure to accommodate mr. fishman's disabilities and those of his two sons Skye and Jonah.

23. Elizabeth Bussian has refused and continues to refuse for over 9 months now to do any home based visitation service unless she receives a full retraction of civil rights complaints her for overcharges, failure to accommodate disabilities, and retaliation. This retaliation is illegal and violates the human rights laws warranting Elizabeth bussian's removal from the case for disability discrimination, retaliation.

24. Am also seeking removal of Judith woods afc. Judith woods has repeatedly opposed my accommodations for myself including an aide for court programs and for my disabled kids. Need four independent attys who have not been influenced by the courts discrimination to represent the kids going forward. Judith has failed to ask or seek any accommodations for my disabled sons Skye or Jonah. Judith has failed to communicate all the civil rights litigation to the kids so they can make their own decisions on seeing me. Judith has been disrespectful and hangs up the phone on me. Said conduct warrant removal of the afc. My son aidan has not seen me since 12/1/18 and needs his own atty. My other kids have not seen me since December. Time cannot be made up and urgent action to stop the disability discrimination and retaliation is needed now to order visitation to comply with the family court act. To wait longer post none months is imminent harm..to parent child relationship.

25. Ann Elliot is the best-qualified Social Worker because ANN already has an established rapport with the family and kids. Social workers are expensive and ANN ELIOT who charges $35 an hour (less than the $100 by Elizabeth bussian) is in the unique position to be able to get a report in the least amount of time possible, since

the therapeutic rapport has been established already and Ann is aware of the disabilities of my sons and I and needed for ada accommodations.

26. Could not take my own notes because my fingers were numb in court with my cubital tunnel disability. Schauer was aware had surgery for that condition as well which further necessitated need for note taker accommodation.

27. The appellate division must act/ have been subject to wrongful prosecution for 21 months in criminal court—without final order to appeal-----for wrongful prosecution due to side effects of not hearing/remembering/registering like nondisabled do.. The lower criminal court refuses to give me an appealable order on the conviction for violating the order of protection I did not receive 6 27 17. Given I was not served ..this matter should have never been tried in family court but was moved to criminal court as retaliation for suing judge schauer in federal court for disability discrimination.

28. It was my understanding that any order of protection was subject to a carve out for visitation based on previous orders of protection shown to me AND PREVIOUS VIISTS INCLUDING OVER 20 VIISTS CURBSIDE AND PICKUP AT JENNIFER'S HOUSE IN THE LAST 5 PLUS YEARS.

29. Currently there is visitation and no contact between father and children.. Per Daghir v Daghir, IN PERSON visitation must be frequent and regular. Ann Elliot has stated she will perform home based visits for my need for disability accommodations while the appointed supervisor bussian has never done a home visit recommended by my doctors.

30. Hope and pray the court grants all requested relief or will have no choice but to seek emergency relief in federal court

31. In person "Visitation is required to be frequent and regular" per case sited in Daghir v Daghir, 82 AD2d at 194, aff'd 56 NY2d 938 [1982], see Matter of Graves v. Smith, 264 – 844 AD2d [1999]; Matter of Gerald D. Versus Lucille S., 188 AD2d at 650. In order to develop meaningful relationship with his or her child, visitation must be frequent and regular. The appellate division must restore visitation now. The disabled cannot be denied visitation due to disability – which is in effect what the state court is doing. This violates my constitutional rights to be a father under the constitution.

32. Parental access with a non-custodial parent is presumed to be in the best interests of the child per case Matter of Granger v. Misercola, 21 NY 3d 86–90, Matter of Grimes v. Pignalosa-Grimes, 165 AD3d 796, 797 and Matter of Irizarry v. Jorawar, 161 AD3d 863, 864.

33. Am disabled and seek fee waiver for the motion and appeal and seek to represent myself going forward. Am making fee waiver application as I have 18b poor person status in the lower courts and it is illegal to charge for grievances for filing appeal of denial of ada accommodations.

WHEREFORE, it is respectfully requested that the relief sought, herein be in all

respects granted, together with such other and further relief as to this Court may seem

just, proper and equitable under the circumstances

Mark Fishman, respondent

Sworn to before me on this
___ day of _____ 2020

Notary Public

STELLA BORUKHOVA
Notary Public, State of New York
No. 01BO6354071
Qualified in Queens County
Commission Expires 02/06/2021

10



8:42 AM Fri Aug 28

Not Secure — nycourts.gov

Crec    LRB Search...    ☒ Matter of So...    [9] Facebook    Judges & Pa...    ...

**Matter of Solomon v Fishman**

2018 NY Slip Op 04740 [162 AD3d 1051]

June 27, 2018

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, August 1, 2018

Exhibit "A"

[*1]

In the Matter of Jennifer S. Solomon, Respondent,
v
Marc H. Fishman, Appellant.

Del Atwell, East Hampton, NY, for appellant.

Nicole E. Feit, White Plains, NY, for respondent.

Kathleen M. Hannon, Scarsdale, NY, attorney for the children

In a family offense proceeding pursuant to Family Court Act article 8, the father appeals from an order of commitment of the Family Court, Westchester County (Michelle I. Schauer, J.), dated June 27, 2017. The order of commitment, in effect, confirmed a decision of the same court dated September 2, 2016, made after a hearing, determining that the father willfully violated a temporary order of protection and an interim order of visitation, and committed him to the custody of the Westchester County Correctional Facility for a period of 21 days unless sooner discharged according to law.

Ordered that the appeal from so much of the order of commitment as committed the father to the Westchester County Correctional Facility for a period of 21 days is dismissed as academic, without costs or disbursements, as the period of incarceration has expired (see *Matter of Becker v Guenther*, 150 AD3d 985 [2017]); and it is further,

Ordered that the order of commitment is affirmed insofar as reviewed, without costs or disbursements.

The father and the mother have four children together. They have been divorced since August 2012. There have been numerous post-matrimonial proceedings and motions made in both the Family Court and the Supreme Court since the parties' divorce, regarding a plethora of issues, including child support arrears, parental access, and the father's failure to comply with various court orders. In the course of a family offense proceeding commenced by the mother by a petition dated [*2] June 11, 2014, the Family Court issued a series of temporary orders of protection and interim orders on behalf of the mother and the subject children with respect to the father. Beginning in June 2014, the mother filed a series of petitions in the Family Court alleging that the father had violated certain provisions of the temporary orders of protection and interim orders. The court conducted a fact-finding hearing on the violation petitions that began on June 28, 2016, and concluded on September 2, 2016, at which time the court found that the father had willfully violated the terms of a temporary order of protection and an interim order of visitation, both dated April 6, 2016. After a dispositional hearing, the Family Court issued an order of commitment dated June 27, 2017, which, in effect, confirmed the court's decision that the father willfully violated the prior court orders, and committed the father to the custody of the Westchester County Correctional Facility for a period of 21 days unless sooner discharged according to law. The father appeals from the order of commitment.

8:43 AM  Fri Aug 28

Not Secure — nycourts.gov

v

Marc H. Fishman, Appellant.

Del Atwell, East Hampton, NY, for appellant

Nicole E. Feit, White Plains, NY, for respondent.

Kathleen M. Hannon, Scarsdale, NY, attorney for the children

In a family offense proceeding pursuant to Family Court Act article 8, the father appeals from an order of commitment of the Family Court, Westchester County (Michelle I. Schauer, J.), dated June 27, 2017. The order of commitment, in effect, confirmed a decision of the same court dated September 2, 2016, made after a hearing, determining that the father willfully violated a temporary order of protection and an interim order of visitation, and committed him to the custody of the Westchester County Correctional Facility for a period of 21 days unless sooner discharged according to law.

Ordered that the appeal from so much of the order of commitment as committed the father to the Westchester County Correctional Facility for a period of 21 days is dismissed as academic, without costs or disbursements, as the period of incarceration has expired (see Matter of Becker v Guenther, 150 AD3d 955 [2017]), and it is further,

Ordered that the order of commitment is affirmed insofar as reviewed, without costs or disbursements.

The father and the mother have four children together. They have been divorced since August 2012. There have been numerous post-matrimonial proceedings and motions made in both the Family Court and the Supreme Court since the parties' divorce, regarding a plethora of issues, including child support arrears, parental access, and the father's failure to comply with various court orders. In the course of a family offense proceeding commenced by the mother by a petition dated [*2]June 11, 2014, the Family Court issued a series of temporary orders of protection and interim orders on behalf of the mother and the subject children with respect to the father. Beginning in June 2014, the mother filed a series of petitions in the Family Court alleging that the father had violated certain provisions of the temporary orders of protection and interim orders. The court conducted a fact-finding hearing on the violation petitions that began on June 28, 2016, and concluded on September 2, 2016, at which time the court found that the father had willfully violated the terms of a temporary order of protection and an interim order of visitation, both dated April 6, 2016. After a dispositional hearing, the Family Court issued an order of commitment dated June 27, 2017, which, in effect, confirmed the court's decision that the father willfully violated the prior court orders, and committed the father to the custody of the Westchester County Correctional Facility for a period of 21 days unless sooner discharged according to law. The father appeals from the order of commitment.

The appeal from so much of the order of commitment as committed the father to the custody of the Westchester County Correctional Facility for a period of 21 days must be dismissed as academic, as the period of incarceration has ended (see Matter of Savas v Bruen, 154 AD3d 859, 860 [2017]; Matter of Becker v Guenther, 150 AD3d 955, 955 [2017]; Matter of Pace v Douglas, 141 AD3d 530, 530 [2016]). However, in light of the enduring consequences which could flow from the determination that the father violated the subject temporary order of protection and interim order of visitation, the appeal from so much of the order of commitment as, in effect, confirmed the determination that the father was in willful violation of those orders, is not academic (see Matter of Pace v Douglas, 141 AD3d at 530).

Contrary to the father's contentions, it was not necessary for the Family Court to find that the father had committed a family offense or a crime prior to making the determination that he willfully violated the subject orders (see Matter of Cass v King-E.Y., 30 NY3d 548, 551 [2017]; Matter of Sandoval v Santiago, 153 AD3d 772, 773 [2018]). Moreover, the court properly found, beyond a reasonable doubt, that the father willfully violated provisions of the subject orders, having freely admitted to engaging in conduct constituting such willful violation (see Matter of Balschin v Rubichin, 61 AD3d 11, 15 [2009]). Rivera, J.P., Maltese, Barros and Christopher, JJ., concur.



Matter of Solomon v Fishman

2018 NY Slip Op 04741 [162 AD3d 1052]

June 27, 2018

Appellate Division, Second Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, August 1, 2018

[*1]

E ch 5.1 "B"

In the Matter of Jennifer S. Solomon, Respondent,
v
Marc H. Fishman, Appellant.

Del Atwell, East Hampton, NY, for appellant

Virginia Foulkrod, White Plains, NY (Nicole F. Feit of counsel), for respondent.

Kathleen M. Hannon, Scarsdale, NY, attorney for the children.

In a proceeding pursuant to Family Court Act article 8, the father appeals from an order of protection of the Family Court, Westchester County (Michelle I. Schauer, J.), dated June 27, 2017. The order of protection directed the father, inter alia, to stay away from the mother until and including June 27, 2019.

Ordered that the order of protection is affirmed, with costs.

Contrary to the father's contention, vacatur of the order of protection is not warranted based upon the Family Court's alleged failure to provide reasonable accommodations for his alleged disabilities, in violation of the Americans with Disabilities Act (42 USC § 1210 et seq [hereinafter the ADA]). The father failed to submit sufficient evidence in support of his claim that he was disabled (see Kadanoff v Kudanoff, 46 AD3d 626, 627 [2007]). Additionally, the father did not demonstrate, as required by the ADA, that, by virtue of his alleged disabilities, he was substantially limited in a major life activity (see id. at 627; Blank v Investec Ernst & Co., 2004 WL 2725138, 2004 US Dist LEXIS 24008 [SD NY, Nov. 29, 2004, No. 02 Civ 3260 (RCC)]). Moreover, the court, despite the absence of an adequate showing by the father of any such disability, nonetheless acceded to all of the father's reasonable requests for accommodations.

The Family Court providently exercised its discretion in denying the father's request for the use by him of a personal note-taker or tape recorder at court proceedings, as the father had the ability to order official transcripts of the proceedings. Likewise, the court providently denied the [*2] father's ex parte requests under the guise of an ADA accommodation for alterations to the terms of his supervised parental access with the parties' children, since no such alterations could be made in the absence of a determination of the best interests of the subject children (see Matter of Wilson v McGlinchey, 2 NY3d 375, 380-381 [2004]; Matter of Izurieta v Izurieta, 161 AD3d 863 [2d Dept 2018]). The court also providently denied the father's ADA-based requests for the production to the father by the court of confidential records prepared for the court by a social worker, and for certain ADA accommodations for one of his sons, who he claimed was also disabled. Rivera, J.P., Maltese, Barros and Christopher, JJ., concur.



