**From:** marc fishman [mailto: ███████████████ ]
**Sent:** Thursday, September 3, 2020 9:49 AM
**To:** romannysdchambers@nysd.uscourts.gov; Loomba, Lalit K. <Lalit.Loomba@wilsonelser.com>; tal5@westchestergov.com; fed.ecf@westchestergov.com; JOELAW40@aol.com
**Subject:** Supplemental request to deny defendants request to dismiss my case Fishman v New Rochelle 19-cv-09265-nsr

Dear Honorable Judge Nelson Riman:

I write to the court per your telephone Instructions on how to reach your honor.  I do not have pacer access.

Am writing to supplement my papers submitted to deny defendants motion to dismiss on the basis that the lower state court has lost jurisdiction to sentence me or convict me because the court intentionally waited too long and has been deaf /failed to act timely to address three motions filed to dismiss.

Not only has criminal court, and the american with disabilities court professional executive failed to respond to three motions filed with my attorney.  But the state criminal court has ignored over ten requests by me to have virtual criminal hearings with closed captioned cart reporting in this case in July and August.  In addition the New York State u ivied court system has ignored the NYS state human rights commission Communication's about the unreasonable delay in my sentencing.  Indeed the state court missed a NY Human Rights conference hearing on the natter last week on 8/25, yesterday on 9/2 and now. An elk Ed the hearing tomorrow 9/4.  NYS Human rights has marked the hearing as final against NYS court system for next week on 9/9.

According to foil requests , conversations with other criminal attorneys and inquiries with court staff and the criminal supervising judges part, there are no other pending state misedeamenor trials from December or January in westchester for nondisabled litigants that have not been sentenced as of September 2020.  In fact 95 percent of the misedeamenor trials and plea's were sentenced within two weeks last year in the ny unified court system.  Why my case has not been sentenced after eight months is a matter that is so egregious to deny me the right to immediate and swift appeal, that a civil rights agency is involved now.  This is quite rare and inexcusable.

 Opposing counsel westchester county and new rochelle city and police cannot ignore the case law in federal and state court that if a criminal court holds out an unreasonable amount of time to sentence a defendant, that they lose jurisdiction to be able to sentence defendant in the future.  This doctrine and case law has been held up by the court if appeals and federal court.  Please see attached case law in Harry v Fay, 10 Ny2d 371  1961 attached.  The decision in the court of appeals..New York's highest court stated."unreasonable delay in imposing sentence caused the trial court to lose jurisdiction to impose sentence."  This decision is further supported by the federal case Mintiest v Biddle in the eighth circuit 15 F 2d 931(8th circuit 1926.). This decision and doctrine is also supported by People ex re Bieber v Barret 292, I'll, 287, 67 N.E.23 (1903.)

There is no way Mr loombas or westchester county's motion to dismiss can be successful, on basis that the criminal court can no longer sentence me for waiting too long.  None of the criminal court delays are from me or my criminal attorney.  All the delays are from the district Atty and criminal court.  No where in state criminal court does it state a pandemic is grounds to

unreasonably delay sentencing for indefinite period of time.  Eight months for a minor misdemeanor..,concerning a false arrest and malicious prosecution is completely unreasonable.

The lower court intentionally delayed sentencing using covid as a disguise to keep a disabled man from appealing, intentionally.  The lower court did this intentionally because lower court made no efforts over four months to sentence me virtually or to even answer the motions to dismiss.  Motions to dismiss as early as March.

Your honor..my case was a January trial, Precovid.  In January, February and March..precovid...many defendants were sentenced in New York and other states.  In fact..state court even found time to take defendant hart vey Weinstein to trial and sentence him..3045 days past my trial.

The state court intentionally delayed the probation report from being produced.  Most defendants in a misedeamenor case in New York for the first time do not even have a probation report.  The probation report on me states completed 6/9.  Why was it done so late?  Over five months past trial?  It was done late because state criminal court wanted to intentionally delay my case so I had no interaction with my kids( in the bail conditions from judge zuckerman,) and to encourage your honor to dismiss this federal lawsuit.  The delays by judge zuckerman and da parib/Scarpino were intentional for me to lose this federal case.  The delays were and still are intentional for me not to be able to appeal or ask for stay in the appellate division second Dept.  Now..eight months post trial I can still not appeal..in lower court because there is no final order , so ordered transcript or certificate of disposition to appeal.  This intentional series of delays were designed and conspired between the da and judge to keep my kids away and violate my rights to speedy appeal.

Am kindly requesting your honor deny the motions to dismiss as there is no conviction and the state court has lost jurisdiction to impose a sentence after eight months.  Am also kindly requesting permission of your honor to amend my federal lawsuit to add Defendant NY Unified court system, administrative judges Warhit , and administrative judge Davidson , administrative judge Caruso, administrative judge marks in their official and administrative capacity only for violating my civil rights , conspiring together to violate my civil rights and the ada, violating section 504 of the rehabilitation act and Chief 9th district executive Mccalister in his official and administrative capacity for denying my civil rights, conspiracy violating ada , violating section 504 of the rehabilitation act and ny human rights laws , as defendants in this case.  It is clear...part of the malicious prosecution against me as a disabled person has to do with administrative actions or in actions by the ny unified court system and its administrative employees to intentional discriminate against me for my disabilities.  I reference the federal case in the second circuit in RE shollenberger v NY unified court system 18-cv-9736 (Vp) where the state court administrators and administrative judges Can be sued in their administrative capacity as judicial reference that I can sue.  The Oca/ court system motion to dismiss was denied in federal court because there is no immunity for administrative  actions Denying ada accommodations or retaliation of the judges that intentionally violate civil rights laws and seek to punish the disabled.  Am seeking to amend case to order the court to comply with ada, administratively in this case.

The actions of the state court and its administrators violates the ada and must be brought to justice.  Please deny defendants motion to dismiss as there is no conviction and now cannot be one due to unreasonable delay (Eight months) and allow me to amend my civil rights lawsuit

against Oca and seek-injunctive relief to force the state court To stop discriminating against me on basis of disability.

Thank you for your consideration.

Marc Fishman, pro Se,qualified disabled plaintiff

C: lolit loomba Atty for new rochelle and police
   Westchester county law Dept
   Jõe Goubough, criminal atty

# St. John's Law Review

Volume 36
Number 2 *Volume 36, May 1962, Number 2*

Article 9

## Criminal Procedure--Sentencing--Unreasonable Delay in Imposing Sentence Caused Trial Court to Lose Jurisdiction Subsequently to Impose Sentence (People ex rel. Harty v. Fay, 10 N.Y.2d 374 (1961))

St. John's Law Review

Follow this and additional works at: https://scholarship.law.stjohns.edu/lawreview

This Recent Development in New York Law is brought to you for free and open access by the Journals at St. John's Law Scholarship Repository. It has been accepted for inclusion in St. John's Law Review by an authorized editor of St. John's Law Scholarship Repository. For more information, please contact selbyc@stjohns.edu.

is in another state *by a holder who is subject to the jurisdiction of that state,* the specific property is not presumed abandoned in this state . . . if:

    (a) It may be claimed as abandoned or escheated under the laws of such other state; and

    (b) The laws of such other state make reciprocal [provisions similar to the provisions made under this statute].[36]

If, under the circumstances of the present case, both New York and Pennsylvania had adopted the Uniform Act (and considering for the moment that no other state had a claim) the problems with which the Court was confronted might well have been avoided. Pursuant to sections 9 and 13 of the act,[37] New York, if that were the state in which the money was held, would have the right to escheat. But by operation of section 10, New York would be obliged to give up its interest to all monies owing to residents of Pennsylvania, which monies could then be escheated by Pennsylvania. Since all *interested* parties would be before the court, Western Union would thereby be secured against a "double escheat."

The solution offered by the Uniform Act can only be effective, however, when all states interested in the intangible have enacted the law. While there has been criticism of the Uniform Act, for example, the possible overreaching by states to persons or property beyond its proper control,[38] in general it is quite satisfactory. The growing number of states passing escheat laws makes a solution to the problem imperative.[39] It would seem that the enactment of the Uniform Act by these states might, to a large extent, offer that solution.



CRIMINAL PROCEDURE—SENTENCING—UNREASONABLE DELAY IN IMPOSING SENTENCE CAUSED TRIAL COURT TO LOSE JURISDIC-

---

[36] HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS 144-45 (1954) (emphasis added).

[37] Section 9 provides: "All intangible personal property, not otherwise covered by this act . . . that is held or owing in this state in the ordinary course of the holder's business . . . is presumed abandoned." *Id.* at 144.

Section 13 provides for the delivery of all property, presumed abandoned in §§ 2 to 9 of the act, to the state. *Id.* at 148.

[38] Ely, *Escheats: Perils and Precautions,* 15 BUS. LAW. 791, 805-08 (1960).

[39] See McBridge, *Unclaimed Dividends, Escheat Statutes and the Corporation Lawyer,* 14 BUS. LAW. 1062 (1959); Note, *A Uniform Disposition of Unclaimed Property Act for Colorado,* 29 ROCKY MT. L. REV. 102 (1956).

