**In the Matter Of:**

MARC H. FISHMAN -against- CITY OF NEW ROCHELLE

19-cv-265-NSR

---

**MARC H. FISHMAN**

*October 17, 2023*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1

 2              UNITED STATES DISTRICT COURT

 3             SOUTHERN DISTRICT OF NEW YORK

 4               Case No.:19-cv-265-NSR

 5    ------------------------------------------x

 6    MARC H. FISHMAN,

 7                            Plaintiff,

 8              -against-

 9    CITY OF NEW ROCHELLE, POLICE
      OFFICER LANE SCHLESINGER SHIELD
10    #1058, JOSEPH F. SCHALLER, ROBERT
      GAZZOLA, IN HIS OFFICIAL CAPACITY
11    AS POLICE COMMISSIONER OF THE
      CITY OF NEW ROCHELLE POLICE
12    DEPARTMENT, SERGEANT MYRON
      JOSEPH SHIELD #18, & COUNTY OF
13    WESTCHESTER,

14                            Defendants.

15    ------------------------------------------x

16

17        REMOTE DEPOSITION OF MARC H. FISHMAN

18             Tuesday, October 17, 2023

19

20

21

22    Reported by:

23    Amy A. Rivera, CSR, RPR, CLR

24    JOB NO.  J10406555

25
```



1

2                                    October 17, 2023

3                                    1:07 p.m.

4

5                    REMOTE deposition of MARC H. FISHMAN,

6    held pursuant to Notice, before Amy A. Rivera,

7    Certified Shorthand Reporter, Registered

8    Professional Reporter, Certified LiveNote Reporter,

9    and a Notary Public.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    MARC H. FISHMAN

 2   R E M O T E    A P P E A R A N C E S:

 3   LAW OFFICE OF CANER DEMIRAYAK, ESQ., P.C.

 4   Attorney for Plaintiff

 5         One Pierrepont Plaza

 6         300 Cadman Plaza, 12th Floor

 7         Brooklyn, NY   11201

 8   BY:  CANER DEMIRAYAK, ESQ.

 9

10   THE QUINN LAW FIRM

11   Attorneys for Defendants

12         399 Knollwood Road, Suite 220

13         White Plains, NY   10603

14   BY:  LALIT K. LOOMBA, ESQ.

15

16   ALSO PRESENT:

17         Heidi Sarsony, Legal Video Specialist

18

19

20

21

22

23

24

25
```



```
 1                  MARC H. FISHMAN

 2          MR. DEMIRAYAK:  I want to make a

 3     statement on the record.  Any objection?

 4          MR. LOOMBA:  I don't know what you're

 5     going to say, so go ahead.

 6          MR. DEMIRAYAK:  Cool.  So I just want

 7     to confirm on the record that we did receive

 8     an audio call and two videos from the police

 9     station regarding this incident several days

10     ago.  I have reviewed it.  My client has

11     listened to the audio; however, my client

12     has not been able to access the video or the

13     audio connected to the video at this time.

14          We are working on trying to make it

15     into an accessible format for him.  So if

16     you are going to ask questions regarding the

17     police precinct video, just keep in mind

18     that although it has been exchanged, the

19     witness himself has not been able to view it

20     and understand anything on it at this point.

21          Additionally, we'll follow up in

22     writing, but there appears to be 51 minutes

23     of missing video, which we're very concerned

24     about.  It's not a point of contention for

25     today.  Today you're going to be questioning
```



```
 1                    MARC H.  FISHMAN
 2    Mr. Fishman regarding this lawsuit, and
 3    we'll follow up with that separately.
 4          Other than that, I just want to thank
 5    you for agreeing to do this remotely and to
 6    working on an accommodation for Mr.
 7    Fishman's disabilities.
