UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

MARC FISHMAN,                          :

                                                    DOCKET NO.

                    Plaintiff,        :   19-CV-265 NSR

          -against-                   :

CITY OF NEW ROCHELLE; LANE            :

SCHLESINGER, SHIELD #1058; JOSEPH

F. SCHALLER; ROBERT GAZOLLA, In His:

Official Capacity as Police

Commissioner of the City of New      :

Rochelle Police Department;

SERGEANT MYRON JOSEPH, SHIELD #18  :

& COUNTY OF WESTCHESTER,

                                       :

                    Defendants.

————————————————————x

                         Lexitas -

                         LegalView VC


                         December 1, 2023

                         10:00 A.M.


          DEPOSITION of OFFICER LANE SCHLESINGER, a
Defendant in the above-entitled action, held at the
above time via Video Conference, taken before a
Certified Court Reporter of the State of New
Jersey.



                    LEXITAS TRI STATE

          100 Merrick Road, Suite 320W

          Rockville Centre, New York 11570

               (516) 678-8700 Ext. 2332

```
(1)    A P P E A R A N C E S:

(2)

(3)    LAW OFFICES OF CANER DEMIRAYAK, ESQ., P.C.

(4)    BY: CANER DEMIRAYAK, ESQUIRE

(5)    300 Cadman Plaza West

(6)    One Pierrepont Plaza, 12th Floor

(7)    Brooklyn, New York 11201

(8)    Tel: (718) 344-6048

(9)    Email: caner@canerlawoffice.com

(10)   Attorney for the Plaintiff

(11)

(12)

(13)

(14)   THE QUINN LAW FIRM

(15)   BY: LALIT K. LOOMBA, ESQUIRE

(16)   399 Knollwood Road, Suite 220

(17)   White Plains, New York 10603

(18)   Tel: (914) 997-0555

(19)   Fax: (914) 997-0550

(20)   Email: loomba@quinnlawny.com

(21)   Attorneys for the Defendants

(22)

(23)

(24)   A L S O   P R E S E N T:

(25)   ROBERT CALVERT, New York State E-Notary
```

(1)                      **I  N  D  E  X**

(2)

(3)

(4)   WITNESS            EXAMINATION BY            PAGE

(5)

(6)   OFFICER LANE SCHLESINGER

(7)

(8)                   MR. DEMIRAYAK              8

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

```
(1)                E   X   H   I   B   I   T   S

(2)

(3)

(4)    EXHIBIT NO.      DESCRIPTION                PAGE

(5)

(6)    P-1             AUDIO RECORDING        PREMARKED

(7)    P-2             UNIDENTIFIED DOCUMENT  PREMARKED

(8)    P-3             TEXT MESSAGES          PREMARKED

(9)    P-4             DOMESTIC INCIDENT      PREMARKED
                        REPORT

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)    *Exhibit marked & retained by Attorney*

(21)

(22)

(23)

(24)

(25)
```

```
(1)
(2)                 S  T  I  P  U  L  A  T  I  O  N  S
(3)
(4)
(5)
(6)          IT IS HEREBY STIPULATED AND AGREED
(7)    by and between (among) counsel for the respective
(8)    parties herein, that filing and sealing being the
(9)    same are hereby waived.
(10)          IT IS FURTHER STIPULATED AND AGREED
(11)   that all objections, except as to the form of the
(12)   question, shall be reserved to the time of the
(13)   trial.
(14)          IT IS FURTHER STIPULATED AND AGREED
(15)   that the within deposition may be sworn to and
(16)   signed before any officer authorized to administer
(17)   an oath, with the same force and effect as if
(18)   signed and sworn to before the Court.
(19)
(20)
(21)
(22)
(23)                    *     *     *
(24)
(25)
```

(1)

(2)         V I D E O   S T I P U L A T I O N S

(3)

(4)          IT IS HEREBY STIPULATED AND AGREED

(5)     by and between counsel for all parties present

(6)     that pursuant to C.P.L.R. Section 3113 (d) this

(7)     deposition is to be conducted by

(8)     Videoconference, that the Court Reporter, all

(9)     counsel, and the witness are all in separate

(10)    remote locations and participating via

(11)    Videoconference ((LegelView/Zoom/WebEx) meeting

(12)    under the control of Lexitas Court Reporting

(13)    Service, that the officer administering the

(14)    oath to the witness shall be sworn in remotely

(15)    by the Court Reporter after confirming the

(16)    witness' identity, that this Videoconference

(17)    will not be recorded in any manner and that any

(18)    recording without the express written consent

(19)    of all parties shall be considered

(20)    unauthorized, in violation of law, and shall

(21)    not be used for any purpose in this litigation or

(22)    otherwise.

(23)

(24)          IT IT FURTHER STIPULATED that

(25)    exhibits may be marked by the attorney

(1)

(2)     presenting the exhibit to the witness, and that

(3)     a copy of any exhibit presented to a witness

(4)     shall be emailed to or otherwise in possession

(5)     of all counsel prior to any questioning of a

(6)     witness regarding the exhibit in question. All

(7)     parties shall bear their own costs in the conduct

(8)     of this deposition by Videoconference.

(9)

(10)

(11)

(12)

(13)

(14)

(15)                              *      *      *

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)    (Whereupon, the deposition commences at 10:09 a.m.)

(2)        O F F I C E R  L A N E  S C H L E S I N G E R,

(3)    47 North Avenue, New Rochelle, New York 10801,

(4)    having been duly sworn, testifies as follows:

(5)    DIRECT EXAMINATION

(6)            **BY MR. DEMIRAYAK:**

(7)        Q.    Good morning, Officer.  My name is Caner

(8)    Demirayak.  I am an attorney and I represent the

(9)    plaintiff, Marc Fishman, versus the City of New

(10)   Rochelle in a lawsuit that involves an incident

(11)   that occurred on December 15, 2018 and

(12)   circumstances arising thereafter.

