UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

MARC FISHMAN,

         Plaintiff.

- against -

CITY OF NEW ROCHELLE, LANE
SCHLESINGER, SHIELD # 1058, JOSEPH F.
SCHALLER, ROBERT GAZOLLA, IN HIS
OFFICIAL CAPACITY AS POLICE
COMMISSIONER OF THE CITY OF NEW
ROCHELLE POLICE DEPARTMENT,
SERGEANT MYRON JOSEPH SHIELD # 18,
AND COUNTY OF WESTCHESTER,

        Defendants.
-----------------------------------------------------------------------X

**LOCAL RULE 56.1 COUNTER
STATEMENT OF MATERIAL
FACTS IN OPPOSITION TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

19-cv-00265-NSR

   Plaintiff Marc Fishman respectfully submit this statement, pursuant to Your Honor's

Individual Practice Rules and Rule 56.1 of the Local Civil Rules of the United States District

Courts for the Southern and Eastern Districts of New York, in response to the Local Rule 56.1

Statement of Material Facts by the Defendant and setting forth the disputed material facts upon

which plaintiff contends that defendant fails to satisfy its burden of dismissal pursuant to Rule 56

or that there are genuine issues to be tried requiring denial of defendant's motion:

**Response to Defendant's Statement of Material Facts**

1. Admit.

2. Admit.

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. <u>Ms. Isabella Bolivar is an individual who resides in New York state, and, at all relevant times, was the fiancée of plaintiff Marc Fishman.</u>

   a. Plaintiff admits in part. However, disputes to the extent this is not an accurate statement of fact. Instead, Ms. Isabella Bolivar was the disability aide appointed by the family court for the purposes of the supervised visitation with plaintiffs' children. *See* March 30, 2018 Order annexed hereto as **Exhibit 4**; *see also* **Exhibit 1** at 93:5-21.

8. Admit.

9. Admit.

10. Admit.

11. Admit.

12. <u>Plaintiff Marc Fishman and Ms. Jennifer Solomon were married on July 4, 2010.</u>

   a. Dispute. Plaintiff was married on July 2, 2002. However, his relationship with Ms. Solomon, the family court proceedings and all other proceedings beyond the police encounter itself are completely irrelevant to a determination of whether the defendant violated the plaintiff's rights against disability discrimination and hence irrelevant to an assessment of whether the defendant is entitled to summary judgment. The fallout and consequences of the discrimination and failure to accommodate is relevant only to an assessment of damages should this matter proceed to a trial. Plaintiff therefore objects to the defendant's failure to focus on the specific issue before the court and the waste of time and resources accompanied by having to respond to irrelevant matters. Unless of course the

defendant wishes to voluntarily open the door to plaintiff's claims for false arrest, malicious prosecution and denial of a fair trial under 42 U.S.C. § 1983.

13. <u>Mr. Fishman and Ms. Solomon had four children together: a daughter, a son, and twin sons.</u>

   a. Plaintiff admits. However, his relationship with Ms. Solomon and their children, the family court proceedings and all other proceedings beyond the police encounter itself are completely irrelevant to a determination of whether the defendant violated the plaintiff's rights against disability discrimination and hence irrelevant to an assessment of whether the defendant is entitled to summary judgment. The fallout and consequences of the discrimination and failure to accommodate is relevant only to an assessment of damages should this matter proceed to a trial. Plaintiff therefore objects to the defendant's failure to focus on the specific issue before the court and the waste of time and resources accompanied by having to respond to irrelevant matters. Unless of course the defendant wishes to voluntarily open the door to plaintiff's claims for false arrest, malicious prosecution and denial of a fair trial under 42 U.S.C. § 1983.

14. <u>Mr. Fishman and Ms. Solomon's divorce became finalized in or about October 2012.</u>

   a. Plaintiff admits. The plaintiff had a noncontentious divorce settlement agreement on consent of Ms. Solomon with joint custody in October 2012. However, the family court proceedings and all other proceedings beyond the police encounter itself are completely irrelevant to a determination of whether the defendant violated the plaintiff's rights against disability discrimination and hence irrelevant to an assessment of whether the defendant is entitled to summary judgment. The

fallout and consequences of the discrimination and failure to accommodate is relevant only to an assessment of damages should this matter proceed to a trial. Plaintiff therefore objects to the defendant's failure to focus on the specific issue before the court and the waste of time and resources accompanied by having to respond to irrelevant matters. Unless of course the defendant wishes to voluntarily open the door to plaintiff's claims for false arrest, malicious prosecution and denial of a fair trial under 42 U.S.C. § 1983

15. <u>On June 13, 2018, the Family Court, Westchester County issued a fact-finding order and order of protection in connection with Mr. Fishman, Ms. Solomon and their children.</u>

   a. Plaintiff admits that on June 13, 2018 the supervised visitation order was issued. However, disputes as this is not a full and hence inaccurate statement of fact. Instead, the June 13, 2018 Order followed the issuance of the March 30, 2018 Interim Decision and Order (1) permitting supervised visits with the children every Saturday (once a week starting on March 31, 2018) supervised by Anne Elliot, LCSW and (2) that Mr. Fishman may choose to secure an ADA aide during the visit and that Ms. Solomon would be notified of the identity of the ADA aide along with a resume and contact information. **Exhibits 4 and 7** for March 30 and June 13, 2018 Orders. The March 30, 2018 order required Ms. Solomon to drive the children back and forth to each visit. The March 30, 2018 order did not permit Ms. Solomon to cancel a visit. The ordered weekly supervised visits from March 31, 2018 until commencement of visits on June 16, 2018 or approximately 25 times, under the final order occurred without any issues, disputes or complaints by Ms. Solomon. The ordered every other weekly visits commencing on June 16,

2018 until December 15, 2018 or approximately 14 times, also occurred without any disputes or complaints by Ms. Solomon until December 15, 2018. The June 13, 2018 visitation order did not prohibit Mr. Fishman from accompanying an appropriate adult in transporting the children to a visit, only not to accompany the children home after a visit. The June 13, 2018 order also permitted alternative transportation arrangements. The June 13, 2018 order did not permit Ms. Solomon to cancel a visit.

