# In the Matter Of:

## MARC H. FISHMAN -against- CITY OF NEW ROCHELLE

19-cv-265-NSR

## MARC H. FISHMAN

*October 17, 2023*



800.211.DEPO (3376)
*EsquireSolutions.com*

1

2                    UNITED STATES DISTRICT COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4                    Case No.:19-cv-265-NSR

5       -----------------------------------------x

6       MARC H. FISHMAN,

7                                    Plaintiff,

8                -against-

9       CITY OF NEW ROCHELLE, POLICE
        OFFICER LANE SCHLESINGER SHIELD
10      #1058, JOSEPH F. SCHALLER, ROBERT
        GAZZOLA, IN HIS OFFICIAL CAPACITY
11      AS POLICE COMMISSIONER OF THE
        CITY OF NEW ROCHELLE POLICE
12      DEPARTMENT, SERGEANT MYRON
        JOSEPH SHIELD #18, & COUNTY OF
13      WESTCHESTER,

14                                   Defendants.

15      -----------------------------------------x

16

17          REMOTE DEPOSITION OF MARC H. FISHMAN

18               Tuesday, October 17, 2023

19

20

21

22      Reported by:

23      Amy A. Rivera, CSR, RPR, CLR

24      JOB NO.  J10406555

25



MARC H. FISHMAN                                              October 17, 2023
MARC H. FISHMAN -against- CITY OF NEW ROCHELLE                            2

```
 1

 2                                    October 17, 2023

 3                                    1:07 p.m.

 4

 5              REMOTE deposition of MARC H. FISHMAN,

 6    held pursuant to Notice, before Amy A. Rivera,

 7    Certified Shorthand Reporter, Registered

 8    Professional Reporter, Certified LiveNote Reporter,

 9    and a Notary Public.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                      MARC H. FISHMAN

 2    R E M O T E    A P P E A R A N C E S:

 3    LAW OFFICE OF CANER DEMIRAYAK, ESQ., P.C.

 4    Attorney for Plaintiff

 5          One Pierrepont Plaza

 6          300 Cadman Plaza, 12th Floor

 7          Brooklyn, NY   11201

 8    BY:  CANER DEMIRAYAK, ESQ.

 9

10    THE QUINN LAW FIRM

11    Attorneys for Defendants

12          399 Knollwood Road, Suite 220

13          White Plains, NY   10603

14    BY:  LALIT K. LOOMBA, ESQ.

15

16    ALSO PRESENT:

17          Heidi Sarsony, Legal Video Specialist

18

19

20

21

22

23

24

25
```



1                    MARC H. FISHMAN

2     before?

3          A.    I've heard of the American

4     Disabilities Act, yes.

5          Q.    And do you have an understanding of

6     the definition of a disabled person under that

7     statute?

8          A.    Yes.

9          Q.    Okay.  And I'm not asking you for

10    legal advice or anything like that.  I'm not

11    asking you to be an attorney, but just in terms of

12    your own personal understanding of that

13    definition, can you please provide that?

14         A.    Sure.  It is a disability covered

15    under the ADA and the amended ADA of 2008, 2009,

16    which is a major bodily impairment that affects a

17    major bodily function rendering the person

18    clinically disabled.

19         Q.    Were you born with any disabilities

20    under the -- that qualify under the Americans With

21    Disabilities Act?

22         A.    Not that I'm aware of.

23         Q.    Do you trace or do you claim to be

24    your ADA disabilities to the car accidents that

25    you had in 2013?



1                    MARC H. FISHMAN

2        A.    Yes.

3        Q.    And I understand that you claim

4    there's more than one disability, but could you

5    please list the disabilities that you claim that

6    qualify under the ADA that were caused by that --

7    by those 2013 car accidents that you were involved

8    in?

9        A.    Yes.  So I have ulnar, U-L-N-A-R,

10   nerve entrapment on both elbows and arms that

11   inhibit my ability to write, use my hand movement.

12   My lower fingers are numb, a significant part of

13   the day.  I have tinnitus which is ringing in the

14   left ear, which impacts my hearing as well as

15   balance and vertigo.

16               I have vertigo daily, particularly

17   when I move my head, get up in the morning or

18   walk.

