NOTICE OF ENTRY

PLEASE TAKE NOTICE that the within
is a true copy of an order entered in
the office of the Clerk of the Family
Court of the State of New York in the
County of Westchester

Date: . . . **6/13/18** . . . . . . .

*M McAuliffe*

Chief Clerk of the Court

Order
Distributed
☐ DSS/SCU
☐ OTHER . . . . . . . . . . . .
P-ATY
R-ATY
C-ATY
☐ M

At a Term of the Family Court of the
State of New York, held in and for
the County of Westchester, at 131
Warburton Avenue, Yonkers, New York
10701 on June 13, 2018

PRESENT: HON. MICHELLE I. SCHAUER

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

-----------------------------------------------------------------------x

In the Matter of  Proceedings under Article 6
of the Family Court Act

JENNIFER SOLOMON,

Petitioner,

DECISION AND ORDER
AFTER FACT-FINDING

Docket Nos.:
V-8186/7/8/9-14/15B
V-8186/7/8/9-14/17P

File No. 131794

MARC FISHMAN,

Respondent.

-----------------------------------------------------------------------x

## NOTICE: YOUR WILLFUL FAILURE TO OBEY THIS ORDER MAY RESULT IN INCARCERATION FOR CRIMINAL CONTEMPT

The parties in this proceeding are the parents of four children (Joanna Fishman born February 9, 2004, Jonah Fishman born November 20, 2005, and Aidan and Skye Fishman, twins born July 14, 2008). The parties were divorced in August 2012. On May 5, 2014, they entered into a So-Ordered Modification Agreement Regarding Custody/Access (Marx, J.) (hereinafter, "the 2014 Agreement"),[1] by which the parties were to share legal custody of the children, with Ms. Solomon having final decision making authority. Ms. Solomon retained physical custody of the children and Mr. Fishman had an access schedule, including alternate weekends and midweek time with the children. Currently before the Court is Ms. Solomon's petition seeking to modify the 2014 Agreement. Additionally, as this Court has issued interim orders modifying the 2014 Agreement, Mr. Fishman's petition to reinstate the terms of the 2014 Agreement is also currently pending before this Court.

Throughout these proceedings, Ms. Solomon has been represented by Nicole

---

[1]The document was admitted into evidence as Court Exhibit 16.

Feit, Esq., of Legal Services of the Hudson Valley. Ms. Feit did not represent Ms. Solomon in the Supreme Court case before Judge Marx. The children have been represented by Kathleen Hannon, Esq., who also represented them in the Supreme Court proceeding before Judge Marx. Since this matter has been pending in this Court, Mr. Fishman has had three separate retained attorneys and in the interests of justice was also assigned a series of four prior attorneys, all of whom requested to be relieved or were discharged by Mr. Fishman. His current attorney, Ian Spier, Esq., his fifth assigned counsel, was assigned in May 2016. Mr. Spier made two applications to be relieved, but this Court denied both applications. Mr. Fishman is not indigent and does not financially qualify for assigned counsel, however, this Court has assigned attorneys to represent him in the interests of justice due to the Court's concerns about Mr. Fishman's apparent mental health issues.

## HISTORY

On June 11, 2014, Ms. Solomon filed a family offense petition against Mr. Fishman, seeking an order of protection on behalf of herself and the parties' four children. She alleged that Mr. Fishman was physically and verbally abusive to the twins. She expressed her concern that Mr. Fishman was "unstable and spiraling out of control" and asserted that he had failed to complete a court-ordered psychological evaluation that was ordered in the context of the parties' divorce proceeding. She also filed, on that date, a petition seeking to modify the access schedule provided to Mr. Fishman in the 2014 Agreement. The ex parte application was heard by Judge Klein,[2] who issued a temporary order of protection directing Mr. Fishman to stay away from Ms. Solomon, her home and her place of business, and that he have no communication with her by any means. Judge Klein also issued a temporary order suspending visits between Mr. Fishman and the four children.

At the preliminary proceeding on June 18, 2014, Judge Klein noted that the 2014 Agreement required that Mr. Fishman complete an evaluation by Dr. Verno. The Agreement stated as follows:

> The Father agrees to have a psychological evaluation by Dr. Robert Verno, at his own cost and expense, and the Father further agrees to comply with the treatment recommendations of Dr. Verno, including a further psychiatric evaluation if recommended by Dr. Verno. The Father shall give to his treating mental health professionals a release to communicate with Kathleen Hannon, Esq., Attorney for the Children, limited to the sharing of information only as to attendance and compliance by the Father.

---

[2]Judge Klein handled the case through December 2014, at which time he retired and all pending matters were assigned to the undersigned.

Mr. Fishman objected to the evaluation on the ground that he could not afford it, but Judge Klein insisted that he complete the evaluation and ultimately, Mr. Fishman did complete the evaluation. Although Dr. Verno's report is part of the Court file, it was not introduced into evidence at the fact-finding and this Court does not rely on the results of that report in reaching its decision in this matter.

Subsequently, the temporary orders of protection and interim visitation orders were modified to allow the parties to communicate to allow for flexibility as to access between Mr. Fishman and the children. During that period of time, Ms. Solomon filed four separate petitions alleging that Mr. Fishman violated both the temporary orders of protection and the interim visitation orders.

The Court bifurcated the family offense and custody proceedings, first conducting a fact-finding hearing with respect to Ms. Solomon's petitions alleging that Mr. Fishman violated the Court's temporary orders of protection, and subsequently conducting a combined hearing with respect to Ms. Solomon's petition seeking a modification of the 2014 Agreement, as well as Mr. Fishman's petition to restore and enforce the terms and conditions of the 2014 Agreement. At the fact-finding hearing regarding custody and visitation, this Court admitted into evidence (at the request of Ms. Solomon's attorney, and without objection) all of the exhibits that had been admitted into evidence during the family offense violation fact-finding (T1 5-6; T3 24-25).[3] Also at the request of Ms. Solomon's attorney, without objection, this Court took judicial notice of and fully incorporated the testimony of all witnesses at the family offense violation fact-finding (T1 5-6). Accordingly, the family offense proceedings are summarized in this decision.

## FAMILY OFFENSE PROCEEDING

The hearing was held over a period of five days, from June 28, 2016 through September 2, 2016. Ms. Solomon introduced 24 exhibits into evidence and Mr. Fishman introduced 2 exhibits into evidence. In addition, this Court considered 15 Court exhibits. At the conclusion of the family offense proceeding, this Court found that Ms. Solomon had established beyond a reasonable doubt that Mr. Fishman had repeatedly violated the orders of protection. There were many violations which Ms. Solomon met her burden of proving, including evidence that Mr. Fishman sent hundreds of text messages to Joanna and a virtual mountain of gifts to the children, all in violation of temporary orders of protection. For purposes of disposition, this Court limited its findings to specific incidents that were admitted by Mr. Fishman, which were in violation of an April 6, 2016 temporary order of protection that was in effect until July 11, 2016.

The April 6, 2016 temporary order of protection issued on behalf of Ms. Solomon and the children provided, in relevant part, that Mr. Fishman have no communication with Ms. Solomon and that he stay away from her place of employment. In addition, the temporary order of protection provided that Mr. Fishman have no communication with

---

[3]References to T1 are to the trial transcript from August 23, 2017. References to T3 are to the trial transcript from August 31, 2017.

the children, "except as provided by court order." The interim order of visitation issued on April 6, 2016 provided for supervised visitation for Mr. Fishman and limited his ability to give gifts to the children to the children's respective birthdays or major holidays. This court specifically advised Mr. Fishman on the record that none of the children's birthdays or major holidays fell between April 6, 2016 and the next scheduled court date, which was July 11, 2016, and that he was not to send any gifts to his children during that time period.

Mr. Fishman acknowledged that he sent gifts to his children for Passover, Memorial Day, and July 4th. As a defense to those violations, he claimed that he did not know that he could not send those gifts as he had not been paying attention in court. The evidence proved otherwise. Significantly, Mr. Fishman's Passover gifts to the children contained cards. The card to Jonah, Aiden, and Skye (Petitioner's exhibit 19) stated "Happy Passover. . . . Passover is a Major Jewish Holiday." Similarly, in his card to Joanna (Petitioner's exhibit 20), he stated "So happy to send you the Gifts on this 'Major Holiday' of Passover." Mr. Fishman also admitted sending the children gifts for Memorial Day and July 4th. Accordingly, this Court found those violations to be established beyond a reasonable doubt, noting that Mr. Fishman was attempting to manipulate the Court's specific directive.

