**Letitia James**
New York State Attorney General

Search

schlesinger

Sort by

Date

Order

Desc

Search

December 19, 2024

## 75(5)(b) Findings - New Rochelle City PD - L Schlesinger

... Re: Executive Law 75(5)(b) Referral of Police Officer Lane **Schlesinger** OAG Matter No. 1-793542917 Dear Police ... your agency's January 26, 2022, referral of Officer Lane **Schlesinger** pursuant to Executive Law §75(5)(b). Based on our review, we conclude that Officer **Schlesinger** engaged in a pattern of misconduct involving the ...

October 05, 2022

## Reports library

... (LEMIO) 75(5)(b) Findings - New Rochelle City PD - L **Schlesinger** View/download document Date: 12-19-2024 Bureau: ...

September 14, 2020

## casa de maryland op

... (4th Cir. 1991) (quoting Tucker Anthony Realty Corp. v. **Schlesinger**, 888 F.2d 969, 975 (2d Cir. 1989)). ...

---

November 27, 2017

### A.G. Schneiderman Announces Guilty Plea Of Brooklyn Real Estate Developer Daniel Melamed

... Assistant Attorneys General Brian McDonald and Lana **Schlesinger**, under the supervision of Real Estate Enforcement ...

---

November 27, 2017

### Schneiderman Anuncia Declaracion De Culpabilidad Propietario De Brooklyn Daniel Melamed

... procesado por los Fiscales Adjuntos Brian McDonald y Lana **Schlesinger**, bajo la supervisión del Jefe de la Unidad de ...

---

August 10, 2016

### A.G. Schneiderman Announces Agreement Barring Tanning Salon Chain From Making Misleading Health Claims - Total Tan, Inc

... Eric T. Schneiderman today announced that Justice Alice **Schlesinger** of the New York Supreme Court approved a ...

---

August 10, 2016

### Schneiderman Anuncia Acuerdo Bloqueando Cadena De Salón De Bronceado Que Hace Afirmaciones Engañosas Sobre Beneficios De Salud - A.G. Schneiderman Announces Agreement Barring Tanning Salon Chain From Making Misleading Health Claims - Total Tan, Inc

... Eric T. Schneiderman anunció hoy que la Jueza Alice **Schlesinger** de la Corte Suprema de Nueva York aprobó un ...

---

February 25, 2016

---

### Westbury Union Free School District AOD

... (516) 876-5006 Copy to: Lawrence J. Tenenbaum, Esq. Jaspan **Schlesinger** LLP 300 Garden City Plaza Garden City, NY 11530 ( ...

---

November 03, 2000

### Spitzer Announces $5 Million Agreement With Contact Lens Manufacturer In Antitrust Violation Case

... Under the proposed settlement, U.S. District Judge Harvey **Schlesinger** has approved the states' request to extend notice ...

---

July 19, 1999

### Garment Manufacturers Cited Under "hot Goods" Law

... industry." New York County Supreme Court Judge Alice **Schlesinger** granted an injunction sought by the Attorney ...

## Type

75(5)(b) Findings (1)

Court Filing (1)

Page (1)

Press Release (6)

Settlements Agreements (1)

## Date

2024 (1)

2022 (1)

2020 (1)

2017 (2)

2016 (3)

2000 (1)

1999 (1)

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF SOCIAL JUSTICE
LAW ENFORCEMENT MISCONDUCT INVESTIGATIVE OFFICE

May 24, 2024

Police Commissioner Robert Gazzola
New Rochelle Police Department
475 North Avenue
New Rochelle, New York 10801

***Via Email***

Re: Executive Law 75(5)(b) Referral of Police Officer Lane Schlesinger
OAG Matter No. 1-793542917

Dear Police Commissioner Gazzola,

We have reviewed your agency's January 26, 2022, referral of Officer Lane Schlesinger pursuant to Executive Law §75(5)(b). Based on our review, we conclude that Officer Schlesinger engaged in a pattern of misconduct involving the abuse of authority in connection with on- and off-duty incidents. Officer Schlesinger was subject to discipline by your agency in connection with these incidents, and it is our understanding that he is currently assigned to desk duty with limited interaction with members of the public.