E ʌʜɪʄʄ 'C'

E ʌʜɪʃɪʇ 'C'ₕ

NEW
YORK
STATE

**Division of**
**Human Rights**

LORE... M... ...

JOHNATHAN J. SMITH
Interim Commissioner

August 3, 2020

Re:    Marc Fishman v. New York State, Unified Court System
Case No.    10208672

To the Parties Listed Below:

The above-referenced case has been filed with the White Plains Office of the New York State Division of Human Rights.

In an effort to expedite the handling of pending cases and in an attempt to achieve favorable resolutions of these charges, the Division of Human Rights (DHR) has selected this case to be part of the Division's early resolution program. As part of the program, cases are scheduled for a conciliation conference at the outset of the investigation.

The conciliation conference for your case is scheduled on **8/25/2020 at 10:00 AM, by telephone. Please use the following call-in instructions: 914-989-3110,** with **Yonette Ageda Scott,** Human Rights Specialist II. You may have an attorney representing you at this conference if you wish, but you are not required to do so.

During the conciliation conference a DHR representative will facilitate the process of settlement. You should be prepared for the following:

1.    **Compromise and cooperation in the achievement of a resolution.** The responding party should be aware that in most cases, this will include providing some benefit, such as monetary compensation, to the complainant.

2.    **Actual signing of a conciliation agreement to officially conclude the processing of the discrimination complaint.** If a responding party participates through a representative, that representative must have the authority to negotiate a settlement and to sign the written agreement.

Your appearance at the conference is required. Your cooperation in this process will expedite the handling of the case. Entering into a signed conciliation agreement at the conference is voluntary for all parties.

If the matter is not resolved, it will proceed without interruption to a **fact-finding conference.** Therefore, please also come prepared to discuss the issues of the case, and you may bring witnesses, documents, etc. in support of your position.

9:36 AM  Fri Aug 28

≡ JUSTIA          🔒 law.justia.com

🔍  Log In   Sign Up

# Matter of New York State Unified Ct. Sys. v New York State Div. of Human Rights

Exhibit "D"

Annotate this Case

Matter of New York State Unified Ct. Sys. v New York State Div. of Human Rights 2020 NY Slip Op 01252 Decided on February 20, 2020 Appellate Division, First Department Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 20, 2020
Gische, J.P., Webber, Oing, Singh, JJ.
11075 450006/18

[*1] In re New York State Unified Court System, etc., Petitioner,

v

New York State Division of Human Rights, et al., Respondents.

John W. McConnell, Office of Court Administration, New York (Pedro Morales of counsel), for petitioner.

Caroline J. Downey, Bronx (Michael K. Swirsky of counsel), for New York State Division of Human Rights, respondent.

Jakub R. Zaic, respondent pro se.

Final order of respondent New York State Division of Human Rights (DHR), dated November 15, 2017, which adopted the recommended order of the Administrative Law Judge, and

8:36 AM  Fri Aug 28

≡ **JUSTIA**                        🔍   Log in   Sign Up

Final order of respondent New York State Division of Human Rights (DHR), dated November 15, 2017, which adopted the recommended order of the Administrative Law Judge, and determined, following a hearing, that petitioner New York State Unified Court System, Office of Court Administration (OCA) discriminated against respondent Jakub R. Zaic based on a disability, and directed petitioner to, inter alia, cease and desist from subjecting individuals to blanket exclusions from the court officer-trainee job title based on hearing loss or the use of hearing aids, pay a civil fine and penalty of $30,000, and pay respondent Zaic $5,000 in compensatory damages, unanimously confirmed, and the proceeding (transferred to this Court pursuant to pursuant to Executive Law § 298 by order of the Supreme Court, New York County [Shlomo Hagler, J], entered June 8, 2018), dismissed, without costs.

The Commissioner's finding of discrimination is supported by substantial evidence. First, Zaic, currently a per diem court interpreter for OCA in its courts and in other courts, established a prima facie case that OCA discriminated against him on account of his disability of some hearing loss in his right ear (Melman v Montefiore Med. Ctr., 98 AD3d 107, 112-113 [1st Dept 2012]; Bennett v Health Mgt. Sys., Inc., 92 AD3d 29, 35 [1st Dept 2011], lv denied 18 NY3d 811 [2012]). Zaic sufficiently demonstrated that upon the provision of reasonable accommodation, namely, a hearing aid, he can perform in a reasonable manner the essential functions of a court officer-trainee (Executive Law § 292 [21]; Romanello v Intesa Sanpaolo, S.p.A., 22 NY3d 881, 883-884 [2013])

Among other things, Zaic passed the written test for the court officer-trainee position and was conditionally hired. In addition, although the job duties are different, he adequately performed the functions of court interpreter without a hearing aid and without complaints from those who used his services. OCA bans the use of hearing aids on the job or for the audiometric test to medically qualify for the position. Zaic was not obligated to be evaluated for and purchase a hearing aid, and to retake the audiometric test, at his expense, to further make his prima facie case after OCA made clear it still would deem him unqualified and reject such test results

Permitting court officers to wear a hearing aid is a reasonable accommodation and would not, as OCA argues, impose undue hardship on OCA by posing any "direct threat," i.e. "a significant risk of substantial harm to the . . . safety of the employee or others" (9 NYCRR 466.11[g][2][i]; Executive Law §§ 292[21-e], 296[3][a]; Pimentel v Citibank, N.A., 29 AD3d 141, 145 [1st Dept 2006], lv denied 7 NY3d 707 [2006]). OCA cites only to the physical demands of the job and the speculative risk that a hearing aid could become dislodged in a [*2]scuffle or fail to operate in an emergency. OCA's argument is undermined by its own policy permitting court officer-trainee candidates to meet its vision standard with or without corrective lenses or glasses, which could be lost or become dislodged in a scuffle.

9:37 AM  Fri Aug 28

≡ **JUSTIA**     🔍  Log In   Sign Up

Next, OCA failed to provide any legitimate non-discriminatory reason for its decision. An individual may be denied employment because of a disability only if that condition will prevent him from performing in a reasonable manner the activities involved in the job or occupation sought, based on an individualized assessment of the specific individual [Matter of State Div. of Human Rights [Granelle], 70 NY2d 100, 106-107 [1987]). No sufficiently individualized assessment occurred here, nor does OCA's formula take into account the ability of someone with asymmetrical hearing loss to perform the essential functions of a court officer-trainee.

Similarly, while OCA's preference for those with a minimal amount of hearing acuity might be a bona fide occupational qualification (Executive Law § 296['][d]), its preference for hearing acuity without the use of a hearing aid is not.

Given OCA's blanket policy barring hearing-impaired persons from employment as court officers and its failure to accommodate Zaic who had an asymmetric hearing loss, the civil penalty of $30,000 was correctly assessed (Executive Law § 297[4][c] [a civil penalty below $50,000 may be assessed if an entity is found to have committed an "unlawful discriminatory act").

" Judicial review of an administrative penalty is limited to whether the measure or mode of penalty . . . constitutes an abuse of discretion as a matter of law . . . [A] penalty must be upheld unless it is so disproportionate to the offense as to be shocking to one's sense of fairness'" (Matter of County of Erie v New York State Div. of Human Rights, 121 AD3d 1564, 1566 [4th Dept 2014], quoting Matter of Kelly v Safir, 96 NY2d 32, 38 [2001]; see also Matter of New York State Div. of Human Rights v International Fin. Servs. Group, 162 AD3d 576 [1st Dept 2018]). Further, we have upheld civil penalties if they were "reasonable" (Matter of Framboise Pastry Inc. v New York City Commn. On Human Rights, 138 AD3d 532, 533 [1st Dept 2016]). Here, the civil penalty was not an abuse of discretion. Nor was it was unreasonable.

The record contains substantial evidence to support the Commissioner's finding that Zaic is entitled to a compensatory damages award of $5,000 (Executive Law § 297[4][c][iii]; Matter of Framboise Pastry Inc. v New York City Commn. on Human Rights, 138 AD3d 532, 533 [1st Dept 2016]; see Matter of New York City Tr. Auth. v State Div. of Human Rights, 78 NY2d 207, 216-217 [1991]; Batavia Lodge No. 196, Loyal Order of Moose v New York State Div. of Human Rights, 35 NY2d 143, 147 [1974]).

We have considered petitioner's remaining contentions and find them unavailing.

THIS CONSTITUTES THE DECISION AND ORDER

OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT

9:37 AM  Fri Aug 28

≡ JUSTIA    🔒 law.justia.com    🔍  Log In    Sign Up

We have considered petitioner's remaining contentions and find them unavailing.

THIS CONSTITUTES THE DECISION AND ORDER

OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED: FEBRUARY 20, 2020

CLERK

# Legal Jobs Delivered to Your Inbox

**Subscribe Now**

## Search this Case

Google Scholar
Google Books
Legal Blogs

Google Web
Bing Web

Google News
Google News Archive
Yahoo! News

Exhibit "E"

Proof of

Disability

TMJ, Cubital Tunnel
Syndrome, TBI

POSt Concussion Syndrome

C Marc Fishman





January 8, 2016

Donald Bernstein, D.D.S.
Scarsdale Dental Associates
688 Post Road, Suite 208
Scarsdale, NY 10583

RE: Marc H. Fishman

Dear Dr. Bernstein:

Thank you for referring Marc Fishman. I saw Marc on January 8, 2016. He presents with the following history. He has had an intermittent swelling over the left TM joint region and left parotid gland. He saw his ENT who diagnosed a possible blocked or infected parotid gland. He had seen Dr. Ross at Westmed, an ENT, and Dr. Ramani. They were not sure exactly what was causing the intermittent swelling. You then saw Marc, said it could be a TMJ disorder. He had independently seen Dr. Paul Gittelman for an IME back on May 12, 2014. Dr. Gittelman found crepitus in the left temporomandibular joint and also gave a diagnosis of TMJ dysfunction which was causally related to November 20, 2013. Marc was involved in two motor vehicle accidents. He was hit driving on Central Avenue which has caused occipital neuralgia and cubital tunnel syndrome. The second motor vehicle accident exacerbated the symptoms, and he had a torn rotator cuff and many other symptoms. Currently Marc is wearing a Medtronic neurostimulator which he got on March 18, 2014, and he is feeling much better. Marc is feeling actually greatly improved. He was able to go off many of your pain medications. He also had a cubital release on March 26, 2014. These surgeries greatly improved his tinnitus and his ear pain. However, the swelling remains over the left parotid and left TM joint. He has been having symptoms of TMJ for at least the last six months, and his hearing has decreased. He also complains of snoring, obstructive sleep apnea, and he was scheduled to have a sleep test, a polysomnogram, next week. He have gained approximately 50 pounds following the motor vehicle accident, and he has high blood pressure. He complains of excessive daytime sleepiness in the late afternoon.

CLINICAL EVALUATION: On muscle palpation, we find mild tenderness in the left trapezius, **exquisite tenderness in the left sternocleidomastoid muscle. The masseter muscles are exquisitely tender on the right.** The left temporomandibular joint is tender to palpation, particularly the lateral TMJ capsule. **Temporal tendon, medial pterygoid, and lateral**

**pterygoid are all exquisitely tender on the left** On my examination, I find swelling over the left parotid gland. Interincisal opening is 52 mm. The mandible is off to the left by approximately 1 mm

Tongue level is a level 3. Occlusion is class 1. Mallampati airway inspection shows a class III airway

**IMAGING** There is beaking in the right temporomandibular joint with an anvil-shaped condyle There is some excess adenoidal tissue still present, and we see hypertrophy at the base of the tongue and the lingual tonsillar region and decreased airway space.

**DIAGNOSTIC IMPRESSION** There is probable sleep-disordered breathing which will be confirmed by the polysomnogram. I also feel that there is a swelling over the left parotid. It is not clear whether this is an autoimmune disease or is in some way related to the temporomandibular joint

**CONTRIBUTING FACTORS** The trauma from the motor vehicle accidents

**SEQUENTIAL TREATMENT PLAN** I have recommended or agreed that the patient should have a polysomnogram based on the results of the polysomnogram. Marc may be eligible for an oral appliance, a 3-D printed oral appliance for sleep apnea. We also discussed the new Medtronic stimulator which monitors his breathing and helps stimulate the genioglossus muscle and maintain an open airway. I have not recommended a daytime appliance at this point. I would like to see Marc again in approximately one month after we have the results of his sleep study.