TION SUBSEQUENTLY TO IMPOSE SENTENCE.—On February 10, 1953 relator pleaded guilty in the Bronx County Court to the crime of robbery in the second degree; sentencing was set for April 9th of that year. However, before relator could be sentenced, he was transferred to Westchester County where he pleaded guilty to another robbery charge and was sentenced therefor to an indefinite term, not to exceed five years, in the Elmira Reception Center.[1] In 1955 relator was released and placed on parole. A year and one-half later, he violated his parole and was returned to custody. In April 1958, at the expiration of the maximum term for which he had been originally sentenced, relator was again released. Some months later, when he was arrested and pleaded guilty to other charges, he was sentenced on the 1953 indictment and placed on probation for five years. However, because of violation of this probation, relator was brought before the court in November 1959, six and one-half years after his plea of guilty, and sentenced on that plea to one and one-half to three-years imprisonment. The Court of Appeals, reversing an order of the Appellate Division which denied relator habeas corpus relief, *held* that the unreasonably long and unexplained delay in imposing sentence caused the trial court to lose jurisdiction subsequently to impose sentence. *People* ex rel. *Harty v. Fay,* 10 N.Y.2d 374, 179 N.E.2d 483, 223 N.Y.S.2d 468 (1961).

In New York the statutory scheme for the rendition of judgment[2] is prescribed by various sections of the Code of Criminal Procedure.[3] The code provides that judgment must be pronounced

---

[1] Upon relator's subsequent transferral to the New York State Vocational Institute, the superintendent thereof wrote to the clerk of the Bronx County Court concerning the disposition of certain warrants which had been lodged as detainers against the relator, one of which was based on the 1953 indictment. Apparently no reply was received. In 1955, immediately prior to relator's release, the authorities of the institute again requested information, this time from the Bronx County District Attorney, as to the disposition of the relator's indictment. The district attorney requested that the warrant be returned to his office.

[2] Some authorities have drawn a distinction between "judgment" and "sentence." The Report of the Commission on the Administration of Justice in New York State (1936) defines "judgment" as "the adjudication by the court that the defendant has been convicted or acquitted," whereas "sentence" is defined as "the pronouncement by the court of the penalty imposed on the defendant after judgment of conviction." However the code and the cases arising thereunder use the terms interchangeably. See PAPERNO & GOLDSTEIN, CRIMINAL PROCEDURE IN NEW YORK STATE § 389 (1960).

[3] N.Y. CODE CRIM. PROC. § 471 provides: "Time for pronouncing judgment, to be appointed by the court. After a plea or verdict of guilty, or after a verdict against the defendant on a plea of a former conviction or acquittal, if the judgment be not arrested, or a new trial granted, the court must appoint a time for pronouncing judgment."

N.Y. CODE CRIM. PROC. § 472 states: "Time for pronouncing judgment,

within "as remote a time as can reasonably be allowed," [4] but it fails to indicate what constitutes a reasonable time, and does not specify whether an unreasonable delay in sentencing would cause the court to lose jurisdiction to impose sentence. Therefore, both of these problems have been left to be resolved by the courts.

Prior to the present case the Court of Appeals was never squarely faced with these questions.[5] However, analogous situations involving deferral of sentencing have arisen.

In *Richetti v. New York State Bd. of Parole,*[6] petitioner was sentenced in 1932 to a twenty-year term as a second felony offender. In 1945, upon the conditions set forth in Section 242 of the New York Correction Law, his sentence was commuted by the governor. After sixteen months on parole, petitioner was charged with being an accessory to a felony, for which he was indicted and found guilty in 1947. Sentencing was deferred indefinitely however, and in June 1947, petitioner was returned to prison as a parole violator. The issue before the court was whether an adjudication of guilt coupled with an indefinite deferment of sentence constituted a conviction within the meaning of Section 242 of the New York Correction Law.[7] The court answered the question in the negative, stating that section 242 required an actual imposition of sentence. The court also pointed out that the question of whether a court has the *power* to defer sentence indefinitely was not presented to it.

---

to be appointed by the court. The time appointed must be at least two days after the verdict, if the court intend to remain in session so long, or if not, as remote a time as can reasonably be allowed; but any delay may be waived by the defendant."

N.Y. Code Crim. Proc. § 482 provides: "If no sufficient cause shown, judgment to be pronounced. . . . 1. If no sufficient cause appear to the court why judgment should not be pronounced, it must thereupon be rendered."

[4] N.Y. Code Crim. Proc. § 472.

[5] In People v. Gorney, 203 Misc. 512, 103 N.Y.S.2d 75 (Sup. Ct. 1951), the defendant moved by way of a writ of error coram nobis for an order vacating his life sentence as a fourth offender. He contended that on his 1916 plea of guilty the court, by deferring sentence without fixing a day certain therefor and without adjourning the term for that purpose, lost jurisdiction subsequently to impose sentence upon him, thus rendering a 1917 judgment void. The court, while holding that the question was not properly before it on the defendant's coram nobis application, stated that Section 472 of the Code of Criminal Procedure expressly provides that any delay in sentencing may be waived by the defendant.

[6] 300 N.Y. 357, 90 N.E.2d 893 (1950).

[7] The determination of this question was relevant since under the applicable provisions of Section 242 of the New York Correction Law, the defendant, if convicted of a felony, would have been required to serve the full sentence on the 1932 conviction which was unexpired at the time of his release in addition to the sentence imposed for the felony.

Three years later in *Hogan v. Bohan*,[8] the Court of Appeals was faced with the question left unanswered in *Richetti*. In this case a felon, while on parole from a grand larceny conviction, pleaded guilty to the crime of forgery in the second degree. Section 219 of the New York Correction Law requires that a parolee who commits a felony serve the maximum sentence which was unexpired at the time he was released on parole—in this case almost seven years. In an attempt to prevent section 219 from applying, the sentence was deferred on the assumption that the defendant would not then be treated as a parole violator convicted of a felony. The district attorney brought an article 78 proceeding in the nature of mandamus to compel the judge to pronounce sentence. The court, citing provisions of Sections 471, 472 and 482 of the New York Code of Criminal Procedure, stated:

[T]he plan is unmistakable; the court is afforded time to reach decision without running the risk of losing jurisdiction of the defendant by expiration of its term—as was the case at common law [citing cases]. *But pronounce judgment, impose sentence, it must.* And that mandate appears even more clear, when it is realized . . . that the process of appeal is completely frustrated by the court's act of deferring sentence.[9]

Although making the imposition of sentence mandatory, the court did not indicate what consequences would flow from a failure to comply with its mandate or how long a court may validly defer sentencing.

In a subsequent case, *People v. Ryan*,[10] the Kings County Court determined that a one-year delay in imposing sentence did not contravene the *Hogan* decision. The *Ryan* case concerned a coram nobis application to vacate a 1939 conviction. In 1938 the defendant had been indicted for various felonies. At the same time he was also being detained as a parole violator on a prior sentence. The court advised the defendant that if he pleaded guilty to attempted grand larceny in the second degree, he would be sent back for the parole violation with the recommendation that only a one-year sentence be imposed. The court further stated that when the defendant returned after serving the one-year sentence for the parole violation, a deferred sentence would be imposed for the attempted larceny. The following year, 1939, when the defendant returned to the court, he was sentenced to Elmira Reformatory but execution of the sentence was suspended. In 1953, relying on the *Hogan* decision for the proposition that a sentence can not be indefinitely deferred, the defendant attempted

---

8 305 N.Y. 110, 111 N.E.2d 233 (1953).
9 *Id.* at 112, 111 N.E.2d at 234 (emphasis added).
10 132 N.Y.S.2d 283 (Kings County Ct. 1954).

to vacate and set aside the 1939 judgment of conviction. His application was denied on the ground that "section 472, Code Cr. Proc. provides that the time appointed for pronouncing judgment can be fixed, 'as remote a time as can reasonably be allowed; but any delay may be waived by the defendant.' [The court] fixed a definite time for sentence, to wit: the date of defendant's return from Riker's Island. It was to the defendant's benefit to waive the delay and he did." [11]

The Court of Appeals in *Hogan* ruled that the imposition of sentence can not be indefinitely deferred. The county court apparently felt that a deferral of sentencing until a defendant's release from prison was a sufficiently definite designation of time so as to comply with both the code and the Court of Appeals' mandate. However, again there was no indication that an unreasonably long delay in imposing sentence would result in loss of jurisdiction.

Courts of other jurisdictions, both federal and state, when faced with the question posed by a delay in the imposition of sentence, have come to varying conclusions as to its consequences.

In *Mintie v. Biddle*,[12] an Eighth Circuit case, appellant was indicted and pleaded guilty to the commission of criminal fraud. Since the government desired to use him as a witness against his codefendant, who was at large, it was announced in his presence that no sentence would be imposed until his accomplice could be brought to trial. No further action was taken by the court for thirty-four months, at which time appellant was sentenced to a prison term of one year and one day. The circuit court felt that postponing judgment until the codefendant could be brought to trial was an indefinite deferral, and as such caused the trial court to lose jurisdiction to lawfully impose sentence.