 8          Other than that, we are ready to
 9    proceed.
10          MR. LOOMBA:  Okay.  And that's fine,
11    and I'll just say that pursuant to our
12    agreement, if for some reason this remote
13    deposition is not successful for whatever
14    reason, maybe an inability to communicate or
15    difficulties with communication, then
16    pursuant to our agreement, you know, we
17    reserve the right to continue the deposition
18    as necessary in person, but hopefully we
19    won't have to get to that and that we'll be
20    successful today.
21          MR. DEMIRAYAK:  And I don't think we
22    will have an issue today.  This realtime
23    transcription that I'm seeing on my own
24    screen as well appears to be the type of
25    accommodation that will make it much easier
```



```
 1              MARC H. FISHMAN

 2   for Mr. Fishman to fully participate.  I

 3   don't expect any issues today, but if there

 4   are, he will let you know.

 5         MR. LOOMBA:  Very good.  We can swear

 6   him in then.

 7         VIDEOGRAPHER:  Let me do my read on

 8   and then she can swear him.

 9         This is file 1 to the videotaped

10   deposition of Marc Fishman in the matter of

11   Marc Fishman versus City of New Rochelle,

12   being heard before the U.S. District Court,

13   Southern District of New York, case number

14   19-CV-265 NSR.

15         This deposition is being held via Zoom

16   conferencing with all parties appearing

17   remotely on October 17, 2023.  The time is

18   approximately 1:07 p.m.

19         The court reporter is Amy Rivera and

20   my name is it Heidi Sarsony, the

21   videographer.

22         Counsel, please introduce yourselves

23   and affiliations, and then the witness will

24   be sworn.  Thank you.

25         MR. LOOMBA:  My name is Lalit Loomba.
```



```
 1                      MARC H. FISHMAN
 2          I'm a partner at The Quinn Law Firm.  We
 3          represent the City of New Rochelle.
 4                 MR. DEMIRAYAK:  This is Caner
 5          Demirayak, plaintiff's counsel for Mr. Marc
 6          Fishman.
 7   M A R C   F I S H M A N, having been duly sworn
 8   by the Notary Public, testified as follows.
 9   EXAMINATION
10     BY MR. LOOMBA:
11          Q.   Good morning, Mr. Fishman.  My name is
12   Lalit Loomba.  I'm an attorney at The Quinn Law
13   Firm.  We represent the City of New Rochelle in
14   your lawsuit.  We're here to take your deposition
15   today.
16               How are you feeling today?
17          A.   I'm okay.  I have a headache, sore
18   throat, but I'm okay.  Good morning.
19          Q.   Good morning.
20               And Mr. Fishman, where are you located
21   right now?
22          A.   I'm in Rancho Mirage, California.
23          Q.   And are you inside a room somewhere?
24          A.   Yes.
25          Q.   And is there anybody else inside the
```



```
 1                    MARC H. FISHMAN
 2    real estate.
 3         Q.    Okay.  And you continued to do that
 4    work today.  Is that right?
 5         A.    Yes.
 6         Q.    At one time you were married to
 7    Jennifer Solomon.  Is that correct?
 8         A.    Yes.
 9         Q.    Do you remember when you first married
10    Ms. Solomon?
11         A.    We got married July 4th, 2010.
12         Q.    Was that your first marriage?
13         A.    Yes.
14         Q.    And when did your divorce with
15    Ms. Solomon become final?
16         A.    The trial -- the divorce trial was in
17    August of 2012.  I believe the judgment was signed