(13)            I'm going to be asking you some questions

(14)   today regarding that lawsuit in your capacity as a

(15)   police officer on behalf of the New Rochelle Police

(16)   Department, and, also, as a factual witness for

(17)   involvement in the arrest and prosecution of Mr.

(18)   Fishman.

(19)            So I'm going to ask you some questions

(20)   about that today. If, at any point, you don't

(21)   understand what I ask or if it didn't make sense,

(22)   please let me know.  I can repeat or rephrase the

(23)   question for you.

(24)            This is important because if you answer a

(25)   question, it's going to be assumed for the record

(1)   **in hyper-escalated state where it differs from when**

(2)   **we interview them one-on-one in person.  So that**

(3)   **wouldn't affect my investigation.**

(4)        Q.   Okay.  In this case, do you have an

(5)   independent recollection of the event of December

(6)   15, 2018?

(7)        **A.   I don't understand what you mean**

(8)   **independent, sir.**

(9)        Q.   Do you remember anything just by your own

(10)  memory?

(11)       **A.   Yes.**

(12)       Q.   Okay.  And on that date when you received

(13)   -- withdrawn.

(14)            Did you receive a radio run to respond to

(15)  the complaining witness, Jennifer Solomon, that

(16)  day?

(17)       **A.   Yes.**

(18)       Q.   At the time you received the radio run,

(19)  wasn't Mr. Fishman already at the precinct

(20)  voluntarily?

(21)       **A.   I don't believe so.**

(22)       Q.   Okay.  Were you notified on that radio

(23)  run that Mr. Fishman was already there?

(24)       **A.   I believe your time line might be askew.**

(25)       Q.   Explain that. What do you mean by my time

(1)      Q.   If he wanted to leave, your 10-12 request

(2)  would basically obligate the other officers and

(3)  supervisors at the precinct to not let Mr. Fishman

(4)  leave.

(5)           Is that correct?

(6)      **A.   Based on the eJustice print-out, yes.**

(7)      Q.   Did you look at the eJustice print-out

(8)  before you got to the precinct?  While on the

(9)  radio?

(10)     **A.   Going back there I looked at it on the**

(11) **computer.**

(12)     Q.   In the car?

(13)     **A.   Mm-hum.**

(14)          **MR. LOOMBA: You have to say yes or no.**

(15)     **A.   Sorry.  Yes.**

(16)     Q.   What was the date of the order of

(17) protection that you saw on the eJustice?

(18)     **A.   I don't recall.**

(19)     Q.   Were there multiple orders of

(20) protection?

(21)     **A.   I believe so.**

(22)     Q.   Which order of protection were you

(23) claiming that Mr. Fishman violated that day?

(24)     **A.   I can't think it out right now.**

(25)     Q.   Was it one?  More than one?

(1)        A.    I don't have the information in front of

(2)    me.  It's five years ago.

(3)        Q.    Okay.  So the 10-12 was authorized upon

(4)    interviewing Miss Solomon and looking at the

(5)    eJustice print-out at that point, right?

(6)        A.    To detain and interview the party.  Yes.

(7)        Q.    Alright.  When you asked for that 10-12

(8)    were you made aware of the fact that there was a

(9)    visitation order in place allowing some contact

(10)   between Mr. Fishman and Jennifer Solomon?

(11)        MR. LOOMBA: Objection to form.  You can

(12)   answer.

(13)        A.    I believe there were several stipulations

(14)   that I observed in the order.

(15)        Q.    Okay.  And were you aware at that point

(16)   that Mr. Fishman was attempting to have a

(17)   supervised visit with his children that day?

(18)        MR. LOOMBA: Objection to form.  You can

(19)   answer.

(20)        A.    Based on my interview only to what she

(21)   stated.  That Miss Elliot explained to her that she

(22)    -- Miss Elliot said she did not want to come

(23)   today.  She knew it was in violation and she was

(24)   made to do so.

(25)        Q.    Who said that she knew it was in

(1)    violation?

(2)        **A.    Miss Elliot.**

(3)        Q.    Okay, but you hadn't spoken to Miss

(4)    Elliot yet.  You only got that from Miss Solomon.

(5)            Is that fair?

(6)        **A.    Right.**

(7)        Q.    Okay.  Now, at that point, did anyone

(8)    allege that Mr. Fishman had threatened or spoken to

(9)    Miss Solomon?

(10)       **A.    No.**

(11)       Q.    Okay.  And the eJustice that you looked

(12)   at in your car, did it say it was a full stay-away

(13)   order or something else?

(14)       **A.    I don't recall.**

(15)       Q.    Okay.  Who did you get the information

(16)   from as far as the -- sorry.  Withdrawn.

(17)           Who did you get the information from as

(18)   far as the visitation order?  Was it from eJustice

(19)   or was it from Miss Solomon or somebody else?

(20)       **A.    At which point, sir?**

(21)       Q.    Before you got back to the precinct?

(22)       **A.    From Miss Solomon.**

(23)       Q.    Okay.  And what did Miss Solomon say Mr.

(24)   Fishman did that would result in a 10-12?

(25)       **A.    I can't recall verbatim but the summary**

(1)    of our conversation was that Mr. -- I'm sorry.  Mr.

(2)    Fishman was able to, under supervised visitation

(3)    and in accordance with her belief, to do so visits

(4)    with a court-appointed liaison.

(5)            MR. LOOMBA: Supervised?

(6)        A.    Supervised visit.  That due to the last

(7)    time, whatever incident occurred, okay, Miss

(8)    Solomon explained to Miss Elliot and Mr. Fishman,

(9)    whatever form of communications that they used,

(10)   that the visitation for that day was canceled which

(11)   she's allowed to do.