16. Admit.

17. The order of protection issued on June 13, 2018, among other things, "directed [Mr. Fishman] to stay away from the children, their home, and their schools except for certain supervised parental access, until and including June 13, 2019."

   a. Plaintiff admits that on June 13, 2018 an order of protection was issued. However, disputes as the defendant and its officers did not arrest and charge plaintiff pursuant to such order, but an earlier order of protection of June 27, 2017. As such it is misleading to this court to make it seem the defendants used the later order of protection in its arrest and charging decision. This is crucial as the June 27, 2017 order says nothing about the right to supervised visitation. Only with a reasonable accommodation and explanation of the March 30, 2018 and June 13, 2018 orders would Mr. Fishman have avoided the consequences of disability discrimination. In fact, the defendant and its officer could not charge Mr. Fishman for violating the June 13, 2018 order of protection as it permitted "supervised parental access!" The June 13, 2018 order of protection superseded the June 27,

2017 order and should not have resulted in any arrest or charge of plaintiff. Defendant's employees knew there were two different orders from two years.

18. Admit. Plaintiff further avers that the Second Department's decision further affirmed plaintiff's right to supervised visitation, and hence, confirmed his actions on December 15, 2018 were completely lawful, and only with a reasonable accommodation, could this be explained.

19. Admit. Plaintiff further avers that the Second Department's decision further affirmed plaintiff's right to supervised visitation, and hence, confirmed his actions on December 15, 2018 were completely lawful, and only with a reasonable accommodation, could this be explained.

20. Admit. Plaintiff further avers that the Second Department's decision further affirmed plaintiff's right to supervised visitation, and hence, confirmed his actions on December 15, 2018 were completely lawful, and only with a reasonable accommodation, could this be explained.

21. <u>Under the Order of Protection and revised custody agreement, Mr. Fishman could only visit with his children when accompanied by a court-approved visitation supervisor.</u>

   a. Plaintiff avers that the June 13, 2018 and March 30, 2018 Orders speak for themselves and disputes defendant's summary of the requirements of the Orders.

22. Admit.

23. Admit.

24. Admit.

25. Admit.

26. Admit.

27. <u>The general procedure for visitations as of December 2018 was that Ms. Solomon would drop the children off with Ms. Elliot near Mr. Fishman's apartment in Riverdale, and then, Ms. Elliot would walk the children to Mr. Fishman's apartment.</u>

    a. Dispute. On several occasions Ms. Solomon agreed to meeting or dropping off the children to a location Mr. Fishman was present at with no issues. **Deposition of Ann Elliot at 23:7-16 annexed to defendant's Rule 56.1 as Exhibit F**. Additionally, after such visits Ms. Solomon agreed to a pick up of the children with Mr. Fishman in a vehicle that was "park[ed] a few years from the home." *Id*. Ms. Solomon even conducted one such visitation Jonah Fishman's hockey game in which Mr. Fishman was present all under Ms. Elliot's supervision with no issues. *Id* at 24-26. During that visit Jonah begged and pleaded with Ms. Solomon to let him have lunch with his dad. Ms. Solomon agreed and after the visit Mr. Fishman accompanied Jonah and Ms. Elliot in the car to drop Jonah off at the end of the visit. *Id*. All of which was permitted under the March 30, 2018 and June 13, 2018 visitation orders on those visits and also during the December 15, 2018 visit, which could not be explained to the defendant and its officer without a reasonable accommodation. There was also a second visit at the hockey rink with a similar drop off and return. *Id* at 27-28.

28. <u>After the visit concluded, Ms. Bolivar would drive the children and Ms. Elliot back to Ms. Solomon's home, located at 55 Halcyon Terrace in New Rochelle; or on at least one occasion, Ms. Elliot would take the children back to Ms. Solomon's home using an Uber car.</u>

    a. Dispute. On several occasions Ms. Solomon agreed to meeting or dropping off the children to a location Mr. Fishman was present at with no issues. **Deposition of Ann Elliot at 23:7-16 annexed to defendant's Rule 56.1 as Exhibit F**. Additionally, after such visits Ms. Solomon agreed to a pick up of the children with Mr. Fishman in a vehicle that was "park[ed] a few years from the home." *Id*. Ms. Solomon even conducted one such visitation Jonah Fishman's hockey game in which Mr. Fishman was present all under Ms. Elliot's supervision with no issues. *Id* at 24-26. During that visit Jonah begged and pleaded with Ms. Solomon to let him have lunch with his dad. Ms. Solomon agreed and after the visit Mr. Fishman accompanied Jonah and Ms. Elliot in the car to drop Jonah off at the end of the visit. *Id*. All of which was permitted under the March 30, 2018 and June 13, 2018 visitation orders on those visits and also during the December 15, 2018 visit, which could not be explained to the defendant and its officer without a reasonable accommodation. There was also a second visit at the hockey rink with a similar drop off and return. *Id* at 27-28.