19               I have occipital, O-C-C-I-P-I-T-A-L,

20   neuralgia, N-E-U-R-A-L-G-I-A, which is severed

21   nerves in the rear of my head, neck on the left

22   side behind the ear, near the ear.

23               I have burning eyes as a result of

24   that, and daily headache pain which affects my

25   nerve system pain management.



```
                      MARC H. FISHMAN
1
2               I have post-concussion syndrome from a
3   concussion sustained June 10, '13, in an accident
4   where I was rear-ended and suffered whiplash by a
5   van carrying six people.  So I am in regular
6   post-concussion therapy care.
7               I have peripheral neuropathy, which is
8   permanent nerve injury from the car accident.
9               I have severe obstructive sleep apnea,
10  which affects my ability to sleep.
11              I have temporal joint disorder or
12  otherwise known as TMJ.  I'm not going to try to
13  spell temporal.  We call it the acronym, TMJ, and
14  basically TMJ prevents my ability to chew, speak,
15  or more importantly to sleep, open my mouth at
16  night, necessitating the Inspire implant, because
17  the TMJ ball joints are damaged and arthritic and
18  don't cause my mouth to open as someone as wide
19  without that disability.
20              I have a mobility disability with my
21  right foot from the hallux rigidis.  I can't walk
22  on my toe.  It's very painful.
23       Q.    That last one would have resulted from
24  the 2021 car accident.  Is that right?
25       A.    Correct.  But prior to that, I had
```



MARC H. FISHMAN

1

2   what's called sesamoiditis, which is the sesamoid

3   bones in the right foot getting damage from the

4   2013 accident.  So I had a right foot injury

5   previous to that.

6             And those are pretty much the major

7   ones, you know, that affect, you know, movement,

8   the post-concussion syndrome, traumatic brain

9   injury affects registration, cognition, short-term

10  memory, names, sequences.  Occipital neuralgia,

11  you know, also affects my ability to see outside

12  without sunglasses.  My eyes burn, so I wear

13  sunglasses pretty much all the time outside.

14       Q.    Okay.  Other than the ones you listed,

15  are there any others?

16       A.    I think those are the main ones.

17  There might be one or two others, but without

18  reading the doctors' report, those are the major

19  ones that I live with day-to-day.  Obviously, the

20  hernia, half of my groin is numb from the meshes,

21  so I have numbness and nerve pain throughout my

22  body.

23       Q.    Sure.

24             And the hernia surgery was as a result

25  of the 2013 car accident?



```
1                    MARC H. FISHMAN
2         Q.    How long have you been treating with
3    Dr. Michelle Maidenberg?
4         A.    I've been treating with Dr. Maidenberg
5    since -- since the accident, 2013.
6         Q.    Continuously since 2013?
7         A.    Regularly, weekly, most weeks, yes.
8         Q.    And what does the treatment consist
9    of?
10        A.    I don't understand the question.
11        Q.    Well, when you treat with
12   Dr. Maidenberg, is it -- is that a talk therapy
13   situation or is she having you do exercises or is
14   it something else?  Just describe it for me?
15        A.    All three.  We do cognitive breathing
16   exercises.  We do executive function testing.  We
17   do memory recall.  We do some speech, traumatic
18   brain injury therapy.  We do some role playing
19   with decision-making, post-concussion treatments,
20   various.
21        Q.    When was the last time you had a
22   session with Dr. Maidenberg?
23        A.    Last Wednesday.
24        Q.    When is your next one scheduled for?
25        A.    Tomorrow.
```



1                    MARC H. FISHMAN

2    Premium Therapy, yes, Joan Ryan, therapist;

3    received cognitive therapy from the Center For

4    Cognition, Dr. Brown, in Manhattan.

5         Q.    Any others?

6         A.    No, there was some cognitive therapy

7    in the South Bronx.  I forget the name where I

8    attended.

9         Q.    By the way, when you see your therapy

10   with Dr. Maidenberg, is that a Zoom call where you

11   can both see and hear each other?

12        A.    Sometimes.

13        Q.    Do you sometimes do it over the

14   telephone?

15        A.    Sometimes.  Mostly face time, Zoom,

16   bad connection, telephone.