This Court also found that Mr. Fishman violated the April 6, 2016 temporary order of protection, which prohibited him from having any communication with Ms. Solomon, by causing flowers to be sent to her on May 6, 2016, for Mother's Day. Ms. Solomon testified that she received flowers with an attached card reading, "Happy Mother's Day from Aidan, Skye, Jonah, Joanna, and Bella. Enjoy the flowers." Ms. Solomon testified that she thought it was from Mr. Fishman because he always included the pets in his cards, that Bella is her dog, and that she asked her family members and they denied sending the flowers. She testified that her children did not have the capability of ordering flowers on line and paying with a credit card.

Mr. Fishman admitted that he sent the flowers. This Court found that his asserted defenses, that he did it in prior years (years in which there were no orders of protection), and that he did so at the request of his son (the court did not find Mr. Fishman to be credible in that respect), were without merit. This Court deemed the sending of flowers to Ms. Solomon to be a violation of this Court's order of protection (see e.g., Matter of Craig O. v Barbara P., 118 AD3d 1068 [3d Dept 2104]), and found the violation to be established beyond a reasonable doubt.

This Court found another violation established beyond a reasonable doubt by Mr. Fishman's admission, was that he was present at Ms. Solomon's place of employment. The April 6, 2016 temporary order of protection specifically required that Mr. Fishman stay away from Ms. Solomon's place of employment. This court found Ms. Solomon to be credible in her testimony that Mr. Fishman was present on the grounds of her place of employment, Chatsworth School, on June 11, 2016. Ms. Solomon testified that while she and the children were home and the children were having a "Face Time" conversation with Mr. Fishman, she watched as he walked to the school, where a carnival was taking place. Mr. Fishman asked each child if they were going to the carnival, which was at the blacktop area of the school at the rear, inside the school's fence. Ms. Solomon testified that the children, who recognized the school grounds,

were alarmed that Mr. Fishman was at her place of employment.

Mr. Fishman admitted being at the Chatsworth School - Ms. Solomon's place of employment - but asserted that he could be there in violation of the order of protection, because he was an individual with disabilities[4] and that it was a "PTA fair to which the public was invited." This Court found Mr. Fishman's attempt to explain his presence at Ms. Solomon's place of employment by labeling it as "a park to which he, as a disabled person, was entitled to be present," to be disingenuous.

The fact finding concluded on September 2, 2016, and a dispositional hearing was scheduled for December 22, 2016. That date was adjourned at the request of Mr. Fishman and his retained American with Disabilities "ADA" advocate Donna Drumm, Esq.[5] who asserted that he would be too ill to appear in court as he needed to heal from hernia surgery he would be undergoing in December. This Court granted his request on the basis of "disability accommodations" over Ms. Solomon's and the Attorney for the Children's objections and ultimately the dispositional proceeding was held on June 27, 2017.

At the dispositional hearing, this Court expressed frustration with Mr. Fishman's continued refusal to comply with court orders. This Court found that his conduct of sending gifts and flowers, while seemingly benign to those unfamiliar with the facts and history of this case, constituted domestic violence, as it was clearly a pattern of manipulative behavior that constituted emotional and psychological abuse of Ms. Solomon, and supported a conclusion that he was attempting to exercise power and control over Ms. Solomon and to interfere with her ability to parent the children. This Court imposed a sentence of three weeks' incarceration. In addition, this Court issued a Permanent Order of Protection, on behalf of Ms. Solomon only, for a period of two years. That Order of Protection requires that Mr. Fishman stay away from Ms. Solomon, her home, her place of employment at the Chatsworth School, including the Chatsworth School grounds, that he have no communication with her by any means, including through third parties, and that he "[r]efrain from assault, stalking, harassment, menacing, reckless endangerment, strangulation, criminal obstruction of breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching, intimidation, threats, identity theft, grand larceny, coercion or any other criminal offense against Jennifer S. Solomon."[6] This Court continued a temporary order of protection on behalf of the children under the pending custody dockets.

_____

[4]Mr. Fishman has repeatedly demanded numerous "accommodations" from the Court on the basis of his assertions that he is disabled.

[5]By Decision and Order Upon Application for ADA Accommodations, entered January 25, 2017, this Court granted several of Mr. Fishman's requests, including that he be permitted to retain an "ADA Advocate" to be present with him at trial. Other requests were denied on the ground that they did not concern court programs, services, or activities and involved issues that would be determined on the merits of the case as it proceeded in court.

[6]This is the UCS/OCA refrain from form language in the Unified Court System-prepared orders of protection.

CUSTODY PROCEEDING

The Court conducted a fact-finding hearing with respect to Ms. Solomon's petition seeking a modification of the 2014 Agreement, as well as Mr. Fishman's petition to restore the terms and conditions of the 2014 Agreement. The hearing took place over the course of five days, from August 23, 2017 through September 12, 2017. The Court admitted into evidence all of the exhibits that had been admitted into evidence during the family offense violation fact-finding (T1 5-6; T3 24-25), and took judicial notice of, and fully incorporated the testimony of all witnesses given at the family offense violation fact finding (T1 5-6). The Court also considered three in camera interviews held with the children and 34 additional Court exhibits . The parties' attorneys and the Attorney for the Children each submitted post trial written summations, and this court has considered their arguments.

Case presented by Jennifer Solomon

At the fact-finding hearing Ms. Solomon testified on her behalf and presented no other witnesses. In addition, this Court considered 26 additional exhibits entered into evidence by Ms. Solomon. It was undisputed that the children lived with Ms. Solomon in a single family home, where they had lived for more than four years. Her sister, Karen Levinson, helped her care for the children (T1 11-12). Providing an update as to how the children were presently doing, Ms. Solomon stated that the children did very well in school the past school year (T1 16). Skye went from having an IEP and needing the support of a resource room, to qualifying for the school's gifted program (T1 16-17). Aiden also qualified for the gifted program (T1 17). Although Jonah was in special education (T1 17) and had weaknesses in reading and writing, she stated that he far exceeded expectations in other areas, and was brilliant in math. He received a special award at the end of the school year (T1 18-19). When he was a baby, Jonah was diagnosed with Langerhan Cell Histiocytosis. He was followed by a specialist until he was four years old, at which point there was no further sign of disease. Ms. Solomon stated that Jonah had one tumor at two months old, he was treated for that tumor, and he had no other tumors after that (T3 22). When he was a toddler, Jonah was diagnosed with pervasive developmental delays, not otherwise specified. He was later diagnosed with ADHD and autism. Ms. Solomon testified that he was currently doing very well (T1 20). Joanna was a high honor role student (T1 19).

Ms. Solomon testified that she filed the petition seeking to modify the 2014 Agreement after the twins returned home upset from a June 11, 2014 visit with Mr. Fishman (T1 26-29; T3 10-12). A video she took of Skye upset, crying, and vomiting upon his return home from that visit was moved into evidence (Petitioner's exhibit 25) (T1 33-34). Ms. Solomon also moved into evidence photos of marks on Skye's neck and buttocks that she observed upon his return home from the June 11, 2014 visit with Mr. Fishman (Petitioner's exhibits 26, 27, 28, and 29; T1 35-45). Ms. Solomon acknowledged that she made a Child Protective Services report and that she called the police about the incident (T3 15). As a result of those contacts, she filed a family offense petition in Family Court requesting an Order of Protection on behalf of herself and the children and a modification petition (T3 17). Judge Klein temporarily suspended visits between Mr. Fishman and all of the children. Subsequently, by Order of the Court dated July 16, 2014 (Court exhibit 18), Mr. Fishman was permitted to have

visits with his children as supervised by the YWCA Supervised Visitation and Safe Exchange Center ("Y") (T3 20-21). All of Mr. Fishman's interim access orders from that point on permitted him to have only supervised contact with Aiden and Skye.

Ms. Solomon testified that Joanna and Jonah had unsupervised visits with their father beginning on September 11, 2014 and that the unsupervised access lasted until November 2014 (T2 12),⁷ at which time Judge Klein suspended Mr. Fishman's unsupervised visits with Joanna and Jonah. Ms. Solomon described the facts giving rise to that suspension as follows: On November 7, 2014, Joanna and Jonah had a visit with their father and he asked Ms. Solomon if he could keep them overnight. Despite Ms. Solomon declining to permit the overnight visit, Mr. Fishman failed to bring the children home on time. Ms. Solomon testified that she tried to contact him and the children, but received no responses. Finally, at 8:30 p.m., she contacted Mr. Fishman's sister to see if she knew where the children were. The aunt said that Mr. Fishman was at her house on Long Island with the children. At about 10:00 p.m. that evening, the children called and told her that they were sleeping at their aunt's house with their father. Mr. Fishman returned the children the next day at noon (T1 66-67). Ms. Solomon also described an incident when Mr. Fishman picked up Joanna from school, in violation of a court order of visitation (T1 67-68), and an incident where Joanna was "tantruming in fear" after a phone call from her father (T1 70).