Following receipt of the referral, personnel from the Office of the New York State Attorney General ("OAG") reviewed NRPD's internal investigative files, disciplinary outcomes, relevant police paperwork, video footage, and policies that governed the alleged misconduct. We also reviewed materials, including video footage, from the North Shore University Hospital, the site of one of the referred incidents. We interviewed several individuals who made complaints against Officer Schlesinger, witnesses to those incidents, and Officer Schlesinger himself.

This letter sets forth the OAG's findings, conclusions, and recommendations relating to NRPD's Disciplinary Procedures and Uniform Traffic Ticket and Enforcement Policy pursuant to Executive Law § 75(5)(c).

## I. FINDINGS

The findings of fact described below are based on an evaluation of the evidentiary record using a preponderance of the evidence standard.

### A. Officer Schlesinger's Employment at NRPD

Officer Schlesinger commenced full-time employment at the New Rochelle Police Department on July 31, 2006, as a police officer. Since January 2008, Officer Schlesinger has been disciplined for twenty-five complaints of misconduct and minor infractions.

Since mid-2022, Officer Schlesinger has been assigned to desk duty in an assignment that does not put him into contact with members of the public.

### B. Complaint #1

On January 21, 2021, Officer Schlesinger conducted a traffic stop involving Complainant # 1, an African American female who was operating a van. Following the traffic stop, Complainant # 1 lodged a complaint with NRPD and reported that she was "randomly pulled over by two officers for no reason." One of the officers informed her that she was pulled over because she drove a van without the appropriate license plate, but she alleged that she was racially profiled. NRPD provided our office with in-car camera video footage of the traffic stop. We were not able to view the in-car camera video footage but were able to retrieve the audio contained therein.

Based on Officer Schlesinger's in-car camera's audio, he approached Complainant # 1 and asked for her license and registration. He explained that he wanted to know if she had a "passenger vehicle" on her registration and that if she was using her vehicle for "work" it would be a "big problem." She explained that she had three vans for personal use. Officer Schlesinger responded, "why would you have three vans, that's my question" and told her work vans usually have commercial plates and hers does not have commercial plates affixed. Officer Schlesinger returned to his police vehicle and verified that she had a valid class C license. He returned to the driver and handed her license and registration and told her to "have a nice day." He did not issue a summons. The driver stated that she has never been pulled over "ever in her life like this, for driving a van."

During Officer Schlesinger's interview with the OAG, he recalled stopping Complainant #1's van because he believed it was being used as a livery service or other commercial purpose since it had twelve to fifteen seats. He asked Complainant # 1 for identification and Complainant # 1 became "combative" and accused him of racially profiling her. He informed Complainant # 1 that he stopped her because she drove an extended van with multiple seats, which indicated that the van was intended to be used for a commercial purpose. She responded that it was her personal vehicle. He ran "checks" of the driver's license and van and learned that the license and registration were valid. He did not remember issuing a summons but explained that he usually did not issue summonses when drivers are compliant and cooperative and there is a "good interaction."

During NRPD's internal investigation, Officer Schlesinger stated at various points that he had pulled over Complainant # 1 for a violation of VTL § 402 for improper plates because the vehicle appeared to be used as a commercial vehicle with passenger license plates, that he pulled over Complainant # 1 for a violation of § 106.3 of the New York State DMV Rules and

Regulations, and that § 390.5 of the Federal Motor Carrier Regulations was another basis for the traffic stop. He denied conducting the stop based on race, creed, color, or gender. He stated that he could not see the driver's race when he initiated the traffic stop because he pulled up from behind Complainant # 1's vehicle.

NRPD concluded that the vehicle stop was not "reasonable." Officer Schlesinger did not have a reasonable suspicion that Complainant # 1 committed a traffic offense and that he could not stop Complainant # 1's vehicle based on federal regulations for interstate commerce or DMV rules and regulations. His delinquency record did not show that discipline was imposed even though that allegation was sustained but, according to IAU, he was verbally counseled. The internal investigation did not sustain allegations that Complainant # 1 was racially profiled and stopped as a result of Officer Schlesinger's of hate or bias because the investigation could not prove or disprove them.