Donald, thanks for thinking of me

Sincerely,


Michael L. Gelb, D.D.S., M.S



cc:        Michael H. Joseph, Esq. 203 E. Post Rd. White Plains, NY 10601







CENTER FOR COGNITION AND COMMUNICATION
952 Fifth Avenue, New York, NY 10075
(212) 535-8932 Fax: (212) 535-5443

3/20/19

**Patient's Name:** Marc Fishman
**Date of Birth:** 8/21/72
**Date of Injury:** 11/20/13

To Whom It May Concern:

Mr. Fishman sustained a Traumatic Brain Injury and Post-Concussion Syndrome and received cognitive rehabilitation treatment at our center. In April 2017, Mr. Fishman underwent a neuropsychological evaluation and demonstrated cognitive deficits in areas of verbal learning and memory trials, initial acquisition of non-verbal learning and memory, working memory, and verbal functioning (confrontation naming).

Respectfully Submitted,

Jason Brown, M.D.
Clinical Professor, Neurology (ret.)
New York University Medical Center

www.drjbrown.org



### CENTER FOR COGNITION AND COMMUNICATION
952 Fifth Avenue, New York, NY 10075
(212) 535-8932  Fax: (212) 535-5443

4/19/18

**Patient's Name:**      Marc Fishman
**Date of Birth:**       8/21/72
**Date of Evaluation:**  4/28/17
**Date of Injury:**      11/20/13

To Whom It May Concern:

Mr. Fishman is a 44 year old male, who was referred for a neuropsychological evaluation. He is currently a patient under my care at Center for Cognition and Communication. Mr. Fishman needs someone to help him with note taking in court.

If there are any other questions, you can contact my office at 212-535-8932.

Respectfully Submitted,

Jason Brown, M.D.
Clinical Professor, Neurology (ret.)
New York University Medical Center

Exhibit "F"

Robyn Powell
Rpat, Barriers to Communication
and Accommodation

on disability discrimination
in State Courts

and how it
Violates

ADA

(published this week)

Forthcoming STANFORD L. & POL'Y REV. Draft, please do not circulate or cite without the author's permission.

Judges also have the opportunity to address some of the tensions raised by the participants in this Study. Several attorneys in this Study expressed concerns that judges did not understand the ADA's application to the child welfare system and that some judges refused to apply the law appropriately. In particular, attorneys reported issues relating to ASFA's reasonable efforts requirement. However, recent decisions in Michigan and Colorado have created a roadmap for addressing these tensions, holding in both cases that reasonable efforts cannot be achieved without reasonable modifications.[160] Judges across all jurisdictions must make similar findings.

## CONCLUSION

The ADA was passed thirty years ago with the promise of "equality of opportunity"[170] for people with disabilities. Notwithstanding the disability rights movement's many triumphs, the fundamental right to parent is still not widely enjoyed by people with disabilities. Significantly, a nascent body of scholarship reveals parents with disabilities experience substantial and pervasive inequities within the child welfare system, resulting in strikingly high rates of involvement with the child welfare system, inadequate family preservation and reunification services, and increased likelihood of termination of parental rights. Moreover, research indicates that the ADA is often disregarded or misapplied by child welfare agencies and courts. However, existing scholarship has failed to empirically elucidate why the ADA is not effectively safeguarding the rights of parents with disabilities. In particular, no research concerning the ADA and the child welfare system has collectively examined the experiences and perspectives of the individuals most intimately involved in these cases: parents with disabilities, child welfare workers, and parents' attorneys. Not including the insights of these individuals is a substantial omission from an otherwise considerable body of research. This Study, therefore, begins to fill this scholarly void.

The ADA should guarantee that the child welfare system treats parents with disabilities justly. Specifically, parents with disabilities should not be at increased risk of involvement with the child welfare system or termination of their parental rights merely because they are disabled. Moreover, the child welfare system should be fully accessible to parents with disabilities, including the provision of reasonable modifications, as necessary, to ensure services and supports meet the individual needs of parents. Above all, the ADA should prohibit widespread bias against parents with disabilities by the child welfare system. As this Study demonstrates, however, numerous challenges remain. In particular, this Study indicates that several barriers and facilitators exist that affect compliance with the ADA by the child welfare system. First, knowledge, training, and information about the ADA by parents with disabilities, child welfare workers, and legal professionals impede or enable ADA compliance. Second, institutional support—especially well-defined agency policies and procedures about the ADA, agency culture and leadership, and resource availability—impact compliance with the ADA. Third, factors related to the legal and

[169] *In re Hicks/Brown*, 893 N.W.2d 639 (Mich. 2017); *People ex. rel. S.K.*, 2019 COA 36, 440 P.3d 1240, 1249.
[170] *Id.* at § 12101(a)(7)

↓ Download　　🔒 Full PDF Package　　🔒 Summary

to 6:00 p.m., when lif  guards are on duty.

*Forthcoming*, STANFORD L. & POL'Y REV. Draft, please do not circulate or cite without the 56
author's permission.

reforming their laws.[160] According to the National Research Center for Parents with Disabilities,
nearly 30 states have introduced or passed legislation aimed at ensuring the rights of disabled
parents.[161] For example, in 2017, South Carolina enacted the Persons with Disabilities Right to
Parent Act.[162] This law adopted the ADA's definitions of covered entities and disability; defined
adaptive parenting equipment, adaptive parenting techniques, and supportive services; required
the child welfare agency and courts to comply with the ADA and ensure that reasonable efforts to
prevent removal and reunify a family is individualized and based on a parent's disability; and
mandated that child welfare agencies make reasonable modifications.[163] Further, the Act amended
the state's termination of parental rights statute to require a nexus between a parent's disability
and their ability to care for the child, and prohibited termination of parental rights based solely on
disability.[164] Similarly, in 2018, Colorado passed the Family Preservation for Parents with
Disability Act.[165] This law prohibited a parent's disability from serving as the basis for denying or
restricting custody, visitation, adoption, foster care, or guardianship, when it is otherwise
considered to be in the best interest of the child, required courts to consider the benefits of
providing supportive parenting services when determining custody, visitation, adoption, foster
care, and guardianship, and mandated the state's child welfare agency to provide reasonable
modifications to parents with disabilities based on individual need.[166] Findings from this Study
underscore the importance of comprehensive state legislation that explicitly requires compliance
with the ADA and addresses perceived tensions between children's rights and parents' rights.

Statutory or regulatory reforms on the federal level should also be considered. With respect
to issues relating to ASFA's timelines, which participants in this Study described as a significant
barrier to ADA compliance, the National Council on Disability recommended: "Statutory time
periods need to be extended to reflect the needs of parents with disabilities and their children.
Specifically, ASFA must be amended to fully accommodate parents with disabilities."[167] The
National Council on Disability also suggested the need for federal legislation to protect the rights
of parents with disabilities or amendments to the ADA to include the child welfare system
explicitly.[168] Indeed, any state or national statutory or regulatory change should address the
intersection of the ADA's reasonable modifications requirement and ASFA's reasonable efforts
mandate.

[160] Kay, *supra* note 103, at 812 ("While the ADA has had a rocky history in child protection courts, particularly as a
defense to termination of parental rights, there are signs of progress in state statutes and court decisions.")
[161] National Research Center for Parents with Disabilities, Map of Current State Legislation Supporting Parents with
Disabilities, (Oct. 22, 2019), *available at* https://heller.brandeis.edu/parents-with-disabilities/map/index.html.
[162] Persons with Disabilities Right to Parent Act, S.C. CODE ANN. § 63-21-10 (2017).
[163] *Id.*
[164] *Id.*



1:05 PM  Tue Aug 25

a academia.edu

↓ Download    Full PDF Package    Summary

*Forthcoming* STANFORD L. & POL'Y REV. Draft, please do not circulate or cite without the author's permission.

disabilities.[190] Accordingly, attention and resources should be allocated to improving services for disabled parents. Moreover, as the findings from this Study demonstrate, attorneys need to advocate fervently for their clients to receive individually-tailored services and supports.

Interestingly, the Family First Prevention Services Act of 2017 ("Family First Act")[191] may offer opportunities to expand the availability of resources and to develop and implement family preservation services for parents with disabilities. Specifically, the Family First Act provides Social Security Title IV-E funds for 12 months of in-home parenting skills programs, substance use treatment, and mental health services to keep families intact and children out of foster care.[192] If these services and supports are individually-tailored to meet parents' specific needs, these programs could serve as reasonable modifications for some parents with disabilities. Nonetheless, the Family First Act does not mandate states to provide services using Title IV-E funds, they must "elect" to do so, and the federal government will match a state's contribution 50% until the year 2026.[193] Hence, the Family First Act, if implemented correctly, could expand access to individually-tailored services for disabled parents through additional federal monies for child welfare agencies.

3    Regulatory, Statutory, and Judicial Considerations

Finally, findings from this Study suggest the need for regulatory, statutory, and judicial attention to address factors related to the legal and social contexts of cases involving disabled parents that are barriers or facilitators to the child welfare system's compliance with the ADA. Many participants described examples of conflicting policies and practices that affected ADA compliance. For example, implicit and explicit tensions between children's rights and parents' rights often shifted the focus away from ensuring that disabled parents received necessary reasonable modifications. Difficulties relating to the intersection between disability and child welfare law were also raised. For instance, some participants described matters related to ASFA's reasonable efforts requirement and how it implicated the ADA's reasonable modifications provisions.

To address discrimination against parents with disabilities involved with the child welfare system, including issues relating to complying with and enforcing the ADA, states have begun

---

[190] Phillip A. Swain & Nadine Cameron, *"Good Enough Parenting:" Parental Disability and Child Protection*, 18 DISABILITY & SOC'Y 165, 170 (2003). Examples of services include in-home training for parents, adaptive parenting equipment, respite services, and mental health treatment.

[191] H.R. 253, 114th Cong. (2017). This legislation was initially introduced in the Family First Prevention Services Act in 2016. H.R. 5456, 114th Cong. (2016); S. 3065, 114th Cong. (2016). It was sponsored by Rep. Vern Buchanan (R-FL) in the House, and by Sen. Orrin Hatch (R-UT) and Sen. Ron Wyden (D-OR), with support from House Ways and Means Committee Chairman Kevin Brady (R-TX) and Ranking Member Sander Levin (D-MI). At The House of Representatives passed the legislation by voice vote on June 21, 2016, but it stalled in the Senate.

[192] H.R. 253, Family First Prevention Services Act; ...

**Langrin, Taryn A**

| | |
|---|---|
| **From:** | marc fishman <rentdriver@gmail.com> |
| **Sent:** | Tuesday, September 1, 2020 3:01 PM |
| **To:** | romannysdchambers@nysd.uscourts.gov; Loomba, Lalit K.; Langrin, Taryn A; Federal Court Electronic Filing Notifications; Joseph Goubeaud Esq, crimimal Atty |
| **Subject:** | Fwd: Fishman v. City of New Rochelle 19-cv-00265-nsr |
| **Attachments:** | IMAG0642.jpg; IMAG0643.jpg; letter-to-judge-ramon-9-1-20.pdf |

Dear Honorable Judge Roman:

Defense counsel Lolita Loomba is in incorrect when he states I would be in violation of every other order of protection.

Every other order of protection I was served with had a carve out for supervised visitation. Supervised visitation was occurring during the alleged arrest with the court supervisor on 12/15/18 present(Ann Elliot), so there was no violation of an other order of protection. Police knew it was a supervised visit because the supervisor told them so In the questioning room with me on 12/15/18. If it was not a court ordered supervised visit, Ann Elliot would have had to been arrested for facilitating a crime by New Rochelle police. Ann picked me up with the disability driver to go to go to Westchester before the visit. Taking me to ex-wife house would be facilitating S crime. Ann was not arrested and neither was the disability driver because police all knew the other orders of protection allowed for supervised visits.

The police, district atty and judge schauer who issued this alleged order of protection while I was in jail on 6/27/17(for sending gifts to my kids on holidays schauer said were not major) knew I was hearing impaired(see attached report from my doctor gelb attesting to the hearing problems and hearing loss with tmj..given to scgauer.)