A contrary rule was announced by the United States Supreme Court in *Miller v. Aderhold*.[13] Petitioner had been convicted of mail theft, but sentence was suspended and he was discharged from custody; at a subsequent term he was sentenced to four-years imprisonment by another judge. Petitioner contended that with the expiration of the district court's term, it had lost power to sentence him. The Court rejected this contention, stating that although the suspension order was void, the district court was not deprived of the power to impose sentence at a subsequent term. While noting that the area was in confusion and that the greater number of cases supported the conclusion reached in the *Mintie* case, the Court nevertheless held that the failure of the

---

[11] *Id.* at 285.
[12] 15 F.2d 931 (8th Cir. 1926).
[13] 288 U.S. 206 (1933).

petitioner to move for timely sentencing constituted a consent to the delay.

An Oklahoma case closely analagous to the case under discussion is *Collins v. State*.[14]   In that case a state court found the appellant guilty of violating the state liquor law and set a date for imposing sentence.   However, prior to the sentencing date, the appellant was imprisoned by a federal court on another charge. The state court therefore stayed further proceedings, including sentencing, until appellant's release from federal custody.   Over four and one-half years later, contesting a motion for judgment on the state court's verdict, the appellant argued that that court had lost jurisdiction to impose sentence.   The Oklahoma Criminal Court of Appeals, citing various sections of the Oklahoma Code (which are substantially similar to Sections 471, 472 and 482 of the New York Code of Criminal Procedure), held for the appellant, since "under the foregoing provisions it is the duty of the court, on a conviction or plea of guilty, to impose sentence within a reasonable time." [15]

In reaching its decision in the present case, the Court noted that New York's strong public policy against unreasonable delays in criminal causes has traditionally been strictly enforced.   While this policy has been predominantly applied to delays in indictment,[16] the fact that sentencing is an integral part of a criminal proceeding seems to require its application with equal force to the imposition of sentence.   The Court considered the vital interests of a convicted defendant in a prompt pronouncement of sentence.   A lack of judgment prevents a convicted defendant from prosecuting an appeal, renders him ineligible for pardon or commutation of sentence, and, in postponing the service of his sentence, delays his return to society—cogent arguments for speedy sentencing.

Ordinarily, a court may delay the pronouncement of judgment for the purpose of hearing and determining motions for a new trial or in the arrest of judgment.[17]   Such a delay is generally based on considerations in favor of the defendant.   In the present case, however, the delay was not due to any request of the relator, but was solely a result of the state's failure to take any positive action.   It might be argued that the relator could have cured this situation by demanding to be sentenced, and, in the absence of such a request, should be held to have consented to the delay.[18]

---

[14] 24 Okla. Crim. 117, 217 Pac. 896 (1923).
[15] *Id.* at 121, 217 Pac. at 897.
[16] See, *e. g.*, People v. Wilson, 8 N.Y.2d 391, 171 N.E.2d 310, 208 N.Y.S.2d 963 (1960) ; People v. Prosser, 309 N.Y. 353, 130 N.E.2d 891 (1955).
[17] See People *ex rel.* Boenert v. Barrett, 202 Ill. 287, 67 N.E. 23 (1903).
[18] Miller v. Aderhold, 288 U.S. 206, 210 (1933).

*RECENT DECISIONS*

Such was the position of the United States Supreme Court in the *Miller* case. However, the Court of Appeals rejected this view notwithstanding the provision of Section 472 of the Code of Criminal Procedure that any delay in pronouncing judgment may be waived by the defendant. The Court stated that "retention or loss of jurisdiction should not depend on activity or nonactivity of [the] defendant." [19]

Much has been said in support of this view. In the *Mintie* case the Court of Appeals for the Eighth Circuit stated that "if [the problem involved] is jurisdictional, and if jurisdiction shall be lost when *sentence is omitted or postponed indefinitely . . .* then no question of consent can be of aid in the case. . . ." [20] In *People* ex rel. *Boenert v. Barrett*,[21] wherein there occurred an interval of over two years between the relator's release on his own recognizance and the final disposition of his motion for a new trial, it was observed:

[I]t cannot . . . be contended that the doctrine of estoppel has any application here; nor can it be held that the relator could waive any requirement respecting the jurisdiction of the court to enter judgment and pronounce the sentence. If the court had no *power* thus indirectly to suspend sentence . . . such power could not be conferred by his consent nor by his express request.[22]

Since the *Hogan* case established the principle in New York that courts lack the *power* to indefinitely defer the imposition of sentence, it appears that the statement from *Barrett* would apply with equal effect to the present situation.

As noted above, the delay in sentencing did not result from any request of, or consideration for, the defendant. Hence the question of whether a loss of jurisdiction would result where a delay was initiated by the defendant was not decided. Cases from other jurisdictions seem to indicate that a delay caused by a defendant does not cause a court to lose power to impose sentence.[23] In *McLaughlin v. State*,[24] where a sixteen-month delay was caused by the defendant's motion to set aside and vacate a judgment, the court stated that while an unjustifiable delay in rendering judgment would result in a loss of jurisdiction, "if . . .

---

[19] People *ex rel.* Harty v. Fay, 10 N.Y.2d 374, 377, 179 N.E.2d 483, 484, 223 N.Y.S.2d 468, 470 (1961).
[20] Mintie v. Biddle, 15 F.2d 931, 932 (8th Cir. 1926).
[21] 202 Ill. 287, 67 N.E. 23 (1903).
[22] *Id.* at 299, 67 N.E. at 28 (emphasis added).
[23] See, *e.g.*, Stephens v. State, 227 Ind. 417, 86 N.E.2d 84 (1949); Varish v. State, 200 Ind. 358, 163 N.E. 513 (1928); State v. Heaston, 109 Mont. 303, 97 P.2d 330 (1939); Zwillman v. State, 9 N.J. Misc. 66, 152 Atl. 775 (1931) (per curiam).
[24] 207 Ind. 484, 192 N.E. 753 (1934).

the party complaining has invited the delay, he has nothing upon which to base any right to avoid the judgment." [25]   In New York it would appear that a delay caused by the defendant would not come within the purview of the rule set forth in the present case by the Court of Appeals, and therefore would not result in a loss of jurisdiction.

In finding loss of jurisdiction the Court used a hindsight approach.   There is no indication as to the point in time at which the trial court lost jurisdiction.   The Court merely stated that under the circumstances a delay of six years was unreasonable. Apparently, that which constitutes an "extremely long delay" remains to be decided in future cases on an *ad hoc* basis.

Whether a provision in Section 472 of the Code of Criminal Procedure for a mandatory time within which judgment must be pronounced, rather than the present indefinite wording "as remote a time as can reasonably be allowed," would be of any value is questionable.   Other states having such statutory provisions [26] seem to indicate that failure to pronounce judgment within the time ordered does not cause a loss of jurisdiction.[27]   For example, the Utah Code provides that the time appointed for pronouncing judgment must not be more than ten days after the verdict.[28]   However, it has been held that "the time fixed by the statute is not jurisdictional, and since it is regarded as merely directory the further provision that the judgment should be rendered within a *reasonable* time has been judicially read into the statute." [29]

The *Harty* decision aligns New York with numerous other jurisdictions [30] which hold that an extremely long delay in imposing sentence ·is not only illegal but also results in a loss of jurisdiction. In spite of uncertainties which are inherent in this case, the Court of Appeals has afforded a measure of protection to those individuals who, through the state's inaction, have never been sentenced.   In so doing it has imposed upon the courts the duty to pronounce judgment within a reasonable time or run the risk of losing jurisdiction, and as a consequence, putting a convicted defendant beyond the court's power to subsequently impose sentence.

---

[25] *Id.* at 487, 192 N.E. at 754.

[26] See, *e. g.,* Cal. Pen. Code § 1191 (Supp. 1961) ; Utah Code Ann. § 77-35-1 (1953).

[27] See, *e. g.,* People v. Mitman, 122 Cal. App. 2d 490, 265 P.2d 105, *cert. denied,* 347 U.S. 991 (1954); People v. Williams, 24 Cal. App. 2d 848, 151 P.2d 244 (1944); State v. Anderson, 12 N.J. 461, 97 A.2d 404 (1953); State v. Fedder, 1 Utah 2d 117, 262 P.2d 753 (1953).

[28] Utah Code Ann. § 77-35-1 (1953).

[29] State v. Fedder, *supra* note 27, at 120, 262 P.2d at 754-55.

[30] See, *e. g.,* Grundel v. People, 33 Colo. 191, 79 Pac. 1022 (1905) (per curiam) ; People v. Penn, 302 Ill. 488, 135 N.E. 92 (1922) ; Commonwealth v. Maloney, 145 Mass. 205, 13 N.E. 489 (1887).

**From:** marc fishman [mailto:█████████████████]
**Sent:** Tuesday, September 1, 2020 3:57 PM
**To:** romannysdchambers@nysd.uscourts.gov; Loomba, Lalit K. <Lalit.Loomba@wilsonelser.com>; tal5@westchestergov.com; fed.ecf@westchestergov.com; JOELAW40@aol.com
**Subject:** Case 19-cv-09265-nsr/response to Lilitta loomba opposition to dismiss case and denial of sixty day extension in case due to disability

Dear Honorable Judge Roman:

As backup for my application to deny Opposing counsels application for summary judgement am attaching the transcript for the disabilities hearing six days before sentencing in the state family court.