18    off by the judge and recorded in October 2012.
19         Q.    Did you remarry after your judgment of
20    divorce was entered?
21         A.    No.
22         Q.    In 2018, you were -- I think you had a
23    relationship with Isabella Bolivar.  Is that
24    correct?
25         A.    Yes.
```



```
 1                      MARC H. FISHMAN

 2          Q.    Okay.

 3          A.    What day was that?  Let me just see

 4    here.

 5          Q.    That would have been about a year ago?

 6          A.    Yes, October 2022, Counselor, yes.

 7    October 2022, yes.

 8          Q.    How long was the visit when you came

 9    to New York at that time?

10          A.    In New York itself, I think it was

11    half a day.

12          Q.    How long were you in New York State

13    during that visit?

14          A.    Half a day.

15          Q.    And then you flew back to California?

16          A.    No, I traveled to New Jersey and

17    Pennsylvania.

18          Q.    Do you have any family in -- actually,

19    withdrawn.

20                You have four children.  Am I right?

21          A.    Yes.

22          Q.    The youngest are twins, and then you

23    have one older son and one older daughter.

24                Did I get that correct?

25          A.    You got it correct, yes.
```



```
 1                    MARC H. FISHMAN

 2        Q.    And how old is your older, the oldest

 3   daughter now?

 4        A.    My oldest daughter right now is 19 and

 5   I believe going to be 20 in February 9th next

 6   year.

 7        Q.    Okay.  And her name is Joanna?

 8        A.    Joanna Dora, yes.

 9        Q.    And I think then just going, you know,

10   the next one, say going in reverse age would be

11   your son Jonah.  Is that correct?

12        A.    Yes, Jonah Sydney Fishman, yes.

13        Q.    And how old is Jonah now?

14        A.    Jonah is 17 and 11 months, he'll be

15   18, November 20th.

16        Q.    And then the two younger ones, the

17   twins, how old are they?

18        A.    They're Sky and Aiden.  They are 15

19   and a half.  They were born in July of 2008.

20        Q.    Where does Sky and Aiden live right

21   now?

22        A.    I believe the boys live at 54 Halcyon

23   Terrace, New Rochelle, New York.

24        Q.    Okay.  And that's with Ms. Solomon,

25   their mother?
```



```
 1                    MARC H. FISHMAN

 2         A.    Yes, I believe so.

 3         Q.    And same for Jonah?

 4         A.    You just mentioned the boys.  I have

 5   three boys, yes, three boys live at 54 Halcyon

 6   Terrace.

 7         Q.    You're absolutely correct, Mr.

 8   Fishman.  So Sky, Aiden, and Jonah live with their

 9   mother in New Rochelle, correct?

10         A.    As far as -- as far as the reports I

11   receive from the school, yes.

12         Q.    Okay.  And is your oldest daughter in

13   college now or is she still in high school?

14         A.    I've been informed she's in the

15   University -- at Binghamton University,

16   Binghamton, New York; sophomore.

17         Q.    That's great.  Thank you.

18               And right now, just a few questions

19   about your medical care.  Do you have a sort of a

20   regular primary care physician in California?

21         A.    Not a regular physician, I have a

22   primary care group.

23         Q.    And what's the name of that group?

24         A.    Eisenhower Primary Care.

25         Q.    Is that also in Rancho Mirage?
```