(12)       Q.    Okay.  So the visit was canceled.

(13)   Alright.  But beyond the visitation being canceled,

(14)   what did Miss Solomon say that Mr. Fishman did that

(15)   was illegal?

(16)       A.    Oh, I'm sorry.  That he went by the

(17)   house, okay?  House is on Halcyon Terrace which is

(18)   a cul-de-sac, dead-end street which is not near any

(19)   main roads. That he drove by in a vehicle.  Got out

(20)   of the passenger seat I believe.  And tried to call

(21)   to his son who was outside playing hockey.

(22)       Q.    But there were no criminal charges made

(23)   against Mr. Fishman with respect to violating order

(24)   of protection with respect to this.  Is that fair?

(25)           MR. LOOMBA: Objection to form.  You can

(1)         Q.    She was the one driving the car when the

(2)    incident happened, right?

(3)         **A.    Yeah.**

(4)         Q.    Mr. Fishman never drove a car, right?

(5)         **A.    Correct.**

(6)         Q.    As you sit here today, do you know

(7)    whether or not Mr. Fishman is a person with a

(8)    disability?

(9)         **A.    Yes.**

(10)         Q.    Okay.  Tell me what disability does Mr.

(11)    Fishman have under your understanding?

(12)         **A.    I believe he stated he had a cognitive**

(13)    **disability.**

(14)         Q.    Okay.  When did he state that?

(15)         **A.    When I was interviewing him.**

(16)         Q.    And did you interview him in a separate

(17)    room?

(18)         **A.    Can you clarify that?**

(19)         Q.    Did you interview him in a room that

(20)    wouldn't be recorded on the video we're looking

(21)    at?

(22)         **A.    Yes.**

(23)         Q.    Okay.  Now, the room in which you

(24)    interviewed him in, please tell me where that is

(25)    specifically in the New Rochelle Police

(1)        Q.    Alright.    When did you start wearing

(2)    body-worn cameras?

(3)        **A.    You'd have to ask the New Rochelle Police**

(4)    **Department.    I don't have the exact date.**

(5)        Q.    I'm asking for you when did you start

(6)    wearing a body camera?

(7)        **A.    When the New Rochelle Police Department**

(8)    **madated it.**

(9)        Q.    Was it in 2017?

(10)        **A.    No.**

(11)        Q.    Was in it 2018?

(12)        **A.    No.**

(13)        Q.    Was it in 2019?

(14)        **A.    No.**

(15)        Q.    So it's your testimony you did not have a

(16)    body-worn camera on you at the time of December 15,

(17)    2018?

(18)        **A.    Yes.**

(19)        Q.    Okay.    Do you have an independent

(20)    recollection of the sum and substance of the

(21)    statements made by yourself and plaintiff, Mr.

(22)    Fishman, in that interview room that's not recorded

(23)    on video?

(24)        **A.    Yes.**

(25)        Q.    Okay.    What do you remember about your

(1)   specific interview independently without reviewing

(2)   documents in your own head that you had with Mr.

(3)   Fishman in that room?

(4)        A.   Mr. Fishman was perfectly lucid in

(5)   conversation. Miss Elliot was in the room with us

(6)   first and stated that she knew that she did not

(7)   want to -- she told Mr. Fishman that he should not

(8)   be going to Miss Solomon's house today.  That the

(9)   visit was canceled.  And that he basically

(10)  threatened her fiscally by saying that if she

(11)  didn't go he would find another court-appointed

(12)  liason.

(13)       MR. LOOMBA: By the way, for Miss

(14)  Reporter, I think, and the witness can correct me,

(15)  I think he meant to fiscally.

(16)       Q.   You can continue.

(17)       A.   Miss Elliot stated the fact that he was

(18)  not supposed to be there.  She stated that in front

(19)  of him.  Mr. Fishman then decided to show me he had

(20)  contact with his daughter and was sending her

(21)  messages via text message.

(22)       Q.   So you didn't interview Mr. Fishman

(23)  individually?  Just with Miss Elliot there?

(24)       A.   I interviewed them together.  And then

(25)  Miss Elliot was excused and I spoke to Mr. Fishman.

(1)          Q.    Okay.  How many minutes did you spend in
(2)     the room with both Mr. Fishman and Miss Elliot
(3)     together?
(4)          **A.    Approximately five to ten minutes.**
(5)          Q.    Okay.  And were you asking them both
(6)     questions or were you just asking one person
(7)     questions?
(8)          **A.    Don't recall.**
(9)          Q.    Okay.  During that conversation, did you
(10)    discuss any sort of order of protection or
(11)    visitation order with Mr. Fishman and Miss Elliot?
(12)         **A.    Yes.**
(13)         Q.    Okay.  What was stated?  What do you
(14)    remember about that?
(15)         **A.    That Miss Elliot knows.  She stated that**
(16)    **she knew that the visit and the actions were in**
(17)    **violation of order of protection.**
(18)         Q.    Did you ask her if she ever saw or read
(19)    the order of protection?
(20)         **A.    Yes.**
(21)         Q.    What did she say?
(22)         **A.    Yes.**
(23)         Q.    Okay.  What did Mr. Fishman say about
(24)    this order of protection and visitation order?
(25)              **MR. LOOMBA: I'm sorry.  The last part of**

(1)    day?

(2)         A.    One second.

(3)              MR. LOOMBA: We're having a tech issue

(4)    here evidently.

(5)              (Off the record at 10:08 a.m.)

(6)              (Back at 11:01 a.m.)

(7)              MR. LOOMBA: Can I have the last question

(8)    read back?

(9)              (Whereupon, the requested portion is read

(10)              back by the court reporter.)