29. Admit. Plaintiff further avers that Ms. Solomon agreed to and never raised any issues in the past with Mr. Fishman being in a car near her house during the drop off of the children as there was no violation of any orders whatsoever.

30. <u>On these two occasions, Ms. Solomon dropped the children off at the ice hockey rink in Mamaroneck, and then after the visit ended, Ms. Bolivar drove the children back to Ms. Solomon's house.</u>

    a. Dispute. On several occasions Ms. Solomon agreed to meeting or dropping off the children to a location Mr. Fishman was present at with no issues. **Deposition of Ann Elliot at 23:7-16 annexed to defendant's Rule 56.1 as Exhibit F**. Additionally, after such visits Ms. Solomon agreed to a pick up of the children with Mr. Fishman in a vehicle that was "park[ed] a few years from the home." *Id*. Ms. Solomon even conducted one such visitation Jonah Fishman's hockey game in which Mr. Fishman was present all under Ms. Elliot's supervision with no issues. *Id* at 24-26. During that visit Jonah begged and pleaded with Ms. Solomon to let him have lunch with his dad. Ms. Solomon agreed and after the visit Mr. Fishman accompanied Jonah and Ms. Elliot in the car to drop Jonah off at the end of the visit. *Id*. All of which was permitted under the March 30, 2018 and June 13, 2018 visitation orders on those visits and also during the December 15, 2018 visit, which could not be explained to the defendant and its officer without a reasonable accommodation. There was also a second visit at the hockey rink with a similar drop off and return. *Id* at 27-28.

31. <u>On or about December 1, 2018, during a scheduled and supervised visit between Mr.</u>
    <u>Fishman and his children, an incident occurred in which one of the twins became very</u>
    <u>upset.</u>

    a. Dispute. As a direct result of parental alienation caused by Ms. Solomon, Aiden
       Fishman was telling Mr. Fishman about things Ms. Solomon claimed he did to her
       during the marriage and he was upset with his father for these things Ms.
       Solomon said to him as a form of parental alienation. **Exhibit 3** at 92:7-93:10.
       Mr. Fishman tried to claim Aiden down and explain that it was not the way Ms.
       Solomon claimed. However, since Aiden took a swing at Mr. Fishman, Ms. Elliot
       stepped in and separated the two. As a result of this and the ongoing parental
       alienation the following visit of December 15, 2018 was to be partial, only with
       Jonah Fishman. **Deposition of Ann Elliot at 34-38 annexed to defendant's Rule**
       **56.1 as Exhibit F**.

32. <u>Ms. Elliot terminated the visit following the incident, and Ms. Bolivar drove everyone</u>
    <u>back to Ms. Solomon's house in New Rochelle.</u>

    a. Dispute. As a direct result of parental alienation caused by Ms. Solomon, Aiden
       Fishman was telling Mr. Fishman about things Ms. Solomon claimed he did to her
       during the marriage and he was upset with his father for these things Ms.
       Solomon said to him as a form of parental alienation. Mr. Fishman tried to claim
       Aiden down and explain that it was not the way Ms. Solomon claimed. However,
       since Aiden took a swing at Mr. Fishman, Ms. Elliot stepped in and separated the
       two. As a result of this and the ongoing parental alienation the following visit of

December 15, 2018 was to be partial, only with Jonah Fishman. **Deposition of Ann Elliot at 34-38 annexed to defendant's Rule 56.1 as Exhibit F.**

33. <u>For the next scheduled visit, December 15, 2018, the two twins did not want to attend, and the older daughter had a school function which prevented her from attending; however, a plan was made to allow J.F. to meet Mr. Fishman for breakfast, after which Mr. Fishman would accompany him to hockey practice.</u>

   a. Dispute. The parties agreed to a partial visit and such visit was confirmed via text message the prior day of December 14, 2018. **Exhibit 2**. Ms. Solomon did not cancel the entire visit. As with prior visits involving Jonah's hockey Mr. Fishman would accompany the parties in picking up Jonah from Ms. Solomon's house stopping the vehicle away from the house.

34. Admit.

35. <u>Ms. Elliot expected that Ms. Solomon was going to drop J.F. off at the restaurant for the breakfast, so when Ms. Bolivar instead drove directly to Ms. Solomon's house, Ms. Elliot was surprised.</u>

   a. Dispute. No where in her deposition does Ms. Elliot say she was surprised. In fact she had "no expectation" of how the visit would go that day. **Deposition of Ann Elliot at 56:2-8 annexed to defendant's Rule 56.1 as Exhibit F.** Ms. Elliot okayed driving to Ms. Solomon to pick up Jonah and when they parked she exited to go pick up Jonah and to address text messages with Ms. Solomon. *Id* at 56:21-57:8. In fact Ms. Elliot confirmed Ms. Bolivar had driven to the location where they normally dropped the kids off (with Mr. Fishman as in the past). *Id* at 58:17-21.

36. Admit.

37. Admit.

38. <u>Because Ms. Elliot had a text message that she wanted to discuss with Ms. Solomon anyway, she decided to walk up to the house to do that.</u>

    a.  Dispute. Ms. Elliot went to go pick up Jonah for the scheduled visit and also wanted to discuss the text message. **Deposition of Ann Elliot at 55-58 annexed to defendant's Rule 56.1 as Exhibit F**.