17        Q.    Do you use realtime transcription when

18   you have your cognitive therapy with

19   Dr. Maidenberg?

20        A.    Yes.

21        Q.    At any time, have you had what's

22   referred to as a disability aide assigned to you?

23        A.    Yes.

24        Q.    And that's Ms. Bolivar, right?

25        A.    Several aides assigned to me.



MARC H. FISHMAN

1
2    you know, for the, you know, denied in person and

3    virtual visits pending in the appellate courts New

4    York.

5        Q.    Okay.  Understood.  Thank you.

6              We were talking about your disability

7    aides, Efrim Cohen, you mentioned Joyce Fishman.

8    Were there any others?

9        A.    Yes.

10       Q.    Who?

11       A.    I had Isabelle Bolivar Court-appointed

12   as the American With Disabilities Act aide.

13       Q.    Which Court appointed her?

14       A.    Family Court Judge Michelle Schauer in

15   Yonkers.  She moved to Yonkers and took the case

16   with me.

17       Q.    Is that how you first met Ms. Bolivar?

18       A.    No.

19       Q.    When did you first meet her?

20       A.    I met Ms. Bolivar in December 2015.

21       Q.    When was she appointed by Judge

22   Schauer?

23       A.    I believe the appointment was in March

24   of 2018 in Court order.

25       Q.    Okay.  Did you ever live with



1                    MARC H. FISHMAN

2    for the reporter?

3         A.    Sure, 3200 Netherland,

4    N-E-T-H-E-R-LA-N-D, Avenue, apartment if F, Bronx,

5    New York, 10463.

6         Q.    Thank you.

7               And that's the Riverdale apartment

8    that we've been talking about, correct?

9         A.    Yes.

10        Q.    Okay.  And you -- when you woke up

11   that morning, am I correct that you were under the

12   impression that you were going to have a

13   supervised visitation with your children?

14        A.    I received a text message from Ann

15   Elliott confirming the visit.

16        Q.    And that's one of the text messages

17   that you reviewed in preparation for your

18   deposition, correct?

19        A.    Yes.

20        Q.    And what did the text message say?

21        A.    In response to my --

22        Q.    In sum or substance, you don't have

23   to --

24        A.    To summarize, in response to my text

25   to her at 5:08 p.m. on December 14th asking her to



MARC H. FISHMAN

1    confirm the visit that it was Hanukkah, and I

2    celebrate Hanukkah, I'd like to see my kids, and

3    is my visit on for the, you know, two-week cycle,

4    which was tomorrow, the 15th.

5            She wrote:  Pick me up at 9 a.m. and,

6    you know, I'll be outside for you to come get me

7    for the visit.

8        Q.    Okay.  And so, am I correct that then

9    you and -- Ms. Bolivar was living at your

10   apartment in the Riverdale at the time?

11       A.    Yes.

12       Q.    And so the two of you woke up, got

13   started, and drove into -- drove to pick up

14   Ms. Elliott, the supervisor, correct?

15       A.    Right.  Ms. Bolivar drove.  I was the

16   passenger, yes, to pick up Ms. Elliott in Harlem,

17   yes.

18       Q.    Okay.  And you picked her up at her

19   house?

20       A.    At her apartment building.

21       Q.    Her apartment building, thank you.

22            And had you done that before?

23       A.    Yes.

24       Q.    When you -- what time did you and



MARC H. FISHMAN
MARC H. FISHMAN -against- CITY OF NEW ROCHELLE

MARC H. FISHMAN

1

2    Q.    By the way, did Jonah -- as Ann

3    Elliott was walking back towards the car, was he

4    still just playing in the driveway?

5    A.    Yes, he had a -- there was another

6    male there who was older and taller, who he was

7    playing with, and there was a net, and there was

8    hockey equipment, and they were -- they were

9    shooting a hockey stick and playing in the

10   driveway.

11   Q.    Did you ever see him run back to his

12   house?

13   A.    No, not while I was there.  He didn't

14   run back.  He was playing with his friend the

15   entire time we were there.

16   Q.    So Ann comes back and says:  The

17   visit's been canceled, and tell me what happens

18   after that?

19   A.    I told Ann I wanted to go make a full

20   report at the police station of a visitation

21   violation and asked the cops if they could enforce

22   my visitation order.