In an attempt to increase the duration of time of Mr. Fishman's supervised visitation with the children this Court suggested the parties' propose and agree to a family member who could supervise visits at Mr. Fishman's home. Accordingly, Ms. Solomon's sister, Karen Levinson, began supervising visits between Mr. Fishman and his children but, on February 19, 2015, Ms. Solomon filed an Order to Show Cause to request that visits between the father and children be supervised by a professional supervisor (Court exhibit 23). She testified that while Ms. Levinson was supervising a visit between the father and children, Mr. Fishman brought in Lorna Hayim-Baker, a social worker, to talk to the children without Ms. Solomon's knowledge, in violation of the terms of the 2014 Agreement (T2 20-24). Ms. Solomon testified that Joanna was angry and upset after the visit, Jonah was circling the room and repeating different things that upset him about the event, and Skye was upset, as well (T2 22-23). Apparently, Mr. Fishman initially attempted to have a psychologist named Dr. Saunders meet with the children, but changed his mind upon learning that the Attorney for the Children would have to talk to the doctor before the visit occurred. Ms. Solomon introduced a text message exchange between Mr. Fishman and Ms. Levinson (petitioner's exhibit 49), in which Ms. Levinson states: "I hear that the psychologist meeting on Sunday for the twins is not going to happen because the children's attorney has to meet with the doctor first before the kids." Mr. Fishman responded to the text: "No, Dr. Saunders will not be performing the evaluation" (T5 35).⁸ Then, he

---

⁷References to T2 are to the trial transcript from August 29, 2017.

⁸References to T5 are to the trial transcript from September 12, 2017.

surreptitiously arranged to have Ms. Baker present.[9]

Ms. Solomon asserted that following Mr. Fishman's hernia surgery in December 2016, he cancelled all visits with his children that were scheduled to occur at the Y from December 2016 until March 2017, asserting that he had health issues and "would be on bed rest/homebound for 3-months recovery from surgery" (Court exhibit 43). Ms. Solomon testified that the children had no visits with Mr. Fishman for a period of about three or four months and that they felt disappointed and rejected by Mr. Fishman cancelling visits (T2 65; T3 39-40). Subsequently, after being threatened with lawsuits by Mr. Fishman, the Y refused to continue to supervise Mr. Fishman's visits with his children and by Order dated March 21, 2017 (Court exhibit 44), Comprehensive Family Services ("CFS") was appointed to supervise Mr. Fishman's visits with his children[10].

Ms. Solomon testified that Mr. Fishman's "erratic behavior" had been "damaging, emotionally damaging to the children and to myself, as well as a long history of harassment that has disrupted our lives in an enormous way" (T1 7). She also believed his behavior put the children in danger (T1 8). Ms. Solomon testified that after the 2014 Agreement was executed, Mr. Fishman's communication with her about the children was harassing - he would call her a number of times per day and would also send a barrage of emails and texts throughout the day, including in the middle of the night, early morning and throughout the workday. She stated that he attacked her on the phone, made demands, threatened her, and called her derogatory names. If he disagreed with something she said, he would attack her personally and threaten and bully her (T2 72-7; T3 44-45). She presented emails from Mr. Fishman showing excessive communication from him to her (Petitioner's exhibits 30 through 43). For example, on June 5, 2014, Mr. Fishman sent emails to Ms. Solomon at 5:13 a.m., 5:25 a.m., 5:49 a.m., 7:15 a.m., 7:18 a.m., 7:27 a.m., 9:35 a.m., and 9:45 a.m. (Petitioner's Exhibit 41; T2 82-83; T3 50-51). During the period of time when Mr. Fishman was permitted to have telephone contact with his children as supervised by Ms. Solomon, Ms. Solomon testified that he threatened the children that he would call the police on them if he couldn't speak to all of them, and that he would verbally attack her in front of the children by telling them that their mother was a liar and that she was in violation of a court order. She testified that such behavior alarmed and upset the children (T2 47)[11]. Ms. Solomon requested a professional supervisor be appointed (T1 9). She also requested that if telephone contact between Mr. Fishman and the children were to be permitted, that it be supervised by someone other than her (T1 10). For all of the above reasons, Ms. Solomon asserted she was requesting sole legal and physical custody of

[9]As a result, the Court issued an order that Mr. Fishman have "therapeutic supervised visits/parenting coaching" provided by Mary Crowe, LCSW (Court exhibit 24).

[10] Post trial, this Court was notified that Mr. Fishman filed a lawsuit against CFS, resulting in them refusing to continue to supervise Mr. Fishman's visits with his children. By order entered on consent dated February 22, 2018, this Court appointed Anne Elliot, LCSW, to supervise the visits.

[11]Due to Mr. Fishman's inappropriate behavior, Ms. Solomon is no longer ordered to supervise phone contact between Mr. Fishman and the children (T2 68).

the subject children due to "a long history of not being able to co-parent with Marc Fishman."

Case presented by Marc Fishman

Mr. Fishman testified on his behalf and called two witnesses: Franco Miele, the Principal of one of his children's schools and Dr. Michelle Maidenberg, his personal therapist. In addition, this Court considered 8 additional exhibits entered into evidence by Mr. Fishman[12].

Mr. Fishman recounted that he had a visit with Skye and Aiden on June 10, 2014 (T3 55). He testified that he picked them up from Tonettte Mayhan's daycare in New Rochelle and took them to the Little Gym in Eastchester (T3 56). He stated that after the class was over, Aiden threw a shoe and backpack at him and Skye, hitting them in their head and neck areas (T3 57; T4 130).[13] As he was putting on Skye's shoes and socks, he "rolled up Skye's pant legs and noticed bruising on his left leg as well as on his arm, head, and neck" (T3 57-58). Although he was alarmed about the bruises, he could not remember if he informed Ms. Solomon about them (T4 131). He later testified that he did inform Ms. Solomon of the bruise on Skye's leg, but that he did not inform her of the bruise on his head or neck (T4 134), and that he "believe[d] he did inform her by email or text, but that he would have to check his records to be sure (T4 134-135). He never followed up with definitive evidence of his claim.

He further testified about his drive home with the twins:

> [The twins were] playing very wildly with one another. I'd
> asked them to settle down and behave in the car so we
> could make dinner timely and get home before the evening
> deadline set by Judge Marks [sic] [pursuant to the 2014
> Agreement] and they continued to play very aggressively
> and throw their bottles of juice at one another and throw
> some toys at one another, as well as play with the window
> openers, pushing them up and down. I'd asked them to
> stop. I tried to disconnect the rear seat window buttons
> using the driver side button and that didn't work, so I asked
> them to stop. And you know, we're driving home and they

---

[12]This Court had directed, upon consent of both parties, that Mr. Fishman was to submit to a forensic evaluation and also pay for an evaluation of Ms. Solomon and the children to be conducted by Dr. Stephen Herman. The basis for the evaluation of Ms. Solomon and the children was Mr. Fishman's assertions that Ms. Solomon was alienating the children from him, and his demand that she and the children be evaluated as to that issue. On April 8, 2016 (Court exhibit 29) this Court entered an Order on consent directing same and providing that the costs relating to the evaluation be borne by Mr. Fishman subject to re-allocation at the conclusion of the trial if the evaluator found that Ms. Solomon had been alienating the children from him. Mr. Fishman has refused to comply with that order. Accordingly, this Court precluded Mr. Fishman from presenting evidence of his mental health, including an evaluation performed by Dr. Mel Gluck, who was not an independent evaluator, as he evaluated Mr. Fishman entirely upon Mr. Fishman's representations and without direction from, or knowledge or consent of, this Court or counsel.

[13]References to T4 are to the trial transcript from September 1, 2017.

> continued to be very, very wild, aggressive, and play rough
> with each other (T3 59).

Mr. Fishman further explained that Skye had his hand and a portion of his head out the side window as he was driving and that Skye's head and hand almost hit a group of trees and branches on the side of the road (T3 59-60). Mr. Fishman had to pull Skye back into his seat (T3 59), which he stated that he tried to do while he was driving (T4 136). On cross-examination, Mr. Fishman admitted that Skye was able to undo the car seat clasp (T4 136). He wanted to take the boys to McDonald's for dinner, but there was a very long line, so he "told the kids that they had to eat the oyster crackers in the car 'cause we missed dinner with the event of having to pause the car" (T3 60). When he arrived at Ms. Solomon's residence, Mr. Fishman noted that the boys were very quiet and reserved. "Skye was upset, had the oyster crackers in his mouth, wasn't eating all of them. I told him you have to eat beforehand or that [daddy] would lose his visits" (T3 60; T4 137). Mr. Fishman denied throwing anything at the boys, or hitting them. He did admit that Skye was crying when he arrived at Ms. Solomon's house as he "was upset that he had to eat the crackers when I told [him] he had to eat them in front of me to prove he had dinner and he really wanted to go to McDonald's and he was very upset from the events that happened when we had to pull off the road and I had to grab him so he didn't hit the tree, the branches that were on the side of the drive we were going and had to yell at him – both of them for almost – almost what would've been a grave injury playing with the windows and Skye sticking his head out with the hand" (T3 61).