We concur with NRPD's conclusion that Officer Schlesinger did not conduct a reasonable vehicle stop and find that it was in violation of NRPD policy and unlawful. NRPD's Uniform Traffic Ticket and Enforcement policy mandates officers to strictly enforce New York's Vehicle and Traffic Law based on reasonable suspicion that a motorist committed a VTL violation.[1] Under the agency's policy, he did not have a reasonable suspicion that Complainant # 1 violated VTL § 402 considering that large vans can be driven for personal use. Furthermore, NRPD's traffic policy does not give officers the authority to enforce§ 390.5 of the Federal Motor Carrier Regulations and § 106.3 of the New York State DMV Rules and Regulations.

### C. Complaint # 2

Complaint 2 involves an off-duty incident that took place on August 30, 2021, at the North Shore University Hospital in Manhasset, New York. NRPD was notified of this incident by the hospital's security director.

The following account is based on the statements of hospital security staff, video from the hospital, and Officer Schlesinger's statements to NRPD and to the OAG.

While off-duty, Officer Schlesinger went to the hospital to visit his mother, who was a patient. He entered the hospital at the security check-in and approached a triage nurse. On August 30th, visiting hours were suspended due to the COVID-19 pandemic. The security officer, who was posted at the security check-in area, overheard the triage nurse inform Officer Schlesinger that visitation hours were suspended. Officer Schlesinger ignored this statement and walked past the triage nurse and toward the Emergency Department ("ED"). The triage nurse called 911 to report Officer Schlesinger's unauthorized entry into the hospital.

One of the security officers attempted to prevent Officer Schlesinger from entering the ED. According to the security officer, when he approached Officer Schlesinger, Officer Schlesinger said to him, "lay hands me," and moved towards him. The security officer stepped

---

[1] In section II, we recommend that NRPD amend its traffic enforcement policy to provide that officers have the authority to conduct a traffic stop when they have *probable cause*, a higher standard than reasonable suspicion, based on the New York Court of Appeals decision in *People v Hinshaw*, 35 NY3d 427 [2020].

back. Officer Schlesinger showed his police badge and said he was a police officer, and told the security officer to call his supervisor. The security officer responded that he could not give him a pass. Officer Schlesinger continued to walk toward the ED and gained entry when someone exited through the ED's locked doors. The security officer radioed a message to another security officer, who was posted inside the ED, and informed her that there was an unauthorized visitor inside the ED.

While Officer Schlesinger disputed that he told the security officer to lay hands on him, asserted he was a police officer, or showed his badge, we find the statements of hospital security staff more persuasive, as they had no motive to distort the day's events and presumably would not have known that Officer Schlesinger was a police officer unless he had told them as much.

The second security officer observed when Officer Schlesinger first entered the ED. She started to follow him and observed him look inside patients' rooms and enter an adjacent area of the ED referred to as the "gold" area. Another security officer observed Officer Schlesinger in the triage area and followed him to the adjacent ED area. He told Officer Schlesinger that visitors were not allowed. The security officers attempted to get Officer Schlesinger's attention and talk to him, but Officer Schlesinger appeared to be upset and acted aggressively. He told them, "Don't touch me." As Officer Schlesinger walked about the ED, he caused a commotion as the hospital's nurses questioned why he was there.

Officer Schlesinger eventually found his mother on a hospital bed in a hallway inside the purple area. As he walked toward her, two security officers continued to follow him. As he stood at the head of her hospital bed, two security officers remained close by. The security officer asked him to leave the hospital. Officer Schlesinger turned to her and said, "What are you going to do, put your hands on me?" Officer Schlesinger eventually walked out of the ED and exited the hospital.

Nassau County police officers arrived at the hospital. One of the Nassau County officers approached Officer Schlesinger. Officer Schlesinger informed him that he was armed and was a police officer. Nassau County officers requested his identification and Officer Schlesinger complied with their request and handed them his driver's license. The hospital employees did not press charges against Officer Schlesinger, who was permitted to leave, but he was banned from the hospital.