 Judge Schauer knew about hearing and memory impairment before she issued the order of protection. Judge Schauer knew I had parotid mass and tmj surgery before the sentencing on 6/27/17...and had to adjourn sentencing due to it. Judge schauer knew about my hearing disability and still decided not to physically give me a copy of this order of protection. In court..that police knew I was not served with. Schauer had a disability hearing Six days before sentencing on 6/21/2017 to rule onnme getting large print court orders and a ntoetaker Ada accommodation. Schauer denied them. But schauer did State all of her orders had typed print AND WOULD BE GIVEN TO ME IN PERSON(see 6/21/17 transcript. I was not given this order of protection in person at any time..neither was my disability aide in court 6/27/17.
Police also knew I was disabled with hearing problems because I told them so and because the police told me they read the jail hospital records which detail occipital neuralgia tmj which effects hearing and my five implants. These records detail that my two neurostimulators impact hearing. Police sited in their arrest report that my medical health was "poor" as reason they released me to my disability aide to take me home.

The da did Not charge me for violating any other order of protection....only the one i was not served with. The Da acknowledged the Other orders of protection all had exceptions for supervised visits.

Mr Loomba knows there is no official state conviction until I have a certificate of disposition. A transcript is not a state certificate of conviction. The state court judge has not so ordered the transcript to certify it is a conviction. It the judge did..i could appeal it. So Mr loomba's attempt to dismiss is premature. Mr loomba knows there would be no pending conviction if my criminal attorney had the document in police records. ..That stated.note :party not served with order of protection.

1

The question for federal disvovery is why did police or district atty white this page out in state discovery. Was it to avoid being liable in this federal case and backup cops and da for false arrest? I think so.

Please your honor..do not dismiss this case. The police and dad need to stop discriminating against disabled people. The police and da need to be held accountable for falsifying records to hide the false arrest in state court.

Thank you, Marc Fishman pro se

Enclosures

C: Westchester county
   Lolita limbs Esq.
   Joe goubough Esq.

---------- Forwarded message ---------
From: **Loomba, Lalit K.** <Lalit.Loomba@wilsonelser.com>
Date: Tue, Sep 1, 2020, 14:05
Subject: Fishman v. City of New Rochelle
To: marc fishman <rentdriver@gmail.com>
Cc: Langrin, Taryn A <tal5@westchestergov.com>

Please see attached correspondence.

Lalit K. Loomba
Of Counsel
Wilson Elser Moskowitz Edelman & Dicker LLP
1133 Westchester Avenue
White Plains, NY 10604
914.872.7118 (Direct)
914.500.3902 (Cell)
914.323.7000 (Main)
914.323.7001 (Fax)
lalit.loomba@wilsonelser.com

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete the original message and any copies of it from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman & Dicker LLP, please see our website at www.wilsonelser.com or refer to any of our offices.

Thank you.





January 8, 2016

Donald Bernstein, D.D.S
Scarsdale Dental Associates
688 Post Road, Suite 208
Scarsdale, NY 10583

RE: Marc H. Fishman

Dear Dr. Bernstein

Thank you for referring Marc Fishman. I saw Marc on January 8, 2016. He presents with the following history. He has had an intermittent swelling over the left TM joint region and left parotid gland. He saw his ENT who diagnosed a possible blocked or infected parotid gland. He had seen Dr. Ross at Westmed, an ENT, and Dr. Ramani. They were not sure exactly what was causing the intermittent swelling. You then saw Marc, said it could be a TMJ disorder. He had independently seen Dr. Paul Gitelman for an IME back on May 12, 2014. Dr. Gitelman found crepitus in the left temporomandibular joint and also gave a diagnosis of TMJ dysfunction which was causally related to November 20, 2013. Marc was involved in two motor vehicle accidents. He was hit driving on Central Avenue which has caused occipital neuralgia and cubital tunnel syndrome. The second motor vehicle accident exacerbated the symptoms, and he had a torn rotator cuff and many other symptoms. Currently Marc is wearing a Medtronic neurostimulator which he got on March 18, 2014, and he is feeling much better. Marc is feeling actually greatly improved. He was able to go off many of your pain medications. He also had a cubital release on March 26, 2014. These surgeries greatly improved his tinnitus and his ear pain. However, the swelling remains over the left parotid and left TM joint. He has been having symptoms of TMJ for at least the last six months, and his hearing has decreased. He also complains of snoring, obstructive sleep apnea, and he was scheduled to have a sleep test, a polysomnogram, next week. He have gained approximately 50 pounds following the motor vehicle accident, and he has high blood pressure. He complains of excessive daytime sleepiness in the late afternoon.

CLINICAL EVALUATION: On muscle palpation, we find mild tenderness in the left trapezius, exquisite tenderness in the left sternocleidomastoid muscle. The masseter muscles are exquisitely tender on the right. The left temporomandibular joint is tender to palpation, particularly the lateral TMJ capsule. Temporal tendon, medial pterygoid, and lateral

pterygoid are all exquisitely tender on the left. On my examination, I find swelling over the left parotid gland. Interincisal opening is 52 mm. The mandible is off to the left by approximately 1 mm.

Tongue level is a level 3. Occlusion is class 1. Mallampati airway inspection shows a class III airway.

**IMAGING** There is beaking in the right temporomandibular joint with an anvil-shaped condyle. There is some excess adenoidal tissue still present, and we see hypertrophy at the base of the tongue and the lingual tonsillar region and decreased airway space.

**DIAGNOSTIC IMPRESSION** There is probable sleep-disordered breathing which will be confirmed by the polysomnogram. I also feel that there is a swelling over the left parotid. It is not clear whether this is an autoimmune disease or is in some way related to the temporomandibular joint.

**CONTRIBUTING FACTORS** The trauma from the motor vehicle accidents.

**SEQUENTIAL TREATMENT PLAN** I have recommended or agreed that the patient should have a polysomnogram based on the results of the polysomnogram. Marc may be eligible for an oral appliance, a 3-D printed oral appliance for sleep apnea. We also discussed the new Medtronic stimulator which monitors his breathing and helps stimulate the genioglossus muscle and maintain an open airway. I have not recommended a daytime appliance at this point. I would like to see Marc again in approximately one month after we have the results of his sleep study.

Donald, thanks for thinking of me.

Sincerely,

_____

Michael L. Gelb, D.D.S., M.S.

cc:        Michael H. Joseph, Esq. 203 E. Post Rd. White Plains, NY 10601



Lalit K. Loomba, Esq.
Direct dial: (914) 872-7118
lalit.loomba@wilsonelser.com

September 1, 2020

**By First Class Mail**

Hon. Nelson S. Román
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, NY 10601

Re:    Marc H. Fishman, Individually, and on behalf of all others similarly situated v. City of New
Rochelle, New Rochelle Police Department, Lane Schlesinger individually and in his
administrative and official capacity as a police officer #1058 employed by the City of New
Rochelle, Joseph F. Schaller individually and in his administrative and official capacity as a
police commissioner/officer employed by the City of New Rochelle, and W. Joseph individually
and in his official and administrative capacity as a police officer/detective #18 employed by the
City of New Rochelle, and Westchester County, Docket No. 19-CV-265 (NSR)
Our File No. 07367.00109

Dear Judge Román:

We represent the City of New Rochelle, Police Officer Lane Schlesinger, Commissioner Joseph F.
Schaller, and Sergeant Myron Joseph (s/h/a "W. Joseph") (collectively, the "City Defendants") in the
referenced action. We are writing in response to the flurry of emails sent on August 31, 2020, by plaintiff
*pro se* Marc Fishman, and to oppose Mr. Fishman's request for a 60-day extension to respond to the City
Defendants' motion to dismiss.

Mr. Fishman seeks this lengthy extension because he claims to have had cancer surgery last week and is
"bedridden and bleeding." In his email sent August 31, 2020, at 2:32 p.m., he also claims to have a
follow-up surgery scheduled for September 24, 2020, and a third surgery scheduled for the first week of
October.

While we certainly have sympathy for Mr. Fishman's medical condition, we believe it would be
appropriate for him to substantiate his request for an extension with a doctor's note. This is because,
based on the balance of his email, it appears that Mr. Fishman is in reality seeking a stay of this
proceeding pending the resolution of his state-court criminal proceeding. In particular, Mr. Fishman
states that he is in process of challenging his state-court conviction, and that he believes that challenge
needs to be resolved before his federal court action can proceed. Indeed, on the basis of Mr. Fishman's
email if those challenges were somehow not resolved by November 1, 2020 (*i.e.,* 60-days after his current
deadline), we might expect yet another request by Mr. Fishman to delay this Court's consideration of this
action.

1133 Westchester Avenue • White Plains, NY 10604 • p 914.323.7000 • f 914.323.7001

Albany • Baltimore • Boston • Chicago • Connecticut • Dallas • Denver • Garden City • Houston • Kentucky • Las Vegas • London • Los Angeles • Miami
Milwaukee • New Jersey • New York • Orlando • Philadelphia • San Diego • San Francisco • Virginia • Washington, DC • West Palm Beach • White Plains
Affiliates  Berlin • Cologne • Frankfurt • Munich • Paris

**wilsonelser.com**

Hon. Nelson S. Román
September 1, 2020
Page 2

Mr. Fishman, of course, chose to commence this action in federal court. He filed a complaint on January 8, 2019, during the pendency of the underlying criminal charges, and more than a year before his conviction, by jury verdict, on January 28, 2020. (DE 2)  On March 21, 2019, the City Defendants filed a pre-motion letter seeking a conference on a motion to dismiss plaintiff's complaint. (DE 15)  On March 4, 2020, after he was convicted, Mr. Fishman filed a letter seeking permission to file a "motion for summary judgment." (DE 18)  Counsel for the City Defendants, and counsel for the County of Westchester, also a defendant herein, responded on March 6, 2020. (DE 18-20)  Finally, on May 29, 2020, the Court set a briefing schedule: motions to be served (but not filed) on July 17, 2020, opposition to be served (but not filed) on September 1, 2020, and replies due September 16, 2020. (DE 21).

Mr. Fishman is asserting, *inter alia,* a Section 1983 claim for false arrest and a state-law claim for malicious prosecution. Plaintiff's conviction on criminal charges is fatal to those claims. However, as detailed in the City Defendants' motion to dismiss, even without reference to Mr. Fishman's conviction, there was ample probable cause, or at the least arguable probable cause, ascertainable from the facts alleged in the complaint, and in the documents referenced and integral to the complaint, to support the argument that those claims fail and must be dismissed. Moreover, Mr. Fishman's state-law claims are procedurally barred because he never served the City with a notice of claim as required by Section 50-e of the General Municipal Law. Accordingly, resolution of Mr. Fishman's challenges to his state-court conviction is not required for this Court to consider and rule upon the City Defendants' motion.

In his August 31, 2020 email, Mr. Fishman references a computer printout detailing the various orders of protection that are at issue. He claims that there was a "Caveat Text" on one of the orders stating: "CAVEAT NOTE, PARTY NOT SERVED WITH ORDER OF PROTECTION." The printout in question, which details each order of protection issued against Mr. Fishman, is attached to the City Defendants' motion as Exhibit B. In fact, one of those orders, issued June 13, 2018 and expiring June 13, 2019, contains the following Caveat Text: "**DEFENDANT ADVISED IN COURT OF ISSUANCE AND CONTENTS OF ORDER – ORDER IS ENFORCEABLE** ***NOTE: THIS ORDER HAS NOT BEEN SERVED***"

Hence, contrary to Mr. Fishman's suggestion, the order of protection on its face states that he was advised of its issuance and contents in Court, and that the order is "Enforceable." But even if the additional note regarding lack of service were to put into question the enforceability of that particular order, which it does not, Mr. Fishman is ignoring the additional orders of protection which were issued and served; which were in effect on the date of his arrest; and upon which the police had probable cause to arrest Mr. Fishman.

In short, the City Defendants do not believe there is any basis to grant Mr. Fishman an extension based on the status of the underlying state-law proceedings. And in the absence of any substantiation of Mr. Fishman's medical condition, we respectfully submit that the request for a 60-day extension of the time to respond to the City Defendants' motion to dismiss should be denied.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

Lalit K. Loomba

Lalit K. Loomba

Hon. Nelson S. Román
September 1, 2020
Page 3

Cc (via email)

MARC H. FISHMAN, *Pro Se* (via Fist Class Mail)
3200 Netherland Avenue, Apt. G
Bronx, NY 10463
(914) 837-3209
e-mail: rentdriver@gmail.com

Cc (via ECF)

Westchester County Attorney's Office
148 Martine Avenue, 6th Floor
White Plains, NY 10048
(914) 995-2684
Attn: Taryn Chapman-Langryn, Esq.