Attached is the transcript of the confidential american with disabilities act hearing on 6/21/17.  The parties present were my ada advocate Mrs. Donna Drumm and Judge Michelle Schauer in Yonkers state family court.

Please see page 14 where the lower court judge in line eight accepts the statement that I am a disabled person under the definition of the american with disabilities act.  Judge Schauer clearly regarded me as disabled, which directs the state court to have to reasonably accommodate my disabilities of traumatic brain injury memory impairment, tinnitus hearing impairment , Tmj eating impairment, cubital tunnel syndrome writing impairment and occipital neuralgia seeing and registering impairment.

Please see page five  where Schauer states all of her orders are typed and " I don't think my orders were less than 12 (font size) point/print." See page six line four and five where Schauer states " he (mr fishman ) has access to people to help him read orders."Yet I did not get a typed order....or any printed order to read or attempt to have interpreted like nondisabled litigants receive in the order of protection that I never received.  Judge Schauers  , clerk  Ed edmead , testified he did not give to me any order in court because he had not typed it yet before I was taken to county jail.  This on top of police knowing I did not get order before arrest...means it was not given to me or served in court.

Since I could not hear with tinnitus, and could not write with cubital tunnel syndrome and could not remember with post concussion syndrome and Tbi and did not Receive a written copy in large print on 6/27/17, there is no way the state court accommodated my disabilities or enabled me to hear or understand an unwritten order.

So for Mr loomba to state an Alleged order that was not typed was read to me in court on 6/27 is mistaken. There was nothing to read in court as no order of protection was produced by the time I left family court.  Police knew I was in jail before this order of protection was entered into system.  Police knew I was not served and with hearing/memory disability Known had zero probably cause for arrest on 12/15/18.  The police cannot ignore the family court clerk entry CAVEAT NOTE PARTY NOT SERVED WITH ORDER OF PROTECTION..with eight stars highlighting the entry.

Please do not dismiss this case of false arrest and malicious prosecution.  Mr loombas client..the police and district attorney intentionally withholding this evidence In state court intentionally from my attorney and I should not reward them for their misconduct, false arrest and brady

violation.  It's plain disability Discrimination and retaliation for my civil rights complaint and federal lawsuit that they intentionally did not disclose this exonerating evidence in state court.

Thank you.

Marc Fishman, pro se

C: Mr loomba
    Westchester county Atty
    Jõe Goubough esq.

```
FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF ONEIDA
  --------------------------------------
FISHMAN                                  )
                                         ) DOCKET
NO.
                                         )
                                         )
Plaintiff,                               )
                                         )
        -against-                        )
                                         )
                                         )
,                                        )
                                         )
                    Plaintiff            )
  --------------------------------------
```

HEARING JUNE 21 2017

HELD AT:

COURT CITY ADDRESS

BEFORE:            HONORABLE JUDGE'S NAME

APPEARANCES:       ATTORNEY 1

                   Behalf of Plaintiff Petitione
                   Attorney 2
                   Behalf of
Plaintiff Petitioner
                   Defendant Name
                   Defendant

        TRANSCRIBER:        ALAN KACHALSKY

1          THE COURT:  We're on the record.  Just state your -- This

2     is the matter of Fishman, file 131794.  Appearance, please.

3          MS. DRUM:  Donna Drum,800 Westchester Avenue, Rye Brook,

4     New York, appearing as ADA advocate for Mr. Fishman.

5          THE COURT:  Thank you.

6          MS. DRUM:  Thank you, Judge.

7          THE COURT:  So I'm calling you Miss Drum, because I have

8     received the latest in what appears to be a continuous

9     onslaught of multiple requests for disability accommodations

10    made either by, or on behalf of, Marc Fishman, with respect to

11    this file.

12         Now, I can go through the chronology, and I probably

13    will, you know, but put it on the record.  With this

14    particular call is precipitated by a document that was

15    received by Mr. Curry, who is the ADA Liason in the Family

16    Court here in Yonkers.  And it contains tables and what

17    looks like three separate dated documents.  Although the

18    one document that I have is numbered page -- four pages,

19    and they're all page 2 of 4, 3 of 4, 4 of 4.

20         But it contains documents dated March 15th,

21    April 12th, and June 13th, all of which I fnd hard to

22    understand, but seem to be requesting various disability

23    accommodations.

24         The request for accommodations began no later than

25    December 13th, which was by an E-mail from you to

1    Mr. Curry, stating that you had been retained by

2    Mr. Fishman as his ADA advocate, and requesting various

3    accommodations.  YOU sent some follow-up e-mails to my

4    Court Attorney, requesting accommodations.

5         And finally, when you sent an E-mail dated

6    January 11th, in response to that, I issued an Order dated

7    January 25th, 2017, formally adressing the accommodation

8    request.  I understand that Mr. Fishman sought to appeal

9    that Order.  His appeal was denied or dismissed.  And yet,

10    I continue to receive non-stop requests, either from you

11    or from Mr. Fishman for a variety of accommodations.  I'm

12    just not sure under what authority I continue to get these

13    continuous correspondence.

14         He had allegedly, a disability caused by an

15    automobile accident, which he allegedly suffered in June

16    of 2013, in November of 2013.  As far as I can see,

17    there's no new disabilities, only new ideas as to how this

18    Court can accommodate whatever disabilities he says he

19    has.

20         And frankly, some of these requests are ridiculous.

21    And I will not be issuing a Court Order.  So this is your

22    opportunity to tell me exactly what it is you're asking

23    for.  And I'm not accepting any further requests after

24    this date, unless there is a new issue with a new

25    disability.

1          MS. DRUM:  All right.  Thank you, your Honor.  I wouldn't

2     characterize my communications as continuous.  The

3     communications I sent were (inaudible) too much in between

4     each other.  The communications you received from Mr. Fishman

5     were also in between.  But I was respectful of giving a period

6     of time for response to the Court.  So I would just like to

7     make that comment on the record.

8          THE COURT:  Okay.  But I issued .

9          MS. DRUM:  -- (inaudible)

10          THE COURT:  I issued -- Miss Drum, I issued an Order in

11     January.  That's it.  I made my decision.

12          MS. DRUM:  Well, there are new requests since then, and

13     we have a right under the ADA to request those accommodations.

14          THE COURT:  Okay.  So --

15          MS. DRUM:  So that's why they were made.

16          THE COURT:  Okay.  So just so I'm clear because --

17          MS. DRUM:  My client --

18          MS. DRUM:  You're the expert on this.

19          MS. DRUM:  Thank you.

20          THE COURT:  -- and I'm not, I'm not trying to be

21     sarcastic.  I'm saying you're the expert on this.

22          You're telling me that under the ADA you have the

23     authority to make continuous multiple accommodation

24     requests, forever?  Endless accommodation requests?

25          MS. DRUM:  --

1        THE COURT:  Or, I mean, -- you're an attorney as well --

2        MS. DRUM:  -- requests are (inaudible), your Honor.

3    What. Mr. Fishman did without my knowledge is what he did.

4    And, yes, I can, if new accommodations are requested by my

5    client, and I believe that they are matched with his

6    disabilities.

7        THE COURT:  All right.  So, what is your understanding of

8    a request that is outstanding?

9        MS. DRUM:  Okay going to page, the bottom of page 1,

10   Court Orders, and then (inaudible) ABLC, and at the top of

11   page 2, Court Orders are to be typed in 12-point font.  And

12   attached or typed Orders are to be the transcribed on a

13   separate sheet of paper, and all Court Orders are to be typed.

14       THE COURT:  Okay.  And why is that a disability

15   accommodation.

16       MS. DRUM:  Because of his offidable neuralgia, it's

17   difficult for him, he gets pain in his head when he reads --

18       THE COURT:  Okay.  And he has an attorney --

19       MS. DRUM:  -- (inaudible) that.

20       THE COURT:  Listen.  He can, as far as his inability to

21   read anything smaller than 12 points, and frankly, I don't

22   think my orders were any smaller than 12, I think most of them

23   are in 12 point.

24       He can do what the rest of us do, which is put on a

25   pair of reading glasses, or use a magnifying glass.  I'm

1    not changing the format of the Court Orders.  Everything I

2    do in Court is read him.  He has an attorney present here

3    in Court.  And I'm not changing my format of Court Orders.

4    That's not a reasonable accommodation.  He has access to

5    to people to help him read orders.  He's hired you to help

6    him.  He has an attorney.

7         MS. DRUM:  I'm just writing it down, your Honor.

8         THE COURT:  You can order a transcript.

9         THE COURT:  All right.  Let's move on.

10         MS. DRUM:  Okay.  So that's -- okay.  The scheduling, and

11    and on the bottom of page 2, special warning herein for trial

12    dates for Monday, one half day.

13         THE COURT:  One moment.  I just want to go back to the

14    Orders.  The handwritten Orders are done because we issue them

15    immediately in the courtroom, so that each party can walk out

16    with an Order and an understanding of what needs to be done.