1                        MARC H. FISHMAN

2       you know, for the, you know, denied in person and

3       virtual visits pending in the appellate courts New

4       York.

5            Q.    Okay.  Understood.  Thank you.

6                 We were talking about your disability

7       aides, Efrim Cohen, you mentioned Joyce Fishman.

8       Were there any others?

9            A.    Yes.

10           Q.    Who?

11           A.    I had Isabelle Bolivar Court-appointed

12      as the American With Disabilities Act aide.

13           Q.    Which Court appointed her?

14           A.    Family Court Judge Michelle Schauer in

15      Yonkers.  She moved to Yonkers and took the case

16      with me.

17           Q.    Is that how you first met Ms. Bolivar?

18           A.    No.

19           Q.    When did you first meet her?

20           A.    I met Ms. Bolivar in December 2015.

21           Q.    When was she appointed by Judge

22      Schauer?

23           A.    I believe the appointment was in March

24      of 2018 in Court order.

25           Q.    Okay.  Did you ever live with

```
 1                    MARC H. FISHMAN
 2   Ms. Bolivar?
 3          A.    Yes.
 4          Q.    When did you first start living with
 5   her?
 6          A.    2016.
 7          Q.    And that was in your apartment in
 8   Riverdale?
 9          A.    Yes.
10          Q.    And how long did you live together
11   with her in that apartment?
12          A.    We lived together through January
13   of -- let's see, through half of January 2022.
14          Q.    Why did you and she stop living
15   together?
16          A.    Because I'm in rehab and surgeries in
17   California and she still lives in New York.
18          Q.    Does she still live in your apartment
19   in Riverdale?
20          A.    No.
21          Q.    Do you own that apartment or did
22   you -- withdrawn.
23                Did you ever own that apartment?
24          A.    It's not owned in my individual name,
25   no.
```



```
 1                    MARC H. FISHMAN
 2   confirm the visit that it was Hanukkah, and I
 3   celebrate Hanukkah, I'd like to see my kids, and
 4   is my visit on for the, you know, two-week cycle,
 5   which was tomorrow, the 15th.
 6            She wrote:  Pick me up at 9 a.m. and,
 7   you know, I'll be outside for you to come get me
 8   for the visit.
 9        Q.    Okay.  And so, am I correct that then
10   you and -- Ms. Bolivar was living at your
11   apartment in the Riverdale at the time?
12        A.    Yes.
13        Q.    And so the two of you woke up, got
14   started, and drove into -- drove to pick up
15   Ms. Elliott, the supervisor, correct?
16        A.    Right.  Ms. Bolivar drove.  I was the
17   passenger, yes, to pick up Ms. Elliott in Harlem,
18   yes.
19        Q.    Okay.  And you picked her up at her
20   house?
21        A.    At her apartment building.
22        Q.    Her apartment building, thank you.
23            And had you done that before?
24        A.    Yes.
25        Q.    When you -- what time did you and
```



1                        MARC H. FISHMAN

2            A.      Yes.

3            Q.      How often did that occur?

4            A.      Practically every visit on the return,

5    Ms. Bolivar and Ms. Elliott, you know, drove to

6    the house, you know, to drop off or pick up kids,

7    one or the other.

8            Q.      Okay.  So how many times had

9    Ms. Bolivar driven to the vicinity of

10   Ms. Solomon's house at the beginning of the visit?

11           A.      At least half a dozen times.

12           Q.      Okay.  So you leave the gas station,

13   you driver towards Halcyon Terrace, and your

14   testimony is that Ms. Bolivar parked the car about

15   four houses away from Ms. Solomon's house?

16           A.      Right.

17           Q.      What happened next?

18           A.      Ms. Ann Elliott got out of the car and

19   walked onto Jennifer's property and rang the

20   doorbell to speak with Jennifer.