(11)             MR. LOOMBA: I was trying to get

(12)    clarification because it wasn't clear at least to

(13)    me what you meant by order.

(14)             MR. DEMIRAYAK: I'll rephrase the

(15)    question.

(16)        Q.    Did you ever get a chance to read all of

(17)    the documents that we referred to so far which

(18)    would include the orders of protection and the

(19)    visitation order that day?

(20)        A.    Yes.

(21)        Q.    Okay. And after having reviewed those

(22)    documents you still felt Mr. Fishman violated some

(23)    sort of law?

(24)        A.    Yes.

(25)        Q.    Okay.  What law do you think he violated

(1)  at that point?

(2)        A.    Criminal contempt.

(3)        Q.    What are the elements of that crime at

(4)  that point?

(5)        A.    Violating a duly advised order that's

(6)  been signed off by a Judge.

(7)              (Off the record at 11:05 a.m..

(8)              Mr. Demirayak has technical issues.)

(9)              (Back on the record at 11:13 a.m.)

(10)             MR. DEMIRAYAK: What was the last question

(11)  and answer?

(12)             (Whereupon, the requested portion is read

(13)                   back by the court reporter.)

(14)        Q.    From your understanding of criminal

(15)  contempt, on December 15, 2018, was intent the

(16)  required element of that crime?

(17)             MR. LOOMBA: To your understanding.

(18)        A.    No.

(19)        Q.    From your understanding, on December 15,

(20)  2018, whether or not there was intent, as long as

(21)  an order of protection was violated in some way,

(22)  it's, as you said, set in stone and the violation

(23)  has occurred.  Is that fair?

(24)             MR. LOOMBA: Object to form.  You can

(25)  answer.

(1)      A.    Can I rephrase what I did say?

(2)      Q.    You can answer whatever you'd like, sir.

(3)      A.    Yeah.

(4)            MR. LOOMBA: Object to the form of the

(5)   question because I wasn't sure that he had

(6)   accurately characterized what you said on the

(7)   video.  My objection is noted for the record.  You

(8)   can answer that.

(9)      A.    I believe every situation is different.

(10)  The actions of Mr. Fishman during that day violated

(11)  the order, okay?  Miss Elliot told him in this

(12)  specific situation that he was violating the order

(13)  and he chose not to listen.

(14)     Q.    Did he violate the order with intent?

(15)           MR. LOOMBA: Objection to form.

(16)     A.    After being told that he was not supposed

(17)  to do it, I would say yes.  In -- this is my

(18)  opinion.

(19)     Q.    You feel there's intent because someone

(20)  told him not to do something?

(21)     A.    A court-appointed liason, that's a

(22)  representative of the court.  Yes.

(23)     Q.    Did you ever accomodate Mr. Fishman's

(24)  cognitive disability during the police encounter

(25)  you had with him?

(1)        Q.   And those conversations would have

(2)    occurred in that side room where there's no video

(3)    or audio recording, correct?

(4)        **A.   Yes, sir.**

(5)        Q.   And when you're telling me that Mr.

(6)    Fishman did not request an accommodation for

(7)    disability, are you telling me that based on your

(8)    independent recollection, or are you telling me

(9)    that based on reviewing documents?

(10)       **A.   My recollection, sir.**

(11)       Q.   So you remember on December 15, 2018, as

(12)   you sit here today five years ago -- approximately,

(13)   five years ago, you remember him not asking for

(14)   accommodation?  You remember that just from your

(15)   own memory?

(16)       **A.   Yes, sir.**

(17)       Q.   Are you sure?

(18)       **A.   Yes, sir.**

(19)       Q.   If Mr. Fishman said he did, in fact,

(20)   request accomodation, would he be wrong?

(21)       **A.   Yes, sir.**

(22)       Q.   Did any other officer or employee at the

(23)   New Rochelle Police Department give Mr. Fishman

(24)   accomodation that day?

(25)       **A.   What do you mean?**

(1)             MR. LOOMBA: What do you mean by

(2)   accommodation?

(3)       Q.    Did anyone accommodate any of his

(4)   disabilities before the end of that day?

(5)             MR. LOOMBA: Object to form.  You can

(6)   answer.

(7)       A.    I believe what you're referring to is the

(8)   fact that we made accomodations for him to be

(9)   bailed out on a non-bailable offense.  The answer's

(10)  yes.

(11)      Q.    Why was that done?

(12)      A.    Out of consideration for Mr. Fishman.

(13)      Q.    Consideration for what?

(14)      A.    His claimed disability.

(15)      Q.    So, although you didn't believe he was

(16)  disabled, you still considered his disability and

(17)  letting him bail out on a non-bailable offense?

(18)      A.    Yes.  The New Rochelle Police Department

(19)  tries to imploy empathy and accomodations for

(20)  people with certain situations.  They did so that

(21)  day.

(22)      Q.    But only after you have someone

(23)  criminally charged, right?

(24)            MR. LOOMBA: Objection to form.  You can

(25)  answer.

(1)    Fishman was two houses away from them?

(2)        A.    Yes, sir.

(3)        Q.    Okay. Now, is this the first time you've

(4)    heard this audio --

(5)        A.    -- yes, sir --

(6)        Q.    -- up to this point?

(7)        A.    Sorry. Yes, sir.

(8)        Q.    Now, after having heard that, I'm

(9)    assuming that it's correct that Mr. Fishman was two

(10)    houses away from the alleged victim.

(11)            Would you still feel that he committed

(12)    criminal contempt at the second degree?

(13)            MR. LOOMBA: Object to form.  You can

(14)    answer.

(15)        A.    Yes, sir.

(16)        Q.    Why?

(17)            THE WITNESS: Can I -- am I allowed to use

(18)    the diagram?