39. While Ms. Elliot was speaking with Ms. Solomon at her front door, Ms. Bolivar moved the car, and drove it directly past Ms. Solomon's house, which caused Ms. Solomon to become upset.

    a.  Dispute. The vehicle was not moved "directly" past the house, but instead went down the block to make a U-turn as it was a cul-de-sac as they waited for Ms. Elliot to bring Jonah for the visit. Ms. Solomon was not upset as belied by her own 911 call **Exhibit 14 for 911 Call by Ms. Solomon (provided on USB drive)**. In any event, her subjective feeling of upset was not caused by Mr. Fishman and he did not violate the order of protection. In fact Ms. Solomon states that Mr. Fishman drove and stayed 2 houses down. 911 call at 0:00:00-0:00:22. Additionally, Ms. Solomon states falsely that Mr. Fishman is not supposed to come by my house whatsoever omitting the lawful supervised visitation. *Id* at 0:00:40-0:00:52. Ms. Solomon made clear she just wanted to make a report.

40. Admit.

41. Admit.

42. <u>Ms. Solomon yelled to J.F. to get back into the house, which he did, and this caused Mr. Fishman to become very upset.</u>

    a. Dispute. As a another form of parental alienation, which Jonah was in Ms. Solomon's presence (from her stoop) and interacting with Mr. Fishman, she ordered her son to come inside and ignore his father. **Exhibit 3** at 92:7-93:10. Jonah listed as to not upset his mother, and Ms. Solomon created further alienation and harm to Mr. Fishman by doing so. Since it was clear Ms. Solomon sought to violate Mr. Fishman's right to visitation that day he was upset but did not take matters into his own hands and went to the police station to report this violation, which the hope the police would help him. He did not know the defendant would discriminate him and turn the situation against him for lawful conduct.

43. <u>Ms. Elliot then returned to the car and announced that the visit was canceled.</u>

    a. Dispute. Ms. Elliot had the right to insist on the visit but decided to cancel it herself since Ms. Solomon became so upset. Specifically, Ms. Elliot testified that "As a supervisor, I could have said to Ms. Solomon, Ms. Solomon, go inside, he does have a visit this morning by court order, we are going to move forward with the visit and move forward," but she decided not to have a visit as her "perception is we'll have future visits…but it didn't work out that way once we got to the police station." **Exhibit 3** for Deposition Transcript of Ann Elliot at 105:8-23

44. Admit.

45. <u>Ms. Solomon then called the New Rochelle Police Department to report that her ex-husband, Mr. Fishman, had violated the terms of the Order of Protection, and Officer Lane Schlesinger was radioed to respond to Ms. Solomon's house.</u>

    a. Dispute. The cited portion of the defendant witness deposition does not provide support for the above, only that he received a call to respond to Ms. Solomon's house. Ms. Solomon stated in her call to the precinct that resulted in the radio run that Mr. Fishman drove and stayed 2 houses down. **Exhibit 14** for 911 call at 0:00:00-0:00:22. Additionally, Ms. Solomon stated falsely that Mr. Fishman is not supposed to come by my house whatsoever omitting the lawful supervised visitation. *Id* at 0:00:40-0:00:52. Ms. Solomon made clear she just wanted to make a report and did not request an officer to respond.

46. <u>Ms. Solomon told Officer Schlesinger that Mr. Fishman had violated the Order of Protection by driving by the house, which sits in a secluded residential neighborhood, and by getting out of the car and trying to call out to J.F. while he was playing hockey.</u>

    a. Dispute. What Officer Schlesinger recalls he was told by Ms. Solomon is not a fact. In any event her call to the station contradicts his recollection. Ms. Solomon stated in her call to the precinct that resulted in the radio run that Mr. Fishman drove and stayed 2 houses down. **Exhibit 14** at 911 call at 0:00:00-0:00:22. Additionally, Ms. Solomon stated falsely that Mr. Fishman is not supposed to come by my house whatsoever omitting the lawful supervised visitation. *Id* at 0:00:40-0:00:52. Ms. Solomon made clear she just wanted to make a report and did not request an officer to respond.

47. <u>At some point, Officer Schlesinger was notified by dispatch that Mr. Fishman was at police headquarters. Based on his conversation with Ms. Solomon, as well as a review of an e-Justice print out in his car, Officer Schlesinger determined that he needed to speak with Mr. Fishman, so he instructed headquarters to keep him there.</u>

    a. Dispute. What Officer Schlesinger thought or determined is not a fact. In any event, there has been no proof provided that Officer Schlesinger reviewed e-Justice in his car. At the moment he instructed plaintiff to be kept at the precinct, he was in a custodial situation requiring reasonable accommodations and *Miranda* warnings, both of which he was denied.

48. <u>While at police headquarters, but before Mr. Fishman met with Officer Schlesinger, Mr. Fishman can be seen and heard conversing with the civilian service officer ("CSO") at the public counter in the lobby.</u>

    a. Dispute. The video and audio speak for itself and plaintiff refers the court to a determination of what the video and audio display. There is no dispute plaintiff suffers from non obvious cognitive and hearing disabilities that are not always captured at a particular moment.

49. <u>The video shows Mr. Fishman listening and participating in a detailed conversations between himself, the CSO, Ms. Elliot and Ms. Bolivar without any obvious or apparent indication that Mr. Fishman had any difficulty understanding or making himself understood during the conversations.</u>

    a. Dispute. The video and audio speak for itself and plaintiff refers the court to a determination of what the video and audio display. There is no dispute plaintiff

suffers from non obvious cognitive and hearing disabilities that are not always captured at a particular moment.