23        And Ms. Bolivar drove to the police

24   station, I believe -- I think it's on Main Street

25   or North Avenue.  It's the building next to the



1                      MARC H. FISHMAN

2      school administration for New Rochelle.

3           Q.    What did Ann Elliott say, if anything,

4      after you said you wanted to go to the police

5      station?

6           A.    I don't understand the question.

7           Q.    Sure.

8                 You said that you wanted to go to the

9      police station to make a report, correct?

10          A.    Yes.

11          Q.    And did Ann Elliott hear you say that

12     that's what you wanted to do?

13          A.    Yes.

14          Q.    And did she react in any way upon

15     learning that that was your intention?

16          A.    Yes, she was upset the visit was

17     canceled.  I prepaid her $500 for a visit, so the

18     money is not refundable, you know, and she saw I

19     was -- I was upset, you know, two Saturdays a

20     month with the kids and my confirmed visit earlier

21     was -- was canceled, according to Ann Elliott,

22     after she spoke with Jennifer.

23                So, you know, I was frustrated and

24     upset.  I wouldn't get to see my kids, who I love

25     very much.



1                    MARC H. FISHMAN

2         Q.    Sure, I understand.  I was more

3    interested if Ann Elliott said anything that you

4    recall?

5         A.    I think she was going to tell the cops

6    that --

7         Q.    No.  Mr. Fishman, sorry to cut you

8    off.  I don't think you understand my question.

9         A.    Okay, I'm sorry.

10        Q.    You're in the car, and the car is

11   parked four houses, 200 feet away, let's say, from

12   the Halcyon Terrace --

13        A.    Yes.

14        Q.    Ann comes back and announces that the

15   visit is going to be canceled.  You announce that

16   you're going to go to the police station?

17        A.    Yes.

18        Q.    She hears that, does she say anything

19   in response to you announcing that you were going

20   to go to the police station?

21        A.    I don't know.  I don't recall exactly

22   what she said.

23        Q.    Okay.  That's fine.  So, in fact, you

24   drove to the police headquarters, right?

25        A.    Ms. Bolivar did, yes.  I was the



                    MARC H. FISHMAN

1

2    exchanged notes with me.

3        Q.    When you say, she exchanged notes,

4    what do you mean?

5        A.    I wrote that I wanted to make a police

6    report of a Court-ordered visit violation and

7    she -- I couldn't hear her, so she wrote on the

8    piece of paper back that she was getting an

9    officer to take my report.

10       Q.    Okay.  So you're saying you actually

11   literally took a piece of paper and wrote

12   something out and handed it to her?

13       A.    There was like -- I wouldn't call it

14   like a bank teller window, but I would call it

15   some sort of receptacle to exchange, I would call

16   it papers or I.D. underneath this bulletproof

17   glass that had I think had some drilled window

18   holes -- drilled holes through it, it was very

19   dark and, yes, I told her I couldn't hear her, and

20   that I was disabled.  I kept on putting my ear to

21   the glass, and then eventually put a note

22   underneath, and she put the note back to me.

23       Q.    What did it say, if you remember?

24       A.    Hold on.  I think, it said, "hold on,"

25   awaiting an officer; meet you outside.



1                    MARC H. FISHMAN

2          Q.    Did you have any verbal exchange with

3    her in front of the window?

4          A.    I was trying to.  I was definitely

5    making statements about violating my visitation

6    order.  I had a very difficult time trying to

7    comprehend her words.

8          Q.    Did you say that to her out loud?

9          A.    I believe I kept on saying, I'm

10   disabled, and I can't hear you.  Can you speak

11   louder?

12         Q.    Was Ms. Elliott standing next to you

13   when you were up at the window communicating with

14   the -- and I'm just going to make a representation

15   that that person is called a civilian service

16   officer, CSO for short.

17              So when you were speaking with the

18   CSO, was Ms. Elliott there?

19         A.    Ms. Elliott and Ms. Bolivar were --

20   were near me, yes.

21         Q.    Did you -- did you hear Ms. Elliott

22   say, while you were there that on the last visit,

23   meaning December 1st of 2018 that the children had

24   become upset and wanted to end the visit with you?