Mr. Fishman acknowledged that he started having supervised visits at the Y at the end of July 2014 (T3 62) and stated that he had an unsupervised visit scheduled with his older children for November 7, 2014. Although there was no order permitting him to have an overnight visit, he stated that his plan was to pick them up at school and take them overnight to his sister's house to celebrate Jonah's birthday and that the plan "was prearranged by my attorney" (T3 63). When questioned on cross-examination as to how he received permission to take the children overnight, he provided the following:

> Ms. Solomon's counsel: Mr. Fishman, prior to Friday,
> November 7, 2015, you asked permission to take Joanna
> and Jonah to stay overnight with your sister on Long Island;
> do you remember that?
> Mr. Fishman: I remember my attorney talking to me
> about the communications he had with opposing counsel
> about a visit.
> Ms. Solomon's counsel: Mr. Fishman, I'm going to
> interrupt you and move to strike that answer as
> nonresponsive. Please listen carefully to my question. Prior
> to November 7, 2014, you asked, through your attorney, for
> permission to take Joanna and Jonah to Long Island for an
> overnight visit at your sister's house. Correct?
> Mr. Fishman: I don't know, Miss – counselor. I'd have

to check the date.

Ms. Solomon's counsel: Mr. Fishman, when we were last in court, you testified that you wanted to take Joanna and Jonah for an overnight visit in Long Island and that you sought consent. Do you recall that testimony?

Mr. Fishman: I testified, but I don't believe I recall the exact date of the request.

Ms. Solomon's counsel: Okay, so you recall that there was a date of a Friday visit and that you had asked permission to take Joanna and Jonah to stay overnight in Long Island at your sister's. Correct?

Mr. Fishman: As I said – as I testified before, my attorney asked for the permission. I don't believe I was able to communicate with Ms. Solomon or counsel directly.

Ms. Solomon's counsel: But Mr. Fishman, that's not my question. You needed to talk to your attorney. You needed to ask somebody for permission, so you asked for permission prior to the Friday night visit. Correct?

Mr. Fishman: I'm not sure, counselor. My recollection is that there was a provision in the Order of Protection that says "such other times as agreed on between the parties," so I'm not sure exactly how the request --

Ms. Solomon's counsel: So is your testimony that you decided to take the kids to Long Island without anybody else agreeing to it?

Mr. Fishman: No, that's not my testimony.

Ms. Solomon's counsel: So my question is, Mr. Fishman, did you ask your attorney for permission to go with the kids to Long Island after 7:00 p.m.?

Mr. Fishman: I asked my attorney to take the kids to my son's birthday party on Long Island, yes.

Ms. Solomon's counsel: Okay. And that was to be an overnight visit, so past your allotted visitation time after 7:00 p.m. Correct?

Mr. Fishman: I don't believe it was past the allotted time. As I testified before, there was a section of the Order of Protection that said "such other times as agreed on between the parties."

Ms. Solomon's counsel: Right. But October 14 the agreement was you had the kids up until Friday – Joanna and Jonah up until Friday 7:00 p.m., so you would need some agreement in order to be able to have the kids past 7:00 p.m. Correct?

Mr. Fishman: I haven't seen that agreement. I would need the Order of Protection and the transcript to specifically

recall what dates and times were referenced on it.

Ms. Solomon's counsel: Mr. Fishman, do you recall
going with Joanna and Jonah to Long Island –

Mr. Fishman: Yes

Ms. Solomon's counsel: – when you had
unsupervised visits?

Mr. Fishman: Several times.

Ms. Solomon's counsel: And did you ask permission
to take the children past 7:00 p.m. on that Friday night?

Mr. Fishman: I believe my attorney communicated
with both yourself and Ms. Hannon [the Attorney for the
Children] about that visit.

Ms. Solomon's counsel: I'm going to move to strike
for lack of personal knowledge.

Ms. Solomon's counsel: Mr. Fishman, did you reach
out to anyone to ask for permission; yes or no?

Mr. Fishman: No, I believe my attorney did, as I
testified before.

Ms. Solomon's counsel: Mr. Fishman, did you
communicate to your attorney that you wanted a visit past
7:00 p.m. on that Friday?

Mr. Fishman: Again, Counselor, I don't know the
times. I'd have to see the transcript and see the Order of
Protection to see the times?

Ms. Solomon's counsel: Mr. Fishman, how would your
attorney know to communicate this to someone else if you
didn't tell him that you wanted to have a longer visit with the
children?

Mr. Fishman's counsel: Objection. It's argumentative.
The Court: Overruled.

Mr. Spier: His testimony has to do with the timing of
the request, not whether there was ever a request.

Ms. Solomon's counsel: Mr. Fishman should listen to
the question. He's been purposefully evasive and we'll be
here all day until I can get my answer, Your Honor.

The Court: Sustained.

Ms. Solomon's counsel: Mr. Fishman, did you ask
anyone whether or not you could take the children for an
overnight visit in Long Island?

Mr. Fishman: As I testified before, my attorney made
the request. I'm not sure if my children requested the
overnight. I saw some emails that my son was discussing for
an overnight. I'd have to check my records and the Order
and transcript.

Ms. Solomon's counsel: So it's your testimony that

> your lawyer wanted you to take your children for an
> overnight visit and that you never asked him; is that your
> testimony?
>
> Mr. Fishman: No, that's your testimony, Miss --
>
> The Court: Wait. Was your testimony that your son
> might've contacted your lawyer? Did you just say your son
> asked your lawyer?
>
> Mr. Fishman: My testimony is, Your Honor, there are
> emails with communication between the partes discussing
> such other times we might agree on. I'd have to check the
> emails and the Order.
>
> The Court: No, I'm asking you what you just said
> because if I had a court reporter I'd ask to read it back, but
> I'm pretty sure you just said that your son asked your
> attorney.
>
> Mr. Fishman: I remember seeing a request in Ms.
> Hannon's emails between the attorneys at the time saying
> that Jonah wants to overnight to his party [sic]. That's what I
> recall. I have an email to that effect.
>
> The Court: Okay.
>
> Ms. Solomon's counsel:  Mr. Fishman, did there ever
> come a time that you said to your attorney I'd like to take the
> kids to Long Island so that they can stay overnight at my
> sister's home with me?
>
> Mr. Fishman:  Yes.
>
> Ms. Solomon's counsel: And you were to stay at your
> sister's home, right?
>
> Mr. Fishman: Yes (T5 17-22).

Although Mr. Fishman refused to acknowledge that he did not have permission to take Joanna and Jonah on an overnight visit to Long Island - indeed he insisted that he did have permission to do so (T5 22-25), he did acknowledge that following the visit, Judge Klein suspended his unsupervised visits with Joanna and Jonah (T3 65). Moreover, while he implied in his direct testimony that Jonah requested an overnight visit in Long Island (T5 21), he admitted on cross examination that he had never seen an email from Jonah to Jonah's attorney requesting that he be permitted to go to Long Island (T5 93-94).

Mr. Fishman acknowledged that in February 2015, he hired Lorna Hayim-Baker, a licensed social worker, to observe him with the children (T3 65-66; T5 25). He asserted that he did so based upon this Court's instructions that he "find someone independent give that name to my attorney, and schedule an independent social

worker" (T3 66).[14]  He also claimed that he advised the supervisor of the visit, who at that time was the maternal aunt Karen Levinson, that Ms. Baker would be present (T5 32). However, he presented no evidence to that effect. Indeed, Mr. Fishman admitted that he told Ms. Levinson "Jen doesn't need to approve anything. This is ordered by the Court. Jen doesn't make decisions. Jen doesn't decide" (T5 38). Mr. Fishman asserted that he had joint legal custody at the time, but that he did not need Ms. Solomon's permission to allow the social worker to interview his children because "it was on instructions from the Court on having a social worker visit" (T5 38). However, Mr. Fishman acknowledged that the 2014 Agreement in effect at that time required that he and Ms. Solomon consult with each other as to medical decisions relating to the children, including "but not limited to medical, dental, orthodontic, and treatment by audiologist, psychologists, speech pathologists, mental health professionals" (T5 40). He asserted, however, that Lorna Hayim-Baker was not included in that category, as she was a social worker (T5 40).