NRPD concluded that Officer Schlesinger's off-duty conduct inside of North Shore University Hospital resulted in multiple violations of departmental policy, including failure to immediately notify his Division Commander for a police related matter outside of the jurisdiction of the City of New Rochelle, failure to notify his Division Commander about his involvement in an off duty incident in which several marked police vehicles and police officers were called to the scene and present during an inquiry into Officer Schlesinger's actions during the August 30, 2021 incident, and acting in a manner that did not reflect most favorably on the NRPD or himself as a member of the department. NRPD also noted that Officer Schlesinger tried to use his status as a police officer to gain access to ED and he was reprimanded for the violations of departmental policy. After the internal investigation, Officer Schlesinger was informed that he would receive positive discipline in the form of a letter of counseling. He

believed that NRPD chose this form of discipline because the Nassau County police department did not generate a police report for the incident at North Shore University Hospital. He told the OAG that after the internal investigation was concluded, he was informed that NRPD would issue a written "letter of counseling." He believed that this letter was issued because Nassau County police officers did not generate a police report. He became "curious what was documented, if anything" and decided to call the Nassau County precinct. He asked the precinct if a report was written for an event on August 31, 2021, and the precinct told him that no report was taken. He did not tell the IAU detective lieutenant who conducted the internal investigation that he called the precinct.

We concur with IAU's decision to sustain the allegations. We find that Officer Schlesinger's off-duty conduct was not in a manner as to reflect most favorably on the agency as required by NRPD's Rules and Regulations for Personal and Professional Conduct.[2] We also find that this conduct constituted an abuse of authority. During the OAG interview, he was not forthcoming about the incident. He did not provide a full account about how often security officers tried to prevent him entering and remaining in the ED and the extent to which he ignored them. We credit the security officer's account that Officer Schlesinger tried to use his badge and status as a police officer to gain unauthorized access to the ED.

In addition, we note that Officer Schlesinger called a Nassau County precinct to find out if a police report was generated about the incident. If he invoked his position as an NRPD officer during that call, this too could constitute abuse of authority.

**D. Complaint # 3**

On December 3, 2021, Officer Schlesinger's sergeant submitted an interdepartmental correspondence to a NRPD lieutenant because, on the same date, Officer Schlesinger declined to read and sign a letter of counsel related to a violation of NRPD Rules and Regulation 1.5 concerning Officer Schlesinger's meal period on December 2, 2021. The interdepartmental correspondence did not discuss the underlying incident but focused on Officer Schlesinger's refusal to read and sign the letter of counsel as constituting an act of insubordination.

In the sergeant's interdepartmental correspondence, he described that on December 3, 2021, he and Officer Schlesinger met inside of the tour commander's office regarding the December 2, 2021 incident. He explained to Officer Schlesinger that he would receive a letter of counsel, which he refused to read and sign. The sergeant explained that the letter of counsel was not the same as command discipline or formal discipline, as they are issued for minor infractions or violations of NRPD rules, regulations, and procedures. Officer Schlesinger told the sergeant that he was refusing to sign the letter of counsel because he did not agree with its account of the December 2, 2021 incident. He told his sergeant that he would speak to a PBA representative about the letter of counsel. Later that day, the sergeant ordered Officer Schlesinger to sign it, but Officer Schlesinger refused. He turned on his body worn camera to record their conversation. According to the sergeant, as soon as Officer Schlesinger turned on his body worn camera, Officer Schlesinger began to "aggressively question" him and repeatedly stated, "You are ordering me to sign a piece of paper that is not true." The sergeant told him that he had until the

[2] NRPD Rules and Regulations Chapter 2 Personal and Professional Conduct § 2.1

end of tour to sign the letter of counsel. The sergeant described Officer Schlesinger's conduct as "wholly inappropriate," "rude, disrespectful, and borderline insubordinate," and "unacceptable, unprofessional, hostile, argumentative, and not in line with the professionalism and strong moral character our officers display on a daily basis."

The agency provided Officer Schlesinger's body worn camera footage and it captured the conversation with his sergeant while they were inside the tour commander's office. The video's audio began the moment Officer Schlesinger told his sergeant, "Are you telling me that what you are writing in this letter, no matter what it is, I have to sign this, no matter what you write?" The sergeant responded and stated, "No, I'm telling you to read it and I'm telling you to sign it, if you want, I will give you another hour and you can have a representative with you while you read it." Officer Schlesinger complained to the sergeant that the letter had inaccuracies and that he should not have to sign it. He abruptly exited the sergeant's office. Officer Schlesinger walked to another office at the precinct, approached PBA representatives, and turned off his body worn camera seconds later.