## Langrin, Taryn A

| | |
|---|---|
| **From:** | Loomba, Lalit K. <Lalit.Loomba@wilsonelser.com> |
| **Sent:** | Tuesday, September 1, 2020 2:05 PM |
| **To:** | marc fishman |
| **Cc:** | Langrin, Taryn A |
| **Subject:** | Fishman v. City of New Rochelle |
| **Attachments:** | letter-to-judge-ramon-9-1-20.pdf |

Please see attached correspondence.

Lalit K. Loomba
Of Counsel
Wilson Elser Moskowitz Edelman & Dicker LLP
1133 Westchester Avenue
White Plains, NY 10604
914.872.7118 (Direct)
914.500.3902 (Cell)
914.323.7000 (Main)
914.323.7001 (Fax)
lalit.loomba@wilsonelser.com

CONFIDENTIALITY NOTICE: This electronic message is intended to be
viewed only by the individual or entity to whom it is addressed.
It may contain information that is privileged, confidential and
exempt from disclosure under applicable law. Any dissemination,
distribution or copying of this communication is strictly prohibited
without our prior permission. If the reader of this message is not
the intended recipient, or the employee or agent responsible for
delivering the message to the intended recipient, or if you have
received this communication in error, please notify us immediately by
return e-mail and delete the original message and any copies of it
from your computer system.

For further information about Wilson, Elser, Moskowitz, Edelman &
Dicker LLP, please see our website at www.wilsonelser.com or refer to
any of our offices.
Thank you.

**Langrin, Taryn A**

| | |
|---|---|
| **From:** | marc fishman <rentdriver@gmail.com> |
| **Sent:** | Tuesday, September 1, 2020 3:57 PM |
| **To:** | romannysdchambers@nysd.uscourts.gov; lalit.loomba@wilsonelser.com; Langrin, Taryn A; Federal Court Electronic Filing Notifications; JOELAW40@aol.com |
| **Subject:** | Case 19-cv-09265-nsr/response to Lilitta loomba opposition to dismiss case and denial of sixty day extension in case due to disability |
| **Attachments:** | FISHMAN 21JUNE 2017 ADA TELEPHONE CONFERENCE.pdf |

Dear Honorable Judge Roman:

As backup for my application to deny Opposing counsels application for summary judgement am attaching the transcript for the disabilities hearing six days before sentencing in the state family court.

Attached is the transcript of the confidential american with disabilities act hearing on 6/21/17. The parties present were my ada advocate Mrs. Donna Drumm and Judge Michelle Schauer in Yonkers state family court.

Please see page 14 where the lower court judge in line eight accepts the statement that I am a disabled person under the definition of the american with disabilities act. Judge Schauer clearly regarded me as disabled, which directs the state court to have to reasonably accommodate my disabilities of traumatic brain injury memory impairment, tinnitus hearing impairment , Tmj eating impairment, cubital tunnel syndrome writing impairment and occipital neuralgia seeing and registering impairment.

Please see page five  where Schauer states all of her orders are typed and " I don't think my orders were less than 12 (font size) point/print." See page six line four and five where Schauer states " he (mr fishman ) has access to people to help him read orders."Yet I did not get a typed order....or any printed order to read or attempt to have interpreted like nondisabled litigants receive in the order of protection that I never received. Judge Schauers  , clerk  Ed edmead , testified he did not give to me any order in court because he had not typed it yet before I was taken to county jail. This on top of police knowing I did not get order before arrest...means it was not given to me or served in court.

Since I could not hear with tinnitus, and could not write with cubital tunnel syndrome and could not remember with post concussion syndrome and Tbi and did not Receive a written copy in large print on 6/27/17, there is no way the state court accommodated my disabilities or enabled me to hear or understand an unwritten order.

So for Mr loomba to state an Alleged order that was not typed was read to me in court on 6/27 is mistaken. There was nothing to read in court as no order of protection was produced by the time I left family court.  Police knew I was in jail before this order of protection was entered into system.  Police knew I was not served and with hearing/memory disability Known had zero probably cause for arrest on 12/15/18. The police cannot ignore the family court clerk entry CAVEAT NOTE PARTY NOT SERVED WITH ORDER OF PROTECTION..with eight stars highlighting the entry.

Please do not dismiss this case of false arrest and malicious prosecution. Mr loombas client..the police and district attorney intentionally withholding this evidence In state court intentionally from my attorney and I should not reward them for their misconduct, false arrest and brady violation.  It's plain disability Discrimination and retaliation for my civil rights complaint and federal lawsuit that they intentionally did not disclose this exonerating evidence in state court.

1

Thank you.

Marc Fishman, pro se

C: Mr loomba
    Westchester county Atty
    Jõe Goubough esq.

```
FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF ONEIDA
--------------------------------------
FISHMAN                                 )
                                        ) DOCKET
NO.
                                        )
                                        )
Plaintiff,                              )
                                        )
        -against-                       )
                                        )
                                        )
,                                       )
                                        )
                    Plaintiff           )
--------------------------------------
```

                    HEARING JUNE 21 2017

  HELD AT:

                    COURT CITY ADDRESS


  BEFORE:           HONORABLE JUDGE'S NAME

  APPEARANCES:      ATTORNEY 1

                    Behalf of Plaintiff Petitione
                    Attorney 2
                    Behalf of
Plaintiff Petitioner
                    Defendant Name
                    Defendant


        TRANSCRIBER:      ALAN KACHALSKY

1        THE COURT:  We're on the record.  Just state your -- This

2    is the matter of Fishman, file 131794.  Appearance, please.

3        MS. DRUM:  Donna Drum, 800 Westchester Avenue, Rye Brook,

4    New York, appearing as ADA advocate for Mr. Fishman.

5        THE COURT:  Thank you.

6        MS. DRUM:  Thank you, Judge.

7        THE COURT:  So I'm calling you Miss Drum, because I have

8    received the latest in what appears to be a continuous

9    onslaught of multiple requests for disability accommodations

10   made either by, or on behalf of, Marc Fishman, with respect to

11   this file.

12       Now, I can go through the chronology, and I probably

13   will, you know, but put it on the record.  With this

14   particular call is precipitated by a document that was

15   received by Mr. Curry, who is the ADA Liason in the Family

16   Court here in Yonkers.  And it contains tables and what

17   looks like three separate dated documents.  Although the

18   one document that I have is numbered page -- four pages,

19   and they're all page 2 of 4, 3 of 4, 4 of 4.

20       But it contains documents dated March 15th,

21   April 12th, and June 13th, all of which I fnd hard to

22   understand, but seem to be requesting various disability

23   accommodations.

24       The request for accommodations began no later than

25   December 13th, which was by an E-mail from you to

1    Mr. Curry, stating that you had been retained by

2    Mr. Fishman as his ADA advocate, and requesting various

3    accommodations.  YOU sent some follow-up e-mails to my

4    Court Attorney, requesting accommodations.

5        And finally, when you sent an E-mail dated

6    January 11th, in response to that, I issued an Order dated

7    January 25th, 2017, formally adressing the accommodation

8    request.  I understand that Mr. Fishman sought to appeal

9    that Order.  His appeal was denied or dismissed.  And yet,

10   I continue to receive non-stop requests, either from you

11   or from Mr. Fishman for a variety of accommodations.  I'm

12   just not sure under what authority I continue to get these

13   continuous correspondence.

14       He had allegedly, a disability caused by an

15   automobile accident, which he allegedly suffered in June

16   of 2013, in November of 2013.  As far as I can see,

17   there's no new disabilities, only new ideas as to how this

18   Court can accommodate whatever disabilities he says he

19   has.

20       And frankly, some of these requests are ridiculous.

21   And I will not be issuing a Court Order.  So this is your

22   opportunity to tell me exactly what it is you're asking

23   for.  And I'm not accepting any further requests after

24   this date, unless there is a new issue with a new

25   disability.

1          MS. DRUM:  All right.  Thank you, your Honor.  I wouldn't

2     characterize my communications as continuous.  The

3     communications I sent were (inaudible) too much in between

4     each other.  The communications you received from Mr. Fishman

5     were also in between.  But I was respectful of giving a period

6     of time for response to the Court.  So I would just like to

7     make that comment on the record.

8          THE COURT:  Okay.  But I issued .

9          MS. DRUM:  -- (inaudible)

10          THE COURT:  I issued -- Miss Drum, I issued an Order in

11     January.  That's it.  I made my decision.

12          MS. DRUM:  Well, there are new requests since then, and

13     we have a right under the ADA to request those accommodations.

14          THE COURT:  Okay.  So --

15          MS. DRUM:  So that's why they were made.

16          THE COURT:  Okay.  So just so I'm clear because --

17          MS. DRUM:  My client --

18          MS. DRUM:  You're the expert on this.

19          MS. DRUM:  Thank you.

20          THE COURT:  -- and I'm not, I'm not trying to be

21     sarcastic.  I'm saying you're the expert on this.

22          You're telling me that under the ADA you have the

23     authority to make continuous multiple accommodation

24     requests, forever?  Endless accommodation requests?

25          MS. DRUM:  --

1          THE COURT:  Or, I mean, -- you're an attorney as well --

2          MS. DRUM:  -- requests are (inaudible), your Honor.

3     What. Mr. Fishman did without my knowledge is what he did.

4     And, yes, I can, if new accommodations are requested by my

5     client, and I believe that they are matched with his

6     disabilities.

7          THE COURT:  All right.  So, what is your understanding of

8     a request that is outstanding?

9          MS. DRUM:  Okay going to page, the bottom of page 1,

10    Court Orders, and then (inaudible) ABLC, and at the top of

11    page 2, Court Orders are to be typed in 12-point font.  And

12    attached or typed Orders are to be the transcribed on a

13    separate sheet of paper, and all Court Orders are to be typed.

14         THE COURT:  Okay.  And why is that a disability

15    accommodation.

16         MS. DRUM:  Because of his offidable neuralgia, it's

17    difficult for him, he gets pain in his head when he reads --

18         THE COURT:  Okay.  And he has an attorney --

19         MS. DRUM:  -- (inaudible) that.

20         THE COURT:  Listen.  He can, as far as his inability to

21    read anything smaller than 12 points, and frankly, I don't

22    think my orders were any smaller than 12, I think most of them

23    are in 12 point.

24         He can do what the rest of us do, which is put on a

25    pair of reading glasses, or use a magnifying glass.  I'm

1    not changing the format of the Court Orders.  Everything I

2    do in Court is read him.  He has an attorney present here

3    in Court.  And I'm not changing my format of Court Orders.

4    That's not a reasonable accommodation.  He has access to

5    to people to help him read orders.  He's hired you to help

6    him.  He has an attorney.

7        MS. DRUM:  I'm just writing it down, your Honor.

8        THE COURT:  You can order a transcript.

9        THE COURT:  All right.  Let's move on.

10       MS. DRUM:  Okay.  So that's -- okay.  The scheduling, and

11   and on the bottom of page 2, special warning herein for trial

12   dates for Monday, one half day.

13       THE COURT:  One moment.  I just want to go back to the

14   Orders.  The handwritten Orders are done because we issue them

15   immediately in the courtroom, so that each party can walk out

16   with an Order and an understanding of what needs to be done.

17   I don't accept handwritten Orders when I do a Notice of

18   Settlement.  But they're done so that we could provide

19   immediate relief and an immediate Order to the parties in

20   Court.  And I'm not changing that.  That process, he is free

21   to hire a person to read the handwritten Order, and to type it

22   up in as large a font as he wants, so that he can look at it

23   that way.  And you may do that for him, as his disability

24   advocate.  Moving on.  Scheduling morning hearings, okay.

25       There was no response.  I thought it was pretty

1    obvious when I scheduled the next court dates, for

2    mornings only.  Did you need me to spell that out?  And I

3    will also note --

4         MS. DRUM:  I believed, your Honor --

5         THE COURT:  I scheduled the hearings for mornings only.

6    Was that not obvious?

7         MS. DRUM:  (inaudible) communicate it to.

8         THE COURT:  Okay.  It was not communicated to you in the

9    sense that nobody said, 'yes, we will schedule this for

10   mornings only.'  However, we did you give you next court

11   dates, which were in the mornings only.  So, did you seriously

12   need --

13        MS. DRUM:  (inaudible)and not ambiguity about all future

14   dates.

15        THE COURT:  Well, if Mr. Fishman is telling me that he

16   can't function in the AEFPBL afternoon, then yes, I'm happy to

17   schedule things in the morning.  But he needs to understand, I

18   wasn't aware of this, and I issued visitation Orders, allowing

19   him to have visits in the afternoon.  So we're going to have

20   to revisit those visitation Orders, as well.