17    I don't accept handwritten Orders when I do a Notice of

18    Settlement.  But they're done so that we could provide

19    immediate relief and an immediate Order to the parties in

20    Court.  And I'm not changing that.  That process, he is free

21    to hire a person to read the handwritten Order, and to type it

22    up in as large a font as he wants, so that he can look at it

23    that way.  And you may do that for him, as his disability

24    advocate.  Moving on.  Scheduling morning hearings, okay.

25         There was no response.  I thought it was pretty

1    obvious when I scheduled the next court dates, for

2    mornings only.  Did you need me to spell that out?  And I

3    will also note --

4         MS. DRUM:  I believed, your Honor --

5         THE COURT:  I scheduled the hearings for mornings only.

6    Was that not obvious?

7         MS. DRUM:  (inaudible) communicate it to.

8         THE COURT:  Okay.  It was not communicated to you in the

9    sense that nobody said, 'yes, we will schedule this for

10   mornings only.'  However, we did you give you next court

11   dates, which were in the mornings only.  So, did you seriously

12   need --

13        MS. DRUM:  (inaudible)and not ambiguity about all future

14   dates.

15        THE COURT:  Well, if Mr. Fishman is telling me that he

16   can't function in the AEFPBL afternoon, then yes, I'm happy to

17   schedule things in the morning.  But he needs to understand, I

18   wasn't aware of this, and I issued visitation Orders, allowing

19   him to have visits in the afternoon.  So we're going to have

20   to revisit those visitation Orders, as well.

21        MS. DRUM:  Well, your Honor, having the children over,

22   it's completely different than being in court --

23        THE COURT:  No.

24        MS. DRUM:  Than court.  Those are two different

25   environments --

1          THE COURT:  Okay, well we'll have that -- we will have

2     that discussion in Court, Miss Drum, because frankly, one

3     needs to be paying attention whether they're in court, or

4     whether they're responsible for the care of four children.

5     He's saying he's falling asleep.  I certainly don't want him

6     to endanger the lives of his four children, if he can't stay

7     awake in the afternoon.

8          MS. DRUM:  Your Honor, he's not (inaudible) fall asleep.

9     He says he gets a Lack of sleep.  And when you're in Court,

10    you need to be on and not (inaudible).

11         THE COURT:  Right.  And so, when you're watching 4

12    children, you need to be less alert, is that what you're

13    telling me?

14         MS. DRUM:  Parents don't have sleep all the time when

15    they watch  (inaudible).

16         THE COURT:  Okay, you're fading in and out.  Is this a

17    cell phone?

18         MS. DRUM:  (inaudible).

19         THE COURT:  The connection is not good.  Are you on a

20    cell phone?

21         MS. DRUM:  Yes, Judge.  (inaudible) parked in front

22    (inaudible).

23         THE COURT:  Okay.  Go on.  A note-taker, already denied.

24         MS. DRUM:  What was the last thing that (inaudible) --

25         THE COURT:  The next request, it looks like is a

1    note-taker.

2        MS. DRUM:  Yes.

3        THE COURT:  Already denied.

4        MS. DRUM:  Okay, thank you.  Two (inaudible) court

5    Orders, we discussed.  Number 3 has already been discussed, so

6    I'd ask that I request it which is the (inaudible) all four

7    children, less than 24 hours for that 365 days.  I've advised

8    Mr. Fishman that the ADA accomodation request would not

9    (inaudible) seek today (inaudible) is a temporary Orders of

10   protection.  (inaudible) forward to the next page, number 4.

11   That I attend all attorney only conferences.

12       THE COURT:  Okay.

13       MS. DRUM:  Good?

14       THE COURT:  Yes?  Denied.

15       MS. DRUM:  Okay, (inaudible) thank you.  Now a denial of

16   the request is based on, according to the ADA --

17       THE COURT:  I don't --

18       MS. DRUM:  Three factors.  And the first factor is how it

19   affects (inaudible) burden, administrative burden, on the

20   service or practices of the courts?

21       THE COURT:  You're an ADA advocate.  You're not an

22   attorney.  If I have an attorney's conference, the attorneys

23   will participate.  You may certainly be present when

24   Mr. Fishman's attorney conveys to him what was said in a

25   conference.  And you can counsel him however you like as an

1    advocate at that point.

2         MS. DRUM:  Thank you, your Honor.  I'm going to move on

3    to number 5, access to his medical records.

4         THE COURT:  I don't even understand what that means.  If

5    they're his medical records, he has access to them.  What is

6    he talking about HIPAA?  He's entitled to his own medical

7    records.

8         MS. DRUM:  So how can he go about requesting those?

9         THE COURT:  He doesn't request them from Court.  He

10   requests them from his medical providers.

11        MS. DRUM:  Well he's requesting medical records that you

12   have, your Honor.

13        THE COURT:  I don't have any medical records that would

14   be things outside of what he could get from his doctors.  So

15   I'm not quite sure I understand what that is.  Do you

16   understand what I'm saying?  I mean, --

17        MS. DRUM:  (inaudible)

18        THE COURT:  What?

19        MS. DRUM:  The Mary Crow records.

20        THE COURT:  Okay.  Well those are not his medical

21   records.

22        MS. DRUM:  Therapeutic social worker, Mary Crow.

23        THE COURT:  Okay.  Well, whatever is in the Court file,

24   his attorney Has an opportunity to review.  They're not his

25   medical records though.  They're Court documents.  They're not

1     his records under HIPAA, because if they were, he could easily

2     get them.  So, that's not a disability accommodation.  Your

3     request is denied.

4          MS. DRUM:  Okay, thank you, your Honor.

5          MS. DRUM:  All right, number 6, what's also being

6     requested is an Order which was denied.  It's a standing of

7     myself making that request.  He's making a new request of the

8     fther, for an ADA advocate to for his son, ██████.

9          THE COURT:  Okay.  And the child'S mother has sole legal

10    and physical custody at this point.  And, I'm not quite sure

11    how that becomes an accommodation for a disabled person.  So

12    that's denied.

13         MS. DRUM:  (inaudible).

14         THE COURT:  I don't -- wait, Miss Drum, you're an expert

15    on court accommodations.  How are any of these requests Court

16    accommodations?

17         MS. DRUM:  (inaudible)your Honor.

18         THE COURT:  A court accommodation --

19         MS. DRUM:  (inaudible), your Honor.

20         THE COURT:  What?  Well the request to get an advocate

21    for this child, that's not a Court accommodation.  A Court

22    accommodation is somebody's hard-of-hearing.  We have

23    equipment that could make it easier for someone to hear.  He

24    has problems with his eyes, he wants some sunglasses.  Wear

25    your sunglasses.  You can't appear in the afternoon, come in

1    the morning.

2         How does asking for records become an accommodation?

3    He's entitled to whatever records he's entitled to,

4    whether or not he's disabled.

5         MS. DRUM:  This  -- well, actually I requested that I be

6    that ADA advocate, and it was accepted.

7         THE COURT:  Correct.

8         MS. DRUM:  And I have requested that I be an ADA advocate

9    as an ADA accommodation, and that is routinely accepted.

10        THE COURT:  Okay.

11        MS. DRUM:  THE difference --

12        THE COURT:  Okay.  And you're going to be in Court,

13   sitting with him, to keep him from getting out of control.  He

14   said he needs some help when he gets out of control in the

15   courtroom.  So you can do that.  I've allowed you to do that.

16   But I'm just not quite sure how this request to get documents

17   is an accommodation.  So those are denied.  Move on.  Number

18   7?

19        MS. DRUM:  It's number 6, your Honor.  It has to do with

20   an ADA advocate for his son.

21        THE COURT:  Okay.  He doesn't have authority to ask for

22   that, at this point.  The mother has sole legal and physical

23   custody.  And, in addition, the child has his own attorney.

24        MS. DRUM:  She is not aware of ADA law at all.

25        THE COURT:  Okay.  I  -- Miss Drum, I denied this

1    request.  He's entitled to file an appeal.  Move on.

2        MS. DRUM:  Number 7, a specialized neuropsych reporting

3    to Court, with a special memory to (inaudible)disabilities.

4        THE COURT:  I don't understand how that's an

5    accommodation.  If he wants to get reports or evaluations, let

6    him get reports or evaluations.  You're arguing that because

7    he's disabled, I have to order that?

8        MS. DRUM:  He wants to show that, since there has been a

9    question about his disabilities, that he wants a specialized

10   report to be presented to you.

11       THE COURT:  And he may do that --

12       MS. DRUM:  And (inaudible) procedurally, he would have to

13   ask your permission to do so.

14       THE COURT:  He can do whatever he wants.  Whether or not

15   it will be admitted, and what -- if so, what weight it will

16   have, is a different question.  That's not a request for an

17   appropriate accommodation of a disability.

18       MS. DRUM:  All right.  Again I'm going to state that the

19   burden of the trial would be if the request would

20   fundamentally alter the nature of the service, program or

21   activity, or the Court may deny a request of the accommodation

22   which would create an undue financial or administrative burden

23   on the Courts.  Or that the -- the rules of the OCA were not

24   followed.  So, are you saying that that this is, would

25   fundamentally alter the nature of the service, the program or

1    activity, or would create an undue financial or administrative

2    burden on the court?