21           Q.      From where the car was parked, could

22   you -- did you have a direct line of sight to

23   Ms. Solomon's front door?

24           A.      Yes.

25           Q.      What did you observe?





```
 1                    MARC H. FISHMAN
 2        Q.    You had a direct line of sight to
 3   Jonah as well?
 4        A.    I did.
 5        Q.    Okay.  And when you were in the car,
 6   were the windows open or closed?
 7        A.    When I was in the car, the windows
 8   were closed.
 9        Q.    Okay.  I should have been more
10   specific.
11             When you were in the car and the car
12   was parked, you know -- you know, as we were
13   discussing it, the windows were closed?
14        A.    Yes.
15        Q.    Okay.  Did you roll down the window or
16   open the door and attempt to talk to Jonah?
17        A.    I didn't roll down a window or open a
18   door, no.
19        Q.    Did you attempt to talk to Jonah?
20        A.    Yes, I got out of the car as Ann
21   Elliott was walking back and I yelled hello to my
22   son, Jonah.
23        Q.    To get out of the car, you had to open
24   the door, right?
25        A.    Yes.
```



```
 1                    MARC H. FISHMAN
 2        Q.    Okay.  So you did open the door?
 3        A.    Yes, I opened the door as Ann Elliott
 4   walked back to the car.
 5        Q.    You got out and you said hello to your
 6   son, Jonah?
 7        A.    Right.  It appears Ann Elliott was
 8   walking towards us, right next to my son, because
 9   the driveway is after the front entrance after a
10   landscaped area, I saw her walk away from the
11   front entrance through the landscaped area towards
12   the driveway, and I walked out of the car, stayed
13   by the car, as Ann is walking towards to me, Ann
14   way moving some stuff in the back seat so Jonah
15   could get in with his 17 pieces of hockey safety
16   equipment I bought him, you know.
17        Q.    Okay.  By the way, did he have that
18   equipment with him?
19        A.    He had the hockey stick with him.
20        Q.    I know a little bit about hockey, so I
21   know there's a lot involved there.  So did he have
22   all that gear with him or was it just his hockey
23   stick?
24        A.    He had the hockey stick, he had the
25   hockey puck, he had some of the hockey tape.  I
```



```
1                    MARC H. FISHMAN
2    saw there's like a substance we use to, I guess,
3    rub the portion of the hockey stick that was on
4    the ground.  And I saw a helmet in the -- in the
5    driveway where he was playing.  I saw a net.
6              So, yeah, I saw hockey equipment, not
7    all of it, but I saw hockey equipment in that
8    driveway.
9         Q.    What about his skates?
10        A.    I saw the skates on the driveway as
11   we -- as we drove by the house.
12        Q.    Okay.  So all right.  You get out of
13   the door.  You say hello to your son, Jonah.  Does
14   he answer you?
15        A.    No.
16        Q.    Did he -- did you make eye contact
17   with him?
18        A.    No.
19        Q.    Is there anything about the way he
20   acted that made you believe he heard you?
21        A.    No, I don't think he heard me.
22        Q.    What happened next?
23        A.    As Ann Elliott got close to the car,
24   she said, the visit has been canceled.  Your
25   ex-wife has canceled the visit.
```



```
1                    MARC H. FISHMAN
2        Q.    By the way, did Jonah -- as Ann
3   Elliott was walking back towards the car, was he
4   still just playing in the driveway?
5        A.    Yes, he had a -- there was another
6   male there who was older and taller, who he was
7   playing with, and there was a net, and there was
8   hockey equipment, and they were -- they were
9   shooting a hockey stick and playing in the
10  driveway.
11       Q.    Did you ever see him run back to his
12  house?
13       A.    No, not while I was there.  He didn't
14  run back.  He was playing with his friend the
15  entire time we were there.
16       Q.    So Ann comes back and says:  The
17  visit's been canceled, and tell me what happens
18  after that?
19       A.    I told Ann I wanted to go make a full
20  report at the police station of a visitation
21  violation and asked the cops if they could enforce
22  my visitation order.
23            And Ms. Bolivar drove to the police
24  station, I believe -- I think it's on Main Street
25  or North Avenue.  It's the building next to the
```



```
 1                    MARC H. FISHMAN
 2   Ms. Elliott was there as well, did you tell
 3   Officer Schlesinger that you suffered from a
 4   disability?
 5        A.   Yes, and I showed him my two
 6   disability cards.
 7        Q.   Okay.  And when you said you suffered
 8   from a disability, which specific disability did
 9   you mention?
10        A.   I said, I suffer from a traumatic
11   brain injury and encephaloneuralgia and have a
12   difficulty with my burning eyes reading very small
13   print, and that the print on the order he showed
14   me was very, very tiny.
15             So I started reading it, I get a
16   headache, at which time, I started getting redder
17   and redder, and got a headache, and had an
18   encephaloneuralgia attack while sitting at the
19   table.
20        Q.   And did you ask Officer Schlesinger
21   for a specific accommodation?
22        A.   Multiple ones, yes.
23        Q.   Which specific accommodations did you
24   request?
25        A.   I asked for my aide to come in to
```



```
 1                   MARC H. FISHMAN

 2    assist immediate with full and effective

 3    communication and reading and interpreting the

 4    order.  I asked for myself and my aide to go to

 5    the car to get the Court file out of the trunk

 6    that had the order for the aide and had the

 7    visitation orders, as well as the calendar of

 8    visits and my medical information.

 9               I asked the officer to go to the car

10    and get it, if he wouldn't let myself or Isabelle

11    go.  I asked for a transcriber or an note taker to

12    assist me if he wasn't going to allow Isabelle to

13    come in.  And I asked him for a notepad and a pen.

14         Q.    Did you request any other

15    disabilities?

16         A.    I asked him to call, you know, my

17    neuro -- neuro doctors to confirm my disability

18    and the phone number on the traumatic brain injury

19    card, which is my -- my father to describe the

20    accommodations and affirm the disability.

21         Q.    Did you ask him for any other

22    accommodations?

23         A.    Yeah, I believe also to call my

24    surgeon for the Inspire.  There were three

25    numbers; one was for Dr. Lubenaire, the
```