(19)            MR. LOOMBA: No.  Just don't write

(20)    anything.  Just answer his question.

(21)        A.    Halcyon Terrace, where the complainant

(22)    lives, is approximately four to five blocks off of

(23)    North Avenue.  So it would be eastbound off of

(24)    North Avenue.

(25)            It's located in a very secluded area that

(1)    is adjacent to Iona College.  On one end of the

(2)    block there's a dead-end and it's a completely

(3)    residential neighborhood.  There's very little

(4)    through-traffic in that neighborhood.

(5)           So two houses down from the place where

(6)    he's not supposed to be, which is, also, four to

(7)    five blocks off of the main thoroughfare, in my

(8)    opinion as a police officer shows intent.

(9)           Also, the fact that he stopped and tried

(10)   to make contact with the children when he's not

(11)   supposed to be, shows intent.

(12)       Q.   Did the order of protection have any

(13)   restrictions on distance, locations, and such?

(14)       A.   No, sir.

(15)       Q.   Do you know that from your own memory?

(16)       A.   I don't recall for most of my career if

(17)   any orders have an exact footage or distance.

(18)       Q.   So whether Mr. Fishman was two houses

(19)   down, one house down, on the curb ten houses down,

(20)   he still violated it?

(21)           MR. LOOMBA: Objection to form.  Go

(22)   ahead.

(23)       A.   If Mr. Fishman was on the curb one house

(24)   down, two houses down, and he tried to make contact

(25)   with the children where he was supposed to stay

(1)        Q.    Was Lieutenant Wenzler in the room when

(2)    you questioned Fishman and Elliot?

(3)        **A.    He was in and out of the room.  I don't**

(4)    **remember at that particular room if he was in or**

(5)    **out, but he was supervising the investigation.**

(6)        Q.    Did he ask any questions of Mr. Fishman?

(7)        **A.    I don't recall.  You have to ask him.**

(8)        Q.    Do you remember the sum and substance of

(9)    what you said and what Wenzler said to you?

(10)        **MR. LOOMBA: Asked and answered.  Go**

(11)    **ahead, answer again.**

(12)        **A.    That there was probable cause to make the**

(13)    **arrest and that the violation of the order of**

(14)    **protection was valid.**

(15)        Q.    Who said that?

(16)        **A.    You stated what was our conversation**

(17)    **about.**

(18)        Q.    I said what were the words stated by you

(19)    and what words were stated by Wenzler?

(20)        **A.    I don't remember verbatim.**

(21)        **MR. LOOMBA: He gave you the sum and**

(22)    **substance of the conversation.  He said he couldn't**

(23)    **remember the precise words.**

(24)        **MR. DEMIRAYAK: Alright.**

(25)        Q.    Did you both ever speak about Mr.

(1)    Fishman's disability?

(2)         A.    Yes.

(3)         Q.    What was stated by you and/or Wenzler

(4)    regarding Mr. Fishman's disability?

(5)         A.    I reiterated to my lieutenant what Mr.

(6)    Fishman stated to me.  I believe the screening

(7)    officer, also, spoke to Mr. Fishman during the

(8)    booking process which he'd have access to the

(9)    video.

(10)           I'm going to assume, because I didn't

(11)   watch it, that he stated his disability and it was

(12)   determined that we would have accomodations made

(13)   for him so that Miss Bulevar could take him.  He

(14)   would post bail and he could return another date

(15)   instead of being in the holding cell for the

(16)   weekend.

(17)        Q.    So was, in fact, a determination of the

(18)   City of New Rochelle Police Department Mr. Fishman

(19)   was disabled?

(20)           MR. LOOMBA: Objection.  You can answer.

(21)        A.    I don't know what an official

(22)   determination of the police department would be

(23)   during the weekend.  Lieutenant Wenzler is my

(24)   ranking officer.  He made a decision based on

(25)   however he decided to, and that was what we did.

(1)        Q.    Well, Lieutenant Wenzler felt Mr. Fishman

(2)   was disabled but you did not, right?

(3)              **MR. LOOMBA: Objection.**

(4)        **A.    That's not what I said at all.  I said**

(5)   **Lieutenant Wenzler made a decision based on his**

(6)   **synopsis of the situation, what was claimed, and he**

(7)   **made a decision to release Mr. Fishman so that**

(8)   **medical attention, if needed, could be given to him**

(9)   **and he doesn't have to be housed in a cell**

(10)  **unnecessarily.**

(11)       Q.    If you were the ultimate decision-maker

(12)  would you have allowed Mr. Fishman to be released

(13)  without bail?

(14)       **A.    I'm not the decision-maker.  Nor would I**

(15)  **make assumptions like that.**

(16)       Q.    Were you told --.

(17)             Well, you didn't -- you told us before

(18)  you didn't believe his disability.

(19)       **A.    I said based off our conversation I**

(20)  **didn't see any reason that he couldn't understand**

(21)  **or had a lucid conversation where he didn't.**

(22)       Q.    As a result, you felt that he did not

(23)  require any accomodations or modifications in the

(24)  police encounter, correct?

(25)       **A.    No.  He didn't ask for any.**

(1)        Q.    Did he ask to go home and not be put in

(2)    jail?

(3)        **A.    Not that I recall.**

(4)        Q.    So it was provided to him at Lieutenant

(5)    Wenzler's decision?

(6)        **A.    Yes.**

(7)        Q.    Okay.  His decision that he was disabled

(8)    should be letting him go home?

(9)            **MR. LOOMBA: Objection to form.**

(10)        **A.    It was his decision based on**

(11)    **circumstances to show leniency.  Not hold Mr.**

(12)    **Fishman in a jail block for the weekend.  To**

(13)    **receive the sort of modified protocol that would**

(14)    **have to be issued.**

(15)            **Lieutenant Wenzler made a decision based**

(16)    **off of whomever he may have spoken to as ranking**

(17)    **officer and as the officer in charge of that day.**

(18)            **What goes into that consideration and**

(19)    **what decision is made you have to ask him, sir.**

(20)        Q.    Did you review any medical record of Mr.