50. <u>After arriving at police headquarters, Officer Schlesinger interviewed Ms. Elliot, who told him that she had told Mr. Fishman that he should not be going to Ms. Solomon's home because the visit had been canceled, and that Mr. Fishman said that if she did not accompany him to Ms. Solomon's home he would find another court-appointed visitation supervisor.</u>

   a. Dispute. Officer Schlesinger's recollection of hearsay statements is not a fact. In any event, Ms. Elliot testified that (1) the visit was confirmed/scheduled and not canceled (2) she agreed to go with Mr. Fishman to pick up Jonah for the visit and also to ask Ms. Solomon about a text message and (3) never testified about any threat of hiring a different supervisor. Ms. Elliot never testified that Mr. Fishman should not be going to Ms. Solomon's home.

51. <u>Ms. Elliot told Officer Schlesinger that she knew that the visit and the actions taken by Mr. Fishman were in violation of the Order of Protection with which she was familiar.</u>

   a. Dispute. Officer Schlesinger's recollection of hearsay statements is not a fact. In any event, Mr. Elliot testified (1) that she never saw or read the terms of any order of protection, and thus does not know what was required or permitted as per any such order, only the visitation agreement and (2) that she did not feel that anything illegal or criminal had occurred that day.

52. <u>Officer Schlesinger also interviewed Mr. Fishman.</u>

    a. Dispute. Officer Schlesinger failed to provide Mr. Fishman with Miranda warnings and denied him the reasonable accommodation necessary to "interview" the disabled Mr. Fishman.

53. Admit.

54. <u>However, Officer Schlesinger did not recall Mr. Fishman asking for a specific accommodation for any cognitive disability.</u>

    a. Dispute. What Officer Schlesinger thought or determined is not a fact. Mr. Fishman did request a specific accommodation. Specifically, While at the stationhouse, "Ms. Bolivar identified herself as [Fishman's] aide for communication…and that she had the papers with her for the orders, and that [Fishman] needed her help, and she needed to assist [Fishman] with communication and interpret and show all the orders to Officer Schlesinger." **Exhibit 1** at 93:5-21. However, "Officer Schlesinger denied Ms. Bolivar as my aide access to the room to assist me with full and effective communication." **Exhibit 1** at 99:10-16.  Additionally, when Fishman "Showed Officer Schlesinger [his] traumatic brain injury card and asked for [his] aide to be brought in with me…he said he wasn't interested." **Exhibit 1** at 100:2-6. The proposed accommodation was requested and was simply for the disability "aide to come in to assist with…reading and interpreting the order [and] for [Fishman or his] aide to go to the car to get the court file out of the truck that had the order [stating she was] the [court appointed] aide and had the visitation orders." **Exhibit 1** at 102:25-103:8; **Exhibit 4**; **Exhibit 7** for June 13, 2018 27 Page Visitation Order.

Had the accommodation been granted "Ms. Bolivar would have brought the order [showing] she's…the court-appointed aide [and] she would have been able to isolate the portions of the order of protection that have a carve-out for visitation…and she would have been able to read the order." **Exhibit 1** at 104:14-105:11. Had the accommodation been granted the disability aide could have articulated to Officer Schlesinger that there was "no violation [of the order of protection] and the visit wasn't canceled in writing beforehand and that we didn't go on any property." **Exhibit 1** at 107:6-18.

55. Instead, Officer Schlesinger found that Mr. Fishman "was perfectly lucid in conversation," and Officer Schlesinger did not believe that Fishman required an accommodation to participate in conversation.

   a. Dispute. What Officer Schlesinger thought or determined is not a fact. In any event, Officer Schlesinger testified "I never said he wasn't disabled." **Exhibit 9** at 129:9-11.

56. In particular, Mr. Fishman's "verbosity" and lack of any manifest difficulty in understanding or answering questions led Officer Schlesinger to conclude that Mr. Fishman did not require any specific accommodation to understand or participate in the interview or in the arrest process that followed.

   a. Dispute. What Officer Schlesinger thought or determined is not a fact. In any event, Officer Schlesinger testified "I never said he wasn't disabled." **Exhibit 9** at 129:9-11.

57. Admit.

58. Admit.

59. Admit.

60. Admit.

61. Admit.

62. <u>After interviewing Ms. Elliot and Mr. Fishman, reviewing the Order of Protection and visitation order, and conferring with his supervisors, Officer Schlesinger concluded that there was probable cause to believe that Mr. Fishman had violated the terms of the Order of Protection and therefore the criminal contempt provisions of the New York Penal Law.</u>

   a. Dispute. Whether probable cause existed is irrelevant to determining whether plaintiff was discriminated against during the police encounter. In any event, Officer Schlesinger knew there was no probable cause to charge plaintiff with criminal contempt as he admitted on the recorded station video as follows when describing Mr. Fishman's actions at Ms. Solomon's home: "I don't think its intentional or malicious" **Exhibit G to Defendant 56.1 at** 11:59:25 (to the extent defendant did not provide the court with the entire video we demand they do so as the snippet is misleading), "I don't think he did it on purpose," *Id*  at12:00:36, and it was "Not intentional or malicious." *Id* at 12:01. These statements of Officer Schlesinger's determination of a lack of intent defeat any probable cause determination as criminal contempt in the second degree requires "Intentional disobedience or resistance to the lawful…mandate of a court when, with knowledge of such…mandate, he…disobeys…such mandate, and his…conscious objective or purpose is to do so." **Exhibit 15 for New York Criminal Jury Instruction for Penal Law 215.50(3).** Additionally, Officer Schlesinger's acknowledgement that Mr. Fishman did not have intent to violate the Order,

further demonstrates that the reasonable accommodation was extremely necessary here to explain that the conduct was permitted under the visitation order. It bears noting that Mr. Fishman was denied access to these videos during the criminal proceedings and Mr. Loomba during these proceedings repeatedly represented there were no videos only to change this representation at the last minute after Robert Wenzler admitted to such videos during his deposition in this case. This video and audio would have resulted in a dismissal of the criminal case and is currently the subject of an anticipated application in the criminal court to dismiss or secure a new trial. The entire videos are annexed as **Exhibit 16** on a USB drive.