25         A.    I don't recall her saying that, no.



MARC H. FISHMAN

2   could see the question-and-answer room in front of

3   me, directly in front of me, the door to a room

4   that had white walls.

5       Q.    So the officers spoke with Ms. Elliott

6   first, and when that happened, you were sitting in

7   a chair, and you could see the door to the room

8   where the officers and Ms. Elliott were speaking.

9   Is that accurate?

10      A.    No.  So what's accurate is that Ms.

11  Elliott went into the room first.  She motioned

12  for all of us to go into the room and held open

13  the door, allowed Ms. Elliott.  He denied

14  Ms. Bolivar.  At which time, Ms. Bolivar

15  identified herself as my aide for communication,

16  Court-appointed, and that she had the papers with

17  her for the orders, and I needed her help, and she

18  needed to assist me with communication and

19  interpret and show all the orders to Officer

20  Schlesinger.  That's what we requested when we

21  were at the window.

22      Q.    So when you said that the officers

23  interviewed Ms. Elliott first.  Is that correct?

24      A.    No, no.  They didn't enter the room

25  with Ms. Elliott until they let me in the room and



1              MARC H. FISHMAN

2              MR. LOOMBA:  Okay, all right.  That's

3         going to take too much time, and I don't

4         want to waste your time; I'm sorry.

5         Q.    So let me ask you this:  Is it correct

6    that the police spoke with Ms. Elliott first?

7         A.    No, in the question-and-answer room, I

8    think they only spoke to Ms. Elliott and I

9    together.

10        Q.    Oh, okay.  So you were in the room

11   together with Ms. Elliott?

12        A.    Yes, I walked into the room after

13   Officer Schlesinger denied Ms. Bolivar as my aide

14   access to the room to assist me with full and

15   effective communication, I went into the room

16   afterwards.

17        Q.    You went into the room with

18   Ms. Elliott, and who else was in the room?

19        A.    Officer Schlesinger and Myron Joseph,

20   at different times and sometimes together.

21        Q.    And how long were -- by the way, why

22   don't you describe first what happened inside that

23   room, like who spoke, who was asking the

24   questions?  And just give me a picture of what

25   happened?



1                    MARC H. FISHMAN

2        A.    Right.  I went to my medical bag and

3   showed Officer Schlesinger my traumatic brain

4   injury card, and asked for my aide to be brought

5   in with me, and showed the card to him, and he

6   said he wasn't interested.

7              Then I showed him my Inspire implant

8   card, and started describing my symptoms, you

9   know, this is a visitation order.  It's over 20

10  pages.  It's very tiny print, and I can't, you

11  know, read that without assistance.  I would need

12  an aide or a note taker or some sort of, you know,

13  transcription service.

14             At which time, you know, he walked

15  back with Mr. -- what's his name -- Officer Joseph

16  back out of the room, left me with Ann, and

17  returned with a copy of this, you know, visitation

18  order from 2018 and a copy of the order of

19  protection with carve-out for supervised visits

20  and asked me to authenticate it and asked Ann

21  Elliott to authenticate it, if this was the

22  document for visits.  That was the governing

23  document.

24        Q.    And that's the 27-page order?

25        A.    It's 20-some-odd pages.  I don't



MARC H. FISHMAN
MARC H. FISHMAN -against- CITY OF NEW ROCHELLE

October 17, 2023
102

1                    MARC H. FISHMAN

2     Ms. Elliott was there as well, did you tell

3     Officer Schlesinger that you suffered from a

4     disability?

5          A.    Yes, and I showed him my two

6     disability cards.

7          Q.    Okay.  And when you said you suffered

8     from a disability, which specific disability did

9     you mention?

10         A.    I said, I suffer from a traumatic

11    brain injury and encephaloneuralgia and have a

12    difficulty with my burning eyes reading very small

13    print, and that the print on the order he showed

14    me was very, very tiny.

15               So I started reading it, I get a

16    headache, at which time, I started getting redder

17    and redder, and got a headache, and had an

18    encephaloneuralgia attack while sitting at the

19    table.

20         Q.    And did you ask Officer Schlesinger

21    for a specific accommodation?

22         A.    Multiple ones, yes.

23         Q.    Which specific accommodations did you

24    request?