Mr. Fishman testified that Joanna smiled when she was told to see Ms. Baker (T3 68) and that when she came out of the meeting 40 minutes later she "came out with a big smile, holding Lorna's hand " and "had a look of relief on her face. Like someone was finally listening to her and her feelings. She looked happy" (T3 69). Mr. Fishman testified that Ms. Baker had a "question and answering session" with him, Joanna and Aiden (T3 70) and then Skye, Joanna and he had a meeting and talked to Ms. Baker. Ms. Baker wanted to meet with Aiden, but the maternal aunt, Ms. Levinson, who was supervising the visit, said that the children had to go and she put them into the car (T3 71).[15]

Mr. Fishman also acknowledged that on at least three occasions he took his children to see his therapist, Dr. Michelle Maidenberg. Although he admitted that he did not inform Ms. Solomon of those visits, he claimed to be permitted to do so because he had joint legal custody and that there was nothing wrong with doing so (T5 41-42).

In August 2015, (over Ms. Solomon's and the Attorney for the Children's objection) this Court granted Mr. Fishman permission to take his two older children to California to visit his parents. Mr. Fishman testified that before he left for California, he took the children to an appointment with Dr. Michelle Maidenberg (T4 12-13). He explained that he did so because "My daughter had asked me to because she enjoyed the sessions that we had previously with Dr. Maidenberg over the years and was trying to tell me something and wanted assistance in helping communicate her thoughts" (T4 13). On cross examination, Mr. Fishman insisted that he brought his children to see Dr. Maidenberg at the request of his daughter, who said that she liked Dr. Maidenberg and wanted to talk to her (T5 97).  Mr. Fishman explained that Joanna had first met with Dr.

---

[14]Although this Court did state that it would be helpful to have an independent provider observe Mr. Fishman with the children, this Court did not authorize Mr. Fishman to unilaterally make a decision and to surreptitiously arrange for that person to attend a supervised visit.

[15]As a result of this incident, the Court issued an order that Mr. Fishman have "therapeutic supervised visits/parenting coaching" provided by Mary Crowe, LCSW (Court exhibit 24).

Maidenberg in December 2013 (T4 13). Mr. Fishman testified that the outcome of the meeting was that "Joanna asked me to be more sensitive to her wishes and when she asked for something to try to accommodate her and really try to hear and listen to her needs as opposed to just assuming what she wants" (T4 13).

Mr. Fishman described himself as a "loving, dedicated, sensitive, and caring parent" (T4 36) and he described a series of activities in which he engaged with the children from 2012 though 2014 (T4 36). He described Skye and Jonah as "disabled children," and for the first time in the court's recollection, referred to his pet dog Pretzel, as a "service dog" (T4 36-38).

Although Mr. Fishman requested that the court reinstate his unsupervised visits, he stated that if the court were not able to do so, he would want the visits to continue with CFS (T4 40).[16] He specifically requested that the visits not be at the Y because he was "in the midst of a federal complaint with – where the U. S. Department has notified the 'Y' of intent to prosecute for a disability discrimination of August of last year by cancelling a visit to a handicapped person and I have an investigator, an assigned person and there's an active case that Congressman Engle is involved with where the 'Y' is about to be charged by the DOJ for disability discrimination for – for sustaining the visit based on a police report being filed. I also have difficulty traveling to the 'Y'" (T4 40). Later during testimony, Mr. Fishman asserted that he couldn't have visits at the Y because "there were two prior injuries I sustained at the 'Y,' both in February '16 as well in the spring in '16 where I sustained the hernia there. They don't allow any assistance, so I over exerted myself" (T4 51).[17] Accordingly, this Court issued an Order, entered March 21, 2017, allowing Mr. Fishman to have visits supervised by Comprehensive Family Services, an agency that would be able to go to his home.

Mr. Fishman claimed to have submitted to "over 30" mental health evaluations, and asserted that he had "457" therapy sessions since June 2014 (T4 42-43). Mr. Fishman admitted to suffering from certain cognitive difficulties: "I'm now engaged and have been engaged since April in the appropriate direct therapy to restore a slight memory impairment that really has lead to a lot of my confusion, not just with Court Orders, but with work, with misfiling papers, with not remembering telephone numbers, with losing my laundry card and that the specific deficiencies I had with that particular cognition are being addressed by Dr. Brown in an eight-month program" (T4 44).

---

[16]At a post-trial conference, Mr. Fishman admitted that he had filed a lawsuit against CFS and thus, they were no longer a viable supervising resource.

[17]Mr. Fishman's claims of injuries suffered at the Y in the first half of 2016 are inconsistent with relief he requested in a November 16, 2016 Order to Show Cause. In that application, Mr. Fishman alleged that Ms. Solomon denied him access to the children and he requested that he be granted additional visits at the Y. Before the Order to Show Cause was decided, however, Mr. Fishman wrote to the Court alleging that he had had a number of medical procedures and was unable to leave the house to have visits at the Y. Interestingly, Mr. Fishman did not mention at the trial that he could not visit at the Y because of an alleged shellac allergy. At a post trial conference on May 1, 2018, to establish a new visitation supervisor, Mr. Fishman refused to have visits at the Y, claiming he was allergic to shellac and could not be there. At the conference he also refused to have visits supervised by CFS, claiming he was in the midst of filing a lawsuit against them.

On cross examination, Mr. Fishman testified as to surgery he had in December 2016 (T4 47), and he was specifically questioned about his limitations post surgery:

> Ms. Solomon's counsel: You also told the Court that due to the surgery on December 19, 2016 that you'd be bedridden for at least three months after surgery; isn't that correct?
>
> Mr. Fishman: I don't believe that's the wording the doctor used on the post-surgery recovery. No.
>
> Ms. Solomon's counsel: What is the wording that your doctor used?
>
> Mr. Fishman: I'd have to see the letter that was written by the doctor.
>
> Ms. Solomon's counsel: Okay. But you did tell this Court that you'd be unable to leave your home for three months; is that not correct?
>
> Mr. Fishman: I don't believe I wrote the medical letter. I believe the doctors did. I think that --
>
> Ms. Solomon's counsel: Mr. Fishman, I'm not asking you about the medical record. You informed the Court, through your counsel, that for at least three months you'd be bedridden and homebound; is that not correct?
>
> Mr. Fishman: I don't believe "bedridden" was the term that was used. I believe it was disabled.
>
> Ms. Solomon's counsel: Mr. Fishman, do you understand what it means to be homebound, that you can't leave your home?
>
> Mr. Fishman: I'm sorry?
>
> Ms. Solomon's counsel: Do you understand what it means to be homebound, that you cannot leave your home?
>
> Mr. Fishman: I don't understand the question.
>
> Ms. Solomon's counsel: Mr. Fishman, isn't it true that you told this Court that you could not go to visits or come to court after your surgery for at least three months?
>
> Mr. Fishman: I believe I answered the question, Miss.
>
> Ms. Solomon's counsel: Please don't call me "Miss." Mr. Fishman, do not be evasive about my questions. It's yes or no, okay. Is it or is it not true that for three months after your surgery you were not able to leave your apartment?
>
> Mr. Fishman: I left my apartment for doctor's visits, hospitalizations, post-surgery follow up.
>
> Ms. Solomon's counsel: Okay, but nothing else?
>
> Mr. Fishman: As well as allergy testing, skin testing, as well as some other medical and therapeutic services.
>
> Ms. Solomon's counsel: But you couldn't come to

court, correct, during the three months after your surgery?

Mr. Fishman: I believe my doctor wrote – the surgeon wrote a letter detailing why he felt court needed to be adjourned and that was addressed by the ADA advocate.

Ms. Solomon's counsel: Mr. Fishman, my question is clear. Were you or were you not able to come to court three months after your surgery; yes or no?

Mr. Fishman: Under doctor's supervision and orders I was instructed not to go to court (T4 47-49).

Mr. Fishman went on to explain that he requested an adjournment of the December 22, 2016 trial date because of "recovery needs and post-surgery infections, allergies, re-hospitalization of at least 18 times with skin infections from the five incisions made late December that didn't heal until April" (T4 50). He also asserted that one of the reasons he could not have visits at the Y during that time because he did not want to "scare kids with incisions that were constantly bleeding and reopening without explanation" (T4 52).

Rebutting Mr. Fishman's testimony, Ms. Solomon's counsel moved into evidence a report made by Dr. Jeffrey Cole (Petitioner's exhibit 44), which demonstrated that he evaluated Mr. Fishman on December 29, 2016 (10 days after Mr. Fishman's surgery), and performed 18 tests of Mr. Fishman.[18]  Significantly, the report yielded that Dr. Cole's evaluation was not necessitated by any of Mr. Fishman's medical conditions. The report described Mr. Fishman as "alert and fully oriented," "well groomed and appropriately dressed," "pleasant and cooperative," and that his gait and motor was unremarkable.  Mr. Fishman testified that he was at Dr. Cole's office for four and one half hours, just ten days after his surgery (T4 56-61).[19]  Yet, when asked by Ms. Solomon's counsel as to why he cancelled a January 7, 2017 visit with his children, to occur at the Y, Mr. Fishman stated:

Under doctor's orders and the previous history of

---

[18]As part of relief requested in an Order to Show Cause filed November 29, 2016, Mr. Fishman requested that this Court order him to undergo a forensic neuropsychological examination by Dr. Jeffrey Cole and to postpone any other forensic examinations (Dr. Herman's evaluation).  He asserted in the Order to Show Cause that his health insurer would pay for a neuropsychological examination, but would not pay for Dr. Herman's evaluation.  This court refused to order Dr. Cole's evaluation, but noted that Mr. Fishman was free to obtain any evaluations he chose outside of a court order.  Mr. Fishman attempted to use the report as evidence in support of his position at the dispositional hearing regarding his alleged violations of this Court's order of protection, but this court refused to allow it into evidence at that time.