During Officer Schlesinger's interview with the OAG, Officer Schlesinger stated that he spoke to PBA representatives about the encounter with the sergeant and ultimately decided not to make a complaint against him. He admitted to turning on his body worn camera to record the conversation and described it as a "mistake in judgement."

Officer Schlesinger's sergeant reported Officer Schlesinger's actions to a lieutenant. An internal investigation was conducted and allegations for insubordination and failure to adhere to departmental policies and procedures for body worn camera usage were sustained. Officer Schlesinger's actions constituted multiple violations of NRPD policy, including, the requirement that all members of the department will not be insubordinate or disrespectful towards superior officers and will obey and comply with any lawful order given by a superior officer, and that body worn cameras shall not be used to record communications with other police personnel without their permission. Negative discipline, namely the loss of five leave days, was imposed by way of NRPD's command discipline process.

We concur with the internal investigation's decision to sustain the allegations. We find that Officer Schlesinger abused his authority when he turned on his body worn camera to record his conversation because it was a clear violation of NRPD's body worn camera policy.

### E. Complaint # 4

On January 5, 2022, a New Rochelle resident reported that his parked vehicle had been struck by another vehicle. Officer Schlesinger was assigned to conduct a preliminary investigation. Earlier that morning, Complainant # 4 had struck the vehicle after a storm that caused icy road conditions. After striking the vehicle, he spoke to a neighbor of the vehicle's owner. Complainant # 4 informed the neighbor that he would return to the accident location because he had to take his elderly father, who was his passenger, to a doctor's appointment. He provided the neighbor with his contact information and left.

Officer Schlesinger and his partner went to the accident location as part of their preliminary investigation. He spoke to the owner of the parked vehicle and observed the damaged vehicle. The owner informed him that his vehicle was struck earlier that morning and that a neighbor took of a picture of the vehicle that struck it. He provided Officer Schlesinger with Complainant #4's name and address and license plate number. Officer Schlesinger and his partner did not speak to the neighbor but went directly to Complainant # 4's home to speak with him.

Minutes later, Officer Schlesinger arrived at Complainant # 4's home and spoke to Complainant # 4 in front of his home. Officer Schlesinger's body worn camera recorded their conversation. Officer Schlesinger asked Complainant # 4 why he left the location of the accident. He ordered him to provide his license and registration because he intended to issue him a summons for leaving the accident location pursuant to VTL § 600(1)(a). Complainant # 4 and his elderly father tried to explain that they had left the scene of the accident to take the father to the hospital. He stated that he had intended to return to the accident location before Officer Schlesinger's arrival. Complainant # 4's elderly father tried to mediate the conversation between Officer Schlesinger and Complainant # 4 asking Officer Schlesinger to show empathy because he was a sick man and needed to go to the hospital.

While Complainant # 4 explained the reason for leaving the accident, he referred to Officer Schlesinger as "brother." Officer Schlesinger told Complainant # 4 to stop calling him "brother" and asked why he called him "brother." Complainant # 4 responded that he called him brother as a "courtesy." Officer Schlesinger responded that it was "demeaning actually." Complainant # 4 provided Officer Schlesinger with his license and registration and Officer Schlesinger issued him a summons. Before leaving Complainant # 4's home, Officer Schlesinger told Complainant # 4 "try not to hit anymore cars today."

During Officer Schlesinger's interview with the OAG, he stated that more than three hours passed from the time the accident occurred to when Officer Schlesinger arrived at Complainant # 4's home, though in actuality, the internal investigation found that approximately one hour elapsed from the time of the accident to when Officer Schlesinger spoke to Complainant # 4.

Complainant # 4 contacted NRPD to make a complaint about Officer Schlesinger's discourteous conduct during the issuance of a traffic summons. He stated that he was not upset about the issuance of the summons but rather the way Officer Schlesinger spoke to him and his father.