21        MS. DRUM:  Well, your Honor, having the children over,

22   it's completely different than being in court --

23        THE COURT:  No.

24        MS. DRUM:  Than court.  Those are two different

25   environments --

1    THE COURT:  Okay, well we'll have that -- we will have

2    that discussion in Court, Miss Drum, because frankly, one

3    needs to be paying attention whether they're in court, or

4    whether they're responsible for the care of four children.

5    He's saying he's falling asleep.  I certainly don't want him

6    to endanger the lives of his four children, if he can't stay

7    awake in the afternoon.

8    MS. DRUM:  Your Honor, he's not (inaudible) fall asleep.

9    He says he gets a Lack of sleep.  And when you're in Court,

10    you need to be on and not (inaudible).

11    THE COURT:  Right.  And so, when you're watching 4

12    children, you need to be less alert, is that what you're

13    telling me?

14    MS. DRUM:  Parents don't have sleep all the time when

15    they watch  (inaudible).

16    THE COURT:  Okay, you're fading in and out.  Is this a

17    cell phone?

18    MS. DRUM:  (inaudible).

19    THE COURT:  The connection is not good.  Are you on a

20    cell phone?

21    MS. DRUM:  Yes, Judge.  (inaudible) parked in front

22    (inaudible).

23    THE COURT:  Okay.  Go on.  A note-taker, already denied.

24    MS. DRUM:  What was the last thing that (inaudible) --

25    THE COURT:  The next request, it looks like is a

1    note-taker.

2        MS. DRUM:  Yes.

3        THE COURT:  Already denied.

4        MS. DRUM:  Okay, thank you.  Two (inaudible) court

5    Orders, we discussed.  Number 3 has already been discussed, so

6    I'd ask that I request it which is the (inaudible) all four

7    children, less than 24 hours for that 365 days.  I've advised

8    Mr. Fishman that the ADA accomodation request would not

9    (inaudible) seek today (inaudible) is a temporary Orders of

10   protection.  (inaudible) forward to the next page, number 4.

11   That I attend all attorney only conferences.

12       THE COURT:  Okay.

13       MS. DRUM:  Good?

14       THE COURT:  Yes?  Denied.

15       MS. DRUM:  Okay, (inaudible) thank you.  Now a denial of

16   the request is based on, according to the ADA --

17       THE COURT:  I don't --

18       MS. DRUM:  Three factors.  And the first factor is how it

19   affects (inaudible) burden, administrative burden, on the

20   service or practices of the courts?

21       THE COURT:  You're an ADA advocate.  You're not an

22   attorney.  If I have an attorney's conference, the attorneys

23   will participate.  You may certainly be present when

24   Mr. Fishman's attorney conveys to him what was said in a

25   conference.  And you can counsel him however you like as an

1    advocate at that point.

2        MS. DRUM:  Thank you, your Honor.  I'm going to move on

3    to number 5, access to his medical records.

4        THE COURT:  I don't even understand what that means.  If

5    they're his medical records, he has access to them.  What is

6    he talking about HIPAA?  He's entitled to his own medical

7    records.

8        MS. DRUM:  So how can he go about requesting those?

9        THE COURT:  He doesn't request them from Court.  He

10   requests them from his medical providers.

11       MS. DRUM:  Well he's requesting medical records that you

12   have, your Honor.

13       THE COURT:  I don't have any medical records that would

14   be things outside of what he could get from his doctors.  So

15   I'm not quite sure I understand what that is.  Do you

16   understand what I'm saying?  I mean, --

17       MS. DRUM:  (inaudible).

18       THE COURT:  What?

19       MS. DRUM:  The Mary Crow records.

20       THE COURT:  Okay.  Well those are not his medical

21   records.

22       MS. DRUM:  Therapeutic social worker, Mary Crow.

23       THE COURT:  Okay.  Well, whatever is in the Court file,

24   his attorney Has an opportunity to review.  They're not his

25   medical records though.  They're Court documents.  They're not

1    his records under HIPAA, because if they were, he could easily

2    get them.  So, that's not a disability accommodation.  Your

3    request is denied.

4         MS. DRUM:  Okay, thank you, your Honor.

5         MS. DRUM:  All right, number 6, what's also being

6    requested is an Order which was denied.  It's a standing of

7    myself making that request.  He's making a new request of the

8    fther, for an ADA advocate to for his son, Jonah.

9         THE COURT:  Okay.  And the child'S mother has sole legal

10   and physical custody at this point.  And, I'm not quite sure

11   how that becomes an accommodation for a disabled person.  So

12   that's denied.

13        MS. DRUM:  (inaudible).

14        THE COURT:  I don't -- wait, Miss Drum, you're an expert

15   on court accommodations.  How are any of these requests Court

16   accommodations?

17        MS. DRUM:  (inaudible)your Honor.

18        THE COURT:  A court accommodation --

19        MS. DRUM:  (inaudible), your Honor.

20        THE COURT:  What?  Well the request to get an advocate

21   for this child, that's not a Court accommodation.  A Court

22   accommodation is somebody's hard-of-hearing.  We have

23   equipment that could make it easier for someone to hear.  He

24   has problems with his eyes, he wants some sunglasses.  Wear

25   your sunglasses.  You can't appear in the afternoon, come in

1    the morning.

2          How does asking for records become an accommodation?

3    He's entitled to whatever records he's entitled to,

4    whether or not he's disabled.

5          MS. DRUM:  This  -- well, actually I requested that I be

6    that ADA advocate, and it was accepted.

7          THE COURT:  Correct.

8          MS. DRUM:  And I have requested that I be an ADA advocate

9    as an ADA accommodation, and that is routinely accepted.

10         THE COURT:  Okay.

11         MS. DRUM:  THE difference --

12         THE COURT:  Okay.  And you're going to be in Court,

13   sitting with him, to keep him from getting out of control.  He

14   said he needs some help when he gets out of control in the

15   courtroom.  So you can do that.  I've allowed you to do that.

16   But I'm just not quite sure how this request to get documents

17   is an accommodation.  So those are denied.  Move on.  Number

18   7?

19         MS. DRUM:  It's number 6, your Honor.  It has to do with

20   an ADA advocate for his son.

21         THE COURT:  Okay.  He doesn't have authority to ask for

22   that, at this point.  The mother has sole legal and physical

23   custody.  And, in addition, the child has his own attorney.

24         MS. DRUM:  She is not aware of ADA law at all.

25         THE COURT:  Okay.  I  -- Miss Drum, I denied this

1    request.  He's entitled to file an appeal.  Move on.

2        MS. DRUM:  Number 7, a specialized neuropsych reporting

3    to Court, with a special memory to (inaudible)disabilities.

4        THE COURT:  I don't understand how that's an

5    accommodation.  If he wants to get reports or evaluations, let

6    him get reports or evaluations.  You're arguing that because

7    he's disabled, I have to order that?

8        MS. DRUM:  He wants to show that, since there has been a

9    question about his disabilities, that he wants a specialized

10   report to be presented to you.

11       THE COURT:  And he may do that --

12       MS. DRUM:  And (inaudible) procedurally, he would have to

13   ask your permission to do so.

14       THE COURT:  He can do whatever he wants.  Whether or not

15   it will be admitted, and what -- if so, what weight it will

16   have, is a different question.  That's not a request for an

17   appropriate accommodation of a disability.

18       MS. DRUM:  All right.  Again I'm going to state that the

19   burden of the trial would be if the request would

20   fundamentally alter the nature of the service, program or

21   activity, or the Court may deny a request of the accommodation

22   which would create an undue financial or administrative burden

23   on the Courts.  Or that the -- the rules of the OCA were not

24   followed.  So, are you saying that that this is, would

25   fundamentally alter the nature of the service, the program or

1    activity, or would create an undue financial or administrative

2    burden on the court?

3         THE COURT:  I'm saying this isn't an accommodation.

4         MS. DRUM:  It has to do with the truth of (inaudible)

5    accommodation, or does --

6         THE COURT:  Listen, I'm giving you answers to your

7    accommodations, on the basis that I'm accepting, I'm accepting

8    your statement that he is a disabled individual, okay?

9         So I don't need to have his neuropsych report.  If he

10   wants to get it, I've already accepted that he's disabled.

11        I have great concerns about his mental health.  I've

12   ordered a forensic evaluation.  He has yet to do that.

13        That's outside the scope of this request, that

14   insofar as you're requesting, as part of your work, that

15   he get various evaluations, I'm just saying, I've ordered

16   a forensic evaluation.

17        MS. DRUM:  Okay.  All right.  Just two more to go.

18   Vacating the restaining Orders, which I've advised him that

19   the ADA accommodations request will not seek to vacate

20   (inaudible) and the morning, -- number 9, we've already

21   discussed, so we don't need to discuss that any (inaudible).

22   I believe that's (inaudible)

23        THE COURT:  Okay.  I'm not accepting any more requests

24   from you, Miss Drum.  Enough.  And enough from him.  This

25   isn't a continuous 'oh I've thought of something else, let me

1   ask the Court.'.

2        This has been going on for over 6 months now, this

3   continuous onslaught of multiple accommodation requests,

4   by you and by Mr. Fishman.  And it has to stop.  So, no

5   more.  You understand that?

6        THE COURT:  I would think --

7        MS. DRUM:  I don't believe that I can be limited to do

8   that, and I don't believe that I am --

9        THE COURT:  Well then I will ask for additional medical

10  information, to explain why the request is being made, on a

11  future date --

12       MS. DRUM:  That's terrific.  I'll be happy to provide

13  that.

14       THE COURT:  Other than that, no more requests.  And you

15  must control Mr. Fishman.  He has sent continuous E-mails to

16  my Court Attorney, to my Court Part.  He has an advocate, he

17  has an attorney.  I've told him many, many times, he may not

18  communicate ex-parte with this Court, that it's inappropriate

19  to do so and he doesn't seem to understand.

20       MS. DRUM:  Judge, I have tried (inaudible) and I totally,

21  I'll do what I can to have him respect you, and to respect

22  your office and to respect your wishes.  What he does at 1:00

23  o'clock in the morning, I can't control.  But believe me, I

24  will continue to let him know how important it is that he not

25  communicate with you when you're (inaudible) doing it.  And he

1        only must do it through his attorney.

2              THE COURT:  Okay.

3              MS. DRUM:  I will continue to do so.

4              THE COURT:  Thank you.

5              MS. DRUM:  You're welcome.  And thank you for your time.

6              THE COURT:  I assume I'll see you next week.

7              MS. DRUM:  Yes, thank you.

8              THE COURT:  Good-bye.  Off the record.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T E

I, Alan Kachalsky, certify that the foregoing

transcript of proceedings in the Yonkers Family

Court of FISHMAN AND SOLOMON, File no. 131794 was

prepared using the required transcription equipment

and is a true and accurate record of the

proceedings.


Signature _____


**Al's Transcription Services**
**800 Westchester Avenue, Suite S-608**
**Rye Brook, New York 10573**
**Tel: (914) 220-5324**
**E-mail: catchsky@earthlink.net**

**Langrin, Taryn A**

| | |
|---|---|
| From: | marc fishman <rentdriver@gmail.com> |
| Sent: | Thursday, September 3, 2020 9:49 AM |
| To: | romannysdchambers@nysd.uscourts.gov; lalit.loomba@wilsonelser.com; Langrin, Taryn A; Federal Court Electronic Filing Notifications; JOELAW40@aol.com |
| Subject: | Supplemental request to deny defendants request to dismiss my case Fishman v New Rochelle 19-cv-09265-nsr |
| Attachments: | Criminal Procedure--Sentencing--Unreasonable Delay in Imposing Se.pdf |

Dear Honorable Judge Nelson Riman:

I write to the court per your telephone Instructions on how to reach your honor.  I do not have pacer access.

Am writing to supplement my papers submitted to deny defendants motion to dismiss on the basis that the lower state court has lost jurisdiction to sentence me or convict me because the court intentionally waited too long and has been deaf /failed to act timely to address three motions filed to dismiss.

Not only has criminal court, and the american with disabilities court professional executive failed to respond to three motions filed with my attorney.  But the state criminal court has ignored over ten requests by me to have virtual criminal hearings with closed captioned cart reporting in this case in July and August.  In addition the New York State u ivied court system has ignored the NYS state human rights commission Communication's about the unreasonable delay in my sentencing.  Indeed the state court missed a NY Human Rights conference hearing on the natter last week on 8/25, yesterday on 9/2 and now. An elk Ed the hearing tomorrow 9/4.  NYS Human rights has marked the hearing as final against NYS court system for next week on 9/9.