3         THE COURT:  I'm saying this isn't an accommodation.

4         MS. DRUM:  It has to do with the truth of (inaudible)

5    accommodation, or does --

6         THE COURT:  Listen, I'm giving you answers to your

7    accommodations, on the basis that I'm accepting, I'm accepting

8    your statement that he is a disabled individual, okay?

9         So I don't need to have his neuropsych report.  If he

10   wants to get it, I've already accepted that he's disabled.

11        I have great concerns about ████████████.  I've

12   ordered a ██████████████.  He has yet to do that.

13        That's outside the scope of this request, that

14   insofar as you're requesting, as part of your work, that

15   he get ██████████████, I'm just saying, I've ordered

16   a ████████████.

17        MS. DRUM:  Okay.  All right.  Just two more to go.

18   Vacating the restaining Orders, which I've advised him that

19   the ADA accommodations request will not seek to vacate

20   (inaudible) and the morning, -- number 9, we've already

21   discussed, so we don't need to discuss that any (inaudible).

22   I believe that's (inaudible)

23        THE COURT:  Okay.  I'm not accepting any more requests

24   from you, Miss Drum.  Enough.  And enough from him.  This

25   isn't a continuous 'oh I've thought of something else, let me

1    ask the Court.'.

2         This has been going on for over 6 months now, this

3    continuous onslaught of multiple accommodation requests,

4    by you and by Mr. Fishman.  And it has to stop.  So, no

5    more.  You understand that?

6         THE COURT:  I would think --

7         MS. DRUM:  I don't believe that I can be limited to do

8    that, and I don't believe that I am --

9         THE COURT:  Well then I will ask for additional medical

10   information, to explain why the request is being made, on a

11   future date --

12        MS. DRUM:  That's terrific.  I'll be happy to provide

13   that.

14        THE COURT:  Other than that, no more requests.  And you

15   must control Mr. Fishman.  He has sent continuous E-mails to

16   my Court Attorney, to my Court Part.  He has an advocate, he

17   has an attorney.  I've told him many, many times, he may not

18   communicate ex-parte with this Court, that it's inappropriate

19   to do so and he doesn't seem to understand.

20        MS. DRUM:  Judge, I have tried (inaudible) and I totally,

21   I'll do what I can to have him respect you, and to respect

22   your office and to respect your wishes.  What he does at 1:00

23   o'clock in the morning, I can't control.  But believe me, I

24   will continue to let him know how important it is that he not

25   communicate with you when you're (inaudible) doing it.  And he

1          only must do it through his attorney.

2              THE COURT:  Okay.

3              MS. DRUM:  I will continue to do so.

4              THE COURT:  Thank you.

5              MS. DRUM:  You're welcome.  And thank you for your time.

6              THE COURT:  I assume I'll see you next week.

7              MS. DRUM:  Yes, thank you.

8              THE COURT:  Good-bye.  Off the record.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

  I, Alan Kachalsky, certify that the foregoing transcript of proceedings in the Yonkers Family Court of FISHMAN AND SOLOMON, File no. 131794 was prepared using the required transcription equipment and is a true and accurate record of the proceedings.


  Signature _____


**Al's Transcription Services**
**800 Westchester Avenue, Suite S-608**
**Rye Brook, New York 10573**
**Tel: (914) 220-5324**
**E-mail: catchsky@earthlink.net**

**From:** marc fishman [mailto: ███████████████ ]
**Sent:** Tuesday, September 1, 2020 3:01 PM
**To:** romannysdchambers@nysd.uscourts.gov; Loomba, Lalit K. <Lalit.Loomba@wilsonelser.com>; tal5@westchestergov.com; fed.ecf@westchestergov.com; Joseph Goubeaud Esq, crimimal Atty <JOELAW40@aol.com>
**Subject:** Fwd: Fishman v. City of New Rochelle 19-cv-00265-nsr

Dear Honorable Judge Roman:

Defense counsel Lolita Loomba is in incorrect when he states I would be in violation of every other order of protection.

Every other order of protection I was served with  had a carve out for supervised visitation.  Supervised visitation was occurring during the alleged arrest with the court supervisor on 12/15/18 present(Ann Elliot), so there was no violation of an other order of protection.  Police knew it was a supervised visit  because the supervisor told them so In the questioning room with me on 12/15/18.  If it was not a court ordered supervised visit, Ann Elliot would have had to been arrested for facilitating a crime by New Rochelle police.  Ann picked me up with the disability driver to go to go to Westchester before the visit.  Taking me to ex-wife house would be facilitating S crime.  Ann was not arrested and neither was the disability driver because police all knew the other orders of protection allowed for supervised visits.

The police, district atty and judge schauer who issued this alleged order of protection while I was in jail on 6/27/17(for sending gifts to my kids on holidays schauer said were not major)  knew I was hearing impaired(see attached report from my doctor gelb attesting to the hearing problems and hearing loss with tmj..given to scgauer.)

 Judge Schauer knew about hearing and memory impairment  before she issued the order of protection.  Judge Schauer knew I had  parotid mass and tmj surgery before the sentencing on 6/27/17...and had to adjourn sentencing due to it.  Judge schauer knew about my hearing disability and still decided not to physically give  me a copy of this order of protection. In court..that police knew I was not served with.  Schauer had a disability hearing Six days before sentencing on 6/21/2017 to rule onnme getting large print court orders and a ntoetaker Ada accommodation.  Schauer denied them.  But schauer did State all of her orders had typed print AND WOULD BE GIVEN TO ME  IN PERSON(see 6/21/17 transcript.  I was not given this order of protection in person at any time..neither was my disability aide in court 6/27/17. Police also knew I was disabled with hearing problems because I told them so and because the police told me they read the jail hospital records which detail  occipital neuralgia tmj which effects hearing and my five implants. These records detail that my two neurostimulators impact hearing.  Police sited in their arrest report that my medical health was "poor" as reason they released me to my disability aide to take me home.

The da did Not charge me for violating any other order of protection....only the one i was not served with.  The Da acknowledged the Other orders of protection all  had exceptions for supervised visits.

Mr Loomba knows there is no official state conviction until I have a certificate of disposition.  A transcript is not a state certificate of conviction.  The state court judge has not so ordered the transcript to certify it is a conviction. It the judge did..i could appeal it.  So Mr loomba's attempt

to dismiss is premature. Mr loomba  knows there would be no pending conviction if my criminal attorney had the document in police records. ..That stated.note :party not served with order of protection.

The question for federal disvovery is why did police or district atty white this page out in state discovery.  Was it to avoid being liable in this federal case and backup cops and da for false arrest?  I think so.

Please your honor..do not dismiss this case.  The police and dad need to stop discriminating against disabled people.  The police and da need to be held accountable for falsifying records to hide the false arrest in state court.

Thank you, Marc Fishman pro se

Enclosures



**the Gelb center**
Headaches, TMJ, and Sleep Disorders

January 8, 2016

Donald Bernstein, D.D.S.
Scarsdale Dental Associates
688 Post Road, Suite 208
Scarsdale, NY 10583

RE: Marc H. Fishman

Dear Dr. Bernstein:

Thank you for referring Marc Fishman. I saw Marc on January 8, 2016. He presents with the following history. He has had an intermittent swelling over the left TM joint region and left parotid gland. He saw his ENT who diagnosed a possible blocked or infected parotid gland. He had seen Dr. Ross at Westmed, an ENT, and Dr. Ramani. They were not sure exactly what was causing the intermittent swelling. You then saw Marc, said it could be a TMJ disorder. He had independently seen Dr. Paul Gittelman for an IME back on May 12, 2014. Dr. Gittelman found crepitus in the left temporomandibular joint and also gave a diagnosis of TMJ dysfunction which was causally related to November 20, 2013. Marc was involved in two motor vehicle accidents. He was hit driving on Central Avenue which has caused occipital neuralgia and cubital tunnel syndrome. The second motor vehicle accident exacerbated the symptoms, and he had a torn rotator cuff and many other symptoms. Currently Marc is wearing a Medtronic neurostimulator which he got on March 18, 2014, and he is feeling much better. Marc is feeling actually greatly improved. He was able to go off many of your pain medications. He also had a cubital release on March 26, 2014. These surgeries greatly improved his tinnitus and his ear pain. However, the swelling remains over the left parotid and left TM joint. He has been having symptoms of TMJ for at least the last six months, and his hearing has decreased. He also complains of snoring, obstructive sleep apnea, and he was scheduled to have a sleep test, a polysomnogram, next week. He have gained approximately 50 pounds following the motor vehicle accident, and he has high blood pressure. He complains of excessive daytime sleepiness in the late afternoon.

CLINICAL EVALUATION: On muscle palpation, we find mild tenderness in the left trapezius, **exquisite tenderness in the left sternocleidomastoid muscle. The masseter muscles are exquisitely tender on the right.** The left temporomandibular joint is tender to palpation, particularly the lateral TMJ capsule. **Temporal tendon, medial pterygoid, and lateral**

Page 30 of 39

**pterygoid are all exquisitely tender on the left**. On my examination, I find swelling over the left parotid gland. Interincisal opening is 52 mm. The mandible is off to the left by approximately 1 mm.