1                    MARC H. FISHMAN

2    neurosurgeon, on the implant card, the second

3    implant card was the Inspire with Dr. Boris

4    Chernobilsky's number on it, and then the other

5    one, my father.

6                    And then I reiterated, I need

7    Ms. Bolivar here to assist me with communication

8    in her Court-appointed role as the visitation and

9    Americans With Disabilities advocate and allow her

10   to come in.

11        Q.    Other than what you've listed, did you

12   ask for any other accommodations?

13        A.    I don't recall.

14        Q.     If Ms. Bolivar had been in the room

15   with you, how would she have -- how do you think

16   she would have helped you?

17        A.    Well, Ms. Bolivar would have brought

18   the order, and she's appointed from March of 2018,

19   and Ms. Bolivar would have been able to give a

20   third perspective on what happened that day as the

21   Court-appointed aide so that the officer didn't

22   just have what he claimed was Jennifer's version,

23   Ann Elliott's version, and my version.

24                    She would also have been able to

25   isolate the portions of the order of protection



```
1                    MARC H. FISHMAN
2    that have a carve-out for visitation, you know,
3    and also affirm the fact that I never received a
4    written copy of the alleged order of protection
5    from, I believe, it's June 27, '17, that was
6    allegedly written while I was in jail and never
7    given a physical copy to me.
8              She would have affirmed that, and she
9    would have been able to read the order.  With
10   encephaloneuralgia and burning eyes, I couldn't
11   read single-spaced orders.
12        Q.   So if she was there, she could have
13   assisted you in -- in making Officer Schlesinger
14   understand that you had a right to be where you
15   were and that you did not violate the order.  Is
16   that -- is that accurate?
17        A.   That's a portion of accurate.  She
18   could have read the order, Judge Schauer's order
19   didn't comply with the ADA accommodation of
20   16-bold print which was granted to me from Office
21   of Court Administration, and William Curry, the
22   ADA advocate.
23              Since this order was single typed,
24   very tiny print in the order of protection, I
25   could not read it.  I could not read it without an
```



1                      MARC H. FISHMAN

2     aide, without getting a headache.

3           Q.    Understood.

4                 And if she had been there and read the

5     order, that would have helped you explain to

6     Officer Schlesinger that, in fact, you hadn't

7     done, you know, you had not violated any laws,

8     right?

9           A.    Correct.  She could explain the fact

10    that I didn't go on her property and that the

11    order of protection was subject to limited

12    supervised visitation every other Saturday, which

13    this was and, that this was a preconfirmed,

14    prepaid, prescheduled visit, and she could have

15    went over the cancellation terms had my ex-wife or

16    the AFC or Ann or anyone canceled it in writing,

17    which is required, then it would immediately be

18    rescheduled to the following weekend.

19                Without her help, I could not, you

20    know, read that order or try to explain it to

21    Officer Schlesinger, who said it was the most

22    complicated visitation order he ever saw in his

23    life.