(21)    Fishman at any time during this investigation?

(22)        **A.    I'm sorry.  Say that again.**

(23)        Q.    Did you review any of Mr. Fishman's

(24)    medical records?

(25)            **MR. LOOMBA: Sorry, Caner, you cut out the**

(1)    opinion?

(2)         **MR. LOOMBA: Objection.**

(3)      **A.    No.**

(4)         **MR. LOOMBA: I'll object.  That's his**

(5)    **answer.**

(6)      Q.    Okay.  Regardless as you not having an

(7)    opinion from your interactions with Mr. Fishman

(8)    that day, you did not feel he required

(9)    accommodation to speak with you.  Is that fair?

(10)      **A.    Sorry.  Can you repeat that?**

(11)      Q.    Knowing what we know now, and knowing --

(12)    remembering what your interactions were with Mr.

(13)    Fishman that day, it was your opinion that Mr.

(14)    Fishman did not require any accomodations because

(15)    he was speaking with you with no issues, right?

(16)      **A.    Correct.  Nor did he ask for one.**

(17)      Q.    But aside from him asking, it was your

(18)    opinion that, whether or not he asked, he did not

(19)    require any modifications because, in your view, he

(20)    wasn't disabled?

(21)      **A.    Being the fact that he said he was**

(22)    **disabled and did not ask for accomodations and he**

(23)    **was able to have a lucid conversation where he was**

(24)    **able to speak, understand, and interact with me in**

(25)    **a normal basis, then the answer would be yes.**

(1)          **So your statement is absolutely incorrect**
(2)  **and I'm going to repeat what I said before.  You**
(3)  **can ask your question.  Please do it in a polite**
(4)  **and professional manner and this witness will do**
(5)  **his best to answer it.  So go ahead.**
(6)     Q.   On December 15, 2018, are you able to
(7)  come to a determination whether or not Mr. Fishman
(8)  was a person with a disability?
(9)     **A.   According to his claim yes.**
(10)    Q.   What was the answer?
(11)    **A.   According to his claim.**
(12)    Q.   According to you, as a public servant who
(13) interacts with citizens, who has to make sure
(14) you're effectively accomodating a person who's
(15) disabled, is it your opinion on December 15, 2018
(16) that he was disabled?  Yes or no?
(17)    **A.   I accomodated his claim by him telling me**
(18) **he's disabled.  So according to that, I have to go**
(19) **by that.  However, during our conversation he did**
(20) **not ask for any assistance.**
(21)    Q.   So I'm trying to find a word that
(22) characterizes the ridiculousness of your
(23) testimony.  And I'm trying my best to do it in a
(24) polite way.  But the answer you gave us does not
(25) answer the question that we've asked and is

(1)    unacceptable.

(2)            So, again, did you come to a

(3)    determination in your head, as an officer, whether

(4)    he was disabled or not?  Not as you just said, I

(5)    accommodated his claim by allowing him to ask me.

(6)    That's not an answer, Officer.  You're in Federal

(7)    Court.  So was he disabled or not in your opinion?

(8)    Yes or no?

(9)        **A.    According to his claim yes.**

(10)        Q.    So the answer is yes?  Can you answer it

(11)    yes or no?

(12)        **A.    According to his claim yes.  I'm not a**

(13)    **doctor.  Nor can I give you diagnosis.**

(14)        Q.    I didn't ask if you're a doctor.  You're

(15)    a police officer.  You have a very, very important

(16)    job.

(17)        **A.    Right.**

(18)        Q.    I'm asking was he a person with a

(19)    disability?  Is your answer yes because it's not

(20)    clear?  The record says yes according to his

(21)    claim.  I'm saying according to you?

(22)            **MR. LOOMBA: You can give opinion**

(23)    **according to you whether you believe he had a**

(24)    **disability.**

(25)        **A.    I don't believe he had a disability that**

(1)   prevented him from making statements or doing

(2)   documents.  He said --

(3)        Q.   -- In other words, the answer is no?

(4)        A.   That's not what I said.  I don't believe

(5)   he had a disability that prevented him from making

(6)   statements, hearing me, and making decisions based

(7)   on his own -- based on my interview with him.

(8)   Based on what he said.  Video I saw.  He seemed to

(9)   be perfectly lucid.

(10)       Q.   Yes or no, was Mr. Fishman a person with

(11)  a disability on December 15, 2018 when you were

(12)  questioning him?  Yes or no?

(13)            MR. LOOMBA: Hang on.  Based upon your

(14)  interaction with Mr. Fishman on that day you can

(15)  give your opinion as whether you believe --

(16)       A.   -- My opinion is, no, he was not

(17)  disabled.

(18)       Q.   Okay.  Why was that so hard?  We're going

(19)  to move on.

(20)            MR. LOOMBA: Let's take a quick bathroom

(21)  break.

(22)            (Whereupon, a recess is taken

(23)                at 12:23 p.m.)

(24)            (Whereupon, the proceedings resume

(25)                at 12:36 p.m.)

(1)     he's already said which is more than enough that

(2)     you would need.  And you can, also, consult Rule 4

(3)     of the federal rules of procedure or Section 308 I

(4)     believe it is of the CPLR.  But beyond that, move

(5)     on to the questions that have to do with this

(6)     lawsuit.

(7)             MR. DEMIRAYAK: I have many opinions, Mr.

(8)     Loomba.  I'm not going to express them to you on

(9)     the record.