63. Admit. However, plaintiff further avers the defendant has still refused to turn over the video of the interview conducted between plaintiff and Officer Schlesinger.

64. Admit.

65. <u>At about 12:12:00, Officer Schlesinger reads Mr. Fishman his *Miranda* rights, and Mr. Fishman indicates that he understands them; and then, for the next 3.5 minutes, Mr. Fishman engages in a detailed conversation with Officer Schlesinger about his version of the events of the day.</u>

   a. Dispute. The video and audio speak for itself and plaintiff refers the court to a determination of what the video and audio display. However, prior to being put in the cell Officer Schlesinger interrogated Mr. Fishman without reading any *Miranda* warnings and denying him a reasonable accommodation. The interaction in the cell was after the fact.

66. <u>During this conversation, there are no obvious or apparent signs that Mr. Fishman had</u>
    <u>any difficulty understanding or making himself understood through oral communication.</u>

   a. Dispute. The video and audio speak for itself and plaintiff refers the court to a
      determination of what the video and audio display. There is no dispute plaintiff
      suffers from non obvious cognitive and hearing disabilities that are not always
      captured at a particular moment

67. <u>Indeed, for the major portion of this video clip, another officer is having a conversation</u>
    <u>with another detainee, asking him a series of background and suicide screening questions.</u>
    <u>The other detainee actually states he cannot hear because of the conversation between</u>
    <u>Mr. Fishman and Officer Schlesinger. Mr. Fishman, to the contrary, did not state that he</u>
    <u>was distracted by this other simultaneous conversation.</u>

   a. Dispute. The video and audio speak for itself and plaintiff refers the court to a
      determination of what the video and audio display. There is no dispute plaintiff
      suffers from non obvious cognitive and hearing disabilities that are not always
      captured at a particular moment.

68. <u>Mr. Fishman was allowed to be bailed out on an otherwise non-bailable offense.</u>

   a. Partially admit. Dispute as this was a concession of plaintiff's disability and need
      for an accommodation because, Lt. Wenzler testified "By allowing him to leave
      that day versus staying in a jail cell for the next two days, I would say that was an
      accommodation, yes." **Exhibit 10** at 96:3-10. Officer Schlesinger confirmed
      plaintiff did not ask for an accommodation to be sent home. Instead, Lieutenant
      Wenzler "Made a decision to release Mr. Fishman so that medical attention, if
      needed, could be given to him and he doesn't have to be housed in a cell

unnecessarily." **Exhibit 9** at 82:1-10. In the reporting officer narrative it is set

forth that "Due to the poor health of Mr. Fishman and his inability to drive it was

authorized to release him to Ms. Bolivar and assign a return date of 17 Dec 18."

**Exhibit 11** for Reporting Officer Narrative.

69. Admit.

70. The decision to allow Mr. Fishman to be released on bail was made by Lt. Robert

Wenzler, who was the tour commander that day.

    a.  Partially admit. Dispute as this was a concession of plaintiff's disability and need

for an accommodation because, Lt. Wenzler testified "By allowing him to leave

that day versus staying in a jail cell for the next two days, I would say that was an

accommodation, yes." **Exhibit 10** at 96:3-10. Officer Schlesinger confirmed

plaintiff did not ask for an accommodation to be sent home. Instead, Lieutenant

Wenzler "Made a decision to release Mr. Fishman so that medical attention, if

needed, could be given to him and he doesn't have to be housed in a cell

unnecessarily." **Exhibit 9** at 82:1-10. In the reporting officer narrative it is set

forth that "Due to the poor health of Mr. Fishman and his inability to drive it was

authorized to release him to Ms. Bolivar and assign a return date of 17 Dec 18."

**Exhibit 11** for Reporting Officer Narrative.

71. NRPD Officers receive training on persons with disabilities in the police academy.

    a.  Partially admit. As of 2023 there is such training. There is no testimony or proof

of training prior to that, or to what extent such training is provided.

72. <u>Following recruit training, the NRPD has had in-service training regarding people who are showing signs of mental health crises or physical impairments.</u>

    a. Partially admit. However, there has been no in-service training for cognitive disabilities.

73. <u>If a suspect or victim presents with a physical or mental disability, the NRPD procedure calls for a supervisor to be notified after which an assessment will be made to determine if an accommodation is required.</u>

    a. Partially admit. There is no such procedure for cognitive disabilities.

74. <u>If a suspect or victim did not speak English, the NRPD has access to the Language Line for Foreign Speakers.</u>

    a. Partially admit. This is irrelevant to the disability discrimination claims herein.

75. <u>If a suspect or victim was deaf, the NRPD would recall or reach out to someone who knows American Sign Language.</u>

    a. Partially admit. This is irrelevant to the disability discrimination claims herein

76. <u>Mr. Fishman was charged with violating the Order of Protection, and in January 2020, a jury found him guilty of that charge.</u>

    a. Dispute. Defendant's reference to "the Order of Protection" is misleading. Mr. Fishman was charged with violating the June 27, 2017 Order of Protection, which has no reference to a visitation right, and not the one from June 13, 2018, which specifically referenced the right to visitation. The jury's verdict was legally inconsistent as it was guilty as to attempted and completed criminal contempt which is a legal impossibility the prosecutor conceded in post trial motions.