25         A.    I asked for my aide to come in to



                          MARC H. FISHMAN

1    neurosurgeon, on the implant card, the second

2    implant card was the Inspire with Dr. Boris

3    Chernobilsky's number on it, and then the other

4    one, my father.

5                And then I reiterated, I need

6    Ms. Bolivar here to assist me with communication

7    in her Court-appointed role as the visitation and

8    Americans With Disabilities advocate and allow her

9    to come in.

10        Q.    Other than what you've listed, did you

11   ask for any other accommodations?

12        A.    I don't recall.

13        Q.    If Ms. Bolivar had been in the room

14   with you, how would she have -- how do you think

15   she would have helped you?

16        A.    Well, Ms. Bolivar would have brought

17   the order, and she's appointed from March of 2018,

18   and Ms. Bolivar would have been able to give a

19   third perspective on what happened that day as the

20   Court-appointed aide so that the officer didn't

21   just have what he claimed was Jennifer's version,

22   Ann Elliott's version, and my version.

23                She would also have been able to

24   isolate the portions of the order of protection



                        MARC H. FISHMAN

1

2    would -- if you had had access to them, that would

3    have also helped you explain to Officer

4    Schlesinger that, in fact, you had not violated

5    any laws, correct?

6         A.    Well, it wasn't my car, Isabelle

7    Bolivar's car.  But, yes, the documents she had in

8    her purse and in her smart phone, and the paper

9    documents would have shown that between 10 and 5,

10   the 1st and 15th of every month, we have

11   supervised visits.  There's no violation, as long

12   as Ann Elliott is around and the visit wasn't

13   canceled in writing beforehand.

14              And that we didn't go on any property,

15   and Ms. Bolivar could emphasize that.  We didn't

16   go on any property, and I hadn't communicated to

17   Ms. Solomon, I haven't communicated with her

18   directly since 2015.

19        Q.    And I guess what I want to make sure I

20   understand properly is that your position is if

21   you had had access to your documents in the trunk,

22   and if Ms. Bolivar had been there and was able to

23   assist you in reading the orders, all of that

24   could have helped you explain to Officer

25   Schlesinger that you, in fact, had not violated



1                    MARC H. FISHMAN

2    between 2019 and 2020 that you used Ms. Elizabeth

3    Bussian as the visitation supervisor?

4           A.     Yes.

5           Q.     And she charged you a total of $1,500

6    for that?

7           A.     No, I was charged over $15,000 for it.

8           Q.     I'm sorry.  I did -- thank you.

9    You're absolutely correct; $15,000.

10                   And why did she stop in 2020?  Was

11   that because of Covid, I think you explained

12   before?

13          A.     She stopped in-person because of

14   Covid, even though the visits were supposed to be

15   in my home because of my disability, you know, and

16   she had interpreted the order appointing her as a

17   visitation voluntary for the kids.  And so missed

18   several visits until judge Capeci clarified after

19   I filed papers that the visit were mandatory and

20   my ex was subject to a contempt order, at which

21   time, my ex filed with the kids to terminate

22   visits, once she was put under threat of contempt,

23   since the kids didn't show up again for virtual or

24   in-person visits.

25          Q.     So Ms. Bussian stopped because all



MARC H. FISHMAN

1

2       A.    All the transcript costs for county

3   court, all the transcript costs for IDV court or

4   Independent Domestic Violence court, all the

5   transcript costs for these cases.

6       Q.    $50,000 for criminal defense legal

7   fees, can you just identify the lawyers that have

8   defended you in the criminal case?

9       A.    I believe my lawyer is Caner

10  Demirayak, who's on this call with us.

11      Q.    Is that $50,000 consist of

12  Mr. Demirayak's fees alone or is there another

13  lawyer that contributes to that number?

14      A.    I believe Donna Drum was my ADA

15  advocate.  There was some legal fees for her.  I

16  believe there were legal fees to Caner.

17      Q.    Have you actually paid $50,000 to

18  Mr. Demirayak or is that an amount that you owe

19  him?

20      A.    I'm not sure exactly what was paid.  I

21  have to check the paid checks and, you know, ACHs

22  to see what I paid him and what I owe him.

23      Q.    What about for Donna Drum, how much do

24  you owe her?