[19]Dr. Cole also noted Mr. Fishman's belief that "he is being 'punished' for being injured and that his injuries are not being properly accounted for in legal proceedings."  Dr. Cole concluded that Mr. Fishman had "a mild tendency towards positive impression management in which he presented himself in a favorable light and relatively free of common shortcomings to which most individuals will admit," and that he "revealed an interest in establishing and maintaining social relationships, but to some extent in an attention-seeking and/or self serving manner." (Petitioner's exhibit 44).

being injured at the "Y" not having my assistants, ADA, okay.
Home visits were requested of the "Y" in advance of January
7 through an ADA accommodation and through the County
and there were numerous discussions with Melinda Kaiser's
boss, as well as the "Y," about their need to provide that
under the funding required under Section 504 of the 1973
Rehab Act. There were discussions back and forth and read
this report and I don't know that that's referenced there. The
discussions were with the "Y" and the County as the "Y"
saying they couldn't accommodate that disability request
and numerous written documents back and forth, including
to the Justice Department and back from them on the "Y"
regarding the need for home visits with designation of a
current provider of supervised visits (T4 62-63).

Further on cross-examination, Mr. Fishman could not remember if he was well
enough to have a visit at the Y in January 7, 2017, and he testified that he had "been to
over 80 doctor's visits and had the surgery openings opening up 27 times....I've been to
an average over eight doctors a day since January 7" (T4 63-63). Mr. Fishman also
could not remember whether he had cancelled a Y visit with his children on February 4,
2017. He was evasive during his testimony, but he eventually acknowledged that he
did not have a visit with his children in January or February 2017 (T4 65-66).

Ms. Solomon's counsel also questioned Mr. Fishman's assertions that he was
homebound for 90 days after his December surgery, and argued that his cancelling
visits was an attempt to manipulate the Court. In support of this position, Ms.
Solomon's counsel placed into evidence a flash drive containing assorted bank account
and credit card documents of Mr. Fishman (Petitioner's exhibit 45). Those documents
revealed numerous debits from a Capital One Bank account (which Mr. Fishman stated
was his business account), during the period from January 1, 2017 through January 31,
2017, for items including January 3, 2017 charges at a bar and grill and at Marshall's
and at Food Town. On January 4, 2017, there were charges at "LaSalle, New York," at
the Disney Store, at Home Depot, and at Hard Rock Café. Mr. Fishman admitted to
being in New York on January 4, 2017: "I was definitely in New York because I was
definitely in medical treatment that day, so I was definitely in Manhattan on the fourth"
(T5 91-92). On January 9, 2017, there were charges at Ticketmaster for Kinky Boots
and a steakhouse. When questioned about whether he went to the show and ate at the
steakhouse, he responded: "I don't know. I'd have to check the receipts and the
records" (T5 94).

While acknowledging that he did not go to the Y to visit with his children during
the month of January 2017, he implied that his failure to do so was due to the Y's failure
to accommodate his disabilities. When asked if it was possible that during that time
period he was in New York City watching a Broadway show and eating at a steakhouse,
Mr. Fishman objected that he "wasn't told this was a financial – counselor, a financial
trial" (T5 95). Mr. Fishman asserted that all of those charges were business expenses
made by "various people," he could not name. Mr. Fishman did acknowledge, however,

that certain of his personal expenses were paid from that account as well (T5 106, 107), including life insurance polices that he had purchased on his own life and the lives of his children. On January 15, 2017, there was a charge for gasoline in Boynton Beach, Florida and a charge at Publix's in West Palm Beach. When asked if he was in Florida on that date, Mr. Fishman asserted that he did not remember (T4 78-109).

Mr. Fishman was also cross-examined about charges on his Nordstrom credit card. He stated that he "very rarely" made business purchases with that card, but that he had two authorized users on the account. He did not remember who those users were. The Nordstrom credit card records showed that on December 26, a few days after his December 19, 2016 surgery, a purchase was made at Nordstrom Rack in New York City in the amount of $993.95. Although Mr. Fishman asserted that such purchase was an on-line purchase, he admitted that it was possible he was in White Plains on February 20, 2017, in Cherry Hill, New Jersey on February 28, 2017, and in White Plains again on March 4 and 10, 2017, when other charges were made to his Nordstrom credit card in Nordstrom stores in those locations (T4 109-114).

Mr. Fishman admitted that on February 9, 2017, he sent an email to CFS during the time the agency was supervising visits between him and his children, stating that he was "on bed rest, home confinement since 12/19 implant surgery." But when asked on cross-examination if he was home on bed rest at that time, Mr. Fishman could not directly answer the question. He stated: "I was on doctor's orders pursuant to an ADA communication to the Court and to CFS" (T4 115-16). The exchange continued as follows:

> Ms. Solomon's counsel: Mr. Fishman, please answer my question. I asked if you were on bed rest, home – is it your testimony that you were on bed rest, home confinement; yes or no?
>
> Mr. Fishman: I was on ADA request three month –
>
> The Court: Are you saying you were not home on bed rest? You just made an application based on an allegation you were home on bed rest.
>
> Mr. Fishman: No, I believe my ADA –
>
> The Court: The question is clear. Either you were home on bed rest or not. It has nothing to do with an ADA request, unless you're saying –
>
> Mr. Fishman: I respectfully disagree, Your Honor. It has to do with an ADA request and those are confidential, so I respectfully disagree.
>
> Ms. Solomon's counsel: Mr. Fishman, were you or were you not on bed rest and home confinement, regardless of what the ADA says? Were you in your apartment in bed sick?
>
> Mr. Fishman: I was instruction (sic) for bed rest. Yes, I was on bed rest by doctor's instructions with a specific schedule that included going to doctor's visits and going for

treatment regularly and over -- (T4 115-116).

In its June 2017 report to Court summarizing visits beginning in March 2017,[20] CFS noted that "Mr. Fishman was observed to play with the children, running and skipping with them and swinging the boys around by their arms" (Court exhibit 48; T4 118). Similarly, in its August 16, 2017 report to Court, CFS, noted that "while walking to Subway, Mr. Fishman was observed to pick up each child and spin him around over his shoulder while walking" (T4 121; Court exhibit 49). Mr. Fishman acknowledged during his testimony that he had done so with Aiden and Skye (T4 121). In its August 22, 2017 report, CFS noted that Mr. Fishman carried Skye, who was nine years old, on the walk back to his apartment (Court exhibit 50), and Mr. Fishman admitted that he had done so (T4 122-123).

The reports describe Mr. Fishman's mainly positive conduct with his children during the supervised visits, but also describe how he struggles to manage his sons' behaviors and how Joanna intervenes to assist him in a parental manner.

When asked by Ms. Solomon's counsel as to whether over the course of the three year litigation between the parties, he did anything wrong, he answered: "definitely married the wrong person" (T5 46). When asked if he believed that his own behavior was partially responsible for him having supervised visits, the following exchange occurred:

> Mr. Fishman: I think that that's – there's a long answer to a question like that.
>
> Ms. Solomon's counsel: It's a simple question. Do you believe that your own behavior is partially responsible for you having supervised visits?
>
> Mr. Fishman: Yes, it's partially responsible in the context of 40 months of never-ending Family Court proceedings. Yes.
>
> Ms. Solomon's counsel: But that your behavior, not anyone else's behavior, Mr. Fishman. I'm asking about your behavior. You don't think that your behavior outside of this courtroom or inside this courtroom is partially responsible for you having supervised visitation?
>
> Mr. Fishman: No. I think that some of the things that I've done in the past I regret and that I should've taken steps years ago to end this unfair, you know, bias, discriminating proceeding.
>
> Ms. Solomon's counsel: You blame Ms. Solomon for bringing false allegations against you, right?
>
> Mr. Fishman: Yes, absolutely.
>
> Ms. Solomon's counsel: And you don't believe that

---

[20]The report is erroneously dated June 27, 2016. CFS was first court-ordered to supervise visits by order entered March 21, 2017 (Court exhibit 44).

there's a problem with your parenting, do you?
Mr. Fishman: No, I don't (T5 48-49).