On January 18, 2022, IAU interviewed Officer Schlesinger about the incident. According to Officer Schlesinger, he spoke to the owner of the parked vehicle as part of his preliminary accident investigation. Officer Schlesinger was informed that the parked vehicle was struck sometime in the morning and a neighbor took a photograph of the driver's vehicle. Officer Schlesinger did not speak to the neighbor but conducted a search using the license plate number and obtained Complainant # 4's name and address. He went to the Complainant # 4's home and spoke to him and his father. He described that he attempted to obtain the driver's license and registration, but Complainant # 4 and his father tried to explain why they left the

scene of the accident. Officer Schlesinger informed IAU that he did not believe their version of events because the damage to the parked vehicle indicated that the driver was not driving in the direction of the hospital. He said that he explained this discrepancy to Complainant # 4 and his father. The internal affairs investigator played his body worn camera during the interview, which revealed that Officer Schlesinger did not explain that discrepancy to them.

Officer Schlesinger stated that he asked Complainant # 4 not to call him brother because he was not friendly with him and did not have a relationship with him. He further stated that "if I called a black guy, a brother, would they like that?"

The internal investigation sustained Complainant # 4's allegations of discourtesy and found that Officer Schlesinger was "dismissive, condescending, disrespectful, and overall displayed a pattern of behavior that evinced rudeness." NRPD concluded that his actions violated two provisions of NRPD's rules and regulations; namely § 2.1 that require officers to conduct themselves in such a manner as to reflect most favorably on the department and § 2.4 that requires officers to be courteous and tactful in the performance of their duties and demonstrate patience and discretion when dealing with the public. The agency imposed negative discipline, namely the loss of two leave days, through the command discipline process for this encounter and other incidents alleging misconduct and expressed concerns regarding Officer Schlesinger's pattern of behavior.

We concur with the internal investigation's findings.

## II. CONCLUSIONS AND RECOMMENDATIONS

Executive Law § 75(5)(b) requires that the OAG "determine whether the subject officer…has engaged in a pattern or practice of misconduct, use of excessive force, or acts of dishonesty." To identify a pattern of misconduct for purposes of Executive Law §75(5)(b), we look to whether the subject officer engaged in multiple acts of similar misconduct. Based on our findings, we conclude that Officer Schlesinger engaged in a pattern of abuse of authority by a preponderance of the evidence with respect to the following acts:

- Stopping and temporarily detaining Complainant # 1 for driving a van without probable cause that she committed a traffic infraction or other offense on January 21, 2021;
- Invoking his badge and status as a police officer to enter a restricted area at the North Shore University Hospital without authorization on August 30, 2021;
- Using his body worn camera to record a supervisor in violation of NRPD policy on; and
- Exhibiting unprofessional and condescending towards a member of the public on January 5, 2022.

Abuse of authority is a serious form of police misconduct and allegations of abuse merit scrutiny. Police officers "entrusted to protect the safety and rights of the public" and "hold an elevated position within the criminal justice hierarchy [that] confers upon them a greater

responsibility of office."[3] The OAG acknowledges that abuse of authority can take many forms and has defined it to encompass misuses of police power during police interactions with the public. Courts routinely subject these police interactions with the greatest scrutiny. In *People v. Debour*, the New York Court of Appeals noted that an officer's role to prevent crime is highly susceptible to subconstitutional abuses; for whereas a policeman's badge may well be a symbol of the community's trust, it should never be considered a license to oppress.[4] Recently in *Matter of Lynch v NY City Civilian Complaint Review Bd.*, 206 AD3d 558 [1st Dept 2022], the Appellate Division granted police oversight agencies latitude to define conduct that amounts to abuse of authority because of their expertise in studying and investigating police disciplinary matter. *See also DiGiacomo v NY City Civilian Complaint Review Bd.*, 214 AD3d 531 [1st Dept 2023]. OAG assesses allegations of abuse of authority based on the availability of credible information showing that committed constitutional abuses against members of the public and violations of their agency's rules for professional conduct.

To address Officer Schlesinger's pattern of abuse of authority, we recommend that NRPD continue to curtail Officer Schlesinger's engagement with members of the public and closely monitor his conduct. His reassignment to desk duty is appropriate given that the potential for encounters with the public has been foreclosed.

We also recommend that NRPD consider the following policy changes:

(1) Limit the use of the command discipline process for officers, like Officer Schlesinger, who repeatedly violate policy.