According to foil requests , conversations with other criminal attorneys and inquiries with court staff and the criminal supervising judges part, there are no other pending state misdeamenor trials from December or January in westchester for nondisabled litigants that have not been sentenced as of September 2020.  In fact 95 percent of the misedeamenor trials and plea's were sentenced within two weeks last year in the ny unified court system.  Why my case has not been sentenced after eight months is a matter that is so egregious to deny me the right to immediate and swift appeal, that a civil rights agency is involved now.  This is quite rare and inexcusable.

 Opposing counsel westchester county and new rochelle city and police cannot ignore the case law in federal and state court that if a criminal court holds out an unreasonable amount of time to sentence a defendant, that they lose jurisdiction to be able to sentence defendant in the future.  This doctrine and case law has been held up by the court if appeals and federal court.  Please see attached case law in Harry v Fay, 10 Ny2d 371  1961 attached.  The decision in the court of appeals..New York's highest court stated."unreasonable delay in imposing sentence caused the trial court to lose jurisdiction to impose sentence."  This decision is further supported by the federal case Mintiest v Biddle in the eighth circuit 15 F 2d 931(8th circuit 1926.).  This decision and doctrine is also supported by People ex re Bieber v Barret 292, I'll, 287, 67 N.E.23 (1903.)

There is no way Mr loombas or westchester county's motion to dismiss can be successful, on basis that the criminal court can no longer sentence me for waiting too long.  None of the criminal court delays are from me or my criminal attorney.  All the delays are from the district Atty and criminal court.  No where in state criminal court does it state a pandemic is grounds to unreasonably delay sentencing for indefinite period of time.  Eight months for a minor misdemenor..,concerning a false arrest and malicious prosecution is completely unreasonable.

The lower court intentionally delayed sentencing using covid as a disguise to keep a disabled man from appealing, intentionally. The lower court did this intentionally because lower court made no efforts over four months to sentence me virtually or to even answer the motions to dismiss. Motions to dismiss as early as March.

Your honor..my case was a January trial, Precovid. In January, February and March..precovid...many defendants were sentenced in New York and other states. In fact..state court even found time to take defendant hart vey Weinstein to trial and sentence him..3045 days past my trial.

The state court intentionally delayed the probation report from being produced. Most defendants in a misedeamenor case in New York for the first time do not even have a probation report. The probation report on me states completed 6/9. Why was it done so late? Over five months past trial? It was done late because state criminal court wanted to intentionally delay my case so I had no interaction with my kids( in the bail conditions from judge zuckerman,) and to encourage your honor to dismiss this federal lawsuit. The delays by judge zuckerman and da parib/Scarpino were intentional for me to lose this federal case. The delays were and still are intentional for me not to be able to appeal or ask for stay in the appellate division second Dept. Now..eight months post trial I can still not appeal..in lower court because there is no final order , so ordered transcript or certificate of disposition to appeal. This intentional series of delays were designed and conspired between the da and judge to keep my kids away and violate my rights to speedy appeal.

Am kindly requesting your honor deny the motions to dismiss as there is no conviction and the state court has lost jurisdiction to impose a sentence after eight months. Am also kindly requesting permission of your honor to amend my federal lawsuit to add Defendant NY Unified court system, administrative judges Warhit , and administrative judge Davidson , administrative judge Caruso, administrative judge marks in their official and administrative capacity only for violating my civil rights , conspiring together to violate my civil rights and the ada, violating section 504 of the rehabilitation act and Chief 9th district executive Mccalister in his official and administrative capacity for denying my civil rights, conspiracy violating ada , violating section 504 of the rehabilitation act and ny human rights laws , as defendants in this case. It is clear...part of the malicious prosecution against me as a disabled person has to do with administrative actions or in actions by the ny unified court system and its administrative employees to intentional discriminate against me for my disabilities. I reference the federal case in the second circuit in RE shollenberger v NY unified court system 18-cv-9736 (Vp) where the state court administrators and administrative judges Can be sued in their administrative capacity as judicial reference that I can sue. The Oca/ court system motion to dismiss was denied in federal court because there is no immunity for administrative actions Denying ada accommodations or retaliation of the judges that intentionally violate civil rights laws and seek to punish the disabled. Am seeking to amend case to order the court to comply with ada, administratively in this case.

The actions of the state court and its administrators violates the ada and must be brought to justice. Please deny defendants motion to dismiss as there is no conviction and now cannot be one due to unreasonable delay (Eight months) and allow me to amend my civil rights lawsuit against Oca and seek-injunctive relief to force the state court To stop discriminating against me on basis of disability.

Thank you for your consideration.

Marc Fishman, pro Se,qualified disabled plaintiff

C: lolit loomba Atty for new rochelle and police
     Westchester county law Dept
     Jõe Goubough, criminal atty

# St. John's Law Review

Volume 36
Number 2 *Volume 36, May 1962, Number 2*

Article 9

## Criminal Procedure–Sentencing–Unreasonable Delay in Imposing Sentence Caused Trial Court to Lose Jurisdiction Subsequently to Impose Sentence (People ex rel. Harty v. Fay, 10 N.Y.2d 374 (1961))

St. John's Law Review

Follow this and additional works at: https://scholarship.law.stjohns.edu/lawreview

This Recent Development in New York Law is brought to you for free and open access by the Journals at St. John's Law Scholarship Repository. It has been accepted for inclusion in St. John's Law Review by an authorized editor of St. John's Law Scholarship Repository. For more information, please contact selbyc@stjohns.edu.

is in another state *by a holder who is subject to the jurisdiction of that state*, the specific property is not presumed abandoned in this state . . . if:

(a) It may be claimed as abandoned or escheated under the laws of such other state; and

(b) The laws of such other state make reciprocal [provisions similar to the provisions made under this statute].[36]

If, under the circumstances of the present case, both New York and Pennsylvania had adopted the Uniform Act (and considering for the moment that no other state had a claim) the problems with which the Court was confronted might well have been avoided. Pursuant to sections 9 and 13 of the act,[37] New York, if that were the state in which the money was held, would have the right to escheat. But by operation of section 10, New York would be obliged to give up its interest to all monies owing to residents of Pennsylvania, which monies could then be escheated by Pennsylvania. Since all *interested* parties would be before the court, Western Union would thereby be secured against a "double escheat."

The solution offered by the Uniform Act can only be effective, however, when all states interested in the intangible have enacted the law. While there has been criticism of the Uniform Act, for example, the possible overreaching by states to persons or property beyond its proper control,[38] in general it is quite satisfactory. The growing number of states passing escheat laws makes a solution to the problem imperative.[39] It would seem that the enactment of the Uniform Act by these states might, to a large extent, offer that solution.



CRIMINAL PROCEDURE—SENTENCING—UNREASONABLE DELAY IN IMPOSING SENTENCE CAUSED TRIAL COURT TO LOSE JURISDIC-

---

[36] HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS 144-45 (1954) (emphasis added).

[37] Section 9 provides: "All intangible personal property, not otherwise covered by this act . . . that is held or owing in this state in the ordinary course of the holder's business . . . is presumed abandoned." *Id.* at 144.

Section 13 provides for the delivery of all property, presumed abandoned in §§ 2 to 9 of the act, to the state. *Id.* at 148.

[38] Ely, *Escheats: Perils and Precautions*, 15 BUS. LAW. 791, 805-08 (1960).

[39] See McBridge, *Unclaimed Dividends, Escheat Statutes and the Corporation Lawyer*, 14 BUS. LAW. 1062 (1959); Note, *A Uniform Disposition of Unclaimed Property Act for Colorado*, 29 ROCKY MT. L. REV. 102 (1956).

TION SUBSEQUENTLY TO IMPOSE SENTENCE.—On February 10, 1953 relator pleaded guilty in the Bronx County Court to the crime of robbery in the second degree; sentencing was set for April 9th of that year. However, before relator could be sentenced, he was transferred to Westchester County where he pleaded guilty to another robbery charge and was sentenced therefor to an indefinite term, not to exceed five years, in the Elmira Reception Center.[1] In 1955 relator was released and placed on parole. A year and one-half later, he violated his parole and was returned to custody. In April 1958, at the expiration of the maximum term for which he had been originally sentenced, relator was again released. Some months later, when he was arrested and pleaded guilty to other charges, he was sentenced on the 1953 indictment and placed on probation for five years. However, because of violation of this probation, relator was brought before the court in November 1959, six and one-half years after his plea of guilty, and sentenced on that plea to one and one-half to three-years imprisonment. The Court of Appeals, reversing an order of the Appellate Division which denied relator habeas corpus relief, *held* that the unreasonably long and unexplained delay in imposing sentence caused the trial court to lose jurisdiction subsequently to impose sentence. *People* ex rel. *Harty v. Fay,* 10 N.Y.2d 374, 179 N.E.2d 483, 223 N.Y.S.2d 468 (1961).

In New York the statutory scheme for the rendition of judgment [2] is prescribed by various sections of the Code of Criminal Procedure.[3] The code provides that judgment must be pronounced

---

[1] Upon relator's subsequent transferral to the New York State Vocational Institute, the superintendent thereof wrote to the clerk of the Bronx County Court concerning the disposition of certain warrants which had been lodged as detainers against the relator, one of which was based on the 1953 indictment. Apparently no reply was received. In 1955, immediately prior to relator's release, the authorities of the institute again requested information, this time from the Bronx County District Attorney, as to the disposition of the relator's indictment. The district attorney requested that the warrant be returned to his office.

[2] Some authorities have drawn a distinction between "judgment" and "sentence." The Report of the Commission on the Administration of Justice in New York State (1936) defines "judgment" as "the adjudication by the court that the defendant has been convicted or acquitted," whereas "sentence" is defined as "the pronouncement by the court of the penalty imposed on the defendant after judgment of conviction." However the code and the cases arising thereunder use the terms interchangeably. See PAPERNO & GOLDSTEIN, CRIMINAL PROCEDURE IN NEW YORK STATE § 389 (1960).

[3] N.Y. CODE CRIM. PROC. § 471 provides: "Time for pronouncing judgment, to be appointed by the court. After a plea or verdict of guilty, or after a verdict against the defendant on a plea of a former conviction or acquittal, if the judgment be not arrested, or a new trial granted, the court must appoint a time for pronouncing judgment."

N.Y. CODE CRIM. PROC. § 472 states: "Time for pronouncing judgment,

within "as remote a time as can reasonably be allowed," [4] but it fails to indicate what constitutes a reasonable time, and does not specify whether an unreasonable delay in sentencing would cause the court to lose jurisdiction to impose sentence. Therefore, both of these problems have been left to be resolved by the courts.

Prior to the present case the Court of Appeals was never squarely faced with these questions.[5] However, analogous situations involving deferral of sentencing have arisen.

In *Richetti v. New York State Bd. of Parole*,[6] petitioner was sentenced in 1932 to a twenty-year term as a second felony offender. In 1945, upon the conditions set forth in Section 242 of the New York Correction Law, his sentence was commuted by the governor. After sixteen months on parole, petitioner was charged with being an accessory to a felony, for which he was indicted and found guilty in 1947. Sentencing was deferred indefinitely however, and in June 1947, petitioner was returned to prison as a parole violator. The issue before the court was whether an adjudication of guilt coupled with an indefinite deferment of sentence constituted a conviction within the meaning of Section 242 of the New York Correction Law.[7] The court answered the question in the negative, stating that section 242 required an actual imposition of sentence. The court also pointed out that the question of whether a court has the *power* to defer sentence indefinitely was not presented to it.

---

to be appointed by the court. The time appointed must be at least two days after the verdict, if the court intend to remain in session so long, or if not, as remote a time as can reasonably be allowed; but any delay may be waived by the defendant."

N.Y. CODE CRIM. PROC. § 482 provides: "If no sufficient cause shown, judgment to be pronounced. . . . 1. If no sufficient cause appear to the court why judgment should not be pronounced, it must thereupon be rendered."

[4] N.Y. CODE CRIM. PROC. § 472.

[5] In People v. Gorney, 203 Misc. 512, 103 N.Y.S.2d 75 (Sup. Ct. 1951), the defendant moved by way of a writ of error coram nobis for an order vacating his life sentence as a fourth offender. He contended that on his 1916 plea of guilty the court, by deferring sentence without fixing a day certain therefor and without adjourning the term for that purpose, lost jurisdiction subsequently to impose sentence upon him, thus rendering a 1917 judgment void. The court, while holding that the question was not properly before it on the defendant's coram nobis application, stated that Section 472 of the Code of Criminal Procedure expressly provides that any delay in sentencing may be waived by the defendant.

[6] 300 N.Y. 357, 90 N.E.2d 893 (1950).