Tongue level is a level 3. Occlusion is class 1. Mallampati airway inspection shows a class III airway.

**IMAGING**: There is beaking in the right temporomandibular joint with an anvil-shaped condyle. There is some excess adenoidal tissue still present, and we see hypertrophy at the base of the tongue and the lingual tonsillar region and decreased airway space.

**DIAGNOSTIC IMPRESSION**: There is probable sleep-disordered breathing which will be confirmed by the polysomnogram. I also feel that there is a swelling over the left parotid. It is not clear whether this is an autoimmune disease or is in some way related to the temporomandibular joint.

**CONTRIBUTING FACTORS**: The trauma from the motor vehicle accidents.

**SEQUENTIAL TREATMENT PLAN**: I have recommended or agreed that the patient should have a polysomnogram based on the results of the polysomnogram. Marc may be eligible for an oral appliance, a 3-D printed oral appliance for sleep apnea. We also discussed the new Medtronic stimulator which monitors his breathing and helps stimulate the genioglossus muscle and maintain an open airway. I have not recommended a daytime appliance at this point. I would like to see Marc again in approximately one month after we have the results of his sleep study.

Donald, thanks for thinking of me.

Sincerely,

_____

Michael L. Gelb, D.D.S., M.S.

cc:        Michael H. Joseph, Esq. 203 E. Post Rd. White Plains, NY 10601

**From:** marc fishman [mailto: █████████████████ ]
**Sent:** Monday, August 31, 2020 2:56 PM
**To:** romannysdchambers@nysd.uscourts.gov; Loomba, Lalit K. <Lalit.Loomba@wilsonelser.com>;
tal5@westchestergov.com
**Cc:** JOELAW40@aol.com
**Subject:** Case 19-cv-00265-ns4

Dear hon judge roman:

Second motion filed in appellate court to get conclusion in state criminal case by getting underlying order of protection in state family case dismissed for failure to serve the order on me.

Your honor....why should case be dismissed against me now in federal court....if new da is goi g to withdraw charges against me in a couple of months if da Scarpino does not drop case first?

Suggest we go right to depositions to ask cops and district Atty about the discovery in the federal case that proves I was not served.  Once da changes in january, may be difficult to get da to answer questions about this case.

If federal court knows state charges will be dismissed by January..Mr loombas and westchester county motion to dismiss should be denied...because one way or another's y alleged pending conviction will be reversed erased, dropped or dismissed.

Not my fault state case taking longer....with covid and the state courts own delays/adjournments.  No way appellate state court does not reverse.  Police knew your honor...knew I was not served before they arrested me when I was begging and requesting a police report for my exwife missing visitation.

But as chief clerk Agostino says in second Dept..." Mr fishman there is no conviction to reverse..because you have no final order or certificate of disposition."  Hence...Mr loombas motion to dismiss is premature until state case finally resolved and completed with paperwork stating conviction and ability to appeal.

Thanks
Marc Fishman, pro Se

```
-------------------------------------------------------------X
```
Supreme Court State of New York
Appellate Division Second Department

JENNIFER SOLOMON,

      Petitioner,

             -against-            Fam. Ct.:
                                     Fu 131794

MARC FISHMAN,                  **ORDER TO**
                                    **SHOW CAUSE**

      Respondent
```
-------------------------------------------------------------X
```

      UPON reading and filing the accompanying Affidavit of Marc Fishman, Respondent, and all exhibits attached thereto, and the pleadings and prior proceedings in this matter, and due deliberation having been had and sufficient cause appearing,

      NOW, on motion of Respondent MARC FISHMAN, it is

      **ORDERED** that Petitioner JENNIFER SOLOMON, by counsel, and the Attorney for the children, show cause at Family court, 45 monroe place brooklyn, New York , on _____, at 10:30 in the morning, or

as soon thereafter as parties/counsel may be called, why an order should not be entered:

1.     To vacate and reverse the decision of this court dated 6/27/2018 in 2018 NY slip op 04740 [162 AD3d 1051] (in exhibit A, attached)on the basis that there could not be a finding of willfulness by Judge Schauer because she knew Mr. Fishman was hearing, visually, writing and memory impaired, and suffered from post concussion registering cognitive impairments, tinnitus hearing impairments and occipital neuralgia vision impairments, and cubital tunnel writing impairments and did not hear or register or fully understand/comprehend Judge Schauer's verbal instructions due to Schauer's intentional denial of tools/aides(required under the ada in 28 cfr 35.160) to help with Mr. Fishman's communication/movement/hearing disabilities.

2.     To vacate the decision of this court dated 6/27/2018 NY Slip op 04741 [162 AD3d 1052] (in exhibit B, attached) denying a note taker and large print court orders as aides/tools for Mr. Fishman's regarded and acknowledged disabilities by the state court administration(required accommodations to be made under the American with disabilities act under 28 cfr 35.160, New York human rights laws and New York city human

2

rights laws) and order/ grant these reasonable accommodations as the are granted today after New York human rights commission involvement and federal litigation where New York State has acknowledged I am disabled under the ada with impairments that effect bodily functions of hearing, seeing, remembering, registering and writing.

3.     To declare and order it was improper and discriminatory of Judge Schauer to interfere and deny administrative American with Disabilities act accommodations granted by the Westchester court ada liaison, William Curry BEFORE SCHAUERS JAILING OF MR FISHMAN,   . as the judicial order of judge schauer intentionally interfered with the administrative order/approvals of both William Curry, ada liaison, and Barbara Gringer- Zahler counsel to the court disability access committee to allow Mr. Fishman's notetaker court access to help him and large print typed court orders for Mr. Fishman to be able to understand and have meaningful communication with the court and court staff.  Mr Curry knew mr fishman could not take his own notes with cubital tunnel syndrome and knew of mr fishman's hearing problems and parotid mass/tmj ear surgery in 2016.

4.     To declare Judge Schauer intentionally denied the administrative accommodations recommended/ordered by both Dan weitz, the court's ada professional coordinator and William Curry ada liaison now approved by the

3

state court, because these administrative accommodations in no way interfered with Judge Schauer's judicial discretion or judicial orders. The sole purpose of Schauer's judicial orders to deny administrative accommodations approved by court administration was to punish/retaliate against Mr. Fishman for the side effects of his multiple disabilities, and retaliate for mr fishman complaining to civil rights authorities that Judge Schauer was violating his state and federal civil rights intentionally.

5.      To order that Judge schauer should have been removed from Mr. fishman's cases(after the 17 application for judge schauer to recuse were made form 2015 to 2018)and appellate court failed to address these recusal requests/motions in any ada grievance appeals) and a new custody determination be made by a new unbiased family court judge due to the willful and intentional disability discrimination, retaliation, and failure to accommodate disabilities by judge schauer and willful interference with the court ada liaison granting administrative accommodations in the court proceedings.

6.      To order four new attorneys for the children as Judith woods, afc has been tainted and biased by the disability discrimination conduct of the court and appoint 4 new unbiased afcs for each child to move forward in the

4

custody and visitation case so the children have frequent and regular unsupervised contact with their father..

7.   The appellate court has a judicial, administrative, legal duty to vacate court orders that violate the State and federal laws civil rights laws. Not to so violates each judge's oath to enforce the law at all times and hold court proceedings free of disability discrimination.

8.   The appellate court must act to vacate orders that effect mr fishman's civil rights as the long lasting effect of Schauer's illegal orders are still effecting mr fishman in his proceedings this day in family and criminal court where Mr Fishman has been denied access to his four children for nine months now.

9.   If the appellate division does not act now with swift, prompt and immediate action to enforce the  state human rights  laws and ada, this grievance court is basically ceding its appellate authority to the federal court. Under the separation of powers states retain jurisdiction for visitation and custody decisions.   However under Supreme court case Tennessee v Lane(541 US 509 2004) there is federal authority to intervene, override state administrators and grant reasonable accommodations to insure meaningful access to the state court by disabled people.

10.    The NYS human rights division has taken the rare step of holding hearings and conferences(see exhibit "C") against the state unified court system on my behalf for conduct it deems is willful disability discrimination, retaliation, and failure to accommodate disabilities.  Indeed in February, the appellate court first dept fined the state court system $35,000 for discriminating against one of its employees mr ziac 2020 NY slip op 01252 (see case in exhibit D) (who was also hearing impaired like mr fishman.)  In the decision the appellate court affirmed that (similar to my case), the unified court system discriminated against mr zaic for his hearing disabilities, hearing aid use and declared the state court violated the ada and the NYS Human Rights Laws intentionally.

11.    The New York Human Rights Division did not have authority to review judges/administrator decisions in 2016, but does now under nys laws. Judge Schauer, Judge Scheinkman and April Ann Agostino are well aware of the  8000 pages of certified medical records delivered to and subpoenaed by the state court detailing disabilities of hearing, eating, sleeping, remembering, speech, writing, vision from years of litigation.  This is also true in the complaints from Magistrate Jordan that judge schauer took these boxes  from New Rochelle family court to Yonkers family court ion 2016 when Judge schauer moved my case with her.