24          Q.    And the documents that were in the

25    trunk of your car, is it fair to say that that



```
 1                    MARC H. FISHMAN
 2   would -- if you had had access to them, that would
 3   have also helped you explain to Officer
 4   Schlesinger that, in fact, you had not violated
 5   any laws, correct?
 6        A.    Well, it wasn't my car, Isabelle
 7   Bolivar's car.  But, yes, the documents she had in
 8   her purse and in her smart phone, and the paper
 9   documents would have shown that between 10 and 5,
10   the 1st and 15th of every month, we have
11   supervised visits.  There's no violation, as long
12   as Ann Elliott is around and the visit wasn't
13   canceled in writing beforehand.
14             And that we didn't go on any property,
15   and Ms. Bolivar could emphasize that.  We didn't
16   go on any property, and I hadn't communicated to
17   Ms. Solomon, I haven't communicated with her
18   directly since 2015.
19        Q.    And I guess what I want to make sure I
20   understand properly is that your position is if
21   you had had access to your documents in the trunk,
22   and if Ms. Bolivar had been there and was able to
23   assist you in reading the orders, all of that
24   could have helped you explain to Officer
25   Schlesinger that you, in fact, had not violated
```



```
 1                      MARC H. FISHMAN
 2   of that would have helped you explain to Officer
 3   Schlesinger that you had not violated any laws?
 4        A.    Yes, together with a notepad or
 5   Ms. Bolivar could write it in large print and
 6   clarify the complicated order to everyone,
 7   including me.
 8        Q.    So you're saying also that in addition
 9   to the documents in the trunk, and having
10   Ms. Bolivar present, if you had had access to a
11   note pad, that also would have helped you explain
12   to Officer Schlesinger that you had not violated
13   any laws?
14        A.    A notepad and pen, yes.
15        Q.    Okay.
16        A.    For my aide to use to definitely write
17   down pages and paragraph numbers of the
18   complicated order.
19        Q.    Okay.  Thank you.
20              So besides Mr. -- sorry -- besides
21   Officer Schlesinger, you said that you
22   interactions with a lieutenant?
23        A.    With, I believe, Myron Joseph.  I'm
24   not sure he was a lieutenant.  I think he was a
25   lieutenant.  I'm not sure what his title was then.
```



```
 1                    MARC H. FISHMAN

 2        A.    Twice.

 3        Q.    When was the -- was this the first

 4   time or the second time?

 5        A.    Second time.

 6        Q.    And when was the first time?

 7        A.    I believe it was in 2010 in Fairfield

 8   County, Danbury, Connecticut.

 9        Q.    By the way, do you remember while you

10   were in the holding cell, the one that we could

11   see there in camera No. 3 telling Officer

12   Schlesinger:  I appreciate your professionalism?

13        A.    I don't recall.

14        Q.    And do you recall in a separate moment

15   while you were still inside the holding cell that

16   we can see in camera No. 3, that you said to

17   Officer Schlesinger:  Thank you for your

18   professionalism?

19        A.    I know I told him thank you for the

20   coat.

21        Q.    That's not my question, Mr. Fishman.

22   Just --

23        A.    No, I don't recall that.

24        Q.    Okay.  Thank you.

25              All right.  So following this arrest,
```



1                        MARC H. FISHMAN

2    you were charged with violating an order of

3    protection.  Is that right?

4          A.    Criminal contempt in the second

5    degree; that's right.

6          Q.    And then you stood trial before a jury

7    in January of 2020.  Is that correct?

8          A.    Yes.

9          Q.    All right.  And the jury found you

10   guilty of attempting to violate the order of

11   protection?

12         A.    Attempting and criminal contempt in

13   the second degree, both charges for one alleged

14   crime.

15         Q.    And you made -- and lawyers

16   representing you on your behalf made various

17   motions to vacate the jury verdict, correct?

18         A.    A lawyer made motions and I made

19   motions pro se.

20         Q.    Okay.  So both yourself and lawyers on

21   your behalf moved to vacate the jury verdict.  Is

22   that accurate?