(10)        Q.    So couple more questions, Officer.  I

(11)    want to get you out of here.  Thanks for your time

(12)    today.  I really do appreciate it.  It's allowing

(13)    us to get this case done in a timely manner.  So I

(14)    do appreciate your time today.

(15)            When did you get out of the police

(16)    academy?

(17)        A.    2006.

(18)        Q.    Since 2006 had you ever trained in

(19)    disability accomodations?

(20)        A.    Yes.

(21)        Q.    When and where?  Under what is

(22)    circumstances?

(23)        A.    We do that training every year in the

(24)    police department.  You have to consult the

(25)    training unit for the exact curriculum.

(1)          Q.    Did you ever recall receiving training on

(2)    people with cognitive disabilities?

(3)          **A.    I don't recall.**

(4)          Q.    How about communications disabilities?

(5)          **A.    I don't recall either.**

(6)          Q.    Have you ever interviewed a person who's

(7)    deaf or hard of hearing?

(8)          **A.    Yes.**

(9)          Q.    Have you ever accomodated a person that's

(10)   deaf or hard of hearing?

(11)         **A.    I answered yes.**

(12)         Q.    I didn't hear you.

(13)               What sort of accomodations have you used

(14)   in the past for or among the deaf or hard of

(15)   hearing?

(16)         **A.    An officer that we work with speaks -- or**

(17)   **signs.  I'm sorry.  He has a brother I believe that**

(18)   **is deaf so he knows sign language.**

(19)         Q.    So there's an officer that happens to

(20)   know sign language because he has a relative that

(21)   suffers from a disability for the hearing

(22)   abilities?

(23)         **A.    Yes.**

(24)         Q.    And you've had an occasion to speak with

(25)   a person or interact with a person who's deaf or

(1)  hard of hearing and requested the presence of and

(2)  use of that officer who would be able to

(3)  communicate with the person through American Sign

(4)  Language, right?

(5)       A.   Yes, sir.

(6)       Q.   Under those -- in that case, were you

(7)  able to make a determination, without giving out

(8)  details, whether or not that person was or was not

(9)  disabled?

(10)      A.   Wait.  I'm not understanding.  Could I

(11) verify that they were deaf or did I verify that

(12) they understand and can sign?

(13)      Q.   First one.  Could you verify someone had

(14) a disability to their hearing such as being deaf?

(15)      A.   I can go behind and clap my hands to

(16) know.  If I listen to what he said I accommodate

(17) him and he did no sign language.

(18)      Q.   Was there anything else that could have

(19) been done to confirm whether or not Mr. Fishman was

(20) disabled that day?

(21)      A.   Confirm he was disabled?

(22)      Q.   Yeah.

(23)      A.   I believe through interactive

(24) conversations he was able to be extremely verbose,

(25) talkative, had no problem understanding or making

(1)  **determinations, answered my questions.  I think**

(2)  **that determined any question that would have been**

(3)  **asked just by interviewing him.**

(4)      Q.    But you're not an expert in the

(5)  percentage of words and phrases that are

(6)  understood, the delay, the difficulty, percentage

(7)  of deficits, you're not an expert in that.

(8)          So, you know, assuming that one

(9)  communicates with you but has some deficits that

(10) you as a medical expert don't know, how can you sit

(11) here and tell me that you didn't think he was

(12) disabled or enough to accept his belief that he was

(13) suffering from a cognitive disability?

(14)         **MR. LOOMBA: Objection.  You can answer.**

(15)     **A.    He was able to answer me.  Not ask for**

(16) **assistance.  Or have me repeat it.**

(17)     Q.    With him speaking with you, would you be

(18) able to tell me whether or not he fully understood

(19) the entire conversation?

(20)     **A.    As much as a normal interview would have**

(21) **been established, yes.**

(22)     Q.    But there's no way for you to know what's

(23) going on in his cognitive processing abilities

(24) whether or not he could actually fully communicate

(25) with you in a way that you thought he was from your

(1)  own observations?

(2)          MR. LOOMBA: Wait.  Objection to form.  Go

(3)  ahead.

(4)      A.   From my own observation if I ask a person

(5)  how they are, to introduce myself, they can answer,

(6)  reply, and interact with me on what they wanted to

(7)  say.  Then based off of just that, that would be

(8)  where I would go from there.

(9)          MR. DEMIRAYAK: Off the record.

(10)          (Whereupon, a short recess is taken.)

(11)          (Whereupon, the proceedings resume.)

(12)

(13)  BY MR. DEMIRAYAK:

(14)      Q.   If someone comes to the precinct in a

(15)  wheelchair, and you see them in a wheelchair, do

(16)  you assume that they can't walk or would you ask

(17)  them to get up?

(18)      A.   I would assume they can't walk.

(19)      Q.   Okay.  And you wouldn't have that person

(20)  say something to you?

(21)      A.   I mean why would I be questioning if

(22)  they're in a wheelchair?

(23)      Q.   Well, there's stairs to get into the

(24)  precinct, right?  So how would you get into the

(25)  room?

(1)    by guiding them by letting them take my arm.

(2)         Q.    Same --

(3)         A.    -- You cut out.

(4)         Q.    Now we have a person in a wheelchair.  We

(5)    have a blind person.  And we have someone like Mr.

(6)    Fishman with a mental incapacity -- a cognitive

(7)    disability.

(8)              Why is it different with his disability

(9)    as opposed to the other one as far as verifying the

(10)   person's disability and having an obligation to

(11)   accomodate that person if they needed help?

(12)   Why is it different.

(13)             MR. LOOMBA: Objection to form.  You can

(14)   answer.

(15)        A.    In all of the situations you just

(16)   mentioned I never said I had to verify anything

(17)   with Mr. Fishman.  I didn't verify anything

(18)   either.  By my interaction, by his conversation

(19)   with me, okay, and by the way he was able to speak,

(20)   understand, answer questions, interact, his body

(21)   language.  And he didn't ask for any assistance.