77. <u>In connection with his criminal conviction, a bench warrant was issued for Mr. Fishman's</u>
<u>arrest when he failed to appear in Court for sentencing.</u>

    a.  Dispute. Mr. Fishman by counsel repeatedly requested an accommodation of
appearing at sentencing virtually or to be sentenced in his absence. The
prosecution agreed to such requests. However, the criminal court judge refused to
grant the accommodations and thus issued a bench warrant instead of formally
denying the requests for accommodation the prosecution agreed with.

78. <u>Mr. Fishman's criminal conviction has never been vacated or reversed on appeal.</u>

    a.  Dispute. The prosecution conceded that the jury's verdict and hence conviction
was legally inconsistent, defective and cannot be sentenced on in full. However,
the criminal court judge refused to dismiss or order a new trial. Mr. Fishman
cannot file an appeal as there is no judgment of conviction at this time.

## Plaintiff's Additional Statement of Material Facts

**I.    Plaintiff Marc Fishman Voluntarily Goes to the New Rochelle Police Department**

1.    On December 15, 2018, Marc Fishman (hereinafter "Fishman") voluntarily walked into the New Rochelle Police Department (hereinafter "NRPD") stationhouse to make a complaint about violation of his court ordered supervised visitation with his children. **Exhibit 1** for Deposition Transcript of Marc Fishman at 73:16-74:2; 75:23-25.

2.    The visit was scheduled and confirmed via text message the day prior. **Exhibit 1** at 62:10-63:8; **Exhibit 2** for text messages of December 14-15, 2018.

3.    Ann Elliot (hereinafter "Elliot") testified that "As a supervisor, I could have said to Ms. Solomon, Ms. Solomon, go inside, he does have a visit this morning by court order, we are going to move forward with the visit and move forward," but she decided not to have a visit as her "perception is we'll have future visits…but it didn't work out that way once we got to the police station." **Exhibit 3** for Deposition Transcript of Ann Elliot at 105:8-23.

4.    Fishman was accompanied by the supervisor for the visitation, Elliot and the court appointed disability aide, Isabel Bolivar (hereinafter "Bolivar"). Deposition of Marc Fishman at **Exhibit 1** at 47:21-25; 56:6-24; 79:12-20.

5.    Bolivar was appointed as Fishman's disability/ADA aide by Judge Michelle I. Schauer in her March 30, 2018 visitation order. **Exhibit 4** for March 30, 2018 Order.

6.    When Fishman arrived at the stationhouse he advised the employee at the counter of his difficulty hearing and understanding her. **Exhibit 1** 78:19-20, 79:2-7.

7.    Fishman disclosed his disability to the window officer at the NRPD. **Exhibit 1** at 79:8-11. Fishman stated he had difficulty interacting and needed an accommodation. *Id*.

## II.  **Plaintiff's Cognitive and Hearing Disabilities**

8.     Fishman suffers from "Post-concussion syndrome [and] traumatic brain injury affect[ing] registration, cognition, short-term memory, names, sequences." **Exhibit 1** at 39:6-10; **Exhibit 5** for Medical Note of March 22, 2021 from Center for Cognition and Communication.

9.     Additionally, Fishman suffers from "tinnitus…which impacts [his] hearing" and "occipital neuralgia, which is severed nerves in the rear of [his] head." **Exhibit 1** at 37:3-22.

10.     As a result of this disabilities, Fishman has received treatment including "executive function testing…memory recall…speak, traumatic brain injury therapy [and] role playing with decision making." **Exhibit 1** at 45:15-20.

11.     Plaintiffs caries cards labeled "Brain Injury Identification Card," and a Medtronic Medical Device Identification card for his Stimulation System Implant. **Exhibit 6** for Identification Cards.

12.     Elliot testified she felt Fishman was "a little slow." **Exhibit 3** at 92:19-93:2.

13.     Elliot testified that Fishman would have difficulty in expressing and communicating what occurred to the police officers who interviewed him, that he could come off as slower and would be jumping all over. **Exhibit 3** at 108:16-109:11.

14.     When asked about whether Fishman needed an accommodation or modification, Elliot explained "I just know with my communication [with Fishman] sometimes it did get a little frustrating but as a professional I had to work with that, so yes." **Exhibit 3** at 109:12-20.

### III.     Defendants Agree Plaintiff is Disabled

15.     Officer Schlesinger testified "I never said he wasn't disabled." **Exhibit 9** at 129:9-11.

16.     In their motion to dismiss the complaint the defendants did not contest plaintiff's disability.

17.     The defendants agreed to and did conduct plaintiff's deposition in this case with the assistance of a real time transcription accommodation.

18.     The Second Circuit previously granted Fishman's motion in another matter for an accommodation for this disabilities in the form of real time transcription during oral argument.

### IV.     Plaintiff Requests a Reasonable Accommodation

19.     While at the stationhouse, "Ms. Bolivar identified herself as [Fishman's] aide for communication…and that she had the papers with her for the orders, and that [Fishman] needed her help, and she needed to assist [Fishman] with communication and interpret and show all the orders to Officer Schlesinger." **Exhibit 1** at 93:5-21.

20.     However, "Officer Schlesinger denied Ms. Bolivar as my aide access to the room to assist me with full and effective communication." **Exhibit 1** at 99:10-16.

21.     Additionally, when Fishman "Showed Officer Schlesinger [his] traumatic brain injury card and asked for [his] aide to be brought in with me…he said he wasn't interested." **Exhibit 1** at 100:2-6.