25      A.    I paid her thousands of dollars.



MARC H. FISHMAN
MARC H. FISHMAN -against- CITY OF NEW ROCHELLE

1             MARC H. FISHMAN

2        Q.    As you're sitting here with me

3   answering my questions, do you know how much?

4        A.    I don't know the exact amount, either

5   one, I know both is thousands dollars.

6        Q.    When you paid Donna Drum, was that out

7   of a checking account?

8        A.    I think we paid Donna Drum via credit

9   card.

10       Q.    And what about Mr. Demirayak?

11       A.    I think Mr. Demiraya was paid via

12   check, via -- I think Zelle, and possibly some

13   other ACH method.

14       Q.    Now, in L, paragraph L, it says that

15   you lost your real estate broker's license, but

16   before you said -- I got the impression that you

17   had not lost it.  So could you please explain?

18       A.    Yeah.  As a result of this case, and

19   the misrepresentations made regarding the visit

20   and the order of protection as the Department of

21   State suspended my license and failed to renew it

22   from around, I believe, the fall of 2021 or the

23   fall of '20 I have to check, until August the

24   following year.

25             So I didn't have my license for 10



MARC H. FISHMAN

1

2    months, until they saw that, you know, the 330s

3    and the representations that I wasn't served with

4    the order of protection, I was convicted of

5    violating, I was actually in jail at the time when

6    everything was typed up, but I hadn't gone on my

7    ex-wife's property and hadn't communicated with

8    her, and I believe they saw some of the federal

9    papers and decided to reinstate

10        Q.    So what's your best estimate as to

11   when your license was suspended?

12        A.    I'm not good with dates, sir, but I

13   know it was October to August.  It was not '22,

14   '23.  Was it '20 or '21?  I think it's either '19

15   to '20 or '20 to '21.  I have to check.  I'm

16   really not good with numbers.  It was a 10-month

17   period in the middle there.

18        Q.    And did that -- did the suspension of

19   your broker's license impact your income in any

20   way?

21        A.    Yeah.  I didn't have any income,

22   couldn't have rental commissions or brokerage or

23   sales or store or building sales, couldn't --

24   couldn't -- couldn't earn with the violation of

25   their licensure.



1                     MARC H. FISHMAN

2          Q.    And it says -- excuse me.  It says:

3     valuation to be supplied under separate cover, do

4     you -- I have not received anything.  Do you have

5     an estimate here as to what the monetary impact of

6     that 10-month suspension is?

7          A.    I would say over $150,000.

8          Q.    And how did you calculate that?

9          A.    Well, because I work on, you know,

10    five to six deals a month, and during that period

11    of time, I couldn't work on any, or actually any I

12    worked on, I wasn't able to be compensated for.

13    So services were rendered free.

14               So your average rental deal is

15    probably a 3 to $4,000 commission, you know, sales

16    of buildings, one building is between 100 and 200

17    a year, you know, and then brokerage for stores,

18    commercial spaces, I usually make $150,000 gross.

19    It varies if I co-broked it, and if my co-broker

20    got a portion of that or not.

21          Q.    And who's your co-broker?

22          A.    I have my broker's license, if I

23    co-broke with someone else.  I wasn't able to do

24    brokerage work for that 10-month period of time.

25    That's what the lawsuit states.



1                    MARC H. FISHMAN

2     say something to you that you felt was

3     disrespecting you because of your claimed

4     disabilities?

5          A.    Yes.

6          Q.    And do you know which officer said

7     that?

8          A.    Officer Schlesinger.

9          Q.    And what did he say?

10         A.    Officer Schlesinger said in front of

11    me to Isabelle Bolivar:  Shame on you as a federal

12    officer, you should know better than to transport

13    someone to attempt to commit a crime.

14         Q.    And did Officer Schlesinger say

15    anything else that you viewed as disrespectful of

16    your disabilities?

17         A.    Yes.

18         Q.    What did he say?

19         A.    When I showed him my traumatic brain

20    injury card, he said:  I don't care.  Put it away.

21              I said:  No.  I want you to read the

22    conditions and symptoms on the back and the

23    accommodation I need.

24              I don't need to see it.  My boss says

25    I don't need to see it.