Later on, during cross examination, Mr. Fishman testified that he was being treated unfairly and he blamed the Attorney for the Children and this Court for preventing him from having unsupervised visits with his children (T5 55).

Mr. Fishman called Franco Miele, the Principal of the William B. Ward Elementary Ward School In New Rochelle, as a witness on his behalf. Mr. Miele testified that he knew Mr. Fishman to be the parent of the four children, but he was unable to recall anything that related to Mr. Fishman's interaction with his children (T4 8-10).

Mr. Fishman called Dr. Michelle Maidenberg to testify on his behalf. Dr. Maidenberg stated that Mr. Fishman had been in treatment with her for the past eight years, since 2009 (T5 59). She acknowledged meeting Joanna and Jonah in 2015, before they left for a trip to California with Mr. Fishman (T5 59). Contrary to Mr. Fishman's claim that Joanna had requested to see Dr. Maidenberg, Dr. Maidenberg asserted that the purpose of meeting with them was "to facilitate communication. It was to help Marc with his parenting skills" (T5 59). She also acknowledged having met the children before 2015, but could not remember the exact date (T5 62). The purpose of that meeting was also "to enhance communication. It was really primarily working on Marc's parenting skills" (T5 62).

Dr. Maidenberg described Joanna in the 2015 meeting as "obviously, you know, she doesn't know me well, so initially she was a little, you know apprehensive or – but you know, as soon as we talked about how we could facilitate communication between her and her father she was very open and willing to speak" (T5 64). Mr. Fishman was present during most of Dr. Maidenberg's conversation with Joanna (T5 64). On cross examination, Dr. Maidenberg stated that she was surprised to learn that Mr. Fishman did not have the legal authority to bring the children to see her, as he had told her he had joint custody of the children (T5 71-74).

## LEGAL DISCUSSION AND FINDINGS

"A party seeking to modify an existing court-ordered custody arrangement must establish that circumstances have changed to the extent that modification of the arrangement is necessary to ensure the best interests of the child" (Matter of Khan v Khan, 160 AD3d 960, [2d Dept 2018]; see also, Gentile v Gentile, 149 AD3d 916, 918 [2d Dept 2017]).

Here, Ms. Solomon has met her burden of proving that circumstances have changed since the parties executed their 2014 Agreement. Additionally, she has established that modification of that agreement is necessary to protect the best interests of the parties' four children. By all accounts, the children are thriving in the care of Ms. Solomon, who has provided them with a stable, loving home without the assistance of Mr. Fishman. She currently has had temporary sole legal and physical custody of the four children for several years and has been able to meet their many needs.

Mr. Fishman was unable to show that modifications to the 2014 Agreement are

unnecessary, especially given that during the fact-finding proceeding he did little more than deny obvious facts and blame others for his own destructive actions.

This Court credits Ms. Solomon's testimony and the accompanying evidence, that this case began after Mr. Fishman lost control and was abusive and hit Skye during an unsupervised visit on June 11, 2014, with Aiden and Skye, and that it continued with instances of Mr. Fishman's abusive behavior towards Ms. Solomon.

In determining an issue of custody, a court must consider the effects of domestic violence upon the children (see, Matter of Andrews v Mouzon, 80 AD3d 761 [2d Dept 2011]; see also, Domestic Relations Law § 240[1]). At the conclusion of the family offense proceedings, of which this Court took judicial notice of with respect to the custody case, this Court found that Mr. Fishman violated this court's orders of protection in several respects. One of the several violations had a direct negative impact upon the children. Mr. Fishman admitted that he was at Ms. Solomon's place of employment. His reasoning, that he was a disabled individual who was entitled to be in a public place (despite the order of protection), was disingenuous. Moreover, Ms. Solomon testified that the children were alarmed that Mr. Fishman was at her place of employment. This Court incarcerated Mr. Fishman for several of his admitted violations of this Court's orders of protection and issued an Order of Protection on behalf of Ms. Solomon against Mr. Fishman, until June 27, 2019, which in part prohibits him from having any communication with her.

In addition to the findings this Court made with respect to the violations of the orders of protection, evidence adduced at the family offense proceeding established that at times when he was afforded unsupervised communication with his children, Mr. Fishman sent hundreds of text messages to his daughter. This Court also finds that Ms. Solomon presented credible evidence of Mr. Fishman's compulsive behavior in other respects. For instance, Mr. Fishman continuously sent gifts to his children largely for no apparent reason, despite Ms. Solomon's claims that he was failing to pay court-ordered child support. Additionally, Ms. Solomon testified credibly and presented credible evidence that after the 2014 Agreement was executed, Mr. Fishman's communication with her about the children and in the children's presence was excessive, aggressive, and threatening.[21]  Also, Mr. Fishman filed numerous petitions

_____

[21]The Court notes that Mr. Fishman has a pattern of excessive and largely redundant communications with many individuals involved in his case. For example, this court noted in its decision and Order to Show Cause entered January 14, 2016, that after Mary Crowe was appointed to provide therapeutic visits to him and the children, Mr. Fishman acknowledged that he supplied her with hundreds of pages of documents on his medical history. This Court has also noted in its Decision and Order Upon Orders to Show Cause entered March 31, 2017, that during the period between November 2016 and March 2017, Mr. Fishman personally sent about 20 emails, faxes, and letters, including attachments, to this Court and this Court's Court Attorney, in which he continued to accuse the Court of discriminating against him and his twin sons because of their disabilities. This Court has repeatedly admonished Mr. Fishman that he is represented by counsel and that, therefore, he may not communicate directly with the Court. The admonishments have been unsuccessful as evidenced by a March 20, 2017 email, sent by Mr. Fishman specifically acknowledging that directive, but stating that since his attorney refused to send his correspondence to the Court, he must do so himself. Mr. Fishman also sent an email dated March 28, 2017, again acknowledging that his attorney refused to send his communications to this Court, again accusing this Court of discriminating against him because he is "marked partially disabled" and asserting

Page 22 of 27

and Orders to Show Cause throughout these proceedings, mostly accusing Ms. Solomon of violating court orders and depriving him of access to the children. Mr. Fishman's inability to restrain himself from filing an endless stream of largely frivolous, repetitive, and threatening petitions and Orders to Show Cause against Ms. Solomon,[22] portrays him to be mean-spirited and inflexible with an inability to be reasonable. It also constitutes harassment against Ms. Solomon, who must risk the loss of her job to defend Mr. Fishman's unwarranted and unjustified attacks. Significantly, this Court finds no evidence that Ms. Solomon is engaging in any type of parental alienation against Mr. Fishman.

It is well established that joint custody is appropriate "for relatively stable, amicable parents behaving in mature civilized fashion," (Braiman v Braiman, 44 NY2d 584, 589-90 [1978]). Here, by his own actions, Mr. Fishman has shown that he is unable to communicate with Ms. Solomon in an appropriate manner or cooperate with her on parenting issues. The evidence in this case supports a conclusion that Mr. Fishman is unduly demanding, unreasonable and hostile. He has, thus, created and perpetuated an antagonistic relationship with Ms. Solomon such that joint custody is inappropriate (see, Matter of Lee v Fitts, 147 AD3d 1058 [2d Dept 2017]; Angelova v Ruchinsky, 126 AD3d 828, 829 [2d Dept 2015]).

In Mr. Fishman's view, he is a loving father who has done nothing to deserve the supervised visits to which he is now subjected. Instead, he continues to make unfounded claims that literally everyone else involved in his case is against him, largely, as he asserts, because he is disabled. While it is undisputed that Mr. Fishman has had a number of medical issues, this Court has continuously had serious concerns about Mr. Fishman's mental health. His refusal to comply with this Court's order directing him to submit to an evaluation by independent evaluator Dr. Stephen Herman, leaves this Court without the benefit of reviewing a neutral forensic evaluation report that would have also provided recommendations, and which may have been helpful in assisting this Court with its determination as to what extent, if any, his claimed disabilities may interfere with his abilities to reason, make sound judgment, control his impulses, and effectively parent or co-parent his children. Thus, at this point, the evidence as presented at trial only supports a conclusion that Mr. Fishman has purposefully manipulated the intent of court orders and engaged in negative behavior that has inured

---

that he is "a great father and wonderful 'mensch.'" This Court also noted at proceedings on August 29, 2017, that Judge Malone had forwarded a copy of an Order she issued on August 23, 2017, in which Judge Malone stated that Mr. Fishman had, for the third time, without having any matters pending in Supreme Court, moved to stay this [Family] court's proceeding and remove it to Supreme Court. Mr. Fishman also filed Orders to Show Cause in Family Court, on November 15, 2017 and November 24, 2017 respectively, which this Court declined to sign on the grounds that they were duplicative requests that were also made numerous times in the past and denied by this Court in prior orders.