NRPD imposed the loss of two leave days for Officer Schlesinger's conduct during the encounter with Complainant # 4 on January 5, 2022. That same penalty also covered four unrelated internal complaints involving other lower-level infractions such as the failure to notify headquarters of a traffic stop on January 4, 2022, failure to maintain his body worn camera in an operational state on January 12, 2022, and failure to act while on special detail and appear for a special detail on time on January 12, 2022, and January 21, 2022. To impose and document the loss of two leave days, the agency assigned the complaint number associated to Complainant # 4 to the four internal complaints (for minor infractions) and imposed the loss of two leave days under that complaint number.

The assignment of the same complaint number to cover Officer Schlesinger's unrelated complaints may have streamlined the disciplinary process, but considering Officer Schlesinger's lengthy record of substantiated violations, he should not have benefited from a minimal loss of leave time, namely two days, to cover five unrelated complaints.[5] The International Association of Chiefs of Police ("IACP") advocates for the documentation of allegations of misconduct, the resulting investigation, and any corrective action so that agencies consider the accumulation of repeated

---

[3] *See Concept & Issues Paper, Standards of Conduct*, Int'l Ass'n of Chiefs of Police, July 2019, at 7, https://www.theiacp.org/sites/default/files/2020-06/Standards%20of%20Conduct%20June%202020.pdf.
[4] *People v De Bour*, 40 NY2d 210 [1976]).
[5] NRPD Manual of Procedure Chapter 6 Disciplinary Procedures Article 6.01

behavioral problems or minor infractions of policy and procedures when determining future penalties for misconduct.[6] Moreover, IACP recommends that each complaint should receive a unique tracking number.[7]

We recommend that division commanders who choose to implement negative discipline through NRPD's command discipline process should impose a separate penalty for each complaint with sustained allegations of misconduct or minor infractions. NRPD's division commanders should refrain from proposing a single penalty to cover unrelated complaints because this practice does not accurately capture the number of complaints and the associated corrective measures or discipline imposed and may inhibit progressive discipline.

(2) Define "minor infraction" and "repeatedly engage in such conduct," as used in the Disciplinary Procedures. The definition of "Command Discipline" and other provisions refer to "minor infractions" without providing guidance as to what conduct falls within this category. Supervisory Responsibility section provides that officers who "repeatedly engage in such conduct," referring to "minor violations," should be formally written up and departmental charges should be preferred, but it does not define what constitutes repeated conduct. Supervisors should have a clear understanding of the agency's expectations for disciplining officers and, similarly, officers should be assured that supervisors will fairly apply the Disciplinary Procedures under these circumstances.

(3) Similarly, to ensure fairness and consistency across officers, NRPD should consider developing a disciplinary matrix to provide guidance on appropriate penalties.

(4) Amend the description of supervisors' reporting requirements in Supervisory Responsibility section. Currently, § 1.1 of the Disciplinary Procedures currently makes it discretionary for supervisors to document and forward complaints for further action for incidents involving officers committing minor infractions, but § 1.7 requires supervisors to make a record of any disciplinary action. Section 1.1 should be amended to have the same reporting requirement as § 1.7 to allow supervisors to track all complaints and the corresponding corrective action or discipline and ensure progressive discipline in the future.

(5) Update Chapter 2, Article 2.03 § 3.1 of the Uniform Traffic Ticket and Enforcement Policy to reflect the proper bases for a lawful traffic stop as set forth by the New York Court of Appeals in *People v Hinshaw*, 35 NY3d 427 [2020]. Currently, NRPD's traffic enforcement policy provides that officers have the authority to conduct a traffic stop when they *reasonably suspect* a motorist committed a traffic offense. However, under *Hinshaw*, officers in New York state must have *probable cause*, a higher

[6] *See Concept & Issues Paper, Standards of Conduct*, *supra* note 3, at 3-4.
[7] *See Concepts & Issues Paper, Investigation of Allegations of Employee Misconduct*, Int'l Ass'n of Chiefs of Police, April 2019, at 1, https://www.theiacp.org/sites/default/files/2020-08/Investigation%20of%20Allegations%20of%20Employee%20Misconduct%20-%20FULL.pdf.

standard than reasonable suspicion, to conduct a traffic stop based on their observance of a traffic offense.

Pursuant to Executive Law § 75(5)(c), we request that your agency inform the OAG within ninety days of the actions it is taking in response to this letter.

Sincerely,

LETITIA JAMES
Attorney General of the State of New York

By: Assistant Attorney General Simone Manigo
Law Enforcement Misconduct Investigative Office