[7] The determination of this question was relevant since under the applicable provisions of Section 242 of the New York Correction Law, the defendant, if convicted of a felony, would have been required to serve the full sentence on the 1932 conviction which was unexpired at the time of his release in addition to the sentence imposed for the felony.

Three years later in *Hogan v. Bohan*,[8] the Court of Appeals was faced with the question left unanswered in *Richetti*. In this case a felon, while on parole from a grand larceny conviction, pleaded guilty to the crime of forgery in the second degree. Section 219 of the New York Correction Law requires that a parolee who commits a felony serve the maximum sentence which was unexpired at the time he was released on parole—in this case almost seven years. In an attempt to prevent section 219 from applying, the sentence was deferred on the assumption that the defendant would not then be treated as a parole violator convicted of a felony. The district attorney brought an article 78 proceeding in the nature of mandamus to compel the judge to pronounce sentence. The court, citing provisions of Sections 471, 472 and 482 of the New York Code of Criminal Procedure, stated:

[T]he plan is unmistakable; the court is afforded time to reach decision without running the risk of losing jurisdiction of the defendant by expiration of its term—as was the case at common law [citing cases]. *But pronounce judgment, impose sentence, it must.* And that mandate appears even more clear, when it is realized . . . that the process of appeal is completely frustrated by the court's act of deferring sentence.[9]

Although making the imposition of sentence mandatory, the court did not indicate what consequences would flow from a failure to comply with its mandate or how long a court may validly defer sentencing.

In a subsequent case, *People v. Ryan*,[10] the Kings County Court determined that a one-year delay in imposing sentence did not contravene the *Hogan* decision. The *Ryan* case concerned a coram nobis application to vacate a 1939 conviction. In 1938 the defendant had been indicted for various felonies. At the same time he was also being detained as a parole violator on a prior sentence. The court advised the defendant that if he pleaded guilty to attempted grand larceny in the second degree, he would be sent back for the parole violation with the recommendation that only a one-year sentence be imposed. The court further stated that when the defendant returned after serving the one-year sentence for the parole violation, a deferred sentence would be imposed for the attempted larceny. The following year, 1939, when the defendant returned to the court, he was sentenced to Elmira Reformatory but execution of the sentence was suspended. In 1953, relying on the *Hogan* decision for the proposition that a sentence can not be indefinitely deferred, the defendant attempted

---

8 305 N.Y. 110, 111 N.E.2d 233 (1953).
9 *Id.* at 112, 111 N.E.2d at 234 (emphasis added).
10 132 N.Y.S.2d 283 (Kings County Ct. 1954).

to vacate and set aside the 1939 judgment of conviction. His application was denied on the ground that "section 472, Code Cr. Proc. provides that the time appointed for pronouncing judgment can be fixed, 'as remote a time as can reasonably be allowed; but any delay may be waived by the defendant.' [The court] fixed a definite time for sentence, to wit: the date of defendant's return from Riker's Island. It was to the defendant's benefit to waive the delay and he did." [11]

The Court of Appeals in *Hogan* ruled that the imposition of sentence can not be indefinitely deferred. The county court apparently felt that a deferral of sentencing until a defendant's release from prison was a sufficiently definite designation of time so as to comply with both the code and the Court of Appeals' mandate. However, again there was no indication that an unreasonably long delay in imposing sentence would result in loss of jurisdiction.

Courts of other jurisdictions, both federal and state, when faced with the question posed by a delay in the imposition of sentence, have come to varying conclusions as to its consequences.

In *Mintie v. Biddle*,[12] an Eighth Circuit case, appellant was indicted and pleaded guilty to the commission of criminal fraud. Since the government desired to use him as a witness against his codefendant, who was at large, it was announced in his presence that no sentence would be imposed until his accomplice could be brought to trial. No further action was taken by the court for thirty-four months, at which time appellant was sentenced to a prison term of one year and one day. The circuit court felt that postponing judgment until the codefendant could be brought to trial was an indefinite deferral, and as such caused the trial court to lose jurisdiction to lawfully impose sentence.

A contrary rule was announced by the United States Supreme Court in *Miller v. Aderhold*.[13] Petitioner had been convicted of mail theft, but sentence was suspended and he was discharged from custody; at a subsequent term he was sentenced to four-years imprisonment by another judge. Petitioner contended that with the expiration of the district court's term, it had lost power to sentence him. The Court rejected this contention, stating that although the suspension order was void, the district court was not deprived of the power to impose sentence at a subsequent term. While noting that the area was in confusion and that the greater number of cases supported the conclusion reached in the *Mintie* case, the Court nevertheless held that the failure of the

[11] *Id.* at 285.
[12] 15 F.2d 931 (8th Cir. 1926).
[13] 288 U.S. 206 (1933).

petitioner to move for timely sentencing constituted a consent to
the delay.

An Oklahoma case closely analogous to the case under dis-
cussion is *Collins v. State*.[14]  In that case a state court found the
appellant guilty of violating the state liquor law and set a date
for imposing sentence.   However, prior to the sentencing date,
the appellant was imprisoned by a federal court on another charge.
The state court therefore stayed further proceedings, including
sentencing, until appellant's release from federal custody.   Over
four and one-half years later, contesting a motion for judgment
on the state court's verdict, the appellant argued that that court
had lost jurisdiction to impose sentence.   The Oklahoma Criminal
Court of Appeals, citing various sections of the Oklahoma Code
(which are substantially similar to Sections 471, 472 and 482 of
the New York Code of Criminal Procedure), held for the appellant,
since "under the foregoing provisions it is the duty of the court,
on a conviction or plea of guilty, to impose sentence within a
reasonable time." [15]

In reaching its decision in the present case, the Court noted
that New York's strong public policy against unreasonable delays
in criminal causes has traditionally been strictly enforced.   While
this policy has been predominantly applied to delays in indict-
ment,[16] the fact that sentencing is an integral part of a crim-
inal proceeding seems to require its application with equal force
to the imposition of sentence.   The Court considered the vital
interests of a convicted defendant in a prompt pronouncement
of sentence.   A lack of judgment prevents a convicted defendant
from prosecuting an appeal, renders him ineligible for pardon
or commutation of sentence, and, in postponing the service of his
sentence, delays his return to society—cogent arguments for speedy
sentencing.

Ordinarily, a court may delay the pronouncement of judgment
for the purpose of hearing and determining motions for a new
trial or in the arrest of judgment.[17]   Such a delay is generally
based on considerations in favor of the defendant.   In the present
case, however, the delay was not due to any request of the relator,
but was solely a result of the state's failure to take any positive
action.   It might be argued that the relator could have cured this
situation by demanding to be sentenced, and, in the absence of
such a request, should be held to have consented to the delay.[18]

---

[14] 24 Okla. Crim. 117, 217 Pac. 896 (1923).
[15] *Id*. at 121, 217 Pac. at 897.
[16] See, *e. g.*, People v. Wilson, 8 N.Y.2d 391, 171 N.E.2d 310, 208 N.Y.S.2d
963 (1960) ; People v. Prosser, 309 N.Y. 353, 130 N.E.2d 891 (1955).
[17] See People *ex rel.* Boenert v. Barrett, 202 Ill. 287, 67 N.E. 23 (1903).
[18] Miller v. Aderhold, 288 U.S. 206, 210 (1933).

Such was the position of the United States Supreme Court in the *Miller* case. However, the Court of Appeals rejected this view notwithstanding the provision of Section 472 of the Code of Criminal Procedure that any delay in pronouncing judgment may be waived by the defendant. The Court stated that "retention or loss of jurisdiction should not depend on activity or nonactivity of [the] defendant." [19]

Much has been said in support of this view. In the *Mintie* case the Court of Appeals for the Eighth Circuit stated that "if [the problem involved] is jurisdictional, and if jurisdiction shall be lost when *sentence is omitted or postponed indefinitely* . . . then no question of consent can be of aid in the case. . . ." [20] In *People* ex rel. *Boenert v. Barrett*,[21] wherein there occurred an interval of over two years between the relator's release on his own recognizance and the final disposition of his motion for a new trial, it was observed:

> [I]t cannot . . . be contended that the doctrine of estoppel has any application here; nor can it be held that the relator could waive any requirement respecting the jurisdiction of the court to enter judgment and pronounce the sentence. If the court had no *power* thus indirectly to suspend sentence . . . such power could not be conferred by his consent nor by his express request.[22]

Since the *Hogan* case established the principle in New York that courts lack the *power* to indefinitely defer the imposition of sentence, it appears that the statement from *Barrett* would apply with equal effect to the present situation.

As noted above, the delay in sentencing did not result from any request of, or consideration for, the defendant. Hence the question of whether a loss of jurisdiction would result where a delay was initiated by the defendant was not decided. Cases from other jurisdictions seem to indicate that a delay caused by a defendant does not cause a court to lose power to impose sentence.[23] In *McLaughlin v. State*,[24] where a sixteen-month delay was caused by the defendant's motion to set aside and vacate a judgment, the court stated that while an unjustifiable delay in rendering judgment would result in a loss of jurisdiction, "if . . .

[19] People *ex rel.* Harty v. Fay, 10 N.Y.2d 374, 377, 179 N.E.2d 483, 484, 223 N.Y.S.2d 468, 470 (1961).
[20] Mintie v. Biddle, 15 F.2d 931, 932 (8th Cir. 1926).
[21] 202 Ill. 287, 67 N.E. 23 (1903).
[22] *Id.* at 299, 67 N.E. at 28 (emphasis added).
[23] See, *e. g.*, Stephens v. State, 227 Ind. 417, 86 N.E.2d 84 (1949); Varish v. State, 200 Ind. 358, 163 N.E. 513 (1928); State v. Heaston, 109 Mont. 303, 97 P.2d 330 (1939); Zwillman v. State, 9 N.J. Misc. 66, 152 Atl. 775 (1931) (per curiam).
[24] 207 Ind. 484, 192 N.E. 753 (1934).

*ST. JOHN'S LAW REVIEW*

the party complaining has invited the delay, he has nothing upon which to base any right to avoid the judgment."[25] In New York it would appear that a delay caused by the defendant would not come within the purview of the rule set forth in the present case by the Court of Appeals, and therefore would not result in a loss of jurisdiction.

In finding loss of jurisdiction the Court used a hindsight approach. There is no indication as to the point in time at which the trial court lost jurisdiction. The Court merely stated that under the circumstances a delay of six years was unreasonable. Apparently, that which constitutes an "extremely long delay" remains to be decided in future cases on an *ad hoc* basis.

Whether a provision in Section 472 of the Code of Criminal Procedure for a mandatory time within which judgment must be pronounced, rather than the present indefinite wording "as remote a time as can reasonably be allowed," would be of any value is questionable. Other states having such statutory provisions[26] seem to indicate that failure to pronounce judgment within the time ordered does not cause a loss of jurisdiction.[27] For example, the Utah Code provides that the time appointed for pronouncing judgment must not be more than ten days after the verdict.[28] However, it has been held that "the time fixed by the statute is not jurisdictional, and since it is regarded as merely directory the further provision that the judgment should be rendered within a *reasonable* time has been judicially read into the statute."[29]

The *Harty* decision aligns New York with numerous other jurisdictions[30] which hold that an extremely long delay in imposing sentence ·is not only illegal but also results in a loss of jurisdiction. In spite of uncertainties which are inherent in this case, the Court of Appeals has afforded a measure of protection to those individuals who, through the state's inaction, have never been sentenced. In so doing it has imposed upon the courts the duty to pronounce judgment within a reasonable time or run the risk of losing jurisdiction, and as a consequence, putting a convicted defendant beyond the court's power to subsequently impose sentence.

---

[25] *Id.* at 487, 192 N.E. at 754.

[26] See, *e. g.,* CAL. PEN. CODE § 1191 (Supp. 1961); UTAH CODE ANN. § 77-35-1 (1953).

[27] See, *e.g.,* People v. Mitman, 122 Cal. App. 2d 490, 265 P.2d 105, *cert. denied,* 347 U.S. 991 (1954); People v. Williams, 24 Cal. App. 2d 848, 151 P.2d 244 (1944); State v. Anderson, 12 N.J. 461, 97 A.2d 404 (1953); State v. Fedder, 1 Utah 2d 117, 262 P.2d 753 (1953).

[28] UTAH CODE ANN. § 77-35-1 (1953).

[29] State v. Fedder, *supra* note 27, at 120, 262 P.2d at 754-55.

[30] See, *e.g.,* Grundel v. People, 33 Colo. 191, 79 Pac. 1022 (1905) (per curiam); People v. Penn, 302 Ill. 488, 135 N.E. 92 (1922); Commonwealth v. Maloney, 145 Mass. 205, 13 N.E. 489 (1887).