12.    The court must act now because the court of appeals denied permission to appeal the denial of ada accommodations by this court in these unlawful orders yesterday in published decision 2020-317.  Dan weitz, , the courts professional ada liaison stated that grievance appeals are handled by the appellate court.   Now that court administrators have ordered these accommodations in other my state cases an d others, the appellate court grievance committee cannot leave Schauer's intentional disability discrimination unaddressed.  This is because Schauer's decision denying me administrative accommodations granted by court administration and Nys human rights for disabilities from car accidents in 2013, effects support and visitation cases now and must be struck down as a violation of state and federal law, as unlawful.

13.    Under title two of the ada a state entity with 50 or more employees must hold a grievance appeal/hearing to address denial of required accommodations.  As April Ann Agostino, appellate division liaison denied my accommodations request for four judges of the court to attend a human rights hearing to go over the human rights oversight of the is court earlier this week, the appellate court must act as the grievance committee and grant accommodations that the nys human rights commission state dictates are

7

required. These include but are not limited to a note taker, large print court orders, cart real time transcription and aides for my disability.

14.  It is very important for this appeals court to set an example by hearing this motion and issuing an order to make it blatantly and directly clear that judges should not be making administrative ada accommodations at all and that these request are to be handled at all times by the experienced ada liaisons/court administrator trained in disability matters..

15.  If the appellate court will not grant all the items requested in this showcause then I request a confidential ada hearing free of the adversarial process between four judges of the appellate court, myself, my disability advocate and the nys human rights commission to resolve these matters to comply with state and federal law.

16.  Order that Marc Fishman may proceed pro se in making this application since appointed counsel, del atwell is unresponsive and mr fishman wishes to file this motion on his own.


Sufficient show cause being shown, it is ordered that:


a. Ordered Mr. fishman is to have eight hours supervised visitation weekly starting this weekend with ann Elliot , court approved social

8

worker, With all 4 children because mr fishman has not had any

visitation in none, (9) months stemming from the denial of these

accommodations and the consequences thereof—of forgetting or not

hearing court orders verbally without a notetaker or large print court

orders or cart real time transcription and the punishment by the lower

courts.   This punishment violates the ada and its anti-retaliatory

provisions in 28 cfr 35.134.

b. Ordered Mr. fishman may represent himself going forward in this

appeal/motion as he has been unable to reach assigned counsel Del

Atwell.

c. Ordered that any filing fees or grievance fees are waived as per the

ada, the disabled may not be charged for requesting appeals of denials

of ada accommodations (see title two of the ada and 28 cfr 35, where

appeals are to be free of charge by the state government.)

17.        **ORDERED** that service of this Order, together with all

supporting papers, on all other parties shall be made by email or facsimile

on or before _____, to be deemed good and sufficient service, on

the following counsel at the following addresses:

NICOLE E. FEIT, ESQ.
Legal Services of the Hudson Valley
Attorney for Petitioner-Respondent
90 Maple Avenue

9

White Plains, NY 10601

Judith Woods, Esq.
Atty for the Children
445 Hamilton Ave
White Plains, NY 10601

WILLIAM CURRY
ADA Liaison AWARE OF MR FISHMANS DISABILITIES
Westchester Family Court – Yonkers, Third Floor
131 Warburton Avenue
Yonkers, NY 10701


E N T E R:


HON. _____
      Judge,      APPELLATE DIVISION 2ND DEPT

C: Judge Egitto, chief family ct judge supervisor
   Judge De fiore, chief judge NY
   Judge Marks, chioef admin judge ny
   Judge Caruso, chief admin judge ny outside nyc
   Judge Davidson, chief Judge Westchester

APPELLATE DIVISION SECOND DEPT COURT OF THE STATE OF NEW YORK
COUNTY/CITY OF BROOKLN

...............................................................................x

JENNIFER SOLOMON,

        *Petitioner*

    -against-

MARC FISHMAN,

        *Respondent.*

...............................................................................x

*Grievance hearing—ada accommodations*
<u>AFFIDAVIT IN SUPPORT</u>

*FILE NO FU 131794*

| | |
|---|---|
| State of New York | ) |
| | ) ss.: |
| County of Westchester | ) |

**Marc Fishman,** being duly sworn, deposes and states as follows:

1. Title two of the ada requires an in person, interactive, negotiated grievance process to obtain administrative American with disabilities act accommodations for the disabled like myself including tools and aides for meaningful communication and access to courts by the qualified disabled.

2. Ny State Human rights commission requires the state court to comply with human rights laws and has requested a conference hearing  that the state court did not show up for on 8/25/2020 on denied administrative accommodations for my unique disabilities.

3. Dan weitz , chief ada professional executive for New York state courts stated that the grievance procedure for denial of judicial ada accommodations is the appellate division 2nd dept and or court of appeals.

4. The appellate division never held an in person or interactive grievance procedure for my denied administrative ada accommodations including a notetaker, large print court orders, tape recorder, and morning only court appearances that were denied judicially

1

by judge schauer. Supervising judges Caruso, Marks, Egitto and Davidson have stated that the appellate division second dept is the grievance procedure for denied judicial ada accommodations.

5. Grievance procedures with the state per the ada technical Manuel are to be held , adjucated and resolved within 30 days.

6. These administrative accommodations were requested years ago and there still not has been a compliant ada grievance procedure.

7. Judge Schauer intentionally and improperly made my ada accommodations judicial ones by interfering and overriding the courts liaison William Curry and chief courts administrator Dan weitz in denying administrative accommodations including but not limited to a note taker, and large print court orders in her courtroom. These determinations were erroneous and the effect or her denial had a large impact in my case. Judge schauer opined that the side effects of my disabilities, because there were not accommodated, warranted a change in custody. Judge schauer opined in court that I talked loudly when that was a side effect of my disabilities. Judge schauer chastised me for not remembering what she said over and over again.

8. I submit that if all my accommodations were satisfied and granted including an aide, note taker and large print court orders that I would have been able to mitigate my lack of hearing and remembering to behave in way those without disabilities do. Instead judge schauer punished me by jailing me for not remembering what she said in state court and not being able to read her half-centimeter incomplete and confusing small print orders. In some cases, like the 6/27/17 order of protection, allegedly read on the record in open court, I was unable to register or remember because I did not

2

receive any written order or hear what judge said. Indeed at the hearing my notetaker was blocked from entry and I told judge repeatedly on the record that I did not understand. This instance alone has resulted in a criminal proceeding and conviction for me alleged not remembering terms of an order of protection that were never physically given to me or served on me. So it is of utmost important to rule on the denial of ada accommodations and the consequences of Schauer's intentional failing to listen and abide by the recommendations and orders of William curry ada liaison and the courts administrative procedures for granting ada accommodations. Schauer knew my memory in 2016/2017 was at 8 percent compared to other 45 year olds my age. Schauer knew I had an implant for tinnitus and occipital neuralgia that manages tinnitus and have hearing difficulties. Schauer knew I was enrolled full time in rehab for speech, cognition, memory and talking/breathing, but ignored intentionally my doctors requests for administrative accommodations. Schauer also knew I had hearing surgery to remove a mass in 2016 from my left ear and had complications. Despite knowing all these bodily major function impairments including writing, hearing, registering, seeing, sleeping and memory disabilities, schauer jailed me 6/27/17 for three weeks as retaliation for the side effects of my disabilities by stating I faked not remembering or hearing. With post concussion syndrome, TMJ and tinnitus it is difficult to eat, hear and register. The appellate division needs to right this wrong intentional act of judge schauer once and for all or the matter will have to be resolved in federal court.

9. Two motions were made to the court of appeals (one in 2018 and one in 2020) to have a grievance hearing on the denied ada administrative accommodations I need for

3

my hearing disability and memory/writing/visual disabilities. In 2018, the court of appeals ruled the denied ada appeal was not a final order for them to consider under the NY constitution. In 2020, yesterday, the court of appeals denied permission to appeal the denial of ada accommodations in the underlying case.

10. Hence am coming back to the appellate division with this motion to address my urgently needed accommodations for my major bodily impairments that was never taken place in a way that complies with both nys and federal civil rights laws for state government entities with 50 employees or more.

11. As April Agostino, appellate court clerk is very aware through multiple communications, I have not seen or had any contact with my four amazing children(two of which are disabled) children for over nine months due to disability discrimination that stems from the underlying custody decision and decision to deny ada accommodations by Judge Michelle Schauer.

12. A formal proceeding has been commenced by the NYS Human rights Division see exhibit" ⊆ " , attached against Judge Capeci, Ny Unified Court System, Ivy Ozer, Elizabeth Bussian and Judge Davidson for failing to make the court program of visitation accessible to me and accommodate my disabilities.

13. I submit this affidavit to recall the 2018 orders attached and vacate the decisions from the appellate division and to restate the decisions to remove judge schauer for her willful blatant and intentional disability discrimination to deny me cart real time transcription, notetaker, aide of my choice, service dog, disability transportation person with hearing/memory/writing/seeing disabilities.

4