23         A.    Yes.

24         Q.    And is it accurate that all those

25   motions were denied?



```
 1                    MARC H. FISHMAN

 2         A.    No.

 3         Q.    So you're saying that the jury verdict

 4    was vacated by a Court order?

 5         A.    No.  I'm saying one of the motions was

 6    not answered by Judge Zuckerman.  He never

 7    answered.

 8         Q.    And am I correct that following the

 9    jury verdict finding you guilty of attempting to

10    violate an order of protection and violating the

11    order of protection, that you have not appeared

12    for your sentencing?

13         A.    That's incorrect.  I appeared over a

14    half dozen times in person until he decided not to

15    sentence me.  I also appeared virtually more than

16    a half a dozen times, and they didn't sentence me.

17         Q.    And you appeared in January of 2020 to

18    be sentenced?

19         A.    Post-January 28th; January, February

20    and March of '20; yes, sir.

21         Q.    And you understand there's a bench

22    warrant for your arrest because you have not

23    appeared for your sentencing in this case?

24         MR. DEMIRAYAK:  Note my objection as

25         asked and answered.
```



1                        MARC H. FISHMAN

2            3:51 p.m.

3                    (Recess.)

4                    VIDEOGRAPHER:  We are back on the

5            record.  The time is 4 o'clock p.m.

6       BY MR. LOOMBA:

7            Q.    Okay.  Welcome back, Mr. Fishman.

8                    So we had, when we stopped, I was

9       showing you what we were going to mark as Exhibit

10      A for your deposition, which is your first amended

11      complaint, and I am now showing you a portion of

12      paragraph 83 of that document.

13                   Do you see it on your screen?

14           A.    Yes.

15           Q.    Okay.  And I'll read it slowly and you

16      can watch it and you can also watch the realtime

17      transcription.  Paragraph 83:

18                   The failure to accommodate resulted in

19      plaintiff being arrested and charged for crimes he

20      was actually innocent of and for which the police

21      lacked probable cause, but for the failure to

22      accommodate plaintiff's disabilities, he would

23      have been able to explain to the defendants that

24      the 28-page custody and visitation order made his

25      conduct on December 15, 2018 completely legal.



1                    MARC H. FISHMAN

2              Do you see the -- do you see where I

3    read?

4         A.    Yes.

5         Q.    Okay.  And I think you know, I'm just

6    confirming your earlier testimony, but do you

7    believe that to be accurate?

8         A.    Yes, a hundred percent accurate.

9              MR. LOOMBA:  Okay, good; all right.

10             I'm going to mark the next document;

11        sorry, just bear with me here.  This is --

12        oh, sorry.  Here we go; okay.

13             We're going to mark this as Exhibit B

14        like boy.

15             (Exhibit B, Plaintiff's initial

16        disclosure, was marked for identification at

17        this time.)

18        Q.    And Mr. Fishman, do you see that this

19   is a document called "Plaintiff's Initial

20   Disclosure, pursuant to Rule 26A"?

21        A.    Yes.

22        Q.    Okay.  Have you seen this document

23   before?

24        A.    Yes.

25        Q.    All right.



1

2                          CERTIFICATE

3              I, AMY A. RIVERA, a Certified Shorthand

4     Reporter, Registered Professional Reporter,

5     Certified LiveNote Reporter, and Notary Public of

6     the State of New Jersey, do hereby certify that

7     prior to the commencement of the examination MARC H.

8     FISHMAN was duly sworn by me to testify the truth,

9     the whole truth and nothing but the truth.

10             I DO FURTHER CERTIFY that the foregoing is

11    a true and accurate transcript of the testimony as

12    taken stenographically by and before me at the time,

13    place and on the date hereinbefore set forth.

14             I DO FURTHER CERTIFY that I am neither a

15    relative nor employee nor attorney nor counsel of

16    any of the parties to this action, and that I am

17    neither a relative nor employee of such attorney or

18    counsel, and that I am not financially interested in

19    the action.

20    _____

21             Notary Public of the State of New Jersey

22             My commission expires July 29, 2025

23             License No. XI00939

24    Dated:  October 17, 2023

25