(22)   So, therefore, I wouldn't have to verify if he was

(23)   able to understand and have interaction back and

(24)   forth.

(25)        Q.    Is it your opinion that Mr. Fishman made

(1)    up his disability?

(2)        A.    I don't have opinion on his personality.

(3)    That day I did not see a disability in my

(4)    interaction with him.

(5)        Q.    In other words, if he said he was

(6)    disabled, he wasn't telling the truth according to

(7)    you?

(8)        A.    No.  If he said he was disabled, that's

(9)    his claim and I'm not here to dispute that.

(10)        Q.    But you didn't agree with his claim?

(11)        A.    I don't have to agree with it.  It didn't

(12)    interfere with my -- with him or with what he was

(13)    trying to convey to me.

(14)        Q.    His disability is complete bullshit?  Is

(15)    that what you're saying?

(16)            MR. LOOMBA: Objection.

(17)        A.    I never said anything.  Nor did I curse.

(18)        Q.    But -- so you didn't think he was

(19)    disabled.  Yet, you say he's still entitled to

(20)    believe he's disabled?

(21)        A.    Right.  He's --

(22)            MR. LOOMBA: -- wait.  Let me object to

(23)    form.  He answered.  Go ahead.

(24)        Q.    What was the answer?

(25)        A.    He's allowed to claim he's disabled.  I'm

(1)    not here to dispute that or argue with him.

(2)        Q.    But you didn't accept it?

(3)        A.    It's not for me to accept or not.    It

(4)    didn't interfere with my ability to communicate

(5)    with him or his ability back to me to explain what

(6)    he wanted to do.

(7)            He interacted with me on a normal basis

(8)    of conversation to have small talk, showing me text

(9)    messages between him and his daughter.    He never

(10)    asked for assistance.    Therefore, his cognitive

(11)    disability didn't have effect on my interview.    And

(12)    he never asked for assistance.    So it's not my

(13)    determination whether he actually has a cognitive

(14)    disability or not.

(15)        Q.    You stand by that testimony even though

(16)    you previously testified that Mr. Fishman told you

(17)    that he had a difficult time sometimes with

(18)    understanding words while talking?

(19)        A.    Yes.    He didn't that day.

(20)        Q.    What did you say?    I couldn't hear you.

(21)        A.    He did not.

(22)            MR. LOOMBA: He said he didn't.

(23)        Q.    He didn't?

(24)            MR. LOOMBA: He did not that day.

(25)        Q.    Were you able to count how many words and

(1)  phrases he understood or didn't understand?

(2)      A.    No.   I wasn't counting my words.

(3)      Q.   How do you know he understood everything

(4)  you told him?

(5)      A.   Because he replied with intelligent

(6)  answers.

(7)      Q.   Can an intelligent person be disabled?

(8)          MR. LOOMBA: Objection to form.

(9)      A.   I don't think intelligence has anything

(10)  to do with disability.

(11)      Q.   You just characterized the fact that he's

(12)  able to answer you intelligently despite the fact

(13)  that he had a disability with his cognition.  You

(14)  just said that.  That's why I'm asking you.  His

(15)  intelligence is a thing that shows that you're not

(16)  disabled.  I'm just using your words.

(17)      A.   You're being argumentative and skewing

(18)  what I'm saying, but I will still answer your

(19)  question nonetheless.

(20)          When he answered me he was articulate,

(21)  answered questions, and didn't have any problem

(22)  cognitively.  Understanding what I was saying or

(23)  speaking himself.

(24)          So when I said that intelligence has

(25)  nothing to do with disability, I don't have to

(1)  characterize that, correspond, or not like that.

(2)  Does that suit your answer?

(3)      Q.  In other words, if he sounded --

(4)      A.  -- That's not what I said at all.  I said

(5)  he was able to have a normal conversation and

(6)  interact properly.  If I asked him a question he

(7)  would respond.  If he asked me a question I would

(8)  respond.  And he would take my answer and ask me

(9)  another question and have a perfectly normal

(10) interaction.  Never said anything about

(11) intelligence or anything.

(12)     Q.  Have you ever spoken to someone with a

(13) mental disability?

(14)     A.  I'm sorry.  I didn't hear your question.

(15)     Q.  Have you ever spoken to someone with a

(16) mental disability?

(17)     A.  Yes.

(18)     Q.  Have you ever spoken to someone with

(19) Down's Syndrome?

(20)     A.  Yes.

(21)     Q.  Have you ever spoken to someone that was

(22) able to speak but due to hearing issues did not

(23) pronounce their words correctly?

(24)     A.  Yes.

(25)     Q.  Did you ever speak with someone who has

(1)                    C E R T I F I C A T E

(2)

(3)         I, MADALENE PALAZZO, a Notary Public

(4)    within and for the State of New Jersey, do hereby

(5)    certify:

(6)         That OFFICER LANE SCHLESINGER, the

(7)    witness whose deposition is hereinbefore set forth,

(8)    was duly sworn by me and that such deposition is a

(9)    true record of the testimony given by the witness.

(10)        I further certify that I am not related

(11)   to any of the parties to this action by blood or

(12)   marriage, and that I am in no way interested in the

(13)   outcome of this matter.

(14)        IN WITNESS WHEREOF, I have hereunto set

(15)   my hand this 1st day of December 2023.

(16)

(17)

(18)

(19)

(20)

(21)   _____

       MADALENE PALAZZO, C.C.R.

(22)   LICENSE NO. XI00119000

       NOTARY PUBLIC NO. 2447950

(23)   COMMISSION EXPIRES 7/16/24

(24)

(25)