22.     The proposed accommodation was requested and was simply for the disability "aide to come in to assist with…reading and interpreting the order [and] for [Fishman or his] aide to go to the car to get the court file out of the truck that had the order [stating she was] the

[court appointed] aide and had the visitation orders." **Exhibit 1** at 102:25-103:8; **Exhibit 4**;

**Exhibit 7** for June 13, 2018 27 Page Visitation Order.

23.     Had the accommodation been granted "Ms. Bolivar would have brought the order [showing] she's…the court-appointed aide [and] she would have been able to isolate the portions of the order of protection that have a carve-out for visitation…and she would have been able to read the order." **Exhibit 1** at 104:14-105:11.

24.     Had the accommodation been granted the disability aide could have articulated to Officer Schlesinger that there was "no violation [of the order of protection] and the visit wasn't canceled in writing beforehand and that we didn't go on any property." **Exhibit 1** at 107:6-18.

25.     Bolivar testified that she was prevented from going into the interrogation room with Fishman. **Exhibit 8** for Deposition Transcript of Isabel Bolivar at 38:19-39:11.

26.     Bolivar testified she told Schlesinger "I wanted to go in with them to explain the situation, to participate in the interrogation and he literally put his arm out and he stopped me. He didn't let me." **Exhibit 8** at 52:3-6.

27.     Bolivar testified she had the court orders and that she could have articulated the situation in a way Fishman could not have. **Exhibit 8** at 38:23-39:2.

28.     Bolivar was intimidated by Schlesinger. **Exhibit 8** at 39:12-20.

**V.     Defendants Deny Plaintiff the Requested Reasonable Accommodation**

29.     Officer Schlesinger intentionally refused to accommodate plaintiff because according to the officer: "I did not think he was disabled" and that "I don't believe he had a disability that prevented him from making statements," and "That day I did not see a disability in my interactions with him." **Exhibit 9** for Deposition Transcript of Lane Schlesinger at 50:8-9, 94:25-9:2, 124:2-4.

30.     When plaintiff showed the officer his brain injury card the officer stated "I don't care. Put it away…I don't need to see it. My boss says I don't need to see it." **Exhibit 1** at 140:18-25.

31.     At some point during the interrogation, Officer Schlesinger asked plaintiff to read, authenticate and explain a 20 plus page visitation agreement to him. Plaintiff "started reading it…and had an occipital neuralgia attack while sitting at the table." **Exhibit 1** at 102:10-19.

**VI.     Defendants Release Fishman on Bail as an "Accommodation"**

32.     While defendant claims it did accommodate plaintiff by allowing him to go home instead of being sent to jail, Robert Wenzler testified that "Decision was not based on some specific policy about accommodating people that were disabled, it was based off of sympathy and empathy to the situation." **Exhibit 10** for Deposition Transcript of Robert Wenzler at 37:2-14.

33.     However, Lt. Wenzler testified "By allowing him to leave that day versus staying in a jail cell for the next two days, I would say that was an accommodation, yes." **Exhibit 10** at 96:3-10.

34.     Officer Schlesinger confirmed plaintiff did not ask for an accommodation to be sent home. Instead, Lieutenant Wenzler "Made a decision to release Mr. Fishman so that medical attention, if needed, could be given to him and he doesn't have to be housed in a cell unnecessarily." **Exhibit 9** at 82:1-10.

35.     In the reporting officer narrative it is set forth that "Due to the poor health of Mr. Fishman and his inability to drive it was authorized to release him to Ms. Bolivar and assign a return date of 17 Dec 18." **Exhibit 11** for Reporting Officer Narrative.

VII.    <u>**Fishman is Significantly Harmed Because of the Denial of a Reasonable Accommodation**</u>

36.    Bolivar testified that had the accommodation been granted "I would have been able to explain [the situation] and help avoid everything that happened to the detriment of these children, him and our families." **Exhibit 8** at 46:15-18.

37.    Fishman was required to expend over $50,000 to defend the criminal case and to hire a disability advocate. **Exhibit 1** at 133:6-25.

38.    Fishman lost his real estate broker's license. **Exhibit 1** at 134:14-135:25.

39.    Fishman lost $150,000 in income as a result of the 10-month suspension of his real estate broker's license. **Exhibit 1** at 136:2-7.

40.    Fishman was convicted of crimes he was actually innocent of. **Exhibit 12** for Memorandum of Law in Support of Motion to Set Aside Guilty Verdict.

41.    Ann Elliot testified "I didn't think there was a crime with Mr. Fishman," with respect to the events of the December 15, 2018 scheduled supervised visitation, and she was not concerned about Mr. Fishman being arrested or charged with a crime that day. **Exhibit 3** at 83:7-17.

42.    The prosecutor conceded that the verdict against Fishman was legally inconsistent. **Exhibit 13** for People's Affirmation in Opposition to Motion to Set Aside Verdict.

43.    The trial judge refused to vacate the legally inconsistent verdict.

44.    Fishman has been prohibited from any visitation with his children since January 28, 2020 as orders of protection have been in place since the jury's legally inconsistent verdict was rendered.

45.     This was a continuation of the parental alienation being created against Fishman as testified to by Elliot. **Exhibit 3** at 92:7-93:10.

LAW OFFICE OF CANER DEMIRAYAK, ESQ., P.C.

Dated: Brooklyn, New York
         July 6, 2024

Caner Demirayak, Esq.
300 Cadman Plaza West
One Pierrepont Plaza, 12th Floor
Brooklyn, New York 11201
718-344-6048
Fax: 646-679-2527
caner@canerlawoffice.com