[22]From February 2018 to April 2018, alone, this Court issued four decisions declining to sign separate pro se Orders to Show Cause filed by Mr. Fishman, notwithstanding this Court's prior directives that he not make any pro se applications. The last decision, entered April 19, 2018, ordered that Mr. Fishman refrain from filing pro se papers and that any application made by his attorney be accompanied by a Certification in accordance with 22 NYCRR 130-1.1a.

to the detriment of his children. His unduly defensive responses to criticism and lack of insight has made it difficult for this Court to work towards reinstating a more traditional visitation schedule, despite its many attempts to do so.

While Mr. Fishman refuses to acknowledge that his actions have played a large role in his inability to have unsupervised contact with his children, and has blamed everyone else involved in the proceedings for his situation, it is most disturbing to this Court that Mr. Fishman has also attempted to absolve himself of liability by claiming that he engaged in certain negative actions at the request of his children. For instance, while acknowledging that he sent flowers to Ms. Solomon in violation of this Court's order of protection, he "blamed" that violation on his asserted claim (not found credible by this Court) that he did so at the request of one of his young sons. In similar fashion, he asserted that he took Joanna and Jonah to see Dr. Maidenberg because Joanna asked him to do so. Not only does this Court find that assertion to be incredible, Dr. Maidenberg, who testified as a witness on Mr. Fishman's behalf, contradicted that claim.

Additionally, there is clear and credible evidence that Mr. Fishman had an agenda and a determination to prove that he was disabled following the December 2016 surgery, and that such plan came at the expense of his children. In this respect, although he asserted he had to be housebound for a 90 day recovery period following his December 2016 surgery,[23] evidence showed that during that same time period numerous purchases were made on Mr. Fishman's credit cards for various locations in stores, restaurants, and other places in and around New York City, New Jersey, and Florida. Mr. Fishman was unable to unequivocally answer questions about whether he made those purchases or was at those locations when those purchases were made. Instead, he asserted that other people had access to those credit cards,and, incredibly, he could not remember their names. His assertion that other individuals he could not name had access to his credit cards was unsupported by any scintilla of proof, and his claim that he could not remember being in Florida during a brief time when credit card purchases were made in that state is similarly not credible. As the evidence yielded that Mr. Fishman was not homebound for three months after his surgery, and given Dr. Cole's evaluation of Mr. Fishman and resulting report provided to this Court by Mr. Fishman himself, this Court finds that Mr. Fishman was physically able to have supervised visits with his children outside of his home during the 90 day period following his hernia surgery. Refusing to visit with the children anywhere but in his home for an over two-month period of time is an example of Mr. Fishman's lack of insight into (or a callous disregard for) the emotional harm he caused his children by his actions. He clearly was unable to put the children's needs above his own agenda to his children's detriment. Indeed, Ms. Solomon testified that Mr. Fishman had no visits with the children for a period of about three or four months, and that the children were disappointed and felt rejected by him during that period of time.

This Court finds that it is appropriate for Mr. Fishman to have only supervised access to his children, as his access to his children needs to be closely monitored and tightly controlled in order to protect them from his poor judgment and impulsive

---

[23]This Court granted an adjournment to accommodate his request for post-surgery recovery time.

behavior. As discussed above, this Court finds that Mr. Fishman was physically abusive to Skye. In addition, when permitted unsupervised access to Joanna and Jonah, he took them to his sister's house for an overnight visit despite lacking permission to do so and without advising Ms. Solomon where he and the children were. He also surreptitiously brought Joanna and Jonah to see his therapist, without legal authority to do so - indeed misrepresenting to his therapist that he had the authority to permit her to talk to the children. He also manipulated the children's maternal aunt, when she was a visitation supervisor, and unilaterally brought a social worker to interview the children at a visit the aunt was supervising, another example of Mr. Fishman's inability to use appropriate discretion in the parenting of his children. Such behavior is harmful to the children's emotional and mental well-being and demonstrates his lack of understanding of his children's emotional and psychological health. The evidence presented reveals Mr. Fishman to be a disruptive and destructive force in his children's lives. The children are entitled to feel safe when they are with him and should not be worried about his possible failure to follow the rules.

This Court has noted during its in camera interviews with the children that they are bright, articulate, personable, and insightful. They showed remarkable resiliency considering that they have been in the midst of contentious proceedings involving their parents for several years. All of them were loving and concerned about the feelings of every other sibling. To protect their privacy, the court is not disclosing the specifics of its in camera discussions with the children. It is sufficient to state that nothing disclosed in those interviews warrants a different result in this matter.

In sum, Mr. Fishman has eschewed any personal responsibility for his actions throughout these numerous court proceedings, and has thwarted this Court's attempts to restore a more traditional visitation schedule. It is overwhelmingly clear to this Court that, for whatever reasons, Mr. Fishman's lack of good judgment, lack of restraint, and lack of insight support a conclusion that his interaction with his children must be supervised. He has not shown that he understands the negative consequences his actions have upon the children. The Court finds it appropriate that under such circumstances, Mr. Fishman shall pay all costs related to the supervised visits. As to a visitation schedule, based on this Court's extensive experience and familiarity with this case, Mr. Fishman needs a simple, limited, and specific order with minimal flexibility, as he has repeatedly attempted to manipulate the visitation schedule to the detriment of his children, by consenting to visitation schedules and then demanding changes. Such behavior is not beneficial to the children, who need the routine and predictability of a regular visitation schedule. Accordingly, if Mr. Fishman is unavailable for his regularly scheduled visit, it shall not be rescheduled. As to the children, if one or more of the children has a conflict with the scheduled visitation, Ms. Solomon and the visitation supervisor shall schedule a makeup visit for that child or children for either the preceding or following Saturday. Also, based upon Mr. Fishman's repeated violations of court orders, including his compulsive behavior in sending text messages and gifts to his children, this Court finds it appropriate and necessary to continue an Order of Protection against him on behalf of the children for a period of one year, a copy of which is annexed to this Decision and Order.

Accordingly, it is hereby

ORDERED, that Jennifer Solomon's petition for modification of the parties' 2014 Agreement is granted and she shall have sole legal and physical custody of Joanna Fishman (DOB:2/9/2004), Jonah Fishman (DOB: 11/20/2005), Aidan Fishman (DOB:7/14/2008) and Skye Fishman (DOB:7/14/2008); and it is further

ORDERED, that Marc Fishman's petition to reinstate and enforce the terms and conditions of the parties' 2014 Agreement is denied and he may have supervised visits with the subject children every other Saturday, commencing June 16, 2018, from 10:00 a.m. to 5:00 p.m., supervised by Anne Elliot, LCSW; and it is further

ORDERED that if Mr. Fishman is unavailable for a visit, it shall not be rescheduled; and it is further

ORDERED that if one or more of the children has a conflict with the scheduled visitation, Ms. Solomon and Ms. Elliott shall schedule a makeup visit for that child or children for either the preceding or following Saturday, from 10:00 a.m. to 5:00 p.m., supervised by Anne Elliot, LCSW; and it is further;

ORDERED that Mr. Fishman may have a visit every Father's Day, from 1:00 p.m. to 5:00 p.m., supervised by Anne Elliot, LCSW. Such visit shall be in addition to the regularly scheduled Saturday visit, if it falls on Father's Day weekend; and it is further.

ORDERED, that Ms. Solomon or an appropriate adult designated by her shall transport the children to the visits and drop off the children curbside at Mr. Fishman's home; and it is further

ORDERED, that unless Ms. Solomon advises Anne Elliot, LCSW, in writing, of alternate transportation arrangements, Mr. Fishman shall arrange to have the children transported to Ms. Solomon's house after the visit by Seaman's Limo Service, located at 4020 10th Avenue NY, NY 100034, in a vehicle that safely seats five (5) passengers excluding the driver, and Anne Elliot, LCSW shall personally accompany the children home in the vehicle; and it is further

ORDERED that Mr. Fishman shall not accompany the children home after the visits; and it is further

ORDERED that Mr. Fishman shall not operate a vehicle in which any of the children are passengers; and it is further

ORDERED, that the paternal grandparents may be present at any visit but no other third parties are to be present; and it is further

ORDERED, that Mr. Fishman shall be solely responsible for all costs associated with both supervision and transportation related to the visits; and it is further

ORDERED, that Mr. Fishman shall be permitted to take photos of the children during the visits; and it is further

ORDERED, that Mr. Fishman shall comply with the terms and conditions of the Order of Protection, entered June 13, 2018, annexed hereto; and it is further

ORDERED, that Ian Spier, Esq., is hereby relieved of any further representation of Mr. Fishman, subject to a future reassignment notice; and it is further

ORDERED that Mr. Fishman shall not personally send any further communication to this court, nor shall he forward any further demands for any attorney or third party to forward to this Court.


**PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.**

Dated: June 13, 2018                    ENTER

                                        Hon. Michelle I. Schauer
                                        Judge of